John R. Lanza, Esq., Attorney No.: 004831975
**Lanza & Lanza LLP**
5 Main Street, P.O. Box 2520
Flemington, New Jersey 08822
(908) 782-2600
**Attorneys for Plaintiff**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEORGIA THOMPSON-EL, | Civil Action No.: 3:19-cv-14253-BRM-TJB |
| Plaintiff, | Civil Action |
| v. | **CERTIFICATION OF JOHN R. LANZA IN OPPOSITION TO ALL DEFENDANTS' SUMMARY JUDGMENT MOTIONS** |
| GREEN BROOK TOWNSHIP, a municipal corporation of New Jersey, POLICE OFFICER ANTHONY PEPE, LAWRENCE TOWNSHIP, a municipal corporation of New Jersey, POLICE OFFICER JOSEPH RADLINSKY and John Does 1-99, | |
| Defendants. | |

John R. Lanza, of full age, by way of certification in lieu of oath or affidavit, states:

1.    I am an attorney at law of the State of New Jersey, and a partner in the firm of Lanza & Lanza, LLP, attorneys for the Plaintiff, Georgia Thompson-el in the within captioned matter. As such, I am fully familiar with the facts of this matter. I make this single certification in opposition to the summary judgment motion filed by Green Brook Township and Officer Anthony Pepe and in opposition to the summary judgment motion filed by Lawrence Township and Officer Joseph Radlinsky.

2.      Attached hereto as Exhibit "A" is a true and correct copy of the transcript of the deposition of Georgia Thompson-el dated September 17, 2020

3.      Attached hereto as Exhibit "B" is a true and correct copy of the transcript of the deposition of Green Brook Police Officer Anthony Pepe dated February 15, 2021.

4.      Attached hereto as Exhibit "C" is a true and correct copy of the transcript of the deposition of Lawrence Police Officer Joseph Radlinsky dated March 4, 2021.

5.      Attached hereto as Exhibit "D" is a true and correct copy of a photograph provided by Georgia Thompson-el during discovery of herself and Junior Hamilton bates stamped PL 723 and a photograph of Douglass Thompson bates stamped PL 722.

6.      Attached hereto as Exhibit "E" is a true and correct copy of two emails produced in discovery by Lawrence Township bates stamped LT 1392 and LT 1393.

7.      Attached hereto as Exhibit "F" is a true and correct copy of the DMV photo of Georgia Thompson-el provided by the Green Brook Defendants during discovery bates tamped GreenBrook 137.

8.      Attached hereto as Exhibit "G" is a true and correct copy of the DMV photo of Junior Hamilton provided by the Green Brook Defendants during discovery bates stamped Green Brook 103.

9.      Attached hereto as Exhibit "H" is a true and correct copy of the DMV photo of Douglass Thompson provided by the Green Brook Defendants during discovery bates stamped GreenBrook 138.

10.     Attached hereto as Exhibit "I" is a true and correct copy of a photograph of Kenneth Edwards produced by the Lawrence Defendants during discovery bates stamped LT000032.

2

11.      Attached hereto as Exhibit "J" are true and correct copies of surveillance images from the Bonefish Grill produced by the Green Brook Defendants during discovery bates stamped GreenBrook 029 through GreenBrook 041.

12.      Attached hereto as Exhibit "K" is a true and correct copy of deposition exhibit P-8, which are pages taken from the Honda brochure for the 2014 Accord and bates stamped PL 726 and PL 747.

13.      Attached hereto as Exhibit "L" are copies of four photographs taken from video images of the Walmart parking lot provided by the Green Brook Defendants through discovery and bates stamped PL 485 to PL 489.

14.      Attached hereto as Exhibit "M" is a true and correct copy of the alert bulletin from the Green Brook Police Department produced by the Green Brook Defendants and bates stamped GreenBrook-027.

15.      Attached hereto as Exhibit "N" is a true and correct copy a document titled "WalletTheft/Credit Card Fraud" produced by the Lawrence Defendants bates stamped LT000052.

16.      Attached hereto as Exhibit "O" is a true and correct copy of a phtographof the male suspect in the Lawrence Case produced by the Lawrence Defendants and marked Plaintiff's Exhibit P-21.

17.      Attached hereto as Exhibit "P" are three true and correct copies of still images of the female suspect in the Lawrence case identified as Plaintiff's Exhibit P-19 and Plaintiff's Exhibit P-20.

18.      Attached hereto as Exhibit "Q" is a true and correct copy of a still image of a vehicle taken from surveillance video produced by the Lawrence Defendants and identified as Plaintiff's Exhibit P-22.

3

19. Attached hereto as Exhibit "R" is a true and correct copy of the cover letter from the OPRA response of the Office of the Mercer County Prosecutor bates stamped PL 788.

20. Attached hereto as Exhibit "S" is a true and correct copy of the cover letter and New Jersey Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures dated April 18, 2001, bates stamped PL 826 through PL 835.

21. Attached hereto as Exhibit "T" is a true and correct copy of the New Jersey Attorney General Directive Regarding Retention and Transmittal of Contemporaneous Notes of Witness Interviews and Crime Scenes bates stamped PL 836 through PL 836 and the New Jersey Attorney General's Revised Model Eyewitness Identification Procedure Worksheets bates stamped PL 840 through PL 847.

22. Attached hereto as Exhibit "U" is a true and copy of the First Amended Complaint in the lawsuit titled Caponi v. Lawrence Township, et al, Docket No. MER-L-1964-19 bates stamped PL 895 .

23. Attached hereto as Exhibit "V" is a true and correct copy of the letter of the Lawrence Township Policemen's Benevolent Association to Acting Chief Tim Drew bates stamped PL 1109 through PL 1111, attached as an exhibit to the complaint described in Exhibit U.

24. Attached hereto as Exhibit "W" is a true and correct copy of selected pages from the Township of Green Brook's interrogatory answers and selected pages from Officer Pepe's interrogatory answers.

25. Attached hereto as Exhibit "X" is a true and correct copy of selected pages from the Township of Lawrence's interrogatory answers.

4

26.     Attached hereto as Exhibit "Y" is a true and correct copy of the arrest report of
Georgia Thompson-el obtained from the Berkeley Heights Police Department and bates stamped
PL 517.

27.     Attached hereto as Exhibit Z" is a true and correct copy of the Amended Pretrial
Release Order issued by Somerset County.

28.     Attached hereto as Exhibit "AA" is a copy of the Complaint-Warrant issued against
Ms. Thompson-el for the Somerset County matter, bates stamped PL 378.

29.     Attached hereto as Exhibit "BB" is a copy of a letter from the Somerset County
Prosecutor's Office dated September 12, 2018, bates stamped PL 449.

28. I am submitting a separate certification with respect to DVD's produced by Defendants
showing surveillance video.

5

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____(L.S.)
John R. Lanza

Dated: 5/11, 2022

6

EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CIVIL ACTION NO. 3:19CV14253

x--------------------------------x

GEORGIA THOMPSON-EL,                    *

              Plaintiff(s),             *

      - vs -                            *

GREEN BROOK TOWNSHIP, a                 *

municipal corporation of New            *

Jersey, Police Officer ANTHONY          *

PEPE, LAWRENCE TOWNSHIP, a              *

municipal corporation of New            *

Jersey, Police Officer JOSEPH           *

RADLINSKY, et al.,                      *

              Defendant(s).             *

x--------------------------------x

DEPOSITION OF:  GEORGIA THOMPSON EL

Thursday, September 17, 2020


SCHULMAN, WIEGMANN & ASSOCIATES

Certified Court Reporters

216 Stelton Road, Suite C-1

Piscataway, New Jersey  08854

(732) 752-7800   Fax: (732) 752-7166

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 2

1
2    Deposition taken in the above-entitled matter
3    by and before ANTHONY HOFMANN, a Certified Court
4    Reporter and Notary Public within and for the State
5    of New Jersey, taken at the offices of DiFRANCESCO,
6    BATEMAN, KUNZMAN, DAVIS, LEHRER & FLAUM, 15 Mountain
7    Boulevard, Warren, New Jersey, on Thursday,
8    September 17, 2020, commencing at 10:10 in the
9    forenoon, pursuant to notice.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    APPEARANCES:
2
3    LANZA & LANZA, ESQS.
4    Attorneys for the Plaintiff(s)
5    5 Main Street
6    Flemington, New Jersey 08822
7    BY: JOHN R. LANZA, ESQ.
8
9
10    DiFRANCESCO, BATEMAN, KUNZMAN, DAVIS, LEHRER &
11    FLAUM, ESQS.
12    Attorneys for the Defendant(s) Green Brook
13    Township and Anthony Pepe
14    15 Mountain Boulevard
15    Warren, New Jersey 07059
16    BY: RICHARD J. GUSS, ESQ.
17
18
19    ECKERT SEAMANS, ESQS.
20    Attorneys for the Defendant(s) Lawrence
21    Township and Joseph Radlinsky
22    2000 Lenox Drive
23    Lawrenceville, New Jersey 08648
24    BY: JASON S. FEINSTEIN, ESQ.
25    BY: IAN OAKLEY, ESQ.

Page 4

1              INDEX
2
3    WITNESS        EXAMINATION BY       PAGE
4    GEORGIA THOMPSON EL
5          Mr. Guss        5/131
6          Mr. Feinstein    79
7
8
9
10
11
12
13
14
15              EXHIBITS
16    NUMBER      DESCRIPTION            PAGE
17    DGB-1    Letter dated August 8, 2018    34
18    DGB-2    DMV response        51
19    DGB-3    CJIS response       51
20    DGB-4    CJIS response       51
21
22
23
24
25

Page 5

1              GEORGIA THOMPSON EL,
2    residing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
3    Scotch Plains, New Jersey 07076, having been first
4    duly affirmed by a Notary Public within and for the
5    State of New Jersey, was examined and testified
6    under oath as follows:
7
8              EXAMINATION
9    BY MR. GUSS:
10        Q.   Good morning, Ms. Thompson El.
11        A.   Good morning.
12        Q.   My name is Richard Guss. I am an
13    attorney and I represent the Green Brook defendants
14    in the lawsuit that Mr. Lanza has brought on your
15    behalf. We are here today at my office for the
16    purpose of taking your deposition.
17        A deposition is an opportunity for the
18    lawyers to meet you and ask you some questions about
19    the allegations that are set forth in your
20    complaint. Before we get started here today I'm
21    going to give you some instructions. More than most
22    likely you've probably gone over those with Mr.
23    Lanza already and I want to give them to you and put
24    them in the record. What that means is that the
25    gentleman to my left and your right is taking what

062eda8d-87b5-433o-80a2-968o30d40ba9

Page 6

1   you and I say. In order for him to get everything
2   down accurately, first of all, you have to verbally
3   respond to my questions, yes, no, explanation,
4   depending on what the question may call for, okay?
5        A.   Okay.
6        Q.   Next, let me ask the question and then
7   respond. If you and I speak at the same time like
8   people do at the dinner table, the court reporter
9   will not get the question and answer down
10  accurately, okay?
11       A.   Okay.
12       Q.   If for some reason you don't
13  understand my question, you tell me and I will
14  rephrase it, okay?
15       A.   Okay.
16       Q.   If for some reason your attorney who
17  is seated next to you uses the word "objection"
18  following one of my questions, stop, do not answer
19  the question until he tells you to do so because
20  there is a chance that he may tell you not to answer
21  a particular question, okay?
22       A.   Okay.
23       Q.   Next, don't guess. If you feel
24  comfortable with an approximation, perhaps a date or
25  a time, that's fine, but just tell us that is what

Page 7

1   it is going to be. If you don't know an answer, you
2   tell us you don't know. That is acceptable, okay?
3        A.   Okay.
4        Q.   Have you ever had your deposition
5   taken before?
6        A.   No.
7             MR. LANZA: Before we start just one
8   thing. We reserve the right to review and correct
9   the transcript.
10            MR. GUSS: Sure.
11       Q.   Now, did you have an opportunity today
12  or some time before today to meet with Mr. Lanza to
13  prepare for today's deposition?
14       A.   Yes.
15       Q.   Are you ready to proceed with your
16  deposition today which is September 17, 2020?
17       A.   Yes.
18       Q.   Did you review any documentation to
19  prepare for today's deposition?
20       A.   Yes.
21       Q.   What did you look at?
22       A.   Just the Interrogatories.
23       Q.   The questions and answers?
24       A.   Uh-huh.
25       Q.   Can I have your full name, please?

Page 8

1        A.   George Thompson El.
2        Q.   Is Thompson El your married name or
3   your maiden name?
4        A.   Neither.
5        Q.   Neither?
6        A.   No.
7        Q.   Okay, so what is your maiden name,
8   let's start with that?
9        A.   Georgia Hussey.
10       Q.   How do we spell that?
11       A.   Georgia like the state and Hussey is
12  H-u-s-s-e-y.
13       Q.   I understand you're divorced, correct?
14       A.   Correct.
15       Q.   What was your married name?
16       A.   Georgia Thompson.
17       Q.   Then what is the significance of the
18  El?
19       A.   The El is a part of my religion.
20       Q.   What is that?
21       A.   The Morish religion.
22       Q.   You currently reside at ▓▓▓ East
23  ▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓▓▓ Scotch Plains?
24       A.   ▓▓▓▓▓▓▓.
25       Q.   1620 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ apartment

Page 9

1   2-O, Scotch Plains, correct?
2        A.   No, Apartment 2-L. L as in Larry,
3   second level.
4        Q.   How long have you resided there?
5        A.   Over ten years.
6        Q.   Have you lived with anyone besides
7   yourself?
8        A.   Yes.
9        Q.   Who do you live with?
10       A.   My mom and my two children.
11       Q.   What is your mom's name?
12       A.   Yvonne Harris.
13       Q.   The children?
14       A.   Natalia Thompson.
15       Q.   All right.
16       A.   And Michael Hamilton.
17       Q.   How old is your daughter?
18       A.   Twelve.
19       Q.   How old is your son?
20       A.   Five.
21       Q.   What's your date of birth?
22       A.   April 6, 1980.
23       Q.   Where were you born?
24       A.   Saint Mary, Jamaica, West Indies.
25       Q.   At some point did you leave Jamaica

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 10

1    and move to the United States?
2        A.    Yes.
3        Q.    When was that?
4        A.    2000.
5        Q.    When you moved from Jamaica, where did
6    you move to?
7        A.    Florida.
8        Q.    Where in Florida?
9        A.    Gainsville -- Archer, sorry.
10       Q.    How long did you live in Florida?
11       A.    Two years.
12       Q.    Then where did you move to?
13       A.    New Jersey.
14       Q.    When you first moved to New Jersey,
15   where did you move to?
16       A.    Union.
17       Q.    How long did you live in Union?
18       A.    Approximately two years.
19       Q.    Then after Union where did you move
20   to?
21       A.    East Orange.
22       Q.    How long were you in East Orange?
23       A.    Approximately another two years.
24       Q.    Then where did you move to?
25       A.    West Orange.

Page 11

1        Q.    How long were you in West Orange the
2    second time?
3        A.    Two years.
4        Q.    After that, where did you go after
5    West Orange?
6        A.    Hillside.
7        Q.    How long were you in Hillside?
8        A.    Approximately three years.
9        Q.    Then where did you move to?
10       A.    Actually, it is approximately four
11   years.
12       Q.    Where did you move to after Hillside?
13       A.    Scotch Plains.
14       Q.    Is that the same location where you
15   are living now?
16       A.    Yes.
17       Q.    Can you give me the benefit of your
18   educational background starting with high school?
19       A.    I finished high school.
20       Q.    Where did you go to high school?
21       A.    Meadow Brook High School in Jamaica,
22   Saint Andrew, Jamaica.
23       Q.    Did you go to college in Jamaica?
24       A.    No, I went to college in Florida.
25       Q.    Where did you go?

Page 12

1        A.    Santa Fe Community College for two
2    years.
3        Q.    What type of degree did you get from
4    Santa Fe?
5        A.    Associates of arts.
6        Q.    Any other higher education?
7        A.    I went to -- for the union we went to
8    college, but I just did twenty credits.
9        Q.    What was that in?
10       A.    Labor studies.
11       Q.    Are you currently employed?
12       A.    Yes.
13       Q.    By whom are you employed?
14       A.    Kleinknecht Electrical.
15       Q.    Where are they located?
16       A.    In Manhattan.
17       Q.    What do you do for them?
18       A.    A journeywoman. Electrical,
19   electrician.
20       Q.    Are you a licensed electrician?
21       A.    No, just journeyperson.
22       Q.    How long have you been employed with
23   Kleinknecht?
24       A.    I think the K is silent.
25       Q.    How long have you been working for

Page 13

1    them?
2        A.    I have been working for them for over
3    a year. Little over a year.
4        Q.    Are you a member of a union?
5        A.    Yes.
6        Q.    Which one?
7        A.    Local 3.
8        Q.    Before you were employed by
9    Kleinknecht, who were you employed by?
10       A.    Multiphase.
11       Q.    Were you employed by Multiphase
12   Electrical at the time of this incident?
13       A.    Yes.
14       Q.    I'll get back to that. At some point
15   in time were you married?
16       A.    Yes.
17       Q.    Who were you married to?
18       A.    Douglas Thompson.
19       Q.    When were you married?
20       A.    2007.
21       Q.    When were you divorced?
22       A.    2012.
23       Q.    When you were married, which residence
24   were you at?
25       A.    When we got married I was in West

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 14

1   Orange.
2       Q.   You have one child with Mr. Thompson,
3   that is Natalia?
4       A.   That's correct.
5       Q.   I had asked you before whether you
6   were a licensed electrician and you told me no, is
7   that correct?
8       A.   Correct.
9       Q.   Have you ever taken the examination to
10  become a licensed electrician?
11      A.   No.
12      Q.   Have you ever studied for that exam?
13      A.   No.
14      Q.   The alleged incident occurred on
15  April 8, 2017, correct?
16      A.   Correct.
17      Q.   At that time you were employed by
18  Multiphase Electrical Services, Inc.?
19      A.   Yes.
20      Q.   They are located in Closter, New
21  Jersey?
22      A.   Correct.
23      Q.   Did you miss any time as a result of
24  the criminal charges being pressed against you in
25  this matter?

Page 15

1       A.   Yes.
2       Q.   How many days, if you know?
3       A.   I know it was maybe seventeen or
4   twenty-one days.
5       Q.   So we can say approximately seventeen
6   to twenty-one, somewhere in that range?
7       A.   Yes.
8       Q.   Did you miss those days, seventeen to
9   twenty-one days as a result of court appearances or
10  other reasons?
11      A.   Court appearances and other reasons.
12      Q.   What were those other reasons?
13      A.   Incarceration.
14      Q.   When and where were you arrested that
15  resulted in your incarceration?
16      A.   It was in April 2018.
17      Q.   What were the circumstances?
18      A.   What were the circumstances?
19      Q.   Right, how did it come about that you
20  were arrested?
21      A.   I was driving home and the cop pulled
22  me over.
23      Q.   Where was that?
24      A.   In Bonnie Burn Road, Scotch Plains.
25      Q.   Can you explain to me what happened?

Page 16

1       A.   I was driving my mom home from work
2   and the cop just pulled me over on the side of the
3   road.
4       Q.   When he approached the car, what, if
5   anything, did he say to you?
6       A.   License and registration and insurance
7   card.
8       Q.   Okay, then what happened next?
9       A.   I gave him the card and I asked him
10  what was the reasons of the pull over and he said
11  he'll get back to me and he took it and went to the
12  car and then he came back and he said wait right
13  here and then a few minutes later he called another
14  cop and then the cop came and asked me to get out of
15  the car and I said for what and then she said we
16  need to ask you some questions. I said you can ask
17  me the questions. Why can't you ask me the question
18  right here. She said like no, we need you to step
19  out of the car and I was like no, I can't. I don't
20  want to step out of the car.
21      That's when they called their supervisor and
22  he came and said do you know why we are pulling you
23  over. I said no and he said -- I believe he said
24  that there is a warrant out for you and I was like
25  for what and I don't remember what took place after

Page 17

1   that. He just said to get out of the car and I was
2   scared. I was fearful. I was never in a situation
3   like this before so I was panicking. I didn't know
4   what to do so I didn't want to get out of the car.
5   I just froze and sat in my seat and he started
6   like -- he called some other cops and told me to get
7   out and I just sat there and I was like no, I'm not
8   getting out and he started to put on his gloves and
9   then he was touching his taser like he was trying to
10  get to it and I'm like why are you touching your
11  taser and he didn't answer me, but he was like come
12  out of the car, but I was just sitting there and I
13  was like no, I'm not getting out, but the windows
14  were open so he put his hand in and opened the door
15  and then dragged me out of the car and pushed me
16  down on the ground, pushed my face down on the
17  ground and put the handcuffs on me and threw me in
18  the back of the car.
19      Q.   Where did they take you?
20      A.   They took me to Berkeley Heights.
21      Q.   To police headquarters?
22      A.   Yes.
23      Q.   What transpired at headquarters?
24      A.   He put me in a cell. He asked me to
25  take my fingerprints. I said no, I don't want to go

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 18

1  in the record because I did nothing wrong, I'm
2  innocent. He was like you have to take your
3  fingerprints. I'm like no, I don't want to take my
4  fingerprint because I didn't do anything wrong. You
5  know, why do you need my fingerprint, I'm innocent,
6  I did nothing wrong. So he was like we have to take
7  your picture. So I stood there, took the picture
8  and then he put me in a cell and then he came to me
9  and said I'm going to ask you again. He printed out
10 the summons because he asked me if I saw any of this
11 information and I said no. He asked me if I know
12 what you are being charged with or the reason for
13 being arrested and I was like no and he printed out
14 the paperwork and showed it to me. Then he said
15 between me and you I am going to take you off the
16 record. I am going to turn off my camera and you
17 can tell me if you did it or not. And I was like I
18 don't know what you are talking about, I don't know,
19 I am telling you the truth. I did none of these
20 things that you are asking me and he said that's
21 what everybody says and then he walked off.
22     Q.   Prior to being stopped in Berkeley
23 Heights and arrested by the police department, were
24 you aware at all that a warrant had been issued for
25 your arrest for criminal charges out of Green Brook

Page 19

1  in Somerset County?
2      A.   No.
3      Q.   You didn't receive anything in the
4  mail from either the police department or the court
5  providing you with a copy of that warrant?
6      A.   No.
7      Q.   So after they give you the paperwork,
8  you read it, you realized what you were being
9  charged with?
10     A.   Yes.
11     Q.   Then what happened next at the police
12 headquarters?
13     A.   Then I believe they had to take me
14 over to Somerset County the next morning.
15     Q.   So approximately what time had you
16 been stopped by the Berkeley Heights Police
17 Department?
18     A.   Approximately 9:30 on April 4.
19     Q.   At night or in the morning?
20     A.   At night.
21     Q.   And it was the following morning they
22 took you over to the Somerset County Jail?
23     A.   Yes.
24     Q.   Were you informed that there was a
25 warrant for your arrest, right?

Page 20

1      A.   Yes.
2      Q.   Did they tell you that the bail would
3  have to be set by a judge the next day?
4      A.   Yes.
5      Q.   Was bail set for you the next day?
6      A.   No.
7      Q.   No?
8      A.   No.
9      Q.   When was bail set, to your knowledge,
10 the first time after you were arrested in Berkeley
11 Heights?
12     A.   It was not -- it wasn't bail. It
13 was -- I saw the judge and it was to come back for
14 another court appearance with a lawyer is what the
15 judge said. So I saw one judge on Wednesday or the
16 Friday, the Friday morning because I was pulled over
17 that Thursday and I saw the judge the Friday morning
18 and after I saw the judge because I did not -- they
19 told me I have to see another judge the following
20 Wednesday and that's when, but they didn't say
21 anything about bail.
22     Q.   So you were arrested on Thursday in
23 Berkeley Heights. Went to Somerset County
24 Courthouse on Friday, saw a judge, right?
25     A.   I went to -- I was arrested on the

Page 21

1  fourth. I don't remember what day the fourth was,
2  but I know it was the fourth and then I saw the
3  judge that Friday.
4      Q.   But did you remain --
5      A.   At Somerset, yes, after I saw the
6  judge, yes.
7      Q.   Until whenever the following Wednesday
8  was?
9      A.   Correct.
10     Q.   So to the best of your knowledge, they
11 didn't set bail for you?
12     A.   No.
13     Q.   You understand what bail is, right?
14     A.   Yes, to pay money to get out.
15     Q.   They say X amount of dollars and you
16 can leave?
17     A.   Correct.
18     Q.   They never told you bail was set?
19     A.   No.
20     Q.   Did you ever ask if bail was set?
21     A.   No, because he didn't say anything
22 about bail.
23     Q.   So the following Wednesday five days
24 later what happened?
25     A.   Then I saw the judge and then I was

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 22

1    released. The judge said he set another date for me
2    to come back to court with a lawyer.
3        Q.    So bail was not set?
4        A.    No, just to come back to court.
5        Q.    You were released on your own
6    recognizance the following time you saw a judge?
7        A.    Correct.
8        Q.    So you didn't work those whatever days
9    in between you would have had to work, you did not
10   work when you had been arrested?
11       A.    Correct.
12       Q.    Then the additional time when you had
13   to have court appearance after that?
14       A.    Yes.
15       Q.    There is in Answers to Interrogatories
16   a reference that you got laid off at some point in
17   time after the alleged incident at Multiphase, is
18   that correct?
19       A.    Correct.
20       Q.    Can you tell me about that?
21       A.    Well, because of this ongoing court
22   cases and court appearances I was absent from work a
23   lot of days so when the company got slow, when the
24   job industry got slow, they looked for who was the
25   least productive and I was one of them that got laid

Page 23

1    off and I was out of work for eight months.
2        Q.    Did you collect unemployment?
3        A.    Yes.
4        Q.    What were you doing at or about the
5    time you got laid off, what was your duties and
6    responsibilities in Multiphase?
7        A.    I was MIJ apprentice, but it was my
8    last stage before I became a journeyperson.
9        Q.    Can you explain that? I'm not
10   familiar with what that is. If you can explain to
11   me the process of that.
12       A.    At the time of the incident I was --
13   at this time when you are an MIJ, you are given more
14   responsibility. You are sent to small jobs because
15   you are in training to be a journeyperson. So they
16   say MIJ meaning men in journey. So now you are
17   going to be running small jobs. You might have an
18   apprentice and you are in charge like a foreperson.
19   So now you have that responsibility to read the
20   prints, do any installation, order any materials
21   that you need, speak to the supers, speak to the GC
22   and get a job done. Now, you have a lot more
23   responsibility as an MIJ.
24       Q.    So first when you first start you are
25   an apprentice, correct?

Page 24

1        A.    Right.
2        Q.    Then you become the MIJ?
3        A.    Fifth year.
4        Q.    Then you become a journeyman?
5        A.    After you pass the test because there
6    is also a written test that you have to do that you
7    have to pass.
8        Q.    What's that written test?
9        A.    It's math and motor skills and the
10   different wiring diagrams for a lot of stuff, the
11   main stuff that we do in the industry.
12       Q.    So when I asked you before if you had
13   taken a test to become a licensed electrician, this
14   is something totally different?
15       A.    Correct.
16       Q.    So the examination, is there a title
17   for it?
18       A.    It is just the MIJ test you do when
19   you become an MIJ and then before you become a
20   journeyperson you take the A test because now you
21   are an A journeyperson.
22       Q.    When did you first take the MIJ test,
23   was it before or after the incident?
24       A.    It was before the incident.
25       Q.    Did you pass the first time?

Page 25

1        A.    Yes.
2        Q.    Had you ever taken a journeyman test?
3        A.    Yes.
4        Q.    How many times have you taken that?
5        A.    One. It was during the time that I
6    was incarcerated so at the time that I was
7    incarcerated when I came out I got a letter that I
8    need to take the test, but I couldn't so I had to
9    send an e-mail to get an extension and then I got
10   the extension.
11       Q.    Then when did you take the test, the A
12   test?
13       A.    I took it I believe June of 2018.
14       Q.    Did you pass the first time?
15       A.    Yes.
16       Q.    Good. Did you have to study for that
17   test, the A test?
18       A.    Yes.
19       Q.    Is it a difficult examination?
20       A.    Yes, we are supposed to be studying
21   weeks in advance and can I make a correction?
22       Q.    Sure.
23       A.    I believe it was May 1st because I
24   came out. I got released in April so I believe the
25   exam was May 1st.

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 26

1  Q.  Studying for that examination is
2  stressful?
3  A.  Yes, it is very stressful because
4  there is a lot of diagrams that you have to remember
5  and you have to know how to wire them and connect
6  them and you also have to do a lot of math and it's
7  not only based on what your knowledge of now or the
8  last part of -- it's not based on what you studied
9  from the MIJ until now, it was what you studied
10  throughout your entire apprenticeship. So you have
11  to go back five years later and study all of that
12  material.
13  Q.  Now, when you were working for
14  Multiphase before the incident and that was as an
15  MIJ A, what type of projects were you working on,
16  was it residential, commercial?
17  A.  Commercial.
18  Q.  All commercial?
19  A.  All commercial.
20  MR. LANZA:  Let the lawyer finish his
21  question before you answer, okay?
22  THE WITNESS:  Okay.
23  Q.  Were those projects in Manhattan most
24  of them?
25  A.  Yes.

Page 27

1  Q.  Big buildings, small buildings?
2  A.  Big buildings.
3  Q.  What buildings have you worked in?
4  A.  At the time of the incident we were
5  doing a school in Roosevelt Island, the Bloomberg
6  building and we were working Manhattan. Just they
7  don't really have any names, it's just addresses and
8  floors.
9  Q.  You just show up and work?
10  A.  Yeah.
11  Q.  Now, getting back to when you were
12  laid off, you said there was a slow time in the
13  industry and they let go of the people who were
14  least productive. Can you explain what you mean by
15  least productive?
16  A.  Well, they do a system to see who is
17  more reliable. Who they can count on, who is more
18  dependable. So, basically, if you are not showing
19  that you can be at work every day and if you show
20  that -- if you keep constantly calling out then you
21  are unreliable so if you're unreliable, then you are
22  going to be on the list that they do a process of
23  elimination when they are trying to let go in slow
24  times.
25  Q.  So it is not based on seniority?

Page 28

1  A.  No.
2  Q.  Did you tell your employer Multiphase
3  about the criminal charges that had been lodged
4  against you from Green Brook?
5  A.  Yes, about the whole incarceration.
6  Q.  So you explained to them everything?
7  A.  Yes.
8  Q.  So they were aware of it?
9  A.  Yes.
10  Q.  They didn't take that into
11  consideration in evaluating you?
12  A.  I don't know.
13  Q.  Did your employer take any action,
14  Multiphase, against you as a result of the criminal
15  charges?
16  A.  No.
17  Q.  I also saw something in the discovery
18  that you had worked at Home Depot at some point in
19  time?
20  A.  Yes.
21  Q.  When was that or do you still work
22  there?
23  A.  It was 2004 to 2017.
24  Q.  Was that a part-time job you had?
25  A.  Originally, it was full-time and then

Page 29

1  it went to part-time when I got into the local.
2  Q.  Did you work in any particular
3  department in Home Depot?
4  A.  Yes.
5  Q.  Electrical?
6  A.  No, never.
7  Q.  Would have made life easy.
8  A.  Yeah.
9  Q.  Where did you work in Home Depot, what
10  department?
11  A.  I worked everywhere. I was -- when I
12  first started I worked in bookkeeping. Then I did
13  that for a year. Then I was a head cashier for a
14  year. Then I did at home services for two years.
15  Then I was supervisor for specialty and then I was
16  supervisor -- then I did the delivery coordinator
17  and then I was the supervisor for the pro desk and
18  then the supervisor for special services. So I did
19  almost everything.
20  Q.  Was getting into the union into the
21  local a better opportunity?
22  A.  Yes.
23  Q.  What reason did you stop working at
24  Home Depot?
25  A.  Because I didn't have enough time and

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 30

1   I was getting more overtime in the local. It was
2   more beneficial.
3       Q.   To work. Got it.
4       A.   Yes.
5       Q.   Now, prior to April 8, 2017, had you
6   ever been arrested for any reason?
7       A.   No.
8       Q.   Since being arrested in Berkeley
9   Heights on the criminal charges from Green Brook,
10  have you been arrested for anything?
11      A.   For --
12      Q.   Other than what is out of Mercer
13  County?
14      A.   No.
15      Q.   As you know, the other attorneys who
16  are seated over to my right, they represent the
17  Lawrence Township defendants so I'm not going to
18  step on their toes and ask questions about what they
19  may have. I am going to try to limit my scope to
20  the Green Brook.
21      A.   Okay.
22      Q.   Who is your primary care doctor?
23      A.   Dr. Clark Philogene.
24      Q.   How do you spell his last name?
25      A.   P-h-i-l-o-g-e-n-e.

Page 31

1       Q.   Where is he located?
2       A.   In Union.
3       Q.   Are you currently under the care of
4   any doctors?
5       A.   No.
6       Q.   Are you currently taking any type of
7   medication?
8       A.   No.
9       Q.   I want to direct your attention now
10  back to April 8, 2017, okay?
11      A.   Okay.
12      Q.   At that time where were you living?
13      A.   ~~~~~~~~~~~~~~~~~~~~~~~~~~~ 2-L
14  in Scotch Plains, New Jersey.
15      Q.   Who were you living with there at that
16  time?
17      A.   My mother Yvonne Harris and my son
18  Michael Hamilton and my daughter Natalia Thompson.
19      Q.   At April 8, 2017, did you own or lease
20  a motor vehicle?
21      A.   I leased a motor vehicle.
22      Q.   What type of vehicle did you lease at
23  that time?
24      A.   It was a black Honda Accord.
25      Q.   Do you know the license plate?

Page 32

1       A.   No.
2       Q.   If I told you in discovery it was
3   A31ELB, would that sound correct?
4       A.   I wouldn't remember.
5       Q.   It was a black vehicle?
6       A.   Yes.
7       Q.   2014?
8       A.   Yes.
9       Q.   What model Honda was it?
10      A.   I don't remember.
11      Q.   Was it an Accord?
12      A.   Yes, it was an Accord.
13      Q.   Was it a four-door sedan?
14      A.   Yes.
15      Q.   How long had you had that car?
16      A.   I have it for the entire lease of
17  three years.
18      Q.   It started in 2014?
19      A.   Yes.
20      Q.   Prior to the 2014 black Honda Accord,
21  what car did you own or lease before that?
22      A.   A silver Honda Accord -- a gray Honda
23  Accord, sorry.
24      Q.   What year was that?
25      A.   2011.

Page 33

1       Q.   Did you ever own or lease a 2004 Honda
2   Accord?
3       A.   2004, no.
4       Q.   License plate YCMI -- excuse me,
5   YCM17A?
6       A.   I don't remember that license plate,
7   I'm sorry.
8       Q.   Have you always owned or leased
9   Hondas?
10      A.   Yes.
11      Q.   When you were married, did you own or
12  lease a Honda?
13      A.   Yes, lease.
14      Q.   Do you remember what vehicle you may
15  have leased back then when you were married?
16      A.   It was a blue Honda Accord.
17      Q.   Your ex-husband, what type of vehicle
18  did he own or lease at the time during your
19  marriage?
20      A.   He owned an Expedition.
21      Q.   During your marriage or after your
22  marriage did Mr. Thompson ever operate your motor
23  vehicles?
24      A.   Yes.
25           MR. GUSS: If we can mark this as I

Page 34

1    guess Defendant Green Brook-1.
2         (Whereupon, a Letter dated August 8,
3    2018 is received and marked as Defendant's
4    Exhibit DGB-1 for Identification.)
5    Q.   Ms. Thompson BI, if you can please
6    look at what we have marked as Defendant GB-1. I
7    believe it's a total of thirteen pages. If you can
8    look through all them first, please. I'll ask you
9    some questions.
10        Did you have an opportunity to look through
11   that document?
12   A.   Yes.
13   Q.   Is this document familiar to you?
14   A.   Yes.
15   Q.   When was the first time you saw it?
16   A.   2018.
17   Q.   Can you tell me what this document is?
18   A.   It is the notice of alibi.
19   Q.   One other instruction I want to give
20   to you is any communication you had with your
21   attorneys is privileged so that not only for Mr.
22   Lanza, but also for Mr. Berowitz who was your
23   criminal attorney, okay?
24   A.   Okay.
25   Q.   Did you prepare this document with

Page 35

1    him?
2    A.   Yes.
3    Q.   Did you provide to him the documents
4    that are attached as the exhibits?
5    A.   Yes.
6    Q.   To the best of your knowledge, all the
7    information contained in Defendant Green Brook-1 is
8    true and accurate?
9    A.   Yes.
10   Q.   And the copies attached are true and
11   accurate copies?
12   A.   Yes.
13   Q.   I'd like to go through that with you,
14   okay?
15   A.   Okay.
16   Q.   If we can skip over to the notice of
17   alibi. I just want to go through the places that
18   you were leading up to going to Bonefish Grill that
19   day, okay?
20   A.   Okay.
21   Q.   It indicates that on April 8, 2017,
22   the first place that you went to was Planned
23   Parenthood in North Plainfield for some test
24   results, is that correct?
25   A.   Correct.

Page 36

1    Q.   Approximately, how long were you at
2    Planned Parenthood?
3    A.   Approximately an hour.
4    Q.   What time did you leave there?
5    A.   Around 12:00.
6    Q.   Where did you go next?
7    A.   I went home.
8    Q.   Scotch Plains?
9    A.   Scotch Plains.
10   Q.   How long were you home before you left
11   your home to go to someplace else?
12   A.   A few minutes, maybe ten minutes.
13   Q.   Then where did you go to next on
14   April 8?
15   A.   I went to -- we all went to the Home
16   Depot.
17   Q.   When you say "we," was that your
18   family?
19   A.   Yes.
20   Q.   You and your kids?
21   A.   My mom and my two kids.
22   Q.   What did you get at Home Depot?
23   A.   I went to get soil that I purchased
24   over the Internet.
25   Q.   Something for your yard or pots?

Page 37

1    A.   Soil for the yard, yes.
2    Q.   How long were you at Home Depot?
3    A.   Maybe ten minutes. It was an online
4    order.
5    Q.   Approximately, what time did you leave
6    there?
7    A.   Approximately 12:30.
8    Q.   Then where did you go after Home
9    Depot?
10   A.   I went to my baby-sitters house in
11   Union, New Jersey to drop off some of the soil.
12   Q.   You got some of that for her?
13   A.   Yes.
14   Q.   What time did you leave there?
15   A.   Approximately 12:45.
16   Q.   Where did you go next?
17   A.   To Tropical Sun Food Market in East
18   Orange.
19   Q.   Food store?
20   A.   Yes.
21   Q.   Did everyone go with you?
22   A.   Yes.
23   Q.   What time did you leave there?
24   A.   Around 1:20.
25   Q.   The date for the Tropical Food Store

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 38

1  that you left, were you relying upon the receipt
2  that you had given, it gave you a time you checked
3  out?
4      A.  Yes.
5      Q.  After Tropical Sun where did you go?
6      A.  Then I went to the fish market, crab
7  fish market which is in Orange.
8      Q.  What time did you leave there?
9      A.  After everything was done, around
10  2:00, 2:10.
11      Q.  Where did you go next?
12      A.  Then I went to Joe's Market Food Store
13  which is right next-door in the same strip. It is
14  near the crab fish store.
15      Q.  What did you get at Joe's?
16      A.  I got just some provision like bananas
17  and yams.
18      Q.  Do you recall what time you may have
19  left Joe's approximately?
20      A.  Approximately, I was there for like
21  ten minutes so approximately 2:30, 2:35.
22      Q.  Then where did you go after Joe's?
23      A.  Went back to Red Crab to pick up the
24  fish.
25      Q.  What time did you leave there

Page 39

1  approximately?
2      A.  Right after. So I wasn't there for
3  more than five minutes.
4      Q.  So we are two something, still in the
5  2:00 o'clock hour?
6      A.  Yes, so maybe 2:35.
7      Q.  Where did you go next?
8      A.  Then we drove to Costco Wholesale in
9  Union.
10      Q.  Where is the Union Costco?
11      A.  It's off of 22. It is Route 22 Union.
12      Q.  How long were you at Costco for?
13      A.  I was at Costco for maybe thirty
14  minutes, forty-five minutes.
15      Q.  What time did you leave there
16  approximately?
17      A.  Maybe 3:45.
18      Q.  Where did you go next?
19      A.  Then we went to the Gap.
20      Q.  Which Gap?
21      A.  Watchung, the one in Watchung. The
22  Gap Outlet in Watchung.
23      Q.  Watchung Square Mall?
24      A.  Correct.
25      Q.  Approximately, what time did you leave

Page 40

1  there?
2      A.  Maybe around 4:45, 4:30.
3      Q.  Where did you go next?
4      A.  Home to Scotch Plains.
5      Q.  About what time did you get home, if
6  you recall?
7      A.  Anywhere between approximately 4:00,
8  ten minutes to 5:00.
9      Q.  How long were you home for?
10      A.  Enough time -- fifteen minutes.
11      Q.  What time did you leave home?
12      A.  Approximately 5:15.
13      Q.  Where did you go next?
14      A.  To the Bonefish Grill.
15      Q.  Did you have plans to meet someone at
16  Bonefish Grill that day?
17      A.  Yes.
18      Q.  Who was that person?
19      A.  Junior Hamilton.
20      Q.  At that time what, if any,
21  relationship were you having with Junior Hamilton?
22      A.  He was my son's father, my boyfriend.
23      Q.  How long had you been engaged in a
24  relationship with Mr. Hamilton?
25      A.  Since 2013.

Page 41

1      Q.  Where did Mr. Hamilton live?
2      A.  In Summit.
3      Q.  Was this date something that had been
4  planned for some period of time or was it something
5  on a regular basis that you would normally do and
6  see him?
7      A.  It was planned.
8      Q.  How long had it been planned for?
9      A.  A couple days.
10      Q.  Had you ever been to Bonefish Grill
11  before?
12      A.  Yes.
13      Q.  How many times had you been there
14  before?
15      A.  Once.
16      Q.  The Green Brook restaurant?
17      A.  Yes.
18      Q.  How did you get to Bonefish Grill?
19      A.  I drove.
20      Q.  Which car would that have been?
21      A.  The black Honda Accord.
22      Q.  2014?
23      A.  Correct.
24      Q.  When you arrived, where did you park?
25      A.  In the front next to Junior.

11  (Pages 38 to 41)

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 42

1    Q.    Was Junior already there when you
2    arrived?
3    A.    Yes.
4    Q.    Was he waiting outside or inside his
5    car?
6    A.    Inside his car.
7    Q.    When you say you parked in front, did
8    you park directly in front of the restaurant?
9    A.    Just in front of the building. I
10   don't remember exactly if it was directly in front
11   of the building, but it was in the front of the --
12   in the front parking lot.
13   Q.    I am trying to figure out, the
14   Bonefish Grill is the last store on that strip mall,
15   correct, to the left?
16   A.    I don't remember.
17   Q.    I'm just trying to configure what the
18   parking lot looks like. I don't think you can park
19   right in front of the restaurant next to the curb,
20   can you?
21   A.    I don't remember. I haven't been
22   there in such a long time.
23   Q.    Approximately, how far was your car
24   parked from the front of the restaurant?
25   A.    A few cars down.

Page 43

1    Q.    You parked next to Junior?
2    A.    Correct.
3    Q.    Do you recall what type of car he was
4    driving?
5    A.    A silver Nissan.
6    Q.    You didn't remember the license plate
7    of your car. Do you remember the license plate of
8    Junior's car?
9    A.    No.
10   Q.    I assume you exited your car, he got
11   out of the car and the two of you entered the
12   restaurant, is that correct?
13   A.    Correct.
14   Q.    Did you have to wait to be seated by
15   the hostess?
16   A.    Yes.
17   Q.    How long did you have to wait?
18   A.    Not very long, maybe ten minutes.
19   Q.    Where were you seated in the
20   restaurant?
21   A.    In the middle somewhere.
22   Q.    Do you recall approximately how many
23   other patrons were in the restaurant at that time?
24   A.    It was a lot. It was very busy.
25   Q.    Do you recall the name of the waitress

Page 44

1    who served on you?
2    A.    No.
3    Q.    Can you describe her to me?
4    A.    No.
5    Q.    Can you describe any of the people
6    that you sat next to?
7    A.    No.
8    Q.    Was Douglas Thompson with you that
9    day?
10   A.    No.
11   Q.    When was the last time you had seen
12   him?
13   A.    I saw him maybe on the weekend at my
14   daughter's track meets.
15   Q.    Back in April of 2017, how was your
16   relationship with your ex-husband?
17   A.    It was good.
18   Q.    Spoke to him on a regular basis back
19   then?
20   A.    Yes.
21   Q.    Can you describe to me the makeup of
22   the other people that were in the restaurant, white
23   people, black people, anything else who were in the
24   restaurant when you were there?
25   A.    It was a mixture of people and mostly

Page 45

1    white.
2    Q.    Were there other black people in the
3    restaurant that you recall?
4    A.    Yes, yes, there were.
5    Q.    Can you approximate how many?
6    A.    Tables, maybe two sets or three sets
7    of tables.
8    Q.    At that two or three sets of tables,
9    were there multiple people?
10   A.    Yes.
11   Q.    Did you see a table with a black
12   woman, a black man and a younger black woman?
13   A.    I can't recall that.
14   Q.    You don't remember -- can't tell me
15   the number of those people -- excuse me, you can't
16   recall the number of black people that made up those
17   two or three tables?
18   A.    No.
19   Q.    Did you recall people getting up and
20   leaving when you got into the restaurant?
21   A.    Yes.
22   Q.    Who do you recall?
23   A.    There was black people leaving and
24   white people leaving.
25   Q.    Can you quantify numbers?

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 46

1    A.    Couples, two people at a time.
2    Q.    Did you see at any point in time when
3    you were in the restaurant to the time you left,
4    again, three people, a black woman, a black man and
5    a younger black woman leave the restaurant?
6    A.    No.
7    Q.    Do you recall what you may have
8    ordered at the restaurant?
9    A.    Yes, we were vegetarian so I ordered
10   shrimp, a shrimp meal, shrimp and pasta.
11   Q.    What did Junior have?
12   A.    Fish.
13   Q.    Did you have something to drink?
14   A.    Yes.
15   Q.    What did you have to drink?
16   A.    One of their cocktails or champagne
17   because it was my birthday, April 6.
18   Q.    Was the incident April 8?
19   A.    Yes.
20   Q.    So you were celebrating your birthday?
21   A.    Correct.
22   Q.    I want to make sure I have it correct.
23   Approximately, how long were you at the restaurant?
24   A.    Approximately two hours.
25   Q.    Where did you go when you left?

Page 47

1    A.    I went to Costco gas.
2    Q.    Then where did you go?
3    A.    Then I went home in Scotch Plains.
4    Q.    When you left, did Junior go home to
5    Summit?
6    A.    Yes.
7    Q.    Do you remember what day of the week
8    this was?
9    A.    Saturday.
10   Q.    On April 8, 2017 when you went to the
11   restaurant, can you tell me what you were wearing?
12   A.    Yes, I was wearing fitted jeans tight,
13   light blue with a peach sheer long sleeve blouse
14   chiffon and some knee high brown four-inch boots.
15   Q.    Any reason you can recall exactly what
16   you were wearing that day?
17   A.    Yes, because it was a celebration and
18   I planned the outfit.
19   Q.    Was it something new?
20   A.    The shirt and the boots were so it was
21   my first time wearing the boots.
22   Q.    Do you still have that?
23   A.    Yes, I have everything.
24   Q.    All those what you were wearing that
25   day?

Page 48

1    A.    Correct.
2    Q.    Do you know what Junior was wearing?
3    A.    His work pants and work shirt.
4    Q.    What does he do for a living or did
5    for a living?
6    A.    He's a tractor trailer driver.
7    Q.    Over-the-road or works -- what I mean
8    by over-the-road, he crosses the country?
9    A.    He works for a company. He does
10   local, but it does sometimes take him out.
11   Q.    Do you still have a relationship with
12   Mr. Hamilton?
13   A.    Yes.
14   Q.    When you left, you left together?
15   A.    Outside of the building, yes.
16   Q.    Now, on April 8, 2017 after being at
17   Bonefish, did you go to the Walmart store in
18   Watchung, New Jersey?
19   A.    No.
20   Q.    After leaving Bonefish Grill on April
21   8, 2017, did you go to the Target in Watchung, New
22   Jersey?
23   A.    No.
24   Q.    Do you know there is an individual in
25   discovery that we received by the name of Tracy Ann

Page 49

1    Lee. Do you know who that individual is?
2    A.    No.
3    Q.    Prior to April 8, 2017, did you know
4    Officer Anthony Pepe of the Green Brook Police
5    Department?
6    A.    No.
7    Q.    Prior to or before April 8, 2017, did
8    you know anyone from the Green Brook Police
9    Department?
10   A.    No.
11   Q.    After April 8, 2017, did there come a
12   point in time where you received a call from Officer
13   Pepe of the Green Brook Police Department?
14   A.    Yes.
15   Q.    When did you receive that call?
16   A.    The following week.
17   Q.    If you can recall, give me as many
18   details about that conversation.
19   A.    I got a phone call. I was at work and
20   I picked the phone up and he said this is Officer
21   Pepe. I'm calling about an incident that took place
22   at a Bonefish Grill on Saturday. I would like for
23   you to come in to discuss. I was taken back because
24   I didn't know how he got my information so I was
25   skeptical at first. I thought it was like somebody

062eda8d-87b5-433e-80a2-968e30d40ba9

## Page 50

1. playing a prank on me because two weeks prior to
2. that I got a phone call from a lawyer stating that I
3. requested information from her so because of that I
4. was like, all right, why, you know, this is another
5. prank call. So I said I don't know what you are
6. talking about. I'm not in the state so I can't talk
7. to you right now and then I hung up and I called
8. Junior, my boyfriend, to ask him if an officer
9. called him some time today and he said no and he was
10. like why. I was like because somebody just called
11. me stating that they are an officer and I should
12. come in for questioning, but I find it weird because
13. I didn't give any information. Everything was in
14. your name and you purchased it with your card so if
15. they are calling me, they should be calling you as
16. well and he said, yeah, true, but nobody called me.
17. If I hear anything else, I will let you know. Then
18. I said okay and that was it.
19.     Q.    So when Officer Pepe asked you to come
20. to police headquarters what, if anything, was your
21. response?
22.     A.    I said I can't come, I'm not in the
23. state.
24.     Q.    Where were you when you got that call?
25.     A.    I was at work in New York.

## Page 51

1.     Q.    Did you say anything else to him?
2.     A.    No.
3.     Q.    Did you refuse to see him?
4.     A.    I said I can't come, I'm not in the
5. state and then I hung up because I wanted to find
6. out if it was a prank.
7.     MR. GUSS:  Let's mark these next.
8.     (Whereupon, a DMV response is received
9. and marked as Defendant's Exhibit DGB-2 for
10. Identification.)
11.     (Whereupon, a CJIS response is
12. received and marked as Defendant's Exhibit
13. DGB-3 for Identification.)
14.     (Whereupon, a CJIS response is
15. received and marked as Defendant's Exhibit
16. DGB-4 for Identification.)
17.     Q.    Ma'am, I'd like you to take a look at
18. what I marked as DGB-2. If you could look at the
19. first page of that document. It has your name,
20. correct?
21.     A.    Correct.
22.     Q.    Is your date of birth correct on
23. there?
24.     A.    Correct.
25.     Q.    Your Social Security number correct?

## Page 52

1.     A.    Yes.
2.     Q.    Is your address at that time correct?
3.     A.    Yes.
4.     Q.    If you can turn over to the second
5. page, is that you?
6.     A.    Yes.
7.     Q.    Is that the picture that is on your
8. driver's license?
9.     A.    Not now.
10.     Q.    On April 8, 2017, was that the picture
11. on your driver's license?
12.     A.    I don't remember.
13.     Q.    The license that you have currently
14. has a different picture?
15.     A.    Correct.
16.     Q.    I'm going to represent to you this is
17. the photograph obtained from motor vehicle for your
18. license at or about April 8, 2017, okay?
19.     A.    Okay.
20.     Q.    The hairdo that is depicted in this
21. photograph, is that the hairdo that you had on
22. April 7, 2017?
23.     A.    No.
24.     Q.    What was your hair like on April 8,
25. 2017?

## Page 53

1.     A.    It was long on one side and short on
2. the other.
3.     Q.    When you mean long on one side, which
4. side was that?
5.     A.    I believe it was the right side that
6. was long and the left side that was short.
7.     Q.    Can you give me a length in terms of
8. how long, shoulder?
9.     A.    Yes, shoulder length.
10.     Q.    And then on the other side where it
11. was short?
12.     A.    It was short almost to the scalp.
13.     Q.    Almost shaved?
14.     A.    There was a little hair there, but it
15. was low.
16.     Q.    Like a number two when someone uses --
17.     A.    Yes.
18.     Q.    Were you wearing a hat if at all when
19. you left the restaurant on that date in question?
20.     A.    No.
21.     Q.    Do you ever wear a hat?
22.     A.    Rarely.
23.     Q.    Do you wear a hard hat at work?
24.     A.    Sometimes, yes, when they force me to.
25.     Q.    So you are not a hat person?

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 54

1    A.    Not anymore.
2    Q.    Why is that?
3    A.    Because I'm always doing my hair.
4    Q.    If we can look at the next one which I
5    believe is Green Brook-3. The first page of that
6    document, the name is Douglas E. Thompson, correct?
7    A.    Correct.
8    Q.    Do you know if on there his date of
9    birth, is that correct?
10   A.    Correct.
11   Q.    Do you know if that is his correct
12   Social Security number?
13   A.    That I don't remember.
14   Q.    The address on this document 287
15   Florence Avenue, Hillside, was that the correct
16   address or Mr. Thompson back in April of 2017?
17   A.    Correct.
18   Q.    You can flip the page. Is that
19   Mr. Douglas Thompson, your ex-husband?
20   A.    Yes.
21   Q.    Is that what he looked like on
22   April 8, 2017?
23   A.    Yes.
24   Q.    Generally back at that time on
25   April 17, did he have a short beard and mustache

Page 55

1    like the photograph shows?
2    A.    Sometimes, yes.
3    Q.    When you saw him the weekend before
4    this incident when you went to the track meet for
5    your daughter, can you describe to me what he looked
6    like in terms of his height, weight, facial hair?
7    A.    He's a slim guy so he's always slim
8    and tall and he's a barber so he cuts -- he shaves
9    his beard at times and this was the first time that
10   I saw him growing it. So it is normally low cut
11   with a mustache.
12   Q.    So in the beginning of April 17 when
13   you saw him at the track meet, did he have short
14   hair or long hair?
15   A.    On his facial hair?
16   Q.    On his head.
17   A.    Short.
18   Q.    Did he have a beard?
19   A.    I don't recall.
20   Q.    What is his height?
21   A.    Six-two.
22   Q.    Approximately, how much did he weigh
23   back then?
24   A.    I don't know.
25   Q.    When you say slim so he wasn't

Page 56

1    heavyset?
2    A.    No, so because he's six-two I don't
3    know what a six-two guy should weigh.
4    Q.    If we could take a look at the last
5    one which was Green Brook-4. On the first page
6    let's start with that. We have a name of Junior M.
7    Hamilton. Is that Mr. Hamilton's correct date of
8    birth to your knowledge?
9    A.    Yes.
10   Q.    Do you know his Social Security
11   number?
12   A.    No.
13   Q.    Is that address correct for
14   Mr. Hamilton back in April of '17?
15   A.    Yes.
16   Q.    If you could take a look at the
17   picture, is that Mr. Hamilton?
18   A.    Yes.
19   Q.    Is that what he looked like at or
20   about April 17?
21   A.    Yes.
22   Q.    I think we may have covered it before.
23   Am I correct that the first time that you learned
24   that you had been charged with a criminal offense in
25   Green Brook was when you were stopped by the

Page 57

1    Berkeley Heights Police Department, correct?
2    A.    Correct.
3    Q.    One of those officers stopped you once
4    you were back in headquarters, gave you a copy of
5    the summons and complaint, is that correct?
6    A.    When I was at the Green Brook -- the
7    Berkeley Heights precinct gave me -- showed me a
8    copy of it.
9    Q.    Did you read it?
10   A.    I looked at it.
11   Q.    Have you read that?
12        MR. LANZA: Excuse me, I believe it
13   was a warrant complaint out of Green Brook.
14        MR. GUSS: Correct, I think I said
15   warrant earlier.
16   Q.    When the officer gave you the warrant
17   in Berkeley Heights after you had been arrested, did
18   you read it?
19   A.    I looked at it.
20   Q.    Since that time have you had an
21   opportunity to review that warrant in its entirety?
22   A.    Yes.
23   Q.    Do you understand what you had been
24   charged with?
25   A.    Yes.

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 58

1    Q.   What is your understanding as to what
2    you had been charged with in Green Brook as a result
3    of what happened at the Bonefish Grill, Watchung
4    Target and Walmart on April 8, 2017?
5        A.   I was charged with a criminal crime of
6    theft. That's my understanding of it.
7        Q.   Let me expand on that. You understand
8    that you were charged with allegedly taking credit
9    cards and using those credit cards from somebody's
10   wallet?
11       A.   Yes, that is what I understand from
12   looking over the documents.
13       Q.   Having had an opportunity since that
14   time, can you sit down with your criminal lawyer to
15   review those charges?
16       A.   Yes.
17       Q.   Based on your conversations with your
18   criminal lawyer, you have an understanding of
19   exactly what you're charged with?
20       A.   Yes.
21       Q.   As we sit here today which is
22   September 17, 2020 --
23       A.   Correct.
24       Q.   -- did you commit those crimes that
25   you had been charged with in Green Brook?

Page 59

1        A.   Did I commit those crimes?
2        Q.   Correct.
3        A.   No.
4        Q.   I want to ask you some questions about
5    what damages you may have as a result of being
6    arrested and prosecuted, okay?
7        A.   Okay.
8        Q.   Before I get there. What is your
9    understanding, if at all, as to why the Somerset
10   County prosecutor's office dismissed the criminal
11   charges out of Green Brook against you?
12       A.   Because I have an alibi and I was
13   innocent.
14       Q.   I'm going to ask you some questions
15   about damages. Did you have to hire a criminal
16   lawyer to defend you as a result of the criminal
17   charges in Green Brook?
18       A.   Yes.
19       Q.   What is his name?
20       A.   Steven Mercer -- Steven Berowitz.
21       Q.   Did you hire Mr. Berowitz to defend
22   you?
23       A.   Yes.
24       Q.   Did you sign a retainer agreement?
25       A.   Yes.

Page 60

1        Q.   How much money, if at all, did you
2    have to initially pay Mr. Berowitz to defend you?
3        A.   Approximately five thousand dollars.
4        Q.   As you sit here today, do you recall
5    how much in total you spent on attorney's fees in
6    defending yourself in the criminal matter?
7        A.   I don't know the actual amounts, but I
8    have it written down.
9        Q.   Has Mr. Berowitz been paid in full?
10       A.   Yes.
11       Q.   Did you have to borrow money from
12   anyone to pay those fees?
13       A.   Yes.
14       Q.   Who did you borrow the money from?
15       A.   From my dad and a friend of mine in
16   the union.
17       Q.   Have you paid all that money back?
18       A.   No.
19       Q.   How much money do you still owe and
20   who do you owe it to?
21       A.   I owe my dad two thousand dollars and
22   I owe my friend in the union Precila two thousand
23   dollars. My dad's name --
24       Q.   What is your dad's name?
25       A.   Norman Hussey.

Page 61

1        Q.   Where does your dad live?
2        A.   In Florida, Archer, Florida.
3        Q.   That is where you lived at one point
4    in time, right?
5        A.   Correct.
6        Q.   Did you have to incur any legal fees
7    with regard to what transpired in Berkeley Heights?
8        A.   Other than the lawyer?
9        Q.   Let me ask a better question. Besides
10   being arrested on the warrant from Green Brook and
11   Berkeley Heights, were you charged with any type of
12   motor vehicle or criminal offenses?
13       A.   Yes.
14       Q.   What was that?
15       A.   I was charged by the Berkeley Heights
16   police resisting arrest and obstruction of license
17   plate and obstruction of rearview mirror, but those
18   charges were dropped to -- I spoke to my lawyer
19   and --
20       Q.   Don't tell us what the lawyer said.
21       A.   I'm not telling you what he said.
22       Q.   Who was that lawyer, Mr. Lanza?
23       A.   Mr. Lanza.
24       Q.   So Mr. Lanza represented you initially
25   in the Berkeley Heights matter?

```
                                    Page 62
 1      A.    Correct.
 2      Q.    What happened to those charges?
 3      A.    It was dropped to an ordinance.
 4      Q.    You paid a fine?
 5      A.    I paid a fine.
 6      Q.    Do you know how much that fine was?
 7      A.    One thousand dollars.  Approximately
 8   one thousand dollars.
 9      Q.    Did you incur a legal fee in Mr. Lanza
10   representing you in Berkeley Heights?
11      A.    Yes.
12      Q.    What was that?
13      A.    Three thousand dollars approximately.
14      Q.    Has that been paid?
15      A.    Yes.
16      Q.    Did you pay that?
17      A.    Yes.
18      Q.    Did you have to borrow money to pay
19   that?
20      A.    I had to take it out of my 401K.
21      Q.    You are paying that back on a monthly
22   basis or bi-weekly?
23      A.    No.
24      Q.    You don't have to pay it back?
25      A.    No.
```

```
                                    Page 63
 1      Q.    You just take it out, it is not a
 2   loan?
 3      A.    No, you just have to pay the penalty.
 4      Q.    Have you incurred any other financial
 5   consequence as a result of the charges out of Green
 6   Brook?
 7      A.    I incurred medical bills.
 8      Q.    I'm going to get to the medical aspect
 9   in terms of financial.  You told me you incurred
10   attorney's fees.  Were you not able to pay credit
11   cards, unable to pay your rent, things of that
12   nature that flowed from these charges?
13      A.    No, this is all I can recall at the
14   time.
15      Q.    That is fine, but you've never had
16   problems paying your rent?
17      A.    Not really.
18      Q.    Did you have difficulty paying the
19   rent when you were unemployed?
20      A.    Yes.
21      Q.    Did you have to borrow money from
22   anyone to help you pay the rent when you were
23   unemployed?
24      A.    No.
25      Q.    You were able to take care of that?
```

```
                                    Page 64
 1      A.    Yes.
 2      Q.    Able to pay your credit cards and your
 3   other bills in a timely manner?
 4      A.    No, I called the credit card company
 5   and explained to them so they gave me extensions.
 6      Q.    Is that as a result of during your
 7   period of unemployment?
 8      A.    Correct.
 9      Q.    Are you current on those things now?
10      A.    Yes.
11      Q.    Have you sought medical treatment, if
12   at all, as a result of those criminal charges being
13   lodged against you in Green Brook?
14      A.    Yes.
15      Q.    Tell me about that?
16      A.    I had to go to the doctor -- the
17   hospital one time at one point because I was having
18   really bad chest pains where I felt like I could not
19   breathe.  So it was a time when I had to go to court
20   and I was panicking.  My cousin took me to the
21   hospital.
22      Q.    What is your cousin's name?
23      A.    Paul Pitter, P-i-t-t-e-r.
24      Q.    Do you remember what hospital this
25   was?
```

```
                                    Page 65
 1      A.    Overlook.
 2      Q.    Do you remember when this was?
 3      A.    May 24.
 4      Q.    What year?
 5      A.    2018 -- no, I don't remember the year.
 6      Q.    But it was Overlook?
 7      A.    Yes.
 8      Q.    When you went to the hospital, did you
 9   explain to them that there was pending criminal
10   charges against you and you were having a panic
11   attack?
12      A.    Yes, I told them I had a court
13   appearance and I was outside and I could not breathe
14   and it was happening all morning when I got up.  It
15   just got worse when I got to the court.
16      Q.    Did you go to court or did you just
17   not go to court and went to the hospital?
18      A.    I was at court so my cousin took me to
19   the hospital and then he went back and went into
20   court and explained it to the judge.
21      Q.    Any other medical treatment that
22   you've sought as a result of anything that may have
23   occurred as a result of the criminal charges in
24   Green Brook?
25      A.    Yes, I had to see a chiropractor
```

17  (Pages  62  to  65)

Page 66

```
 1  because I was having -- I had to take the test, the
 2  A test and I was having these really bad headaches
 3  and nothing -- I believe I spoke to the lawyer that
 4  day. We were going over or we had court that day,
 5  Steven Berowitz, and I had a headache from in the
 6  morning and it was just stressful and I got home and
 7  I tried to study for the exam and I couldn't sleep and I needed
 8  to study for the exam and a friend of mine said go
 9  to the chiropractor because sometimes they can do
10  different things to ease the pain. So I went to the
11  chiropractor.
12      Q.  What is his name or her name?
13      A.  It was -- I don't know his name.  I
14  just got it from looking it up in Google because it
15  was the closest one to me and being that the pain
16  was so excruciating I couldn't really go far and it
17  was only -- I was the only person at home so it is
18  somewhere in Scotch Plains. I can provide it to you
19  later.
20      Q.  I think I got it.  I was just
21  inquiring if you knew the name. How many times did
22  you go?
23      A.  Just that one time.
24      Q.  When you saw the chiropractor, did you
25  explain to him that there is these criminal charges
```

Page 67

```
 1  pending and you had headaches?
 2      A.  I told him I went to court and I was
 3  having a headache and I needed to get rid of this
 4  pain because I have to study for my exam tomorrow.
 5      Q.  Then you told me already this is the A
 6  test. This was the one to become the journeyman,
 7  correct?
 8      A.  Yes.
 9      Q.  You did pass that examination,
10  correct?
11      A.  Yes, because the headache after a few
12  hours after what he did the headache actually went
13  away.
14      Q.  I think you told me this already.
15  Studying for the exam is difficult and stressful?
16      A.  Yes. So I needed to be in a good
17  frame of mind.
18      Q.  Any other medical treatment?
19      A.  Yes, I was having headaches through
20  all of this, you know, ongoing consistently and I
21  went to my doctor, my primary care doctor. I told
22  them about it. I told them it was very stressful
23  and I explained what was going on to him and he had
24  prescribed something for the headache.
25      Q.  When you say you told your primary
```

Page 68

```
 1  care doctor about it, you told him about the pending
 2  criminal charges, correct?
 3      A.  Correct.
 4      Q.  And court appearances?
 5      A.  Yes.
 6      Q.  Any other doctors that you sought
 7  medical treatment as a result of any consequence of
 8  the criminal charges in Green Brook?
 9      A.  I also spoke to Mary Lance. She's a
10  psychologist so I was talking to her about it.
11      Q.  Where is Dr. Lance located?
12      A.  She's in New York.
13      Q.  How do you know her?
14      A.  I went to her once before a long time
15  ago.
16      Q.  What was that for?
17      A.  Just to talk about my life in general.
18  Just to have someone to speak to.
19      Q.  How many times did you see Dr. Lance
20  after the charges in Green Brook?
21      A.  I saw her approximately two or three
22  times.
23      Q.  When was the last time?
24      A.  It was before this whole COVID thing
25  so it was 2000 -- maybe it was 2019 last year.
```

Page 69

```
 1      Q.  Do you have any appointments to see
 2  any doctors in the future as a result of any medical
 3  issues that you believe are related to the charges
 4  from Green Brook?
 5      A.  I'm still going back to see her
 6  because we haven't finished. We were talking about
 7  a lot of other stuff so we didn't get finished. We
 8  didn't get into the nit and grit of all of this.
 9      Q.  But you did talk to Dr. Lance you said
10  about the charges, court appearances, things of that
11  nature?
12      A.  Correct.
13      Q.  Were there other issues that you were
14  talking to her about?
15      A.  Well, originally we were talking to
16  her about my daughter and what my daughter --
17  because my daughter was having issues because of
18  this whole court cases. But my daughter wouldn't
19  speak.
20      Q.  What type of issues was your daughter
21  having as a result of this?
22      A.  She was stressed out that she was
23  going to lose her mom. She might lose her mom so
24  she was acting out in school and she was being
25  rebellious and not listening.
```

18 (Pages 66 to 69)

Page 70

1    Q.    Did your daughter see any type of a
2    doctor?
3        A.    Well, we took her to Overlook to get
4    evaluated, but she still wasn't saying anything.
5    She just -- they asked her some questions and she
6    talked -- she just answered those questions and she
7    seemed perfectly okay, but when she spoke to me, she
8    expressed herself, but she didn't speak to any
9    doctor, no.
10    Q.    When was this evaluation at Overlook
11    for your daughter?
12        A.    2019.
13    Q.    Was that like a neuropsychological
14    evaluation?
15        A.    Yes, something like that.
16    Q.    They did all kinds of tests?
17        A.    No tests, just talking.
18    Q.    Did the psychologist come back and
19    give you an opinion as to what she thought the
20    problem was?
21        A.    She said just to get -- just to speak
22    to someone outside to make sure that she's okay.
23    Q.    Just like you had been doing with Dr.
24    Lance?
25        A.    Yes.

Page 71

1    Q.    Any issues with your son?
2        A.    No. My son --
3    Q.    Too young?
4        A.    Yeah, there was no one in the house
5    speaking about it, but because my husband was very
6    upset, my ex-husband was very upset over the
7    situation he would be talking about it in front of
8    my daughter so my daughter took it very personally.
9    She felt really bad.
10    Q.    Now, after you got arrested in Green
11    Brook -- excuse me, after you got arrested in
12    Berkeley Heights on the Green Brook charges you told
13    your employer, correct?
14        A.    Correct.
15    Q.    Obviously, did you speak with Douglas
16    Thompson about it because he was also charged,
17    correct?
18        A.    He wasn't talking to me because he was
19    very upset.
20    Q.    Do you know how Douglas Thompson
21    learned about the charges?
22        A.    He said he got a mail.
23    Q.    When he got it in the mail, did he
24    call you and tell you?
25        A.    Yes, and I told him to e-mail me a --

Page 72

1    take a picture and send me a copy.
2    Q.    Was that before or after you were
3    arrested?
4        A.    Before.
5    Q.    Did Mr. Thompson e-mail you a copy of
6    those criminal charges?
7        A.    No.
8    Q.    When you learned from Mr. Thompson
9    about the criminal charges before the Berkeley
10    Heights arrest did you take any action, if at all?
11        A.    No, because he didn't say -- I didn't
12    know of anything. I don't know what was in it. He
13    didn't tell me what was in it.
14    Q.    He didn't tell you that it related to
15    an alleged theft that took place at Bonefish Grill
16    on April 8, 2017?
17        A.    Yes, he told me that, but he didn't go
18    in detail because it's asking me what this is all
19    about and I said I don't know, send me the copy so I
20    can see what it is.
21    Q.    He didn't do that?
22        A.    No, so I couldn't.
23    Q.    When he told you it took place on that
24    day April 8, '17 in Bonefish Grill, did you say wow,
25    I was there that day maybe it involves me?

Page 73

1        A.    I don't believe he told me -- I don't
2    recall him telling me the dates. He did not go into
3    detail.
4    Q.    Who else have you told about this
5    incident besides your employer, obviously Junior
6    Hamilton, correct?
7        A.    Correct.
8    Q.    I assume you spoke to your mom?
9        A.    Correct.
10    Q.    Anyone else?
11        A.    My dad, my step mom. Douglas has told
12    his family, my ex-mother-in-law, my
13    ex-father-in-law, majority of my co-workers, my
14    ex-coworkers at Home Depot, Morvet Shaw. The person
15    that my mom had to call, Marvin Henry, to come and
16    take my car from when they impounded it. The
17    baby-sitter that we went to drop the soil off, her
18    family, my cousins that all live here and in
19    Florida.
20    Q.    When you would talk to them about
21    this, what would you explain to them?
22        A.    I would say I don't know how something
23    like this could even happen because I've been
24    working since I was ten years old like it was
25    just --

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 74

```
1        Q.   You want to take a little break?
2    Sure, okay, not a problem.
3              (Whereupon, a short recess has been
4    taken.)
5        Q.   Ms. Thompson El, my question is as a
6    result of being charged in Green Brook has this
7    taken an emotional toll on you?
8        A.   Yes, it has. Every time I think about
9    it it just -- it makes me sad. It tears me up to
10   see, you know, how the justice system failed me and
11   put me through all of this when all my life I've
12   done everything to uphold the justice system, to do
13   right. I never stole anything in my life and when
14   this happened it really devastated me and my whole
15   family. They couldn't believe because everything I
16   have I worked for. When I went to school when I was
17   a kid, I was ten years old in fifth grade, I had to
18   work every weekend and every holiday just so I could
19   get my lunch money from my mom. It is not like I
20   could just say oh, mommy, can I have my lunch money.
21   I had to earn it and I have been working since then,
22   since I was ten I worked every Saturday, every
23   Sunday, every holiday. I never missed a day of work
24   in the summer and I came over here and I went to
25   college and then when I started working I worked
```

Page 75

```
1    every single time, you know. At one point I had
2    three jobs just to make sure that everybody was
3    okay. I would never think to steal anything from
4    anyone so when this happened and my daughter hears
5    about this it's like she's looking at me in a
6    different light to say how could you, you know,
7    steal. The cop is saying that you did it so that
8    means you did it. Her dad told her and her dad said
9    the cop said you did it so you got to have done it
10   and I'm like how could he say that to you when he
11   knows me. You know, his mom, she stopped talking to
12   me because she thought that I did this and pulled
13   her son through all this mess. You know, nothing
14   like this ever happened to anybody in the family
15   before so it was just -- it was just heart
16   rendering. The topic always comes up. I will be at
17   work working and it will flash in my mind and I just
18   start crying and can't function.
19             Every time I see a cop on the street I start
20   panicking because I'm thinking that they are going
21   to pull me over for something that I know nothing
22   about. Every time they drive by or they are sitting
23   on my street I'm like are they watching me to see if
24   I'm doing something, you know, I'm so paranoid. It
25   just hurts all the time. I can't sleep, you know,
```

Page 76

```
1    I'm just fearful of everything. Like I just don't
2    feel like the justice system is on my side.
3        Q.   When you found out the charges were
4    dismissed, how did you feel?
5        A.   I was happy and I told my family and
6    they were so happy and I told my friends at work and
7    they were all happy because they know that I
8    wouldn't do something like that because when I told
9    my friend Precila, the one that gave me the money,
10   she was so sad and she was like oh, my God, Georgia,
11   that is such a bad thing. Anything you need tell me
12   because I know you wouldn't do something like this
13   and she's the one that offered the money. I didn't
14   even have to ask her. She was the only one that
15   offered. And she was like anything you need because
16   at the time, you know, I wasn't making that much
17   money yet and I had my two kids and my mom because
18   my mom is living with me.
19       Q.   So at this time were you supporting
20   not only yourself, but your mom and your children?
21       A.   Yes, my mom was working, but she was
22   working part-time so basically I'm supporting her.
23       Q.   So was your mom assisting you
24   financially back then a little bit?
25       A.   No, my mom doesn't assist me.
```

Page 77

```
1        Q.   She didn't give you any money at all?
2        A.   She -- I told her to save her money.
3        Q.   Did you receive money from any other
4    sources such as child support?
5        A.   My son's father, he helped out with
6    his child day care and school.
7        Q.   What about your daughter's father?
8        A.   No, because we share custody like she
9    is with me half the week and she is with him half
10   the week.
11       Q.   You just share the expenses?
12       A.   Yes.
13       Q.   One of the allegations in the
14   complaint against the Green Brook Police and
15   particular Officer Pepe is that the charges were
16   racially motivated.
17             Do you believe that Officer Pepe signed these
18   charges because of your race?
19       A.   I believe so.
20       Q.   What are you relying on to support
21   that?
22       A.   Because he saw a black person in the
23   picture and he just randomly picked any black person
24   because he just put my picture and put it up against
25   hers and said that I was the one without doing a
```

20  (Pages 74 to 77)

062eda8d-87b5-433e-80a2-968e30d40ba9

## Page 78

1  thorough investigation. So I think it was just
2  because he saw that it was a black person and pinned
3  it on any black person.
4      Q.  You've read his police reports,
5  correct?
6      A.  Yes.
7      Q.  You know that he found there was
8  photographs they got from the Bonefish Grill and
9  they compared them to your driver's license,
10  correct?
11     A.  Yes.
12     Q.  You believe that that wasn't proper?
13     A.  No, because we asked for the same
14  photographs and you can't compare the pictures,
15  doesn't match. You can't even see it.
16     Q.  You are talking about the pictures
17  from Bonefish to your driver's license?
18     A.  Correct.
19     Q.  I don't have anything else, ma'am,
20  thank you very much for your time and cooperation
21  today.
22     A.  You're welcome.
23
24          EXAMINATION
25  BY MR. FEINSTEIN:

## Page 79

1      Q.  Ms. Thompson El, we weren't formally
2  introduced. I'm Jason Feinstein. I represent
3  Lawrence Township and Detective Joseph Radlinsky.
4  With me to my right is my colleague from my law firm
5  Ian Oakley.
6      I have some questions. Some of my questions
7  are going to be more directed to the claims that you
8  have asserted in this case against Lawrence Township
9  and I do have a few questions to just follow up on
10  some of the answers that you've already given today
11  to Mr. Guss. So if I backtrack over a few items
12  that we have already covered, bear with me, it is
13  probably because I am trying to ask something that
14  may not have been asked or I did not hear your
15  answer.
16     I'm wearing my mask, hopefully you and the
17  court reporter are hearing me fine. I'm happy to
18  take it off if anyone feels the need for that, but
19  if no one feels the need, my preference is to keep
20  it on. I told my son who is going back to school on
21  Monday and he's going to have to wear his mask five
22  hours a day so that if he could do it, I could do
23  it. So I am going to try to prove myself right.
24     Ma'am, the E-l that you use as part of your
25  surname, when did you first start using that?

## Page 80

1      A.  2018.
2      Q.  Is that a separate word or would you
3  hyphenate Thompson hyphen E-l?
4      A.  It's a separate word.
5      Q.  Your driver's license, does it have
6  the Thompson El name on it?
7      A.  Correct.
8      Q.  Have you actually formally or legally
9  changed your name through some judicial proceeding?
10     A.  Yes.
11     Q.  When did that occur?
12     A.  2018.
13     Q.  Was that before or after your arrest
14  in Berkeley Heights?
15     A.  Before.
16     Q.  You are still in a relationship with
17  Junior Thompson, is that correct?
18     A.  No, Junior Hamilton.
19     Q.  I'm sorry, that's my bad. You are
20  still in a relationship with Mr. Hamilton?
21     A.  Yes, that's correct.
22     Q.  Do the two of you live together?
23     A.  No.
24     Q.  Have you ever lived together?
25     A.  No.

## Page 81

1      Q.  I want to ask you about some names
2  that I saw in the discovery that we received from
3  your attorney in this matter. Some we have talked
4  about, some we have not yet talked about. Who is
5  Lou Alvarez?
6      A.  That's my shop steward from my job
7  that I was working on.
8      Q.  Which job?
9      A.  When I was in New York at the time of
10  the incident. The whole incident he was the shop
11  steward on the job when I was working at Multiphase
12  Electric.
13     Q.  Is Mr. Alvarez someone that you told
14  about the criminal matters that you were involved
15  in?
16     A.  Yes.
17     Q.  Is he the person that made the
18  decision to lay you off from Multiphase?
19     A.  No.
20     Q.  Who was that?
21     A.  Rich McCoskr.
22     Q.  I have it as M-c-C-o-s-k-r, does that
23  sound right?
24     A.  Yes.
25     Q.  What was Rich McCoskr's position?

Page 82

1     A.    The super, the shop super.
2     Q.    So he was above Lou Alvarez?
3     A.    Yes.
4     Q.    Was Rich your ultimate boss?
5     A.    Yes, next to the owner.
6     Q.    Was Rich McCoskr aware of what you
7  were going through with your criminal matters?
8     A.    Yes.
9     Q.    You've spoken to him as well?
10    A.    Yes.
11    Q.    Is there anyone else at Multiphase
12 that you spoke to about your criminal matters other
13 than Mr. Alvarez and Mr. McCoskr?
14    A.    Yes.
15    Q.    Who else?
16    A.    My foreman Jason. I don't have his
17 last name. I would be able to get it though. I
18 thought I gave it on the list, but if not, I will
19 double-check and -- Courtney Irving.
20    Q.    Who is she?
21    A.    It's a him.
22    Q.    Who is he?
23    A.    He's a coworker of mine on my job.
24    Q.    So right now you are employed at
25 Kleinknecht, is that correct?

Page 83

1     A.    Correct.
2     Q.    Is that a Monday through Friday job?
3     A.    Yes.
4     Q.    You work there full-time?
5     A.    Correct.
6     Q.    Did you have to take today off to
7  participate in this deposition?
8     A.    Yes.
9     Q.    Have you worked throughout the course
10 of the pandemic?
11    A.    Yes, when the state shut us down then
12 we were shut down, but when they told us we could go
13 back, we went back.
14    Q.    You are referring to the State of New
15 York?
16    A.    Yes.
17    Q.    What was the period of time that you
18 were not working during the pandemic?
19    A.    March 27 to June 1st.
20    Q.    Did you collect unemployment during
21 that period?
22    A.    Yes.
23    Q.    Did you collect the additional stipend
24 from the Federal Government?
25    A.    Yes.

Page 84

1     Q.    Have you been working full-time since
2  June 2020?
3     A.    Yes.
4     Q.    Who is your direct supervisor at
5  Kleinknecht?
6     A.    His name is -- can I look one minute
7  on my phone?
8     Q.    Yes, go ahead.
9     A.    I only have his first name which is
10 Enam, E-n-a-m.
11    Q.    Have you told anyone at Kleinknecht
12 about this case or your prior criminal matters?
13    A.    No.
14    Q.    In your discovery you had indicated
15 that at one point you worked part-time at Saint
16 Barnabas Hospital, is that correct?
17    A.    Correct.
18    Q.    That's in Livingston?
19    A.    Correct.
20    Q.    What were the dates you worked at
21 Saint Barnabas?
22    A.    I worked at Saint Barnabas since
23 2000 -- the dates are different. It varies. Are
24 you talking about the time of the incident or are
25 you talking about when I worked there previously to

Page 85

1  the incident?
2     Q.    Let's start with the very first time
3  you worked at Saint Barnabas, what year was that?
4     A.    2009 to 2014.
5     Q.    I think you told us earlier that
6  during those years you were also working at Home
7  Depot, is that correct?
8     A.    Correct, 2004 to 2017.
9     Q.    Was your work at Saint Barnabas
10 part-time from '09 to '14?
11    A.    Yes.
12    Q.    What was your job?
13    A.    First it was transporter and then it
14 was supervisor of housekeeping and transport which
15 is like dispatch.
16    Q.    Why did you stop working there in
17 2014?
18    A.    I was pregnant with my son.
19    Q.    Did there come a point in time when
20 you were rehired at Saint Barnabas?
21    A.    Yes.
22    Q.    What year was that?
23    A.    It was 2019.
24    Q.    Do you know what month?
25    A.    June 2019.

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 86

1    Q.   Are you still working there?
2    A.   No.
3    Q.   When did that end?
4    A.   I ended it when I went back to work, a
5    little bit after I went back to work. So it was
6    maybe around September of 2019.
7    Q.   About three months of work, does that
8    sound about right?
9    A.   Correct.
10   Q.   Was that full or part-time?
11   A.   It was part-time.
12   Q.   What were you doing then?
13   A.   The same, transport, dispatch.
14   Dispatch or supervisor of housekeeping and
15   transport. I believe they called it customer
16   service. They changed the name.
17   Q.   Just so I understand your most recent
18   employment history, your work with Multiphase ended
19   in January of 2019, is that right?
20   A.   Correct.
21   Q.   You then did not work until you were
22   employed part-time at Saint Barnabas in June of
23   2019?
24   A.   Correct.
25   Q.   But you collected unemployment during

Page 87

1    the period where you weren't working, is that
2    correct?
3    A.   Correct.
4    Q.   While you were working part-time at
5    Saint Barnabas, were you also collecting
6    unemployment?
7    A.   I don't believe I was. I can
8    double-check.
9    Q.   Then you stayed Saint Barnabas until
10   you were employed full-time with Kleinknecht, is
11   that correct?
12   A.   Correct.
13   Q.   That was in September of 2019?
14   A.   That's when I left Saint Barnabas. I
15   started Kleinknecht in August.
16   Q.   Were you working both jobs for a
17   period of time?
18   A.   Correct.
19   Q.   Your work for Kleinknecht since you
20   started there, has that been full-time employment
21   for you?
22   A.   Yes.
23   Q.   Do you get paid an hourly rate for
24   your work there or is it a salary position?
25   A.   Hourly.

Page 88

1    Q.   Do you have the opportunity to earn
2    overtime in that position?
3    A.   Yes.
4    Q.   When you worked at Multiphase, was the
5    compensation the same hourly with the opportunity
6    for overtime?
7    A.   Yes.
8    Q.   Who are Grace and Uriel if I'm saying
9    that right?
10   A.   Grace is the baby-sitter, my son's
11   baby-sitter's sister and Uriel is her husband and
12   they are close friends of mine because they took
13   care of my son as well.
14   Q.   I think you told us that on the date
15   that you had dinner with Mr. Hamilton at Bonefish,
16   you had visited their home earlier in that day, is
17   that correct?
18   A.   That's correct.
19   Q.   Did either of them ever go with you to
20   any of your court proceedings?
21   A.   Yes.
22   Q.   Did they both go to court proceedings?
23   A.   No, just Grace.
24   Q.   Where were the court proceedings
25   located that she joined you at?

Page 89

1    A.   Somerset.
2    Q.   Who is Cardell Carter?
3    A.   She's the baby-sitter. That's Grace's
4    sister.
5    Q.   They live in the same home?
6    A.   Yes.
7    Q.   You told us that Paul Pitter is your
8    cousin, is that correct?
9    A.   Yes.
10   Q.   He took you to the hospital on that
11   one occasion?
12   A.   Yes.
13   Q.   Did he ever go with you to any of your
14   court proceedings?
15   A.   Yes.
16   Q.   Which location?
17   A.   Mercer, the one in Mercer.
18   Q.   Who is Patrick Hussey?
19   A.   My cousin.
20   Q.   What does Patrick know about your
21   matters?
22   A.   Everything that I told him.
23   Q.   Did he ever go with you to court?
24   A.   Yes.
25   Q.   Which location?

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 90

1    A.    Somerset.
2    Q.    Who is Morvet Shaw?
3    A.    A co-worker of mine from Home Depot
4  and good friend.
5    Q.    Did she ever go to court with you?
6    A.    No.
7    Q.    Have you spoken to her about these
8  matters?
9    A.    Yes, she was the one that referred the
10  lawyer Mr. Lanza.
11    Q.    Who is Courtney Irving?
12    A.    A co-worker from Multiphase.
13    Q.    You told him about these matters as
14  well?
15    A.    Yes.
16    Q.    I think I may have misheard your
17  testimony earlier as Precila, but is it
18  P-r-e-c-i-l-a?
19    A.    Yes.
20    Q.    And her last name is Eddy?
21    A.    No, not Eddy.  How is it spelled?
22    Q.    E-d-d-y?
23    A.    No, that's not it.
24    Q.    That is not it?
25    A.    No, I have to get you the correct

Page 91

1  spelling of her name.
2    Q.    She worked with you at Home Depot?
3    A.    In the local we did the apprenticeship
4  together.
5    Q.    Do you know a Kenneth Edwards?
6    A.    No.
7    Q.    Have you ever heard his name at all?
8    A.    Just in the court proceedings for
9  Mercer.
10    Q.    What is your understanding, if you
11  have one, as to who he is?
12    A.    Someone that was also at the
13  Bonefish -- well, at one of these restaurants.  I
14  think at the Bonefish Grill.
15    Q.    Do you understand that Kenneth Edwards
16  was charged by the Mercer County prosecutor with the
17  same crimes in Mercer County that you were charged
18  with?
19    A.    Yes.
20    Q.    Have you ever spoken with Mr. Edwards?
21    A.    No.
22    Q.    Were you ever in court when he was in
23  court?
24    A.    No.
25    Q.    Do you know the name Peter Lyneborg,

Page 92

1  L-y-n-e-b-o-r-g?
2    A.    No.
3    Q.    Have you ever heard that name before?
4    A.    No.
5    Q.    Have you ever been to Lawrence
6  Township, New Jersey?
7    A.    No.
8    Q.    Have you ever been to a restaurant
9  known as Zoe's Kitchen?
10    A.    No.
11    Q.    Have you ever been to a Target store
12  in Monmouth Junction or South Brunswick, New Jersey?
13    A.    No.
14    Q.    That dinner that you had at Bonefish
15  Grill with Junior Hamilton on April 8 of 2017, at
16  any time while you were at that restaurant, did you
17  come to learn that someone had reported a theft of a
18  credit card?
19    A.    No.
20    Q.    Did anyone from the Bonefish Grill
21  before you left there that day ever approach you and
22  ask you if you knew anything about the theft of a
23  credit card?
24    A.    No.
25    Q.    Back in 2018 when you were working for

Page 93

1  Multiphase, did you work Monday through Fridays?
2    A.    Yes.
3    Q.    Did you work on Saturdays and Sundays?
4    A.    Sometimes.
5    Q.    Would it be overtime for you to work
6  on one of those days?
7    A.    Yes, it is overtime.
8    Q.    That would be your decision whether or
9  not you wanted to take the overtime?
10    A.    Correct.
11    Q.    When did you become a member of Local
12  3?
13    A.    October of 2010.
14    Q.    Have you continuously remained a
15  member of Local 3 since then?
16    A.    Yes.
17    Q.    I just want to make sure and I think
18  you explained this, but I want to make sure I got it
19  right.
20          The job titles that you've had with the local
21  started first with apprentice, is that correct?
22    A.    Correct.
23    Q.    How long were you an apprentice for?
24    A.    Almost six years.
25    Q.    After apprentice you became an MIJ

24  (Pages  90 to  93)

Page 94

1  apprentice?
2       A.   No, that is a part of it. MIJ is
3  still an apprentice.
4       Q.   So the six years includes the MIJ, is
5  that correct?
6       A.   Correct.
7       Q.   So we are talking roughly 2010 through
8  2016?
9       A.   No, 2018. I didn't take the A test
10  until 2018.
11      Q.   So you had the title apprentice or MIJ
12  apprentice through 2018, is that right?
13      A.   Correct.
14      Q.   When did you earn the title of
15  journeyperson?
16      A.   I believe August of 2018.
17      Q.   You sat for that exam in June of 2018,
18  is that right?
19      A.   I believe so.
20      Q.   That promotion to journeyperson, did
21  it involve more responsibilities on the job?
22      A.   Yes.
23      Q.   Did it involve an increase in pay?
24      A.   Yes.
25      Q.   What was the rate you were earning as

Page 95

1  an MIJ apprentice before you became a journeyperson?
2       A.   Twenty-nine dollars.
3       Q.   What did your rate become when you
4  became a journeyperson?
5       A.   It's now fifty-six.
6       Q.   Per hour?
7       A.   Yes.
8       Q.   Is that your current rate right now?
9       A.   Yes.
10      Q.   When you got laid off in January of
11  2019 by Multiphase, did I get the year right?
12      A.   Yes.
13      Q.   To your knowledge, was anyone else
14  also laid off at the same time?
15      A.   Yes.
16      Q.   How many other people were laid off
17  when you were laid off?
18      A.   To my knowledge, only one.
19      Q.   Who is that?
20      A.   Christian. A guy named Christian.
21      Q.   Do you know his last name?
22      A.   No.
23      Q.   In the three or four months before you
24  were laid off, was anyone prior to you laid off at
25  Multiphase?

Page 96

1       A.   Yes.
2       Q.   One or more than one person?
3       A.   I know of one person.
4       Q.   Who is that?
5       A.   The guy they called Big Mike.
6       Q.   When you got laid off at Multiphase,
7  did someone actually say to you that the reason why
8  you were being selected was because you were not
9  dependable?
10      A.   No, they don't ever speak to you.
11      Q.   So how is it that you know that the
12  reason for you being laid off had to do with your
13  reliability?
14      A.   Because I asked a prior time when Big
15  Mike got laid off and I was told it is because he
16  was unreliable. He always had issues that he had to
17  take care of.
18      Q.   Does your local union have any
19  guidelines for how an employer should make a
20  decision as to who among the employees should be
21  selected to be laid off?
22      A.   No.
23      Q.   At any time while you were working at
24  Multiphase and I have your start time in 2015, is
25  that correct?

Page 97

1       A.   Correct.
2       Q.   So you were there from 2015 until
3  January of 2019, right?
4       A.   Correct.
5       Q.   Had you ever been laid off for any
6  period of time while you worked there?
7       A.   No.
8       Q.   You told counsel earlier that the
9  vehicle that Mr. Hamilton met you in at the Bonefish
10  was a silver Nissan, is that right?
11      A.   That's correct.
12      Q.   Do you know what the model is of that
13  car?
14      A.   Altima.
15      Q.   That day you said you were wearing a
16  new pair of jeans and a new pair of boots, is that
17  right?
18      A.   A new pair of boots and a new shirt,
19  blouse.
20      Q.   Take any pictures of yourself that
21  day, any selfies?
22      A.   No.
23      Q.   When you were at the restaurant, did
24  you and Junior have any photos taken of yourselves
25  whether it be a selfie or you asked a waiter or

Page 98

1  waitress to do that?
2      A.  No.
3      Q.  To your knowledge, do you have any
4  photos of yourself from the time period of
5  April 2017?
6      A.  No.
7      Q.  I see you took out your phone before.
8  I noticed it was an iPhone, is that correct?
9      A.  Yes.
10     Q.  Have you had an iPhone since 2017?
11     A.  Yes.
12     Q.  Is the iPhone you have today the same
13 iPhone you had back then?
14     A.  No.
15     Q.  When you got your newer iPhone, did
16 you have any data or photos that you had transferred
17 from the old phone to the new phone?
18     A.  Just a few.
19     Q.  Do you know if any of those photos
20 date back to 2017?
21     A.  Yes.
22     Q.  Are you in any of those photos?
23     A.  Yes.
24     Q.  Those photos right now are sitting on
25 your current cellphone, is that correct?

Page 99

1      A.  No.
2      Q.  What became of the photos that got
3  transferred to your new cellphone?
4      A.  I uploaded them to another phone and
5  then that phone died. That phone it won't power
6  back on. I lost it.
7      Q.  Does that mean your photos from 2017
8  are now lost?
9      A.  But I printed a few of them.
10     Q.  Are you in any of them?
11     A.  Yes.
12     Q.  Are they from say the first half of
13 2017?
14     A.  Yes.
15     Q.  You have those at home?
16     A.  Yes, actually I have a correction. I
17 believe it was May or April that I had a picture
18 taken and I can provide that one. It has the date
19 on the background of it. It is either April or May.
20     Q.  That is a printed photo, is that
21 right?
22     A.  Yes.
23     Q.  Just please bear with me. I'm going
24 through my notes and trying to skip things that
25 you've already been asked about.

Page 100

1      A.  Okay.
2      Q.  Have you ever spoken with any employee
3  from the Lawrence Township Police Department?
4      A.  No.
5      Q.  Were you ever in court whether in
6  Lawrence Township or Mercer County where there was
7  an officer present from the Lawrence Township Police
8  Department?
9      A.  Not to my knowledge.
10     Q.  I'll ask a more specific question
11 although I gather I know your answer. Have you ever
12 met or spoken with Detective Joseph Radlinsky from
13 the Lawrence Township Police Department?
14     A.  No.
15     Q.  Have you ever been contacted by anyone
16 from the Lawrence Township Police Department?
17     A.  No.
18     Q.  Have you ever received anything in the
19 mail from Lawrence Township?
20     A.  No, I just received a summons to go to
21 court in Mercer.
22     Q.  Let me ask you about that. When did
23 you receive a summons to be in court in Mercer?
24     A.  June of 2017. It was so long ago.
25     Q.  Do you still have that summons in your

Page 101

1  possession?
2      A.  I believe I do.
3      Q.  Did it come to your address in Scotch
4  Plains?
5      A.  Yes.
6      Q.  Delivered by the U.S. Postal Service
7  as far as you know?
8      A.  Yes.
9      Q.  Were you the one to receive and open
10 that mail?
11     A.  Yes.
12     Q.  Did you have any idea what it had to
13 do with when you received it?
14     A.  No.
15     Q.  What did you do about it, if anything?
16     A.  I cried and I started to panic and was
17 wondering what was going on. I was like is this a
18 trick. I'm like what is this. So I started to call
19 my family to tell them that I received this letter
20 and I don't know what it is about and they said go
21 and find out.
22     Q.  Did that summons have a date in it for
23 a court hearing?
24     A.  It had an intake number telling me to
25 come to Mercer County.

Page 102

1    Q.    Did it have a date and time that you
2    were asked to arrive?
3        A.    Yes.
4        Q.    Do you know what that date was?
5        A.    I don't remember it.
6        Q.    Was it also in June of 2017 the date
7    for your court appearance?
8        A.    Yes.
9        Q.    Did you go?
10       A.    Yes.
11       Q.    Did you appear in front of a judge?
12       A.    Yes.
13       Q.    Were you represented by an attorney at
14   that appearance?
15       A.    No.
16       Q.    What happened at that appearance?
17       A.    The judge asked me if I know why --
18   the reason why I'm here and I said no, I don't know
19   and he said -- then he explained what was on the
20   notice and he said do you understand the charges and
21   I was like I do not understand the charges of what
22   you just read to me because I have no idea what's
23   going on here. He stated to me that this is serious
24   and he asked me also that I'm -- telling me that I
25   am charged with theft and I told him I don't

Page 103

1    understand it and he said do you not understand what
2    theft is. I said I know what theft is, but I don't
3    understand how the charges relate to me because I
4    don't know anything about these charges. I was
5    never in Lawrenceville Township. I never come this
6    far. I don't know anything. So can you please
7    provide me with some proper proof so I can see what
8    I'm working with and then he asked me if I didn't
9    have a copy of the proof and I was like no. So then
10   he gave me a copy of the summons. I'm like this
11   doesn't explain anything different. So he said some
12   more stuff that I don't remember and then he gave me
13   another court date.
14       Q.    Just so I'm a hundred percent certain,
15   that appearance you are telling me about, was that
16   at the courthouse in Trenton?
17       A.    Yes.
18       Q.    Was anyone else with you there that
19   day?
20       A.    No.
21       Q.    Did the judge say anything to you
22   during that proceeding about you obtaining an
23   attorney, whether it be on your own or through a
24   public defender?
25       A.    Yes.

Page 104

1    Q.    What was the next event that occurred
2    out of Mercer County?
3        A.    I believe he scheduled it for July,
4    some time in July.
5        Q.    What was it that you understood would
6    be happening in July?
7        A.    It was another appearance before a
8    different judge.
9        Q.    Did you attend that appearance?
10       A.    Yes.
11       Q.    Did anyone else go with you to that
12   appearance?
13       A.    No.
14       Q.    Had you hired an attorney by that
15   point or had one assigned to you for that
16   appearance?
17       A.    No.
18       Q.    What happened when you showed up in
19   court for that appearance?
20       A.    He told me about the charges and asked
21   me if I have a lawyer. I told him no and he just
22   went over what was on the summons and I told him
23   that I need proof. Can somebody please provide me
24   with proof that I was the person that did all the
25   things that was stated in the summons and I was not

Page 105

1    able to be provided with anything. I told him that
2    I'm innocent of every charge on that paper so I
3    don't know what's going on. Everything here is
4    foreign to me. I was like I'm innocent of all these
5    charges. I've never been to Lawrenceville. I just
6    told him the same thing I told the other judge.
7        Q.    What was the outcome of that day's
8    appearance?
9        A.    He scheduled another date.
10       Q.    For when?
11       A.    August.
12       Q.    Did you attend the August hearing?
13       A.    Yes.
14       Q.    Were you with anyone?
15       A.    No.
16       Q.    Did you have an attorney at that
17   hearing?
18       A.    No.
19       Q.    Did you return to one of the first two
20   judges?
21       A.    Yeah, the same judge that I saw the
22   last time.
23       Q.    What happened on that visit?
24       A.    He said the same thing and I told him,
25   you know, we can resolve this if the prosecutor

27 (Pages 102 to 105)

## Page 106

1  would provide me with proof, with evidence and they
2  still did not give me anything. Then he just ended
3  the case and I didn't hear anything back from him.
4      Q.    What do you mean when you said he
5  ended the case?
6      A.    That was it, he just talked about the
7  severity of the case of the theft.
8      Q.    Was someone from the prosecutor's
9  office present during those appearances?
10     A.    Yes, he just wanted my fingerprint.
11     Q.    Did you give it?
12     A.    No.
13     Q.    Did you speak to anyone from the
14  prosecutor's office during those visits?
15     A.    No.
16     Q.    When was the next time after that
17  August 2017 court appearance that you heard about
18  anything related to the criminal charges against you
19  in Mercer County?
20     A.    I believe in February.
21     Q.    Of 2018?
22     A.    Yes.
23     Q.    What is it that you heard then?
24     A.    To appear in court again.
25     Q.    So I just want to make sure I have the

## Page 107

1  sequence right. When you showed up for June 2017 it
2  was because you received something in the mail, is
3  that correct?
4      A.    Correct.
5      Q.    When you showed up in July 2017, was
6  it also because you received something in the mail?
7      A.    It was because I got the ticket from
8  the judge.
9      Q.    While you were in court the first
10  time?
11     A.    Yes.
12     Q.    Did you separate from that receive
13  anything in the mail scheduling your appearance in
14  July 2017?
15     A.    I don't recall.
16     Q.    When you appeared in August 2017, did
17  you receive anything in the mail?
18     A.    I don't remember that. I remember
19  having the ticket that the judge gave me.
20     Q.    In February 2018, how did you learn
21  that there was something going on with the case?
22     A.    They sent me a letter in the mail.
23     Q.    It arrived in your Scotch Plains home,
24  your apartment?
25     A.    Yes.

## Page 108

1      Q.    What did that notice tell you?
2      A.    To appear in court.
3      Q.    It gave you a date to do that?
4      A.    Yes.
5      Q.    What was the date?
6      A.    I don't remember the date for that
7  exactly.
8      Q.    Was it for some day in February of
9  that year?
10     A.    Yes.
11     Q.    Did you appear at that court hearing?
12     A.    No.
13     Q.    Why did you not appear?
14     A.    Because I wrote a letter -- because I
15  was trying to put a case together to talk to the
16  judge and the prosecutor to see if they would listen
17  to me and if we could come to some kind of
18  understanding so they could see that I was innocent
19  because I wanted to plead my case with them so we
20  could come to an ending and they could drop it.
21     Q.    Is that what your letter was intended
22  to try to do?
23     A.    Yes, my letter to them was trying to
24  extend the date so I can have more time to talk to
25  them.

## Page 109

1      Q.    At that point in time, February 2018,
2  were you being represented by an attorney?
3      A.    No.
4      Q.    How did you send your letter?
5      A.    Express mail, but they had to --
6  certified.
7      Q.    Did you receive back any sort of
8  signed return receipt card from that mailing?
9      A.    Yes, online.
10     Q.    Do you know the date that you sent
11  that certified?
12     A.    No, I can look for it.
13     Q.    Do you know whether the court received
14  your letter before or after the date scheduled for
15  your next hearing?
16     A.    Yes.
17     Q.    What is your understanding about that?
18     A.    That they received it that day.
19     Q.    Of the hearing?
20     A.    Yes.
21     Q.    Did they proceed with the hearing even
22  though you weren't there?
23     A.    Yes.
24     Q.    Did you come to learn what the outcome
25  was of you not being there?

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 110

1    A.   Yes, he told me that when I went --
2    after I was incarcerated it was the same judge.  He
3    said he got the notice, my lawyer, but he got it
4    after the time that he issued a warrant.
5    Q.   I just need to back up for a minute
6    because I'm confused with our dates.  This hearing
7    and your letter were some six weeks or so I think
8    before you were arrested in Berkeley Heights, is
9    that correct?
10   A.   I don't know how many weeks before it
11   was.
12   Q.   Well, it was February of 2018 that
13   these events occurred in Mercer County, is that
14   right?
15   A.   Yes.
16   Q.   When did you first learn that
17   something occurred in Mercer County without you
18   being present?
19   A.   When I didn't appear.  When I wrote
20   the letter.
21   Q.   Were you further contacted by Mercer
22   County following that non-appearance?
23   A.   Yes.
24   Q.   How were you contacted?
25   A.   By mail.

Page 111

1    Q.   What type of mail did you receive
2    following that date?
3    A.   Just a regular mail.
4    Q.   What did it say to you?
5    A.   That they issued a warrant for me
6    because I didn't appear in court.
7    Q.   Did you understand there to be what is
8    known as a bench warrant issued for your arrest?
9    A.   No.
10   Q.   But you understood there was a warrant
11   issued, is that correct?
12   A.   Yes.
13   Q.   Prior to receiving that document, were
14   you aware that there was a warrant for you out of
15   Mercer County?
16   A.   No.
17   Q.   Did you do anything about that warrant
18   after receiving that piece of mail?
19   A.   I was just putting a letter together
20   to go and speak to the judge.  So that is what I was
21   working on.
22   Q.   Whatever became of that letter you
23   were working on?
24   A.   Well, I got incarcerated so I never
25   got to send the letter.

Page 112

1    Q.   The warrant that you received in the
2    mail, did you receive that in February of 2018?
3    A.   I believe --
4         MR. LANZA:  Objection.  I don't think
5    she testified to receiving a warrant, but receiving
6    a letter.
7    A.   Correct, a letter.
8    Q.   The letter informed you that there was
9    a warrant, is that correct?
10   A.   Yes.
11   Q.   You got that in February of 2018, is
12   that correct?
13   A.   Yes.
14   Q.   Did you ever receive a warrant itself?
15   A.   No.
16   Q.   Were you ever given a warrant at any
17   of your appearances in court?
18   A.   No.
19   Q.   Did you ever contact Mercer County and
20   ask for a copy of the warrant?
21   A.   No.
22   Q.   The letter that you were preparing
23   prior to your incarceration, did that letter ever
24   get completed and sent?
25   A.   No.

Page 113

1    Q.   The incarceration you are speaking
2    about would be the one that started with your arrest
3    in Berkeley Heights on the evening of April 4, 2018?
4    A.   Yes.
5    Q.   As I understood your earlier testimony
6    starting on April 5 of 2018, you were transferred to
7    the Somerset County Jail, is that correct?
8    A.   Yes.
9    Q.   You remained in the Somerset County
10   Jail for how long?
11   A.   Until Thursday morning.
12   Q.   Do you know how many total days you
13   were in the Somerset County Jail?
14   A.   Eight days.
15   Q.   Then it was, as I understood your
16   testimony, it was after you saw a judge that
17   following week that you were released in Somerset
18   County, is that correct?
19   A.   Yes.
20   Q.   What happened after that release?
21   A.   They said I have to go to Mercer
22   County.
23   Q.   So were you transferred from Somerset
24   to Mercer?
25   A.   I had to wait for someone from Mercer

062eda8d-87b5-433e-80a2-968e30d40ba9

## Page 114

1    to pick me up the following day.
2        Q.    What was the first day of your
3    incarceration in Mercer?
4        A.    A Thursday after the Wednesday. I
5    don't know the dates.
6        Q.    Well, your arrest in Berkeley Heights
7    on April 5, was that a Thursday?
8        A.    It was April 4 that night.
9        Q.    That was a Thursday, correct?
10       A.    I don't remember what day it is. I'd
11   have to look at my phone.
12       Q.    That's fine. How many days in total
13   were you in the Mercer County jail?
14       A.    I was in Mercer County from that
15   Thursday morning until that Monday midday.
16       Q.    On that Monday midday, were you back
17   in court?
18       A.    No.
19       Q.    Were you in court at all from that
20   Thursday through?
21       A.    I went to court that Friday morning.
22       Q.    What happened in court that day?
23       A.    The judge released me and told me I --
24   after we discussed everything and I got the public
25   defender, he released me to go and take my

## Page 115

1    fingerprints and gave me a court date to come back
2    with my lawyer after we discussed the case. So he
3    released me that Friday and told me I was going
4    home.
5        Q.    Did you leave the county jail on that
6    Friday?
7        A.    No.
8        Q.    You told me you left the county jail
9    the following Monday, is that correct?
10       A.    Correct.
11       Q.    Do you have any understanding why you
12   were not permitted to leave that Friday?
13       A.    They said at 9:00 o'clock that there
14   was an issue with the -- there was an issue with the
15   court system paperwork so I need -- they don't have
16   it at the desk so I'd need to find out from --
17   Saturday morning from I guess admissions or the
18   other part of the county jail that deals with the
19   paperwork so on Saturday morning I called. They
20   said that court is closed and they can't do anything
21   about it so I have to wait until Monday. So I used
22   my phone call to call the lawyer, couldn't get her
23   so I called my cousin and they asked Paul, Paul
24   Pitter, and he made some phone calls and was able --
25   they said that there was a glitch in the system and

## Page 116

1    then I was released on Monday, but nobody said what
2    it was.
3        Q.    Then you were released on that Monday,
4    is that correct?
5        A.    Yes.
6        Q.    Then at some point Mr. Berowitz
7    becomes your attorney for the cases in both Somerset
8    and Mercer County, is that correct?
9        A.    Yes.
10       Q.    What became of the case against you in
11   Mercer County?
12       A.    It was dismissed.
13       Q.    Do you have an understanding as to why
14   it was dismissed?
15       A.    Because I was innocent.
16       Q.    Did someone tell you that your case
17   was dismissed because you were innocent?
18       A.    No, they just said it was dismissed.
19       Q.    Were you ever present in court when
20   the prosecutor said that the state wanted to dismiss
21   against you?
22       A.    No, not the prosecutor. The judge.
23       Q.    Were you ever present in court when
24   the judge said your case is being dismissed?
25       A.    Yes.

## Page 117

1        Q.    Did the judge state why your case was
2    being dismissed in your presence?
3        A.    No, I don't remember.
4        Q.    As part of the current lawsuit that
5    you have against Lawrence Township and Detective
6    Radlinsky, have you personally reviewed the Lawrence
7    Township police investigation file?
8        A.    Yes.
9        Q.    Do you understand that as part of that
10   investigation Detective Radlinsky showed a
11   photograph to the victim that was involved in the
12   crime for which you were charged?
13       MR. LANZA: Object to the form of the
14   question. Our position is that that was not a
15   proper photo array or photo display. We don't know
16   what the detective did at that time so I object to
17   the form of that question, but you can answer it if
18   you can.
19       Q.    Can you answer my question, ma'am?
20       A.    No.
21       Q.    Do you have an understanding that as
22   part of the Lawrence Township police investigation
23   the victim involved in that alleged crime was shown
24   certain photos or photographs?
25       A.    Yes, it was stated.

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 118

1    MR. LANZA: Again, I interpose an
2 objection. I don't know anything about photographs.
3 I think the report said a photograph.
4    Q.   Do you have any knowledge or
5 understanding as to what photo the victim in the
6 Lawrence Township matter was shown?
7    A.   No.
8    Q.   Who is Dr. Magidson, M-a-g-i-d-s-o-n?
9    A.   That's probably one of the doctors --
10 I don't know.
11   Q.   Who is Dr. Ebon Gleimer,
12 G-l-e-i-m-e-r?
13   A.   I don't know.
14   Q.   Who is David Printz, P-r-i-n-t-z?
15   A.   I don't know.
16   Q.   Who is Dr. Douglas Brylka,
17 B-r-y-l-k-a?
18   A.   I do not know those doctors.
19   Q.   Who is Robert Yabaorn, Y-a-b-a-o-r-n?
20   A.   I don't know.
21   Q.   Since your charges against you were
22 dismissed both in Mercer and Somerset Counties, has
23 your relationship with Mr. Douglas Thompson and his
24 family improved?
25   A.   Yes.

Page 119

1    Q.   Has the situation at home with your
2 daughter improved?
3    A.   It is getting there.
4    Q.   The psychologist you told us about,
5 Mary Lance, was she your treating psychologist
6 before your daughter was treating with her?
7    A.   Yes.
8    Q.   You said you had one visit some period
9 of time ago, is that correct?
10   A.   I had a few visits some time ago, yes.
11   Q.   Well before the events of 2017 and
12 '18, right?
13   A.   Correct.
14   Q.   Have you been her patient since 2017?
15   A.   Not since 2017.
16   Q.   So whatever discussions you've had
17 with Mary Lance, has that been in connection with
18 her treatment of your daughter?
19   A.   It is both. The treatment of my
20 daughter plus me.
21   Q.   That is what I am asking. Have you
22 been her patient since 2017?
23   A.   Yes.
24   Q.   Have you had one visit or more than
25 one visit with her with you as the patient since

Page 120

1 2017?
2    A.   More than one visit.
3    Q.   Your last visit was in 2019, is that
4 right?
5    A.   Yes.
6    Q.   Over the last ten months, have you
7 attempted any telephone visit with her?
8    A.   No.
9    Q.   Have you asked for a telephone visit
10 with her?
11   A.   No.
12   Q.   Do you have any appointment presently
13 scheduled with her?
14   A.   Not at the moment.
15   Q.   The physical ailments you told us
16 about when you were having that chest pain, do you
17 associate any of those ailments with any stress you
18 were undergoing in your life that were separate from
19 the criminal matters?
20   A.   No.
21   Q.   Did you ever report to any of the
22 doctors where you treated for those ailments that
23 you were under stress related to your electrical
24 examination?
25   A.   No.

Page 121

1    Q.   Have you been given any medical
2 prescriptions for stress or any psychological
3 conditions?
4    A.   No.
5    Q.   Did you get into a car accident last
6 year?
7    A.   Yes.
8    Q.   Where was the car accident?
9    A.   Toms River.
10   Q.   Were you injured?
11   A.   Yes.
12   Q.   What part of your body?
13   A.   My shoulder.
14   Q.   Your left or your right?
15   A.   Left.
16   Q.   Miss any time from work?
17   A.   No, I got laid off.
18   Q.   Was that during the period while you
19 were laid off?
20   A.   Yes.
21   Q.   What month in 2019 did that happen?
22   A.   January.
23   Q.   So it is right after you got laid off,
24 within that month?
25   A.   Yes.

062eda8d-87b5-433e-80a2-968e30d40ba9

Page 122

1    Q.    What happened in the car accident?
2    A.    The car slid. The road was covered
3    with snow and it was almost going down an incline so
4    the car -- somebody slid before me. They parked in
5    the road. They pulled off to the side, but in the
6    road and my car went -- wouldn't divert to the sides
7    or anything so it went straight into the other
8    person's back and spun around.
9    Q.    Did your vehicle hit another vehicle?
10    A.    Yes.
11    Q.    Did the police respond?
12    A.    Yes.
13    Q.    Did you give a statement to the
14    police?
15    A.    Yes.
16    Q.    To your knowledge, did the other
17    driver give a statement to the police?
18    A.    Yes.
19    Q.    Could you still drive your car after
20    the accident?
21    A.    No.
22    Q.    Was it towed somewhere?
23    A.    Yes.
24    Q.    Was it subsequently repaired?
25    A.    No.

Page 123

1    Q.    Was it totaled?
2    A.    Yes.
3    Q.    So you got a new car?
4    A.    Yes.
5    Q.    Did you have any medical treatment as
6    a result?
7    A.    Yes.
8    Q.    Did you have medical treatment that
9    day?
10    A.    Yes, we went to the hospital.
11    Q.    Down in Toms River?
12    A.    Yes.
13    Q.    Do you know which hospital?
14    A.    No, don't remember.
15    Q.    Were you admitted or were you
16    discharged out of the ER?
17    A.    I was discharged out of the ER.
18    Q.    Did they take any X-rays or scans of
19    any part of your body at that visit?
20    A.    Yes.
21    Q.    Was it your left shoulder?
22    A.    No.
23    Q.    What was scanned?
24    A.    My left hand.
25    Q.    What was the outcome of the studies?

Page 124

1    A.    Nothing.
2    Q.    Came back negative for fracture?
3    A.    Yes.
4    Q.    Since that ER visit, have you had any
5    further medical treatment related to the injury in
6    that car accident?
7    A.    Yes.
8    Q.    Where else have you treated?
9    A.    At Summit Medical Group.
10    Q.    What sort of persons treated you or
11    did treat you at Summit?
12    A.    The orthopedics.
13    Q.    Which orthopedic doctor?
14    A.    Dr. Khose.
15    Q.    Spell his last name?
16    A.    K-h-o-s-e.
17    Q.    Have you been given a diagnosis for
18    the injury?
19    A.    No, just to get other tests done.
20    Q.    What tests?
21    A.    MRI.
22    Q.    For what body part?
23    A.    My shoulder.
24    Q.    Have you done that?
25    A.    Yes.

Page 125

1    Q.    When?
2    A.    I believe the end of 2019, yeah, 2019.
3    Q.    Do you know what the MRI showed?
4    A.    It said nothing was wrong, nothing was
5    broken.
6    Q.    When was the last time you treated
7    with anyone for the shoulder injury?
8    A.    I believe it was some time in 2019,
9    but I don't have the actual month.
10    Q.    Was it the orthopedic doctor?
11    A.    No, it was the neurologist.
12    Q.    What neurologist did you see?
13    A.    It was a referral for a neurologist at
14    Summit Medical Group. I don't know her name.
15    Q.    Was it one visit or more than one
16    visit with the neurologist?
17    A.    More than one visit.
18    Q.    Was that visit the last of those
19    visits also in 2019?
20    A.    Yes.
21    Q.    Have you had any treatment for the
22    shoulder injury during the current year?
23    A.    Yes.
24    Q.    Who and when?
25    A.    It was at Summit Medical Group. It

Page 126

was the -- I don't remember their name, but Dr. Khose referred it. Physical therapy.
Q. Did you go through physical therapy for your shoulder?
A. Yes.
Q. How many visits?
A. I believe six approximately.
Q. Have you hired a lawyer in connection with that car accident?
A. No.
Q. The days that you missed from your job in connection with having been incarcerated and court appearances, am I correct that whatever that total number of days are, those are the two reasons why those days were missed, either you were incarcerated or you were in one of the courthouses?
A. Yes.
Q. For example, if there was a day when you needed to meet with your lawyer, but you weren't in court, are you including that or not including that in the total number of days?
A. Not including that.
Q. We have information that you must have given us that prior to being laid off you were earning one hundred five dollars per day on your

Page 127

job, is that amount correct?
A. Yes.
Q. Now, if you had not missed those days from work due to incarceration and court appearances, do you have any knowledge or information that you would not have been laid off by your job in January of 2019?
A. That's my understanding of it.
Q. Aside from your understanding, has anyone told you that?
A. No, not other than when the other person got laid off because he was missing so many days of work.
Q. In your total count of the time missed from work, are you including the days that you needed to appear in the Berkeley courthouse?
A. Yes.
Q. Now, we have been given an amount of money that you paid in total to your attorney, Mr. Berowitz. It is a little over twelve thousand dollars. Does that amount sound correct to you?
A. It sounds close.
Q. Do you have checks that total that amount of money?
A. I can look, yes.

Page 128

Q. Is that how you paid Mr. Berowitz, was it by way of check?
A. Yes.
Q. Do you have invoices from Mr. Berowitz for the amounts that he billed you for his representation of you?
A. Yes.
Q. Do you know of that twelve or so thousand dollars how much of that billing was for his work done in the Somerset matter versus his work done in the Mercer matter?
A. If I look at the statements I probably can decipher.
Q. My understanding from what you told us before is that Mr. Lanza, you paid him roughly three thousand dollars for his representation of you in Berkeley Heights, is that right?
A. Roughly, yes.
Q. Do you also have cancelled checks for whatever amounts you paid to Mr. Lanza's law firm?
A. Not cancelled check. I can look in my statement.
Q. Meaning that you paid Mr. Lanza in some format different than a check?
A. No, in a check, but I can get my

Page 129

statement from the bank.
Q. Understood. There was some reference to you having paid three thousand seven hundred dollars roughly in a finance charge related to a loan. Do you know what I'm talking about?
A. Yes.
Q. Who was the lender for that loan?
A. Avant.
Q. Who is Avant?
A. A loan company.
Q. You told us earlier that you got a two thousand dollar loan from your dad, a two thousand dollar loan from a former co-worker, right?
A. Yes.
Q. What was the amount of your loan from Avant?
A. Approximately six thousand.
Q. In addition to paying Avant back the six thousand dollar loan, you've also paid them roughly three thousand seven hundred dollars in interest?
A. I believe so. I can printout that statement.
Q. Is that loan paid in full at this point in time?

Page 130

1       A.    Yes.
2       Q.    Your loan with your father, is that
3  paid?
4       A.    No.
5       Q.    Is it still two thousand dollars?
6       A.    Yes.
7       Q.    How about your friend?
8       A.    It's still unpaid.
9       Q.    And is it still the full amount?
10      A.    Yes.
11      Q.    Can we just take a two-minute break?
12  I just want to go through my notes. I may be done.
13            (Whereupon, a short recess has been
14  taken.)
15      Q.    Do you have any social media accounts?
16      A.    No.
17      Q.    Have you had any social media accounts
18  since 2017?
19      A.    No.
20      Q.    To your knowledge, has anything
21  related to your criminal matters in Somerset and
22  Mercer Counties been published in any way on any
23  social media?
24      A.    No.
25      Q.    To your knowledge, have there been any

Page 131

1  news articles about your matters?
2       A.    No.
3       Q.    That is all I have. Thank you.
4            MR. GUSS:  I have one question.
5
6            EXAMINATION
7  BY MR. GUSS:
8       Q.    This loan from Avant, I guess I must
9  have missed that in reviewing discovery. What was
10 the purpose of that six thousand dollar loan?
11      A.    To get Mr. Lanza.
12      Q.    All right, that is all I have. Thank
13 you.
14            MR. LANZA:  Thank you.
15
16            (Whereupon, the witness has been
17 excused.)
18            (Whereupon, the deposition was
19 concluded at 1:00 p.m.)
20
21
22
23
24
25

062eda8d-87b5-433e-80a2-968e30d40ba9

EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW JERSEY

3              CIVIL ACTION NO:   3:19-CV-14253-BRM-TJB

4  GEORGIA THOMPSON-EL,                :

5                   Plaintiff,         :

6       vs.                            :

7  GREEN BROOK TOWNSHIP, a             :

8  municipal corporation of New        :

9  Jersey; POLICE OFFICER              :

10 ANTHONY PEPE; LAWRENCE              :

11 TOWNSHIP, a municipal               :

12 corporation of New Jersey;          :

13 POLICE OFFICER JOSEPH               :

14 RADLINSKY and JOHN DOES 1-99,       :

15                Defendants.          :

16 --------------------------------x

17              VIDEOTAPED DEPOSITION OF:

18            POLICE OFFICER ANTHONY PEPE

19           DATE: MONDAY, FEBRUARY 15, 2021

20             COMMENCING AT 10:02 A.M.

21

22

23

24

25

**2**

```
 1        BEFORE RONDA L. REINSTEIN, a Certified Court
 2   Reporter and Notary Public of the State of New Jersey,
 3   at the offices of DiFrancesco, Bateman, Kunzman,
 4   Davis, Lehrer & Flaum, P.C., 15 Mountain Boulevard,
 5   Warren, New Jersey 07059, on Monday, February 15,
 6   2021, commencing at 10:02 a.m., pursuant to notice.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1   A P P E A R A N C E S :
 2
 3   LANZA & LANZA, LLP
 4   BY: JOHN R. LANZA, ESQUIRE
 5       5 Main Street
 6       Flemington, New Jersey 08822
 7       (908) 782-2600
 8       Jrlanza@lanzaandlanza.com
 9   Attorneys for the Plaintiff
10
11   DiFRANCESCO, BATEMAN, KUNZMAN, DAVIS,
12   LEHRER & FLAUM, P.C.
13   BY: RICHARD J. GUSS, ESQUIRE
14       15 Mountain Boulevard
15       Warren, New Jersey 07059
16       (908) 757-7800
17       Rguss@newjerseylaw.net
18   Attorneys for the Defendants
19   Green Brook Township and
20   Police Officer Anthony Pepe
21
22
23
24
25
```

**4**

```
 1   A P P E A R A N C E S :
 2
 3       ECKERT, SEAMANS, CHERIN & MELLOTT, LLC
 4   BY: JASON S. FEINSTEIN, ESQUIRE
 5       Princeton Pike Corporate Center
 6       2000 Lenox Drive
 7       Suite 203
 8       Lawrenceville, New Jersey 08648
 9       (609) 989-5057
10       Jfeinstein@eckertseamans.com
11   Attorneys for the Defendants
12   Lawrence Township and
13   Police Officer Joseph Radlinsky
14
15
16   ALSO PRESENT:
17   PATRICK BRASK, Foreshore Media
18   NICK MARCHESI, Foreshore Media
19
20
21
22
23
24
25
```

**5**

```
 1            I N D E X
 2   WITNESS        DIRECT CROSS REDIRECT RECROSS
 3   POLICE OFFICER
 4   ANTHONY PEPE
 5   BY MR. LANZA      8      137, 146
 6   BY MR. FEINSTEIN       119
 7   BY MR. GUSS       131      144
 8
 9
10          E X H I B I T S
11   NUMBER   DESCRIPTION              PAGE
12   P-1    Complaint -Warrant        7
13   P-2    Green Brook Police        7
14          Supplementary Report
15          #17079154/2
16   P-3    Photocopies of Screenshots    7
17          from Bonefish Grill,
18          Bates Stamped GB 029
19          through GB 041
20   P-4    DVDs Bates Stamped GB 180,    7
21          086 and 087
22   P-5    DMV Photograph of Georgia    7
23          Thompson
24   P-6    Notification Bulletin,      7
25          "Credit Card Fraud/Theft"
```

6

```
1            EXHIBITS
2  NUMBER   DESCRIPTION            PAGE
3  P-7      Photocopy of Information    7
4           Inquiry
5  P-8      Attorney General Guidelines  7
6  P-9      Supplemental Narrative Report of  7
7           Detective Joseph D. Radlinsky
8  P-10     Transcript of Grand Jury    7
9           Testimony of Officer Anthony
10          Pepe
11 P-11     Somerset County Prosecutor's  17
12          Office Screening Decision,
13          Bates Stamps 016 through 021
14 P-12     DMV Photograph of Douglass   87
15          Thompson
16          (EXHIBITS NOT ANNEXED HERETO)
17
18
19
20
21
22
23
24
25
```

7

```
1  (P-1, Complaint -Warrant; P-2, Green
2  Brook Police Supplementary Report #17079154/2; P-3,
3  Photocopies of Screenshots from Bonefish Grill, Bates
4  Stamped GB 029 through GB 041; P-4, DVDs Bates Stamped
5  GB 180, 086 and 087; P-5, DMV Photograph of Georgia
6  Thompson; P-6, Notification Bulletin, "Credit Card
7  Fraud/Theft"; P-7, Photocopy of Information Inquiry;
8  P-8, Attorney General Guidelines; P-9, Supplemental
9  Narrative Report of Detective Joseph D. Radlinsky;
10 P-10, Transcript of Grand Jury Testimony of Officer
11 Anthony Pepe, marked for identification.)
12          THE VIDEOGRAPHER: My name is Patrick
13 Brask. I'm a legal videographer employed by Foreshore
14 Media, located at 149 Ocean Avenue, Island Heights,
15 New Jersey. The court reporter is Ronda Reinstein
16 from Jacqueline Klapp.
17          Today's date is Monday, February 15th,
18 2021. The time is 10:02 a.m.
19          We are at the Law Offices of DiFrancesco,
20 Bateman located at 15 Mountain Boulevard, Warren,
21 New Jersey. And we are here to videotape the deposition
22 of Mr. Anthony Pepe. The caption of the case is
23 Georgia Thompson-El vs. Green Brook Township, et al.
24          Will each of the attorneys please
25 identify themselves and state their interest in the
```

8

```
1  case?
2          MR. LANZA: My name is John R. Lanza. I
3  have the privilege of representing Ms. Thompson in
4  this litigation.
5          MR. GUSS: Good morning. My name is
6  Richard Guss, G-U-S-S. I represent Officer Pepe and
7  the Township of Green Brook.
8          MR. FEINSTEIN: Good morning. This is
9  Jason Feinstein from the Law Firm of Eckert Seamans.
10 And I represent Defendants Lawrence Township and
11 Joseph Radlinsky.
12          THE VIDEOGRAPHER: The court reporter
13 will now swear in the witness and we can begin.
14 OFFICER ANTHONY PEPE, Green Brook
15 Township Police Department, 109 Greenbrook Road, Green
16 Brook, New Jersey 08812, having been duly sworn
17 according to law, testifies as follows:
18 DIRECT EXAMINATION BY MR. LANZA:
19     Q.  Good morning, Officer. My name is John
20 Lanza. I'm a lawyer. I represent Georgia Thompson
21 in certain litigation that has been filed against you
22 and others. And we're here today to take your
23 deposition in that litigation.
24          If I state a question you do not
25 understand or hear, say so. I will repeat it or
```

9

```
1  rephrase it, whatever is necessary so that you hear
2  and understand the question.
3          Do you have any questions of me or your
4  attorney before we start?
5     A.  No.
6     Q.  Sir, as a trained police officer, you
7  are involved in investigations, correct?
8     A.  Yes.
9     Q.  You investigate crimes?
10    A.  Yes.
11    Q.  And as a result of those investigations,
12 you issue warrants and affidavits of probable cause?
13    A.  Well, as far as indictables?
14    Q.  Yes.
15    A.  They have to be screened first through
16 the Somerset County Prosecutor's Office before
17 they're actually approved.
18    Q.  All right. Now, the Somerset County
19 Prosecution's Office, or the person who does the
20 review, would be relying on your investigation as a
21 result or the results of that investigation in order
22 to review the matter and issue a warrant, or summons
23 or warrant --
24    A.  Yeah.
25    Q.  -- or complaint?
```

10

1    A.    They would look at it. And they would
2  review what I have and determine whether or not there
3  is substantial evidence, probable cause, to issue.
4    Q.    As a trained police officer, what is
5  your understanding of the term probable cause; what
6  does that mean?
7    A.    Probable cause is, essentially you have
8  enough evidence or infractions to pursue further an
9  investigation, or to stop somebody if you're doing a
10  motor vehicle stop.
11    Q.    What is your -- what was your
12  understanding in September of -- September 21st,
13  2017, when you issued the Affidavit of Probable Cause
14  in the matter of The State of New Jersey vs. Georgia
15  Y. Thompson?
16    A.    My understanding was that I had enough
17  evidence obviously to screen it, because I was
18  confident enough that she was one of the suspects, to
19  screen it to the Somerset County Superior Court,
20  which is what we have to do by policy.
21    Q.    As a result of your investigation, you
22  signed and issued an Affidavit of Probable Cause?
23    A.    Yes.
24    Q.    And you swore that the statements made
25  in your affidavit were true?

11

1    A.    Yes.
2    Q.    Sir, I'm going to show you what -- well,
3  first of all, is there anything else you would like
4  to add as far as your understanding of what probable
5  cause means?
6    A.    No.
7    Q.    Sir, I'm going to show you what I've
8  marked P-1 for identification, which is a group of
9  documents, pages 1 through 7, and ask if you can
10  review that, please.
11    A.    Okay.
12    Q.    The first page, can you first of all
13  identify what that is, sir?
14    A.    The Complaint - Warrant.
15    Q.    In which case?
16    A.    State versus -- The State of New Jersey
17  vs. Georgia Thompson.
18    Q.    Did you sign a certification on the
19  first page?
20    A.    Yes.
21    Q.    The date of your certification is
22  9-21-2017?
23    A.    Yes.
24    Q.    You charged Ms. Thompson with five third
25  degree offenses?

12

1    A.    Yes. These were the -- those were the
2  charges that were sent from the Somerset County
3  Prosecutor's Office.
4    Q.    And as a result of the Complaint -
5  Warrant, in that Complaint, those five charges would
6  total a maximum jail time of 25 years?
7    A.    I'm not sure of the years as far as...
8    Q.    Is it your understanding, or are you
9  aware, that a third degree offense in the state of
10  New Jersey carries a penalty of between three to five
11  years in prison?
12    A.    I wasn't -- I don't really know the time
13  frame of essentially each charge, you know, I believe
14  with them being pleaded down and whatnot.
15    Q.    When were you first assigned the
16  investigation -- first of all, were you assigned to
17  investigate the charges or the incidents that
18  occurred and are referred to on the first page of
19  P-1? Would it help you --
20    A.    April. Yeah. Do you have the report in
21  front of you?
22    Q.    Yes. I'm going to show you what we
23  marked as P-2 for identification and ask if you can
24  identify that.
25    A.    Sure. Do you want the date now or the

13

1  report that this is --
2    Q.    Excuse me. I didn't mean to talk over
3  you.
4    A.    No problem.
5    Q.    Why don't we start with your
6  identification of P-2.
7    A.    Supplemental Report?
8    Q.    Yes.
9    A.    Yep, Supplemental Report.
10    Q.    Is that the report that you authored in
11  this matter?
12    A.    Yes.
13    Q.    Did you author any other reports?
14    A.    As far as, like, a screening packet
15  and...
16    Q.    Any other official reports of your
17  investigation?
18    A.    Yeah. There's a screening packet.
19  There is -- I mean, I guess this affidavit would
20  technically -- technically be somewhat of a report, a
21  pre-synopsis of it.
22         But going back to what you were saying,
23  yes, this is a supplemental report. And I followed
24  up. The date I followed up with this from the
25  initial report was on April 13th of 2017.

14

1    Q.    All right. Looking at P-2, a
2    Supplementary Report, Number 1709154/2. Did you
3    issue any other supplementary reports other than this
4    report, P-2?
5    A.    No. It was the only supplemental report
6    I have.
7    Q.    Referring to the narrative. When were
8    you first assigned this investigation?
9    A.    It would be April 13th.
10    Q.    And when was it that you issued your
11    supplementary report?
12    A.    I'm sorry, what was that?
13    Q.    When was the date that you issued your
14    supplemental report?
15    A.    The date I issued it?
16    Q.    If you look at the bottom of the first
17    page, it says, "Reporting Officer, OFC Anthony Pepe."
18    A.    Yes.
19    Q.    That's you, correct?
20    A.    Yeah.
21    Q.    And it says -- under it, it says,
22    "04/14/2017."
23    A.    So that would be the next day.
24    Q.    Is that when you issued this report?
25    A.    I'm not sure if that was the day I

16

1    County sending down what to charge these individuals
2    with. If it's not that day, it would be -- I would
3    take a look at that to see if there's a date on it.
4    But as far as my recollection, I don't -- I don't
5    recall.
6    Q.    First of all, you mentioned the
7    screening process. Can you describe that process for
8    me, please?
9    A.    Sure. If you have -- do you have the
10    form on you, so I can -- to get a better idea so I
11    can go off the form.
12    Q.    Yes.
13    A.    Thank you.
14    Q.    Let me see if I have it marked already.
15    I may or may not have it marked. But if I don't we
16    can mark it. Let me just check my records.
17    A.    What's that right there? Is that the
18    screening packet?
19    Q.    Yes. That's the -- this is a something
20    entitled, "Somerset County Prosecutor's Office
21    Screening Decision."
22    A.    Yeah, yep.
23    Q.    Okay. I'm just going the see if I
24    marked that, or we have to mark it.
25         We're going to have to mark this, if

15

1    issued it or the day I finished it.
2    Q.    Well, let's put the day you finished it.
3    A.    Okay. We'll do April 14th.
4    Q.    So you had this case for approximately
5    24 hours before you issued your report?
6    A.    Correct.
7    Q.    And in this report you name two
8    suspects, correct?
9    A.    Correct.
10    Q.    Douglass E. Thompson, correct?
11    A.    Correct.
12    Q.    And Georgia Y. Thompson, correct?
13    A.    Correct.
14    Q.    So in 24 hours, you were able to
15    complete your investigation and issue your report
16    listing the Thompsons as the offenders, correct?
17    A.    That is correct; however, that wasn't
18    the completion of the actual investigation. It does
19    -- it is kind of the start of it.
20    Q.    All right. What was the completion of
21    the investigation?
22    A.    April? So I would say it -- well, I had
23    to subpoena bank records or credit card information.
24    The day that I issued -- it would be -- you should
25    have a piece of paper in there as far as Somerset

17

1    that's what you're referring to.
2         MR. GUSS: Counsel, do you want me to
3    make a copy?
4         MR. LANZA: If you don't mind. It
5    appears to be Green Brook Bates stamped 016 to 021.
6         MR. GUSS: Okay, got it. I'll go make a
7    copy. We can go off the record.
8         MR. LANZA: Yes, thank you.
9         THE VIDEOGRAPHER: We're going off
10    camera. The time is 10:14 a.m.
11         (Brief recess was taken.)
12         (P-11, Somerset County Prosecutor's
13    Office Screening Decision, Bates Stamps 016 through
14    021, marked for identification.)
15         THE VIDEOGRAPHER: We are back on camera.
16    The time is 10:17 a.m.
17    Q.    Officer Pepe, I'm going to show you what
18    we marked P-11 for identification and ask if you can
19    identify that.
20    A.    Okay.
21    Q.    Can you identify what it is?
22    A.    Yes. It's the Somerset County
23    Prosecutor's Office Screening Decision. It's our
24    screening form.
25    Q.    Can you explain what the screening

18

1  process is?
2  A.  Sure. So you screen -- so you put all
3  your information as far as we have in your
4  investigation on this form. And you have to do this
5  form in order to -- to get charges -- not just this
6  form, but it's basically notifying either one of the
7  on-call assistant prosecutors or the one that's
8  actually in the office at that time what you're
9  seeking as far as your investigation. It basically
10 is a notification or a heads-up to them.
11 Q.  What do you provide to the some Somerset
12 County Prosecutor's Office for the Screening
13 Decision, the screening process?
14 A.  Do you want, like, what am I -- what was
15 I asking?
16 Q.  Well, what documents do you provide
17 first?
18 A.  Um. So you've got to provide them with
19 the investigation reports. Um. You have to provide
20 them with obviously this form. Um, let me see what
21 else. I have to -- I actually had to e-mail, because
22 this was actually e-mailed up, I believe. So there
23 should be an e-mail receipt, if you have that. Then
24 I could tell you specifically what I sent to them.
25 Q.  Was it you that filled out --

19

1  A.  I filled this out, correct.
2  Q.  -- the screening --
3  A.  Yep, yes.
4  Q.  -- document?
5  A.  Correct. Basically just their -- so the
6  defendant information is their information, their
7  addresses DL numbers. Basically a synopsis, like, of
8  the incident is on the last page.
9  Q.  So you submit the Somerset County
10 Prosecutor's Office Screening Decision -- you prepare
11 the document and you submit that with your
12 investigation reports?
13 A.  Correct.
14 Q.  What reports did you submit in
15 Ms. Thompson's screening process?
16 A.  To the best of my recollection, like I
17 said, there should be an e-mail printout. But it was
18 -- this is what they want. So every time it's the
19 investigation reports, screening packet, essentially
20 basically information -- any information, things
21 pertinent to it. And if they want more, they usually
22 request more. Which if you look -- you probably
23 looked through the case file where they asked for
24 this or that. And that's all prior to even getting a
25 charge approved.

20

1  Q.  Now, P-1, the Complaint - Warrant, where
2  in the process was this Complaint - Warrant issued;
3  was that before or after?
4  A.  This was on September 21st of 2017.
5  Q.  Would that be before or after the
6  screening decision?
7  A.  It would be before.
8  Q.  Was this part of the packet that you
9  submitted to the Somerset County Prosecutor's Office?
10 A.  This, as far as part of the screening,
11 it would -- you wouldn't have this until it was
12 screened.
13 Q.  When you say "this" you're referring to
14 --
15 A.  Okay. So you wouldn't have -- I'm sorry
16 to talk over you. I know what you were going to ask.
17      So you wouldn't have the screening
18 packet done after the complaint was being issued,
19 because this is to assist with all the information
20 that you have thus far in the investigation to the
21 Somerset County Prosecutor's Office to an assistant
22 prosecutor to review everything to get to this. This
23 would be the final, like, one -- at the final stage.
24 Q.  All right. What documents did you
25 author in -- to submit to the Somerset County

21

1  Prosecutor's Office in order for them to issue the
2  screening decision?
3  A.  What? What did I send them?
4  Q.  Yes. The documents that you authored
5  that were sent and provided to the Somerset County
6  Prosecutor's Office.
7  A.  To the best of my recollection, I'm
8  pretty sure they had the case file.
9  Q.  The case file consists of what?
10 A.  The reports, DMV printouts, pictures,
11 all of the bank records, the subpoenas for the bank
12 records, the fraudulent purchase receipts from the
13 stores that the stolen cards were you used, pictures
14 of those transactions.
15      I mean, there's -- I mean, I'm sure you
16 saw the case file. I'm sure there's a lot in there.
17 Q.  I saw what was given to us, yes.
18 A.  So, to the best of my recollection,
19 there was, like I said, printouts of DMV information,
20 reports.
21 Q.  Okay.
22 A.  I mean, there was quite significant
23 paperwork.
24 Q.  Anything else that you recall?
25 A.  At this point, to the best of my

22

1  knowledge, I can't really put a finger on what else
2  was in there. There was a lot of stuff in there.
3      Q.    Now, the Complaint - Warrant that you
4  signed and certified to, when in the process was this
5  issued?
6      A.    When was this issued?
7      Q.    Yeah. The Complaint - Warrant.
8      A.    The complaint?
9      Q.    Yeah.
10     A.    Okay. This was issued on September 21st
11 of 2017.
12     Q.    Was that before or after you submitted
13 the information to the Somerset County Prosecutor's
14 Office for the Screening Decision?
15     A.    So everything pertaining to the
16 Screening Decision was sent prior to this. If they
17 sent charges, which -- so they approve charges, all
18 right? You're following, correct?
19     Q.    Yes.
20     A.    Okay. So all the information that I
21 have with the investigation that I put together, I
22 sent to the Somerset County Prosecutor's Office. An
23 AP reviews all that information prior to a complaint
24 being issued.
25          If for some reason they want more as far

23

1  as prior to grand jury, or if they want more as far
2  as prior to a trial, they'll continue -- continuously
3  ask if they want anything else so...
4      Q.    Was there any other investigator that
5  was involved in the investigation of the incident on
6  April 8th, 2017, that's referred to in P-1, the
7  Complaint - Warrant, other than yourself?
8      A.    As far as on April 8th?
9      Q.    Yes.
10     A.    The initial responding officers, is what
11 you're asking?
12     Q.    Well, anyone else, yes.
13     A.    Of course.
14     Q.    After it was assigned to you, the
15 investigation was assigned to you, were there any
16 other officers or detectives that investigated the
17 incident of 4-8-2017?
18     A.    I had assistants, correct.
19     Q.    Who were your assistants?
20     A.    There was a Detective Mauer. He
21 assisted with my investigation. We had a -- he's not
22 the lieutenant detective anymore. But he -- if I had
23 a question as far as -- I was -- so I was -- I don't
24 know if you're aware, but I was in a position called
25 Special Operations. Were you aware?

24

1      Q.    What does that --
2      A.    Special Operations?
3      Q.    What does that mean, special operations?
4      A.    So basically I supplemented at that
5  point the Detective Bureau. So it was an educational
6  spot, per se. So it was learning the ropes as far as
7  paperwork and, you know, conducting an investigation.
8          So I did have questions obviously as far
9  as, you know, filling out a subpoena, bank record,
10 or, you know, paperwork for the bank records.
11         As far as getting surveillance or
12 pictures, that was a new realm for me as well, so I
13 had Detective Mauer help me with that.
14     Q.    Anyone else?
15     A.    As far as after I took the investigation
16 from the initial officers, or do you want the names
17 of the initial officers that were there that kind of
18 -- that essentially got the initial information?
19 Because there was initial -- the initial responding
20 officers were able to get, like, registrations and
21 review the video at the establishment and pass it
22 along to the Bureau.
23     Q.    I'm going to show you what I've marked
24 P-4 for identification and ask if you can identify
25 that?

25

1      A.    Sure.
2      Q.    What is P-4?
3      A.    This is the initial report, as I was
4  stating before.
5      Q.    And who prepared that initial report?
6      A.    This would be from -- initially was
7  Officer Kula.
8      Q.    Okay. Referring to the initial report
9  from Officer Kula, as part of your investigation and
10 your submission to the Somerset County Prosecutor's
11 Office, did you rely on the information in this
12 report?
13     A.    Yes.
14     Q.    Was this report part of the
15 investigation in this matter?
16     A.    Correct.
17     Q.    Okay. Referring to the report, this is
18 -- so what I've just handed you.
19     A.    Yes.
20     Q.    Okay?
21     A.    Yep, yes.
22     Q.    There's a time -- date time reported.
23 It says 19:29:04.
24     A.    Correct.
25     Q.    That is approximately 7:29 p.m.?

26

1    A.    Correct.
2    Q.    What does it mean the date time
3 reported?
4    A.    Date and time reported, that was the
5 incident time.
6    Q.    Would that be when it was called into
7 the police department? I'm not trying to trick you
8 or anything, Officer. But you'll see right next to
9 that it says, "Date time occurred."
10    A.    That's when it happened, yes, correct.
11 I believe this was when they assigned the report.
12    Q.    Okay.
13    A.    The date and time it occurred is the
14 incident date and time.
15    Q.    All right. So we have the date and time
16 occurred is the incident date and time. And the date
17 and time reported, if I understand you, this would be
18 the date that your office was notified -- first
19 notified about the --
20    A.    Dispatched, correct. Thank you for
21 clarifying that.
22    Q.    If you have any questions, please feel
23 free to ask. Your attorney is here. We can clarify
24 that for you, okay?
25         One -- just a cautionary thing for

27

1 purposes of the record. We can't both speak at the
2 same time. So let me finish my question and then you
3 give your answer. I'll let you finish. This is for
4 purposes of a clear record and the court reporter can
5 get that, okay?
6    A.    Awesome.
7    Q.    So getting back to your -- P-4, I
8 believe, the initial incident report that was
9 authored by Officer Kula. It was reported at 7:29
10 p.m. that there was an incident, correct?
11    A.    Correct.
12    Q.    And in a narrative Officer Kula sets
13 forth essentially what his investigation entailed, or
14 what he gleaned or got from his investigation,
15 correct, a brief summary?
16    A.    He's the reporting officer. But there
17 was Sergeant Skikus, Officer Seidel, Officer
18 O'Connor, and obviously Officer Kula that did the
19 initial -- they were the initial responding officers.
20    Q.    Okay. It says in the first paragraph,
21 and I quote -- I guess it's the third sentence --
22 "Lee stated she was sitting at a table inside of the
23 establishment and she felt an unknown individual bump
24 into her," correct?
25    A.    Correct.

28

1    Q.    And Lee is the victim, Tracy Ann Lee,
2 correct?
3    A.    Correct.
4    Q.    It states, "She didn't think much of it
5 at the time it occurred," correct?
6    A.    Correct.
7    Q.    Then going down to the next paragraph,
8 "When she received her bill for her dinner, she
9 grabbed her purchase which was laying on an empty
10 chair next to her to retrieve her wallet," correct?
11 That would be the first --
12    A.    Correct.
13    Q.    -- and second paragraph.
14         So thus far we have an unknown
15 individual bump into the -- into her, and she
16 completed her dinner, at least to the point where she
17 received her bill, correct?
18    A.    Correct. I'm not sure if she completed
19 her dinner or not, but correct.
20    Q.    All right. But she -- she did receive
21 her bill for dinner. And up to that point there was
22 no -- there was no record of anything being wrong,
23 correct?
24    A.    Correct.
25    Q.    Then it says, "She observed that her

29

1 wallet was not inside of her" -- "of her purse, but
2 knew she previously had her wallet with her,"
3 correct?
4    A.    Correct.
5    Q.    All right. So she -- she noticed that
6 her wallet wasn't there, then she looked around the
7 restaurant and then she found her wallet laying on
8 the floor under the chair where the purse was
9 located, correct?
10    A.    Correct.
11    Q.    "At this time, she observed there were
12 multiple credit cards missing from her wallet."
13         So from the time she felt her bump,
14 there were certain activities that she was involved
15 in trying to find her credit cards, correct?
16    A.    Correct.
17    Q.    Then she listed she had her stolen
18 credit cards or her charge cards, correct?
19    A.    Correct.
20    Q.    Then she received an alert that her --
21 from Chase in regards to possible fraudulent activity
22 on her credit cards, correct?
23    A.    Correct.
24    Q.    All right. So people were already using
25 her credit card while she was in --

A. Looking around --
Q. Yes.
A. Looking around for her cards.
Q. Okay. And upon contacting Chase, they advised Lee that someone attempted to make a -- well, you have to flip back because these weren't in order, mine weren't -- to make a purchase at Target in Watchung and the Walmart, correct?
A. Correct.
Q. All right. So while she was there, she's getting calls that -- or notices that her credit card is being used at Walmart and also at the Target store, correct?
A. Let me just look.
Q. Take your time.
A. This was out of order.
Q. Yeah. That's we were going by the Bates stamps.
A. That's why.
Q. Yeah.
A. Yeah. So shortly after she noticed the cards were gone she got an alert.
Q. Okay. So at some point in time your office was contacted regarding a potential theft of a credit card, right?

A. I'm sorry, it fell off. Did you hear me last time? All right. Can you repeat that?
MR. LANZA: Can you repeat the question, please?
(Previous question read.)
A. We were contacted?
Q. Yeah. It was reported on 4-8-2017 at 19:29 hours that something occurred at the Bonefish Grill, right?
A. Correct. Yeah, 18:29. 18:29 was the date and time occurred.
Q. 19:29, correct?
A. That was the --
Q. Reported. That's when it was reported.
A. Well, it occurred on -- at 18:29.
Q. That's when it occurred. But I'm talking about when it was reported. It was reported at 7:29 p.m., right? I'm just looking at the report.
A. Yeah, I get what you're saying. I'm not sure if there was a discrepancy between the time that it actually occurred and the time that the report was generated.
Q. Well, the time occurred, referring to Michael Kula's report, has between 6:29 p.m. and 7:29 p.m., correct? 4-8-17, 18:29 hours to 19:29 hours.

Again, it's on the first page.
A. Oh, correct. That's the time they spent on the call.
Q. Okay. Well, let's go back. I don't want to confuse you, sir. But there are two times on the front page of the report. One says "Date/Time Reported." We've established that that was the time that the incident was called into your department, correct?
A. Do we have the -- do we have the CAD printout? Because that would -- that would clarify this. Because I understand what you're saying, but I'm not too certain as to if 18:29 was the hour when they got the initial call, and the time from 19:29 was how long until they closed out the call.
Q. Do you ever fill out these initial reports?
A. Correct. This is -- this is auto-populated into the report. So if there's a CAD printout, that would tell you exactly, like, step-by-step with responding, when they got there.
Q. All right. Well, okay. Well, let's just go by what -- what the official initial report says. It says 4-8-17, 19:29 hours for date time reported, correct?

A. Correct.
Q. So based on this report, your office was first contacted at about 7:29 p.m. on 4-8-2017, correct?
A. Approximately.
Q. All right. Now, referring to page 4 of the initial report, it states, "An employee was able to obtain two New Jersey registrations of the vehicles they believe the actors left in." Okay?
A. Correct.
Q. Who is the employee who took the registrations?
A. Well, unfortunately, they didn't get that employee's info, the initial responding officers. However, as I tried to follow up on both occasions, the witness didn't want to come forward for some reason.
And also they were, like, changing hands, this restaurant, so it was impossible to actually get that witness's information, unfortunately.
Q. Are you saying that the Bonefish Grill didn't have a list of the employees that were working the evening of this investigation?
A. I'm sure they did; however, when I asked

34

1  for that information, it basically just didn't come
2  full circle as far as getting that individual's name.
3      Q.   Wouldn't it be important? Wouldn't that
4  person have been a witness?
5      A.   Absolutely. It would have been
6  important. However, that's not just one part of the
7  investigation.
8      Q.   Well, other than the registration for
9  Ms. Thompson's vehicle, what other evidence did you
10 have that she was even there?
11     A.   Well, I have watched the video
12 surveillance there. And then we had pictures of
13 individuals coming and going. And up until I -- when
14 I tried to call her too, she was dismissive about
15 being there.
16     Q.   Well, that's -- well, wait a second.
17 You called her on the phone, right?
18     A.   Later on, correct.
19     Q.   You had her phone records, or at least
20 you had her phone number?
21     A.   Correct.
22     Q.   That's how you called her, right?
23     A.   Correct.
24     Q.   How did you get that?
25     A.   Google search.

35

1      Q.   So you got her cellphone number?
2      A.   I had a phone number for her.
3      Q.   Okay. So you call her, okay. What --
4  in substance, what did you say to her, and what did
5  she say to you?
6      A.   When I spoke to her on the phone, I
7  asked her about the incident regarding the Bonefish
8  Grill. She was dismissive.
9      Q.   So dismissive, what do you mean? Did
10 she admit it or deny it?
11     A.   She denied it, and argumentative on the
12 phone and then hung up on me.
13     Q.   Is that all that happened?
14     A.   Yep.
15     Q.   Did she say anything else?
16     A.   Oh, she did say that she was out of the
17 country. I don't know why she said that.
18     Q.   Did she say country or county?
19     A.   She said country.
20     Q.   Did you record that?
21     A.   I was actually sitting in front of the
22 computer as I was on the phone with her.
23     Q.   You didn't record it?
24     A.   I did write it down on a sticky note.
25     Q.   Now, you called her out of the blue,

36

1  correct?
2      A.   I wouldn't say out of the blue, no.
3      Q.   When you called her, did she have any
4  notice that she was involved in an incident at the
5  Bonefish Grill on 4/8/17?
6      A.   That was her notice.
7      Q.   When you called her?
8      A.   Correct.
9      Q.   So up to that point she didn't know she
10 was involved or at least a suspect in anything,
11 correct?
12     A.   I mean, I can't speak for her so I'm not
13 sure what her standpoint is.
14     Q.   Well, what contact does the
15 investigating officer, are you aware of, that was
16 made before your phone call?
17     A.   From another officer? No one. None.
18     Q.   Just you?
19     A.   Correct.
20     Q.   All right. Is there any reason you
21 didn't personally go to her house to question her?
22     A.   To the best of my recollection, I
23 believe we drove by her house.
24     Q.   Did you stop in?
25     A.   We did stop. We did go to her house.

37

1  As far as leaving a note, I'm not too certain.
2      Q.   When you say "we," who is we?
3      A.   Me and the detective.
4      Q.   So you drove to her residence, I
5  believe, in Scotch Plains?
6      A.   Scotch Plains, correct.
7      Q.   And did you leave a note or anything?
8      A.   I'm not sure. To the best of my
9  recollection, typically I would leave a card with
10 obviously our information on it. It's got the, you
11 know, Green Brook Police card. And like a note,
12 like, please contact the police department.
13     Q.   Do you have a record of that? Does that
14 appear anywhere in your official report that you did
15 that?
16     A.   I don't believe so.
17     Q.   Now, do you think it's reasonable or
18 unreasonable that an individual would not engage in a
19 conversation over the phone with someone who
20 identified themselves as a police officer?
21     A.   I would say yes and no. Because all I
22 asked her was to talk about the incident, to come
23 down to police headquarters at her convenience, to
24 the police department. So, I mean, I wasn't --
25 obviously I wasn't getting into questions over the

38

1  phone.
2      Q.   Did you send any other police officer,
3  like from Scotch Plains, her hometown, and ask that
4  police officer to please contact her and say that you
5  were doing an investigation, to either expect a phone
6  call or expect another phone call?
7      A.   No.
8      Q.   Do you think it would have been
9  important for you to make a physical observation of
10  Ms. Thompson before you charged her with something
11  that could lead to her being 25 years in prison?
12     A.   I was confident as far as what I had at
13  that point where I didn't have to physically see her.
14     Q.   Do you know what hairdo she was wearing
15  on 4-8, whether it matched the people -- the person
16  that you say is in these photographs?
17          MR. GUSS: Objection.
18          MR. LANZA: All right. Off the record.
19          THE VIDEOGRAPHER: We're going off
20  camera. The time is 10:44 a.m.
21          MR. GUSS: This report says "video" and
22  not photographs.
23          MR. LANZA: Okay. Thank you, sir. I
24  stand corrected.
25          THE VIDEOGRAPHER: We are back on camera.

39

1  The time is 10:44 a.m.
2      Q.   You, in your investigation, actually
3  reviewed videos?
4      A.   Correct.
5      Q.   What videos did you review as part of
6  your investigation?
7      A.   So I had -- the video that I reviewed
8  was the initial Bonefish Grill. The video
9  surveillance wasn't interior; it was exterior at the
10  door. And I reviewed with video from Target and -- I
11  believe it was Walmart. Do you have the report so I
12  can confirm that? Because there's quite a few. Oh,
13  my report. I'm sorry. I might have it, actually.
14          Bonefish, Bonefish video. There was a
15  Walmart video and Target. Target.
16     Q.   You reviewed all those videos?
17     A.   Correct.
18     Q.   First let's go with the Bonefish video.
19  Did you review the video itself?
20     A.   Yes.
21     Q.   What part of the video did you review?
22     A.   I reviewed -- stand by. Let me just
23  look over the report. Because it was already
24  reviewed prior to me reviewing it.
25     Q.   All right. I have a packet here -- it

40

1  might be easier for you -- that I've marked P-3,
2  which we obtained from your attorney. It's a series
3  of photographs. I want you to take a look at those
4  photographs in P-3 and see if you can identify those.
5      A.   Did you want me to answer that first
6  question, though, with the time frame I reviewed?
7      Q.   Yes.
8      A.   Okay. Just confirming before, it's
9  Target and Walmart.
10          So from after looking at the initial
11  report, Officer Seidel watched the video initially,
12  and then that's when I watched the video.
13     Q.   All right. Where were you when you
14  watched the video?
15     A.   I was at Bonefish.
16     Q.   As far as the time frame, approximately
17  what time did that video surveillance start, or did
18  you start, at what time frame, and what time frame
19  did you end?
20     A.   To the best of my recollection, the
21  three suspects entered Bonefish and then exited. It
22  was a very short time frame. Let me double check.
23          It was very -- it was, like, basically
24  in and out of it. They didn't sit down and eat food
25  so...

41

1      Q.   Do you have any records as to when they
2  left, "they" the suspects that you -- let me finish,
3  please.
4          Do you have any record or recollection
5  of the time that the suspects left the Bonefish
6  Grill?
7      A.   So it was approximately 15 minutes from
8  entering that they left.
9      Q.   When did they enter?
10     A.   To the best of my recollection, they
11  entered -- it's going to be approximate.
12     Q.   So you don't know?
13     A.   18:29.
14     Q.   You don't know?
15     A.   Stand by. (Witness mumbling.)
16     Q.   There is a time stamp on -- do you see a
17  time stamp on P-3?
18     A.   Correct.
19     Q.   And it has Officer Kula's name on it?
20     A.   Correct.
21     Q.   What time is stamped on it?
22     A.   That's 22:17, so that would be 10:17 at
23  night; however, it was daylight.
24     Q.   So that can't be correct?
25     A.   No. That time -- that time is

42

1  incorrect. The timing on the -- the timing on the
2  actual video surveillance was off so...
3      Q.   Well, do you know, how did you know
4  where to go on the video to view the suspects?
5      A.   I got that based off of the initial
6  report. When the responding officers went there,
7  they actually reviewed the video shortly after, I
8  guess -- well, you know, on scene the day of the
9  incident.
10      So, I guess, from the best of my
11  knowledge is the people there gave -- gave them a
12  time frame of, like, what happened, what transpired
13  and from the victim from when she noticed the cards
14  were gone. And then they reviewed back to the
15  surveillance video and were able to determine that
16  time frame of when the victim was there and the time
17  they got the call.
18      So when they looked at that, that's how
19  they would have determined the time frame as far as
20  watching the video of who came and left, and then
21  these individuals came and left within 15 minutes.
22      Q.   How did you as the investigating officer
23  determine the time frame to watch the video
24  surveillance tape; how did you do it?
25      A.   Based off the initial report. Like I

43

1  said before, that's the time frame that they were
2  able to obtain initially. So that's -- when I went
3  there, that's when I looked at it.
4      Q.   How many people did you see when you
5  looked at the video as coming and going from the
6  Bonefish Grill when you reviewed the video?
7      A.   Three.
8      Q.   None others?
9      A.   The time frame that I watched it that
10  they established was three.
11      Q.   Who established the time frame?
12      A.   The responding officers that were able
13  to obtain that information from the victim and the
14  employee from the establishment.
15      Q.   Which employees from the establishment
16  did they get that information from?
17      A.   I guess the witness that we don't have
18  the name of.
19      Q.   Only the witness that you don't have the
20  name of? Anyone else?
21      What I'm getting -- I'm sorry. What I'm
22  getting at, Officer, why didn't you as the
23  investigating officer look at a larger time frame to
24  determine whether or not Georgia Thompson came and
25  went from that restaurant as to what time, as you

44

1  used -- as you referred to her photograph of her
2  driver's license?
3      A.   Because those were the last -- her
4  license plate was the last one to leave during that
5  time frame.
6      Q.   How do you know that?
7      A.   Just based off of the initial
8  investigation report and the camera footage.
9      Q.   All right. Well, did you as the
10  investigating officer ever look -- review more than
11  the video of the three suspects that appear in your
12  investigation?
13      A.   Did I see other video?
14      Q.   Yeah. Did you expand your view of the
15  video to encompass more than just those three
16  suspects?
17      A.   Well, I'm kind of unsure what you're
18  asking.
19      Q.   Well, let me show you P-5. Can you
20  please identify P-5?
21      A.   Georgia Thompson.
22      Q.   Yes. And you obtained that photograph,
23  correct?
24      A.   Correct.
25      Q.   And you obtained that from a driver's

45

1  license, her driver's license?
2      A.   Correct.
3      Q.   Is that the only photograph you had of
4  Georgia Thompson?
5      A.   Correct.
6      Q.   When you did your investigation?
7      A.   Correct. I also had -- I also had --
8  have her characteristics, like, her basically
9  characteristic profile.
10      Q.   Where did you get that?
11      A.   It should have been accompanied with
12  that. It has her height, her weight.
13      Q.   On her driver's license?
14      A.   Yeah, correct.
15      Q.   Any other -- is that where you got that
16  information, from her driver's license?
17      A.   From the, yeah, DMV.
18      Q.   How old was the driver's license when
19  you looked at it?
20      A.   I could see when it expired. Hold on,
21  let me see if it's in here. It was valid so -- at
22  the time. I don't recall the issue date of that
23  driver's license, based off what I have in front of
24  me.
25      Q.   Okay. Did you ever -- with regard to

46

1  the Bonefish Grill, you had access to their video
2  surveillance that occurred on the evening of the
3  incident, 4-8-2017?
4       A.   Did I have access to it?
5       Q.   Yes.
6       A.   On that day?
7       Q.   During any time during your
8  investigation.
9       A.   Yeah, from Bonefish Grill.
10      Q.   Well, you looked at the video, you said?
11      A.   Correct.
12      Q.   When did you do that?
13      A.   That was on April 13th of 2017.
14      Q.   Did the Bonefish Grill put any
15  restrictions on your review of their video
16  surveillance?
17      A.   As far as what I can and can't see?
18      Q.   Yes.
19      A.   No.
20      Q.   Why didn't you look at the video
21  surveillance for more than just those three suspects?
22      A.   Because those three suspects were within
23  -- like I said, within the time frame of when it was
24  called in, the time frame the victim was there until
25  she noticed that things were missing. They were to

47

1  dial in three people that were coming and going
2  within approximately a 15-minute period.
3       And then further on from that, from
4  those three individuals that you're talking --
5  speaking about, the three suspects --
6       Q.   Um-hm, yes.
7       A.   -- they're in -- there's video
8  surveillance and pictures of them making the
9  fraudulent purchases at the store. They're wearing
10  the same clothing.
11      Sorry if I'm talking too fast.
12      Q.   No, that's all right.
13      So at 7:29 p.m., according to the
14  initial report, the incident was reported to your
15  department, correct? That's what the report says,
16  right?
17      A.   Correct.
18      Q.   All right. Now, up until the time that
19  Ms. Lee reported she had her credit cards, or her
20  charge cards were missing, was there reason for
21  anybody to report license plates numbers in the
22  parking lot?
23      A.   Like I said, I don't know what
24  transpired inside that restaurant as far as when it
25  -- when it actually -- what caused people to bump

48

1  into each other to make anybody aware or suspicious.
2       Like I said, I wasn't able to locate the
3  actual witness to follow up further with that
4  individual.
5       Q.   Now, if the -- your report -- if the
6  report and the employee that say that they took the
7  license plate numbers of people they thought that
8  were involved, correct?
9       A.   Correct.
10      Q.   It had to be after it was reported to
11  the Bonefish Grill manager, or whomever, that a crime
12  had been committed, correct?
13      A.   Correct. But can I add to that?
14      Q.   You certainly may.
15      A.   I'm not sure -- like I said before, I'm
16  not sure actually -- I couldn't locate the actual
17  witness to follow up with that witness as far as the
18  details as far as what happened inside the
19  restaurant.
20      I don't know if there was a disturbance
21  in there with the three people that left, you know,
22  within 15 minutes. I don't know if there was a
23  suspicion as to whether or not that was the reason
24  why the employee ran out and said let me get the tag
25  and call the police. Like I said, I can't speak on

49

1  that.
2       So that's where I stand on that. As far
3  as why they were able to get the license plates or
4  what made them -- made them alarmed to go get the
5  license plates, unfortunately, I wasn't able to
6  follow up with that.
7       Q.   Well, if there was a disturbance or
8  anything else untoward in the restaurant, there would
9  be eyewitnesses to that, right?
10      A.   I'm not sure how isolated it was, or
11  packed it was.
12      Q.   Is there anything in your investigation
13  that says that there was an incident or something,
14  some confrontation or something that went on between
15  these individuals and patrons or anyone at the
16  Bonefish Grill that night?
17      A.   I'll look. There's nothing in my
18  report.
19      Q.   Okay. Now, how far is it from the
20  Bonefish Grill to the Walmart where the cards were
21  used, according to your report?
22      A.   I'll give an approximation. From
23  Bonefish to the Watchung -- that mall -- that mall
24  area, without traffic, three minutes; with traffic,
25  five to ten minutes, approximately. It's right up

50

1  22.
2      Q.      If the crime was reported at 7:29 p.m.,
3  correct?
4      A.      Correct.
5      Q.      And the individual, or Tracy Lee, would
6  have had to report the stolen -- would have reported
7  that her cards were stolen to your department,
8  correct?
9      A.      Correct.
10     Q.      Do you know whether Tracy Lee made the
11  phone call to your department, or whether it was
12  somebody else?
13     A.      That would be on the initial CAD report.
14  So I don't have that in front of me so I wouldn't
15  be...
16     Q.      Well, you reviewed the Walmart videos,
17  correct?
18     A.      Correct.
19     Q.      And isn't it a fact that the suspects
20  were already at the register at Walmart at 7:12 p.m.,
21  according to their timetable, to their time slot?
22     A.      This was Walmart you're speaking of?
23     Q.      The Walmart was --
24     A.      I'm sorry.
25     Q.      Wasn't Walmart the first store that the

51

1  suspects went to after they left the Bonefish Grill?
2      A.      Correct, 19:15 hours, 7:15.
3      Q.      And up until the time that Ms. Lee
4  determined that someone had stolen her charge cards,
5  up until that time, there was no reason for anybody
6  to take down anybody's license plate number, correct?
7      A.      Like I said, I can't -- I can't speak on
8  that as far as if there was an alarm raised. If
9  there was -- there was a delay with, you know, prior
10  to calling us.
11     Q.      Well, according to at least your report,
12  my records of the Walmart, I'll represent that
13  Walmart video shows the people at the register at
14  7:12 p.m. By the time -- is it true, Officer, by the
15  time Ms. Lee even discovered that her crime had been
16  committed and the report was made to your office at
17  7:29 p.m., these people had already left the Bonefish
18  Grill?
19     A.      Well, that's correct. Like I said, if
20  it occurred at 6:29 p.m., I mean, there was some kind
21  of pause within reporting it to us initially if we
22  didn't get there until -- if it wasn't reported until
23  7:29 p.m. to us.
24          So if there was an alarm inside. I
25  can't speak on -- of what, like I said, before

52

1  transpired as far as the alarm raised or if an
2  employee ran outside, whoever that witness was
3  grabbed the license plates as that -- the crime was
4  transpiring within Bonefish and then to the point
5  where they were looking for the cards and then
6  determined that they were stolen from her purse, and
7  then to the point where then they called the police
8  department.
9      Q.      Isn't it a fact, Officer, based on your
10  investigation, the videos you reviewed, the
11  timetables you reviewed, that by the time there was
12  any reason for anyone to record anybody's license
13  plates at the Bonefish Grill, the suspects were at
14  Walmart and had departed already?
15     A.      Correct.
16     Q.      Correct? Okay. All right.
17          Also, by the way, Officer, if you need a
18  break, just say so and we can take a break.
19     A.      I appreciate it.
20          MR. GUSS: Do you need to take a break?
21     Q.      All right. Referring back to P-1. Can
22  you go back to that, sir? Officer, that's page 5 of
23  7. That's the beginning of your Affidavit of
24  Probable Cause.
25     A.      Correct.

53

1      Q.      Can you go to page 5 of P-1, sir? Okay.
2  This P-5 is the Affidavit of Probable Cause that was
3  issued and signed by you on 9-21-2017 in the matter
4  of New Jersey vs. Georgia Y. Thompson, correct?
5      A.      Correct.
6      Q.      So in your description of the relevant
7  facts you state, "On 4-8-2017 at approximately 19:30
8  hours, or 7:30 p.m., the patrol responded to Bonefish
9  Grill in reference to a stolen purse."
10          Do you see that?
11     A.      Correct.
12     Q.      So you've testified that it was 7:30
13  when you -- your office received the notice?
14     A.      Correct. I put "approximately" because
15  there's usually a delay with dispatch stuff.
16     Q.      Now, this is -- at the conclusion of
17  that Paragraph 1 you state, "Both cards were
18  fraudulently used in Watchung at Target and Walmart
19  by the defendant, which was learned through
20  surveillance video." You made that representation --
21     A.      Correct.
22     Q.      -- and testified to that, correct?
23     A.      Correct.
24     Q.      All right. Going through first in that
25  video surveillance statement that you learned it was

54

1  Ms. Thompson, which was through the videotapes, did
2  your observation include your view of the videotape
3  at Bonefish?
4      A.   Correct, the surveillance video.
5      Q.   All right.  And other than P-5 -- I
6  showed you that before -- you had no other photo
7  identification of Ms. Thompson, correct?
8      A.   Correct.
9      Q.   Could you -- first of all, can you go
10 through the series of photographs that are in -- is
11 that P-3?
12     A.   Correct.
13     Q.   And these were the photographs taken
14 from the Bonefish Grill video, correct?
15     A.   Correct.
16     Q.   And who took those?
17     A.   Kula.
18     Q.   Okay.  Now, can you go through those
19 photographs and pick out the photographs which you
20 feel contributed to your identification --
21     A.   Sure.
22     Q.   -- of Georgia Thompson?
23          MR. GUSS:  Just note my objection.  Again
24 the same as before.
25     Q.   Video.  Well, my point is that we have a

55

1  video, but the only evidence we have of the video are
2  the pictures.  So when I refer to the pictures, I'm
3  referring to the pictures from the video, okay?
4      A.   Correct.  And I was going to expand on
5  that.  So these are -- these are screenshots of the
6  video.  As you can see, the surveillance monitor is
7  behind them.  These don't really do it justice as far
8  as the realtime video they watched.  It was -- I
9  mean, you're taking a picture with a Nikon camera of
10 a computer monitor.  So like I said, these don't do
11 it justice, but I'll show you pictures of her.
12          So, I mean, these aren't even, you know,
13 enlarged.  But even if you try to enlarge these,
14 which obviously when you try it, they just become
15 more pixilated.  So that's -- you know, just make
16 note of that.  So here --
17     Q.   You're on P-3?
18     A.   P-3 here.
19     Q.   Okay.  Why don't you go through, just
20 circle the ones that you feel show Ms. Thompson.  Why
21 don't you do this.
22     A.   Do you want it back?
23     Q.   Yeah.  Why don't you do this.  Just put
24 a number one on that page, then put a number two on
25 the next page so we know what you're referring to.

56

1      A.   Some of these pictures that I'm circling
2  as far as build is just to coincide with the DMV
3  printout as far as the characteristics of the
4  individual.  And like I said, video surveillance is
5  way better than -- these don't do any justice to
6  physically watching the video surveillance.
7          Do you want me just to put the numbers
8  on here?
9      Q.   Put the numbers as you go through so we
10 know which ones you're referring to.  You can also
11 circle the ones that you feel assisted you in
12 identifying Ms. Thompson as the suspect.
13          Can you go through the ones that you
14 circled as those assisting in you identifying
15 Ms. Thompson as the suspect, and describe any facial
16 characteristics that are depicted in those
17 photographs that correspond to P-5, Ms. Thompson's
18 driver's license photo?
19     A.   Like I said, these are screenshots,
20 because, unfortunately, we weren't able to get the
21 video so...
22          MR. GUSS:  Officer, if you can just tell
23 us the picture on the page that you're on so we can
24 follow, please.
25          THE WITNESS:  Yeah, Picture 1.

57

1      Q.   On page 1?
2      A.   Yep, correct.
3      Q.   And you circled it?
4      A.   Correct.
5      Q.   Does that show any facial physical
6  characteristics that correspond to Ms. Thompson's
7  photograph that you used?
8      A.   Like I said, this picture that I circled
9  is a picture of a screenshot of the video.  If you
10 saw the video, it shows a thinner jawbone, a more
11 narrow jawbone like hers.  And her body
12 characteristics, based off the DMV printout as far as
13 her stature.
14     Q.   Why aren't you -- looking at the
15 photograph, can you describe the physical
16 characteristics of the woman that you associate with
17 Ms. Thompson?
18     A.   From this video here?
19     Q.   Yes.
20     A.   You want me -- her characteristics in
21 the video?
22     Q.   Yeah.
23     A.   Thinner, thinner build.  Hair
24 essentially, like, shoulder length, like
25 Ms. Thompson's.

58

1    Q.    Can you determine from the picture
2  you're referring to now, which is the picture circled
3  Number 1 on P-3, can you determine the individual's
4  height?
5    A.    You can do an approximate. I mean,
6  she's a thinner, smaller build compared to -- like I
7  said, these pictures don't do as much justice. But
8  you can see a bigger built individual next to her.
9    Q.    What are you referring to now?
10   A.    Page 2. And just based off, like, the
11 level of the height of the door where she's at and
12 the video, the gap in the door, I mean, these all
13 played a role into identifying her as far as her body
14 -- bodily characteristics.
15   Q.    What bodily characteristics did you
16 associate with Ms. Thompson?
17   A.    Like, a thinner build. Essentially,
18 first I had -- I actually had a picture, a printout
19 of her characteristics based her DL info, and, like,
20 height, weight. And I see hair. That's obviously
21 not on -- as far as length of hair is not on a DMV
22 printout but...
23   Q.    From the video that you reviewed from
24 the Bonefish, how -- how tall or short did you
25 estimate the suspect to be, the one that you

59

1  associated with Ms. Thompson?
2    A.    Between five-four and five-eight,
3  around there, five-six, five-eight.
4    Q.    What about the weight?
5    A.    I based it off of her DMV printout, and
6  I just associated that with her.
7    Q.    So you took -- you took -- let me get
8  this straight. You took the characteristics you knew
9  were hers and then just applied them to the
10 photographs?
11   A.    Not just the photograph buts the video.
12 I used that as a basis of identifying her. This is
13 -- this was stemming also from the surveillance
14 video, or the witness getting the registrations, and
15 also pictures and stuff, videos from the other two
16 stores.
17   Q.    All right. Now, regarding the witness,
18 just to clarify, you never -- you never were able to
19 identify the name of the individual witness or the
20 employee, correct?
21   A.    Correct.
22   Q.    Or where that person lived, right?
23   A.    Correct.
24   Q.    And any contact information for that
25 person, correct?

60

1    A.    Just Bonefish Grill.
2    Q.    And you were at the Bonefish Grill about
3  five days after the incident? I believe it was on
4  the 13th?
5    A.    Let me double check. Yeah, the 13th.
6  It happened on the 8th. Correct.
7    Q.    And at that time, you had the
8  opportunity and made the request to look at the
9  employee records who were working for the Bonefish
10 Grill at the time of the incident?
11   A.    If it was the next day, I would have.
12 But, however, I was actually not at work for when it
13 happened, the day after, the day after that and the
14 day after that.
15   Q.    But on the 13th did you request --
16   A.    Correct, I did request.
17   Q.    And what was the response?
18   A.    They were going to look into it. And
19 then I followed up again. Like I said, it never came
20 full circle as far as the witness coming forward.
21 I'm not sure of the circumstances behind why a
22 witness -- sometimes witnesses don't cooperate if
23 it's about crime. After the fact, they change their
24 mind, change their heart. I don't know. I can't
25 speak for the witness.

61

1    Q.    Did anybody -- during your
2  investigation, did anyone actually witness the theft
3  of Ms. Lee's wallet while she was at the Bonefish
4  Grill?
5    A.    To the best of my knowledge, nobody
6  actually witnessed it, that I'm aware of.
7    Q.    So really the only connection that you
8  have of Ms. Thompson being at the Bonefish Grill is
9  the license plate number that was taken by the
10 unknown employee, correct?
11   A.    Correct.
12   Q.    The employee that you never were able to
13 get a statement from, correct?
14   A.    Correct.
15   Q.    Now, based on your investigation and
16 follow-up of the license plate, what did you do to
17 follow up and obtain the identity of the owner of the
18 license plate numbers that you obtained from the
19 witness, from the employee?
20   A.    The initial responding officers were
21 able to get the DMV inquiries for those, and then I
22 followed up from that.
23   Q.    And how did you follow it up?
24   A.    Well, once I had the RL information,
25 that's when I did the D -- when you do a DMV inquiry,

62

1  it's gives you the registered owner's information as
2  far as their DL number. Then you look that up
3  through DMV also, and that's how you can get a
4  picture, you know, license plate, or their driver's
5  license information.
6       Q.   Right. Sir, I'm going to show you what
7  I've marked P-7 for identification and ask if you can
8  identify that.
9       A.   This is a DMV look-up.
10      Q.   Is that the result -- is that the result
11 of a look-up that you obtained when you did the
12 license look-up from the information from the
13 Bonefish employee?
14      A.   The initial paper was done on the 8th.
15 This is time stamped the 13th.
16      Q.   So is there any difference between the
17 two that you can see?
18      A.   Yeah, there is a difference.
19      Q.   What's the difference?
20      A.   This one is -- this one just gives the
21 generic information of her name and her driver's
22 license. So what I did was -- so if you actually
23 check the driver's license number with the DMV,
24 that's when you get basically their characteristic
25 profile with their picture.

63

1       Q.   What license plate number did you get
2  that you ultimately associated with Ms. Thompson?
3       A.   That was (witness mumbling). The Honda
4  Accord, New Jersey reg Alpha 31 Echo Luna Bravo.
5       Q.   And could you just set forth the
6  alphabet that -- the exact license plate?
7       A.   Sure. You don't want me to do the
8  phonetic alphabet?
9       Q.   No.
10      A.   Okay. New Jersey Registration A31ELB.
11      Q.   That was for what year vehicle?
12      A.   2014 Honda Accord, black.
13      Q.   And from that you were able to obtain
14 the driver's license information for Ms. Thompson?
15      A.   Correct.
16      Q.   I show you what we've marked P-8 for
17 identification and represent to you that this is a
18 photograph taken from Honda documents from the
19 manufacturer for a 2014 Honda. Do you see that?
20      A.   Yes.
21      Q.   And during the course of your work as a
22 patrolman, have you become familiar with Honda
23 Accords, pulling them, over things like that?
24      A.   Correct.
25      Q.   Is that a true and accurate depiction of

64

1  a 2014 Honda Accord?
2       A.   Yes.
3       Q.   Do you want to take a short break? If
4  you want so I can...
5       A.   Yeah, we'll take a short break so we can
6  do that.
7            THE VIDEOGRAPHER: We're going off
8  camera. The time is 11:21 a.m.
9            (Brief recess was taken.)
10           THE VIDEOGRAPHER: We are back on the
11 camera. The time is 11:29 a.m.
12      Q.   All right. Officer, after the break, or
13 during the break, I reviewed a video that was
14 provided by your attorney that purports to be the
15 video of the suspects leaving the Walmart. There are
16 a number of areas where the video show them in the
17 Walmart. But this is the one where they're leaving.
18 And the time is 7:17:28. That's the time stamp,
19 okay?
20           What I'd like you to do is, I'll start
21 this video from the beginning. It's not long. Take
22 a look at it. And I'm going to ask you about the
23 type of car that the suspects were driving. Okay?
24      A.   Okay.
25      Q.   To see if you can identify that as a

65

1  2014 Honda Accord, okay? All right. Let me get this
2  to the beginning.
3            Okay. We were provided with three clips
4  -- with four clips. This appeared Clip Number 3 on
5  the DVD that we received. And I'm going to start
6  that. Okay, it started. Is it operating?
7       A.   Yes.
8       Q.   Whoops.
9       A.   I think there's something wrong with it.
10 I didn't see it.
11      Q.   It's going to take a while. Have you
12 had an opportunity to review the video, Officer?
13      A.   Yes.
14      Q.   Is that a true and accurate depiction of
15 the video that you reviewed in connection with your
16 investigation of the Bonefish Grill incident?
17      A.   Yes.
18      Q.   I'm just getting to a point in the video
19 that I want to look at with you, okay. I'm going to
20 show you this portion of the -- of the video. I'll
21 present this to you.
22           MR. LANZA: Do you need this down there?
23           THE VIDEOGRAPHER: Right in the middle is
24 fine.
25           MR. LANZA: Okay, okay.

66

1          MR. FEINSTEIN: John, would you just tell
2    us the time stamp?
3          MR. LANZA: Yeah. On the video the time
4    stamp is April 8, 2017, at 7:18 and 40 seconds.
5          MR. FEINSTEIN: Thank you.
6     Q.    Officer, when you reviewed the video, is
7    this a true and accurate depiction of the vehicle
8    that the suspects used to leave the Walmart parking
9    lot?
10    A.    That's it, correct.
11    Q.    And what type of vehicle is that?
12    A.    A black, four-door vehicle.
13    Q.    Does it reflect, or is that a 2014 Honda
14   Accord?
15    A.    I mean, it's not the one that you have
16   here. I mean, the possibility of alterations done to
17   it, it's possible. For a fact, I can't say if it's a
18   Honda or it's not a Honda.
19    Q.    Right. First, referring to P-8, the
20   Honda 2014 Accord picture that you identified as
21   being accurate before, how does the grille on that
22   Honda, 2014 Honda Accord, compare to the grille
23   that's depicted in the video?
24    A.    I can't tell if it's missing. Chrome.
25    Q.    I'm talking about the shape. I'm

67

1    talking about the way the grille -- particular
2    attention to the grille. Is that the same grille
3    that's depicted?
4     A.    These two are different. P-8 is
5    different than the video.
6     Q.    Did you -- as you looked at the video,
7    did you pay attention to the shape of the car?
8     A.    It's a four-door sedan.
9     Q.    Is the shape of the car consistent with
10   a 2014 Accord? There's also a second page to P-8.
11   That would give an idea.
12    A.    It looks like slightly different
13   comparing it to the video to the picture here.
14    Q.    When you did your investigation, did you
15   do a comparison of the vehicle depicted in that video
16   with a 2014 Honda Accord?
17    A.    I did. That's why I just have in my
18   report that they're leaving in a black vehicle, not a
19   2014 Honda Accord.
20    Q.    Well, a 2014 Honda Accord is the vehicle
21   that Georgia Thompson had at the Bonefish Grill that
22   night, correct?
23    A.    Correct.
24    Q.    And the video from the Walmart is not
25   depicting a 2014 Honda Accord, is it?

68

1     A.    Correct. I'll just extend onto that.
2    There were three suspects. The possibility of one of
3    them having a vehicle in the area was a possibility
4    as well.
5     Q.    Did you ever -- did you ever actually do
6    a comparison between the vehicle in the Walmart video
7    and a 2014 Honda Accord for your investigation?
8     A.    Not to my recollection.
9     Q.    Now, the video time stamp has April 8th,
10   2017, at 7:18 p.m. correct?
11    A.    Correct.
12    Q.    And the distance or the driving distance
13   between the Walmart and the Bonefish Grill you'd say
14   is about three minutes?
15    A.    I would say it's probably roughly two --
16   roughly two miles, maybe. Depending on the traffic,
17   you can get there rather quickly.
18    Q.    This is them departing, the suspects
19   departing the Walmart at 7:18 p.m., correct?
20    A.    Correct.
21    Q.    So they've already been in the Walmart
22   and they're leaving, right?
23    A.    Correct.
24    Q.    And the incident was reported to you at
25   your department at 7:29 p.m.?

69

1     A.    Correct.
2     Q.    Now, while we're at the Walmart, your
3    attorney provided me with, on the DVD, three or four
4    clips. I showed you Clip 3. I'm going to have you
5    look at Clip 1 and ask if you can look at it first
6    and then identify what's depicted in there, okay?
7    All right?
8     A.    Cool.
9     Q.    Whoops, I'll start it up. This is a
10   video from the Walmart, Saturday, April 8, 2017,
11   starting at 7:12 and 18 seconds. And I'm going to
12   start playing that for you, Officer. You just take a
13   look at it first. It's done?
14          MR. GUSS: It's still going.
15          MR. LANZA: It's longer than I thought.
16    A.    I think it's 20 minutes, maybe.
17    Q.    Yeah. How much is left? Can you tell
18   on this?
19    A.    I don't think it tells. No, it doesn't
20   tell you where we're at with it. It might be over.
21          Yeah, so the transaction was just
22   declined there. She took all the gift cards. You
23   can tell everyone is kind of suspicious of that.
24    Q.    It looks like it.
25    A.    Yeah.

70

1    Q.   Now, Officer, having reviewed this clip
2    video from Walmart, is it a true and accurate
3    depiction of that -- of that part of the video that
4    you reviewed in your investigation?
5        A.   Correct. Are there pictures with this
6    also that are coming in?
7        Q.   Yes, yes. We'll get to that, right.
8        Now, is there anything in this clip that
9    you reviewed -- this is Clip 1 of what we were given
10   -- that you refer to to identify Georgia Thompson as
11   being a suspect?
12   A.   The same clothing as Bonefish.
13   Q.   Referring to the Bonefish Grill.
14   Anything else other than the clothing?
15   A.   Just this -- the stature, the physical
16   features as far as body build.
17   Q.   Were you able to determine -- make a
18   determination of any physical characteristics of the
19   suspect as depicted in the video and Georgia
20   Thompson's driver's license video picture? Eyes?
21   Nose? Chin? Mouth? Anything?
22   A.   Body build and hair.
23   Q.   That's it?
24   A.   Correct. And just the same clothing as
25   Bonefish.

71

1    Q.   Anything else?
2    A.   Not that I recall, no.
3    Q.   Okay. Now I'm going to show you what
4    was deemed Clip 2, if I can get there. Here we go.
5    This is Clip 2 of what was provided to me from the
6    Walmart surveillance camera, dated April 8, 2017.
7    It's 7:16:51 p.m. I'll ask you to look at that.
8        Well, first of all, going back to the
9    prior video, what did that video depict?
10   A.   The fraudulent purchases.
11   Q.   At the register?
12   A.   Correct. Or attempted. It was
13   declined. That's why she took all the cards away.
14   Q.   All right. I'm going to turn this on.
15   I'll ask you to look at this clip, please. This is
16   Clip 2.
17   A.   I think they left already.
18   Q.   Okay. Did you see enough of this video
19   as far as your investigation was concerned?
20   A.   Yes.
21   Q.   Is it a true and accurate depiction of
22   the video that you reviewed of customers departing
23   the Walmart at the time specified?
24   A.   Correct.
25   Q.   And is there anything in that video that

72

1    contributed to your identification of Georgia
2    Thompson as being the defendant and suspect?
3        A.   Just corresponding with the video from
4    Bonefish.
5        Q.   Were you able to determine any
6    characteristics, facial characteristics, of the
7    person or the suspect that was depicted in the video
8    we just reviewed?
9        A.   The same -- the same as before. The
10   same characteristics and corresponding with the
11   Bonefish.
12   Q.   But can you point to any facial
13   characteristics: eyes, nose, shape of mouth, or
14   anything?
15   A.   If you want to go back and just pause at
16   that screen?
17   Q.   Sure. And we'll show the -- get to it.
18   You tell me when to stop, Officer.
19   A.   All right. So, I mean, this is kind of
20   grainy.
21       MR. GUSS: Can you identify the time
22   first that's on there, please?
23       THE WITNESS: This one says 6 -- 7:17 on
24   April 8th.
25   Q.   What's depicted in that frame?

73

1    A.   I mean, it's a still shot; it's kind of
2    grainy. But it's the build of Thompson as far as
3    correlating to her DMV printout as far as her build,
4    if you can -- I don't know if it's the computer
5    but... You've got to go back.
6        This is based off like her -- her lower
7    part of her face.
8        Q.   You say you can determine from the lower
9    part of her face?
10   A.   This is kind of tough on here.
11   Q.   But there's a resemblance to Georgia
12   Thompson?
13   A.   As far as, like, the hair, the jawline,
14   and just her body build, yeah.
15   Q.   There are two individuals depicted in
16   this still photograph.
17   A.   Correct.
18   Q.   Which one do you assert is Georgia
19   Thompson?
20   A.   The white hat.
21   Q.   The one with the white hat?
22   A.   Correct.
23   Q.   Correct. And that was the same person
24   that you identified as Georgia Thompson at the
25   Bonefish Grill?

74

1    A.    Bonefish, correct.
2    Q.    Right. I'm going to show this still to
3  the...
4    A.    There might be some better ones if you
5  play a little bit longer.
6    Q.    Well, let's do this one and then I'll
7  let you go through it, sir.
8    A.    Counsel, is there any way you can just
9  play the whole video for them?
10    Q.    I could. It's going to take some time.
11  I'll be glad to do it if you want to do it.
12    A.    I think it looks better in realtime.
13        MR. LANZA: With the consent of Counsel,
14  I'll do the whole video.
15        MR. GUSS: Which one?
16        MR. LANZA: Whichever one he wants.
17        MR. GUSS: Okay.
18        THE WITNESS: I think the videos look
19  better realtime. Because when you start pausing them
20  in realtime they get pixilated.
21    Q.    Is it your testimony, sir, when we play
22  this in realtime it will give a better perspective of
23  how you identified Georgia Thompson from this video?
24    A.    Well, it may -- it may give a better
25  perspective for the other if you play it in realtime.

75

1        THE VIDEOGRAPHER: Mr. Lanza, your
2  microphone.
3        MR. LANZA: What, did it fall off?
4  Sorry. Okay, I'm going to start this from the
5  beginning.
6        MR. GUSS: And we're playing Clip Number
7  2, correct?
8        MR. LANZA: I'm going to double check
9  that. Yeah, it's Clip Number 2. I'll start this from
10  the beginning.
11    Q.    Now, do you want me to go all the way to
12  the beginning or just when these two people appear?
13  I'm talking about just this video.
14    A.    I mean, would it be better as a matter
15  of record if you did the whole video or...
16    Q.    Whatever you want, sir. I'll play the
17  whole thing.
18    A.    You could do it from when they appear
19  until the gentleman behind them is exiting.
20    Q.    What I'll do is I'll go to where I think
21  we should start, and then you tell me if I've gone
22  back far enough.
23    A.    I think it's right after him.
24    Q.    I think that's -- okay?
25    A.    Yeah. Play it.

76

1        MR. LANZA: Let me know when you're
2  ready, folks. Is that in your way? Whenever you're
3  ready?
4        THE VIDEOGRAPHER: We are ready.
5        MR. LANZA: They already walked through.
6    Q.    Okay. So, Officer Pepe, in the videos
7  that you reviewed, Clip 1 and Clip 2, from the
8  Walmart, were you able to discern or pick out any
9  physical characteristic -- I'll say facial
10  characteristic, eyes, nose, mouth, jaw -- from those
11  videos that you assert you used to identify Georgia
12  Thompson?
13    A.    Just the lower portion of the face and
14  the hair.
15    Q.    That's the hair that's depicted in her
16  photograph?
17    A.    Just shoulder, like, about shoulder
18  length.
19    Q.    Where -- do you have any -- do you know
20  the hairdo that Georgia Thompson had when she was at
21  the Bonefish Grill?
22    A.    Like, from the video that I saw it looks
23  like it's about shoulder length, a bob cut, I guess
24  you would say.
25    Q.    The video of the individual that was

77

1  depicted in the Bonefish video, correct?
2    A.    Correct.
3    Q.    Are you aware that Georgia was not
4  wearing that type of hairstyle at the time that she
5  was at the Bonefish Grill?
6    A.    Was I aware of this?
7    Q.    Yes.
8    A.    Like until today?
9    Q.    Yes.
10    A.    No.
11    Q.    Do you think that would have been
12  important for you to know before you charged her with
13  these crimes?
14    A.    You know, I wouldn't be aware of that up
15  until today so...
16    Q.    If you went to her house or had a
17  personal interview with her, you would have noticed
18  that, wouldn't you, before you filed these charges?
19    A.    If I had seen her and she had a mohawk,
20  then yeah, that's a huge difference. But that didn't
21  happen.
22    Q.    Why didn't it happen? Why didn't you
23  interview her?
24    A.    Why didn't I? I tried to interview her.
25    Q.    Just with that one phone call?

78

1    A.    Correct.
2    Q.    Any follow-up after that phone call to
3  try and interview her?
4    A.    I mean, from that phone call, from what
5  I got out of it, my understanding, she didn't want to
6  talk to me. I got hung up on.
7    Q.    Did you ever determine -- did you ever
8  speak to Junior Hamilton?
9    A.    I never spoke to him.
10    Q.    Wasn't he the other individual that you
11  identified as having his registration or car license
12  plate recorded?
13    A.    That was the other registration,
14  correct.
15    Q.    Why didn't you talk to him?
16    A.    Because from the -- from his DMV
17  printout and his build, he didn't appear to be
18  anybody in that video. He was more of a slender
19  individual.
20    Q.    But for some reason, the employee who
21  was unidentified took down his license plate number,
22  correct?
23    A.    Correct.
24    Q.    And you never determined from your
25  investigation why the employee did that, right?

79

1    A.    My understanding is they were the last
2  two cars to leave of whatever the incident was
3  transpiring inside the Bonefish Grill.
4    Q.    Anything else?
5    A.    No.
6    Q.    Can we go back to P-1, please? That's
7  the charges.
8    A.    P-1.
9    Q.    This is it. In P-1, I'm referring to
10  page 6. No, I'm not. I'm referring to page 7 of 7.
11  Do you see that?
12    A.    Yes.
13    Q.    And that is the last page of your -- or
14  that's the Preliminary Law Enforcement Incident
15  Report, correct?
16    A.    Correct.
17    Q.    That's incorporated into your Affidavit
18  of Probable Cause, correct?
19    A.    As far as the affidavit, as far as what
20  I sent to the Prosecutor's Office?
21    Q.    Let me read to you where it says,
22  "Purpose," the first paragraph after the caption.
23    A.    Yeah.
24    Q.    It says, "The Preliminary Law
25  Enforcement Incident Report (PLEIR) is designed to be

80

1  appended to and expressly incorporated by reference
2  into the Affidavit of Probable Cause."
3         Do you see that?
4    A.    Correct.
5    Q.    So this document was incorporated into
6  your Affidavit of Probable Cause, right?
7    A.    Correct.
8    Q.    And you certified the information in it
9  to be true, correct?
10    A.    Correct.
11    Q.    Now, it says, in the third sentence it
12  says, "Identification procedures were used by
13  utilizing photo array."
14         Do you see that?
15    A.    Correct.
16    Q.    What is a photo array?
17    A.    Photos that I have.
18    Q.    What photos did you have that you had a
19  photo array?
20    A.    DMV photos, and then all the videos you
21  have here, or pictures from video that I have.
22    Q.    Doesn't the term photo array have a
23  particular importance in the Rules of Court?
24    A.    I'm not understanding what you're
25  saying.

81

1    Q.    All right. Photo array has a certain
2  meaning, does it not? What is your understanding of
3  what a photo array is? Let's start there.
4    A.    Okay. An array of photos, of various
5  photos.
6    Q.    Is there any report or record that is
7  required when you have a photo array?
8    A.    If I have photos, it's usually
9  documented in evidence, digital evidence.
10    Q.    Is it required that you have a report
11  specifically about a photo array?
12    A.    I'm not -- I'm not really sure I'm
13  understanding.
14    Q.    Doesn't the Attorney General of the
15  State of New Jersey and the court rules provide what
16  the procedure for a photo array?
17    A.    From my understanding, the photo array
18  was the photos that I had -- that were obtained. I
19  mean, they were put into photo evidence, digital
20  evidence.
21    Q.    That's your understanding of a photo
22  array?
23    A.    Correct.
24    Q.    Are you familiar with New Jersey
25  Superior Court Rule 3:11, Record of an Out-of-Court

82

1  Identification Procedure; are you familiar with that?
2    A.    I would have to refresh my knowledge on
3  that.
4    Q.    Okay. Are you familiar with Part A that
5  says, "Recordation and out-of-court identification
6  resulting from a photo array, lot lineup, or showup
7  identification procedure conducted by a law
8  enforcement officer shall not be admissible unless a
9  record of identification procedure was made."
10        Are you familiar with that?
11   A.    Now I am.
12   Q.    You weren't familiar?
13   A.    My understanding was utilizing a photo
14  array was photos that I obtained, not a showup, a
15  lineup.
16   Q.    Well, let me -- when we're involved in
17  certain things, documentation and things, we tend to
18  use forms, correct?
19   A.    Correct.
20   Q.    Was this part of your -- Affidavit of
21  Probable Cause part of a form used by your
22  department?
23   A.    What was? I'm sorry.
24   Q.    I'll rephrase it. Was that part of the
25  Preliminary Law Enforcement Incident Report signed by

83

1  you and setting forth the following:  identification
2  procedures -- "identification procedures were used by
3  utilizing photo array." Photo in capital; Array in
4  capital.
5    A.    Correct.
6    Q.    Is that your language, or is that form
7  language from the department, or something else?
8    A.    That's actually language from the, I
9  guess -- to the best of my knowledge, it's from PLEIR
10  form. I misinterpreted that as photos that I
11  obtained.
12   Q.    Okay. So the photo array procedure
13  referred to in Rule 3:11 and in the Attorney
14  General's Guidelines was not used by you, correct?
15   A.    Correct. There was no showup or lineup.
16   Q.    All right. The last paragraph, or the
17  last sentence of that section says, quote, "A member
18  of the public provided information to a 911 call
19  center or dispatcher."
20        Who was the member of the public who did
21  that?
22   A.    If I had the CAD in front of me to
23  specifically pinpoint on who called 911. It was
24  either Bonefish or the victim.
25   Q.    Did you have that information when you

84

1  signed this certification?
2    A.    Correct. It should be on the incident
3  -- the initial incident CAD.
4    Q.    So we'd find that if we referred to the
5  CAD but not in your report, correct?
6    A.    Correct. It's different than the
7  report, but it should be in the case file.
8    Q.    I'm just looking over my notes so I
9  don't repeat everything that I've done before.
10        You also charged in these proceedings a
11  Douglass Thompson, right?
12   A.    Correct.
13   Q.    What information did your investigation
14  reveal regarding Douglass Thompson that led to you
15  filing charges against him?
16   A.    So this was when we were attempting --
17  well, we were attempting to identify everyone. He
18  became involved because the responding officers
19  looked into other vehicles linked to that Georgia
20  Thompson had, has or at this point had registered in
21  her name, and located an individual that had gotten
22  tickets in one of her -- her -- her vehicles, and
23  ended up being a Douglass Thompson.
24   Q.    That's it?
25   A.    As far as getting him? And then once we

85

1  located his DMV information, his characteristic, his
2  build, that's when we associated him with Doug -- or
3  Georgia.
4    Q.    Did you ever get any information that a
5  vehicle registered to Douglass Thompson was at the
6  Bonefish Grill that night?
7    A.    No. Like I said, from what I -- what I
8  learned was he drove a vehicle under Georgia Thompson
9  and had gotten tickets. She had multiple vehicles
10  registered to her, or had all vehicles that were
11  registered to her that he drove.
12   Q.    And how did you tie Mr. Thompson into
13  these crimes?
14   A.    So basically that -- once we located
15  that he was associated with Georgia Thompson as far
16  as either being married or a relative, we moved to
17  get his driver's license information based off a
18  previous citation he got under her car. And once we
19  got his descriptors, we just matched his descriptors
20  up to the male suspect in the videos, in the
21  pictures.
22   Q.    When you say "we," do you mean you or
23  somebody else?
24   A.    Well, me and the detective.
25   Q.    Detective who?

**86**

1  A.  Mauer.
2  Q.  And you matched his description from his
3  driver's license to the individual, or the male
4  that's depicted in the videos?
5  A.  Correct.
6  Q.  I'm going to show you what we've
7  identified as P-6, or labeled P-6. Can you identify
8  that for us, please?
9  A.  Correct. It's a TRACS bulletin.
10  THE REPORTER: I'm sorry, it's a what?
11  THE WITNESS: Um.
12  THE REPORTER: What you just said.
13  THE WITNESS: It's an identification
14  bulletin, a notification bulletin, or tracking, call
15  it TRACS.
16  Q.  That's a notification bulletin?
17  A.  Correct. The TRACS bulletin.
18  Q.  Did you issue that?
19  A.  Correct.
20  Q.  What is it for?
21  A.  Essentially it's what we had. So this
22  one was -- this is basically notification sending out
23  this is we're investigating this crime, this is what
24  we have thus far, does anybody has any further
25  information, contact us, thank you.

**87**

1  Q.  Is there a photograph in P-6 that you
2  would ascribe to Mr. Thompson?
3  A.  Yes.
4  Q.  Which one is that?
5  A.  It's going to be this one here.
6  Q.  The first one from the right? I guess
7  from your left, my right. I'm sorry. All right.
8  Can you just put, like, initials there for Douglass
9  Thompson so we know which one you're referring to.
10  And how is that individual dressed?
11  A.  How is he dressed? He's dressed the
12  same way as the Bonefish video.
13  Q.  Did he have a hat?
14  A.  It's not a fedora. It's -- I don't
15  know. Like, a golf hat, I guess.
16  Q.  And he had a full beard?
17  A.  A beard.
18  Q.  Glasses?
19  A.  To my knowledge, I don't remember if it
20  was glasses. I would have to look at the picture. I
21  don't see glasses in this picture. But the same
22  clothing descriptors.
23  MR. LANZA: Can you mark this, please.
24  This is P-12.
25  (P-12, DMV Photograph of Douglass

**88**

1  Thompson, marked for identification.)
2  Q.  Sir, what is P-12?
3  A.  That's a picture of Douglass Thompson's
4  DMV photo.
5  Q.  Is that the photograph you utilized in
6  your investigation to identify him as a suspect?
7  A.  Correct.
8  Q.  Did you have any other information to
9  identify him as a suspect?
10  A.  His identifiers based from his DL.
11  Q.  Which were?
12  A.  It was 6-foot-2. I'll just take it off
13  the top of my head right now, but I had it in my
14  paperwork. 6-foot-2. Either one hundred... One
15  hundred or two hundred pounds. Male. 6-foot-2. It
16  was six-two, yeah.
17  Q.  Did your investigation reveal that
18  Mr. and Mrs. Thompson had been divorced for some time
19  prior to the Bonefish Grill incident?
20  A.  I had no idea.
21  Q.  Did you have any idea they were living
22  separate and apart?
23  A.  No.
24  Q.  So the only thing in your investigation
25  that led to you charging Mr. Thompson was the fact

**89**

1  that, in your opinion, his photo ID resembled the
2  male suspect in the videos?
3  A.  His photo and identifications.
4  Q.  Which you compared to the videos?
5  A.  Correct.
6  Q.  All right. I'm going to show you
7  another video. This is a video -- let me go back --
8  from Walmart -- from Target. Excuse me. And we were
9  given one, two, three, four, five clips, if you will.
10  This would be -- this is register --
11  labeled "Register 74." It looks like, "112 suspect,
12  unknown male exit," okay. That's what it says.
13  I'm going to play that for you and ask
14  if you can identify that as being the video that you
15  reviewed and used in your investigation of -- of
16  the --
17  A.  If I used any of these videos?
18  Q.  Yeah.
19  A.  I used all of them.
20  Q.  All right. We want to take a look at
21  them because I want to make sure that we're on the
22  same page here.
23  This is the first one. Is that a true
24  and accurate depiction of that part of the video that
25  you reviewed?

90

1    A.    Yes.
2    Q.    And what does that depict?  What does
3    that show?
4    A.    Douglass Thompson and an unknown female
5    walking in the Target.
6    Q.    All right.  And which person is Douglass
7    Thompson?
8    A.    The only male in that picture.
9    Q.    And pictured is a male and a female.
10   Would you say she's in shrubs?
11   A.    Correct.
12   Q.    Was she also a suspect?
13   A.    She was.  Well, essentially she still
14   would be.
15   Q.    Is she still a suspect?
16   A.    I mean, we were never able to identify
17   her so...
18   Q.    So the three people, suspects, were the
19   woman in the blue scrubs, the person you identified
20   in this video as being Mr. Thompson, and also Georgia
21   Thompson; those were your three suspects, correct?
22   A.    Okay, correct.
23   Q.    Let me just -- I'm going move this back
24   for a still.
25         What does that still depict?

91

1    A.    Talking on the cellphone.  The same
2    clothing as Bonefish.
3    Q.    That's the male suspect and the female
4    in the blue scrubs that you've identified as
5    suspects, correct?
6    A.    Correct.
7          MR. FEINSTEIN:  Once again, John, for the
8    record, can we have the time stamp of the still shot?
9          MR. LANZA:  Saturday, April 8, 2017,
10   7:38:20.  That's 7:28:20 (sic) p.m.
11         MR. FEINSTEIN:  Thank you.
12   Q.    Now I'm going to the second video that
13   we have.  It's labeled, "Register 74 Transactions,"
14   okay.  I'll ask you to look at it, and then I'm going
15   to ask you whether or not it's a true and accurate
16   depiction of the video you reviewed from Target for
17   the 4-8-2017 incident.
18   A.    After this I'd like to take a break.
19   Q.    Sure.  I'll just let it run for 26
20   seconds.  If you've seen enough to identify --
21   A.    I've seen enough.
22   Q.    Okay.  Let's do this.  Officer, you've
23   reviewed enough of the video labeled "Register 74
24   Transactions, correct?
25   A.    Correct.

92

1    Q.    Is that a true and accurate depiction of
2    the video that you reviewed as part of your
3    investigation for the offenses that were committed at
4    Target?
5    A.    Correct.
6    Q.    And in general, what does that video
7    depict?
8    A.    Fraudulent transactions.
9    Q.    Is the person you have identified as
10   Ms. Thompson in those videos?
11   A.    Correct.  And the unknown female suspect
12   in blue scrubs.
13   Q.    From her depiction in this video, were
14   you able to discern any physical characteristic of
15   that person's face that you could connect with
16   Ms. Thompson's photograph?
17   A.    That was just to help put her on
18   location there as far as her clothing and
19   identifying, you know, the same suspects as the other
20   videos.
21   Q.    Okay.  Did you ever do a NIC check, a
22   background check, on Ms. Thompson?
23   A.    To the best -- to the best of my
24   knowledge, the detective did that, detective Mauer.
25   Q.    Wouldn't that be in your records that

93

1    were supplied to us?
2    A.    I don't know.  Are they in here, or in
3    the case file?  To the best of my knowledge, I...
4    Q.    As the investigating officer, would it
5    have been important for you to do a background check
6    on Ms. Thompson?
7    A.    To the best of my knowledge, I believe
8    we did.  I typically would now at this point.
9    Q.    Are you aware that she had no criminal
10   record?
11   A.    To the best of my knowledge, I don't
12   recall what the outcome of that was.
13   Q.    Now, we've seen a few videos, both at
14   Target and at Walmart, that depict interactions
15   between employees and the suspects, correct?
16   A.    Correct.
17   Q.    Now, did you ever approach any of those
18   employees with a photo array to determine whether or
19   not they could identify Ms. Thompson as being the
20   person who actually did these fraudulent
21   transactions?
22   A.    No.
23   Q.    Why not?
24   A.    To the best of my knowledge, at that
25   time, I believe that we had, you know, enough to not

94

1  do that.
2      Q.    You felt like at that time you had
3  enough to charge her with five counts of third degree
4  offenses totaling a maximum of 25 years in prison;
5  you thought you had enough?
6      A.    Due to the totality of everything, and
7  then when I screened it and when an AP reviewed it,
8  it appeared that I had enough to prove charges.
9      Q.    Didn't the AP rely on your statements
10 and your identification of Ms. Thompson in order to
11 form their opinions?
12     A.    Well, they would rely on everything I
13 had given them or that they want, but yes.
14     Q.    Okay. Do you want to take a short
15 break?
16     A.    Yeah.
17          MR. LANZA: I don't know what you fellas
18 want to do lunch, or not?
19          THE VIDEOGRAPHER: We're going off the
20 camera. The time is 12:29 p.m.
21          (Brief recess was taken.)
22          THE VIDEOGRAPHER: We are back on camera.
23 The time is 12:35 p.m.
24     Q.    It's not long at all. I'm sorry.
25     A.    Do you want to come over here for a

95

1  better angle?
2      Q.    I'm okay. Officer, I'm going to show
3  you what's been marked on the discovery provided as
4  "Register 76, Subject Exit," and represent to you
5  that this is from the Target store. And let me see
6  if I can stop that. And the time is -- well, the
7  date is April 8, 2017, 7:30 and 17 seconds p.m.,
8  okay?
9          Now, first I'm going to play it for you.
10 It's very short. And then you can say what it
11 depicts.
12          All right. Officer, is that a true and
13 accurate depiction of the surveillance video you
14 reviewed at the Target store in conjunction with this
15 investigation?
16     A.    Yes.
17     Q.    All right. And what does this
18 particular video clip show?
19     A.    Ms. Thompson exiting the store, wearing
20 the same -- the same attire as Bonefish, the initial.
21     Q.    She's engaged in a particular activity,
22 isn't she?
23     A.    At this point or right there she's on
24 the phone.
25     Q.    She's on the cellphone. And you had a

96

1  phone number for Ms. Thompson. Did you ever subpoena
2  or obtain her cellphone records to see whether they
3  corresponded with this person talking on the -- on
4  her cellphone?
5      A.    To my knowledge, no, we did not.
6      Q.    Did you use this video that we just saw
7  in conjunction with your identification of
8  Ms. Thompson as a suspect?
9      A.    Yes.
10     Q.    And what in this particular clip is
11 important or significant for that identification?
12     A.    You get -- if you want to just... In
13 that video you get her full body, you get her, you
14 know, her general characteristics.
15     Q.    What about her face, can you see her
16 face?
17     A.    Partially. You can see this area here,
18 the lower portion of her face and a little bit more
19 up to her nose.
20     Q.    But her eye and nose and facial
21 characteristics are not visible, correct?
22     A.    From this still shot?
23     Q.    No, no. From the video.
24     A.    So if you want to just...
25     Q.    Sure.

97

1      A.    Like I said, it's been four years so...
2      Q.    I'm trying to get this thing going here.
3  Let me try. We'll play the whole thing.
4      A.    I'm sorry, yeah.
5      Q.    That's all right. We'll play the whole
6  thing. It's not that difficult. Here she comes.
7      A.    From that video, I mean, you still get a
8  general idea of the structure down here and just her
9  hair again, like, a bob cut.
10     Q.    Can you see the suspect's eyes?
11     A.    No. You couldn't see them with the hat.
12     Q.    Can you see the nose?
13     A.    It's a little grainy in this video.
14          MR. LANZA: I'm going to turn now and
15 have the videographer depict the entire video, which
16 is not a long one. Is that okay? All right.
17          THE VIDEOGRAPHER: You've got turn it
18 back towards this way.
19          MR. LANZA: It's over.
20     Q.    And to be clear, you're referring to the
21 female suspect with the white baseball cap in this
22 video?
23     A.    Correct.
24     Q.    Now I'm going to show you the video
25 that's marked, "Register 76," again "Transactions,"

98

1  the second one. The time frame is Saturday,
2  April 8th, 2017, 7:28:59 p.m. You can position it
3  any way you want. Move it closer if it helps you.
4      A.    I tried to pause it.
5      Q.    Yeah, it's okay.
6      A.    It didn't work.
7      Q.    Were you done?
8      A.    I was trying to just pause it in the
9  beginning, but it didn't work.
10     Q.    Let's see if we can get it to work for
11 you, if you need that. That's important. Let's get
12 our exhibits organized here. Just say when you want
13 it paused and I'll pause it. That's pausable.
14     A.    I tried. It's okay. It was just...
15     Q.    Well, I have to get it right anyway.
16 Let's see. Is this what we're looking at? Okay.
17 Tell me when you want it paused.
18     A.    I just wanted to clarify one thing. I'm
19 good.
20     Q.    Now, is that a true and accurate
21 depiction of that clip from the Walmart surveillance
22 camera that you viewed as part of your investigation?
23     A.    I believe this one's Target.
24     Q.    Oh, Target. Excuse me. It is?
25     A.    Yes.

99

1      Q.    And is there anything significant in
2  this particular video to your investigation?
3      A.    Yes.
4      Q.    And what is that?
5      A.    The same suspects as in the entire
6  ordeal/incident making -- attempting to make
7  fraudulent purchases at the counter.
8      Q.    And that is the person that you've
9  identified as Ms. Thompson?
10     A.    Correct.
11     Q.    Now, in this video, are you able to
12 identify any of the facial characteristics of the
13 suspects?
14     A.    Not in this video. Just the same -- the
15 same build, the same -- the same attire as the
16 initial.
17     Q.    In this again this -- you didn't attempt
18 to have the suspect further identified by a personal
19 interview with the employee that's depicted, correct?
20     A.    Correct.
21     Q.    All right, one last video. The time for
22 this is 7:31:31. And it appears to be the tech area
23 of the Target store at that time and on April 8th,
24 2017.
25     A.    Correct.

100

1      Q.    Anything else?
2      A.    Just, like, if I could try to scroll
3  this video is just putting a subtext (witness
4  mumbling).
5      Q.    Is this particular video a true and
6  accurate depiction of the video you reviewed for the
7  incidents that occurred at Target that night?
8      A.    Correct.
9      Q.    Generally what does it depict?
10     A.    The suspects in the store.
11     Q.    Which ones?
12     A.    Target. The unknown and the male
13 identified -- identified as Douglass Thompson.
14     Q.    And the person that you identified as
15 Ms. Thompson is not depicted in this particular
16 video?
17     A.    Not -- correct. Not in the tech area.
18     Q.    Okay. Do you want to keep looking at
19 it?
20     A.    Oh, no.
21     Q.    Did you confer with a Police Officer
22 Radlinsky regarding your investigation?
23     A.    Correct, briefly.
24     Q.    I'm going to show you what's been marked
25 P-9 for identification and ask if you can identify

101

1  that?
2      A.    It looks like a Supplemental Narrative
3  Report from Lawrence police.
4      Q.    Is that authored by an officer or
5  Detective Joseph D. Radlinsky?
6      A.    Correct.
7      Q.    And you said you did confer with Officer
8  or Detective Radlinsky regarding your investigation?
9      A.    Yeah. It was briefly over the phone.
10 Basically our phone call was we were supposed to --
11 he wanted to get together to share information, and
12 that never happened.
13     Q.    Now, on page 4 of his report, I guess
14 the second full paragraph, the last sentence he
15 states and reports, "I asked Officer Pepe about his
16 identification of Georgia Thompson, and he stated
17 that he identified her with '100 percent certainty'
18 after comparing Georgia Thompson's New Jersey
19 driver's license photo to his surveillance video."
20         Did you make that statement to Officer
21 Radlinsky?
22     A.    To the best of my knowledge I don't know
23 if I said "100 percent certainty," or -- you know, I
24 mean, like I said, four years ago, it might have been
25 in the realm of, you know, I positively identified

102

1  them two. I don't know if he said -- or like I said,
2  I don't -- I don't really -- I don't 100 percent
3  remember the exact, you know, verbiage or what I
4  said, you know, four years ago. But they look like
5  the same people, you know, I guess, what he had or
6  from what I got out of it.
7        Q.    Did you ever meet with Officer Radlinsky
8  and compare your investigations?
9        A.    No. He never -- he never followed up.
10       Q.    Other than that one phone call with
11 Officer Radlinsky, did you have any other contact
12 with him?
13       A.    Not to my knowledge, no.
14       Q.    Until today, have you ever seen the
15 report that I just presented to you as P-9?
16       A.    This is the first time I'm seeing it.
17       Q.    Officer, have you ever been subject to a
18 disciplinary complaint?
19       A.    Disciplinary? No.
20       Q.    Okay. Have you ever been accused of
21 racial profiling?
22       A.    No.
23       Q.    Are you aware of any complaints in your
24 department concerning racial profiling?
25       A.    No.

103

1        Q.    As you sit here today, is it your
2  position that your investigation was proper, thorough
3  and complete?
4        A.    I would say that it was all the above.
5  However, I wish we were able to obtain the
6  surveillance video from Bonefish, because I think
7  that draws a better picture than still shots.
8  Unfortunately, you know, we weren't able to get that
9  because of technology. And, you know, unfortunately,
10 witnesses, you know, don't come through. And it
11 would have been nice to, you know, have that witness
12 come forward. As far as the thorough part, those are
13 the two parts I wish, you know, but, unfortunately,
14 it didn't work out.
15       Q.    Yet you made a representation to the
16 Somerset County Prosecutor's Office that you properly
17 and positively identified Georgia Thompson as the
18 suspect depicted in the videos at the Bonefish Grill
19 and the other locations, correct?
20       A.    Correct.
21       Q.    You also represented in your Affidavit
22 of Probable Cause that the identification came about
23 as a result of a photo array, correct?
24       A.    Correct. I, from after brushing up on
25 what you told me, I misunderstood that as everything

104

1  that -- all the photos I had and the surveillance,
2  not as far as a lineup or a showup.
3        Q.    And just to recap. You never presented
4  a photo array to any of the employees, either at the
5  Bonefish Grill, at the Target, or at the Walmart that
6  actually participated in the transactions involving
7  these charges, correct?
8        A.    No, not to my knowledge.
9        Q.    Can you describe particularly what
10 characteristics you noticed or found in your
11 investigation that connected Georgia Thompson to this
12 crime or these crimes?
13       A.    Basically just her DMV profile matched
14 -- matched the description portrayed in the videos of
15 Bonefish and, you know, the other -- other videos.
16 Hair style, a particular -- one thing that stood out
17 on me in the Bonefish video was the cheekbone area,
18 it was more of a narrow, like, framed area. And the
19 hairstyle with the DMV hairstyle. That's where she
20 -- that's how I was able to -- she came -- that's how
21 Georgia Thompson became a suspect, amongst, you know,
22 the vehicle registration and stuff like that.
23       Q.    I'm talking the photo ID.
24       A.    Yeah.
25       Q.    The identification you made from the

105

1  photos and things, are there any, I'll say,
2  photographs or videos that you viewed as part of your
3  investigation that depicted the facial
4  characteristics of Ms. Thompson other than the
5  jawline or the lower part of her face?
6        A.    As far as the rest of the face, no. But
7  just the rest of her body, the build.
8        Q.    All right. Did her race have anything
9  to do with her identification?
10       A.    Well, she's -- the suspects are African
11 American. So I wouldn't say, like, race was the
12 drive. I mean, if I was looking for a white suspect
13 or somebody of different color, obviously they would
14 also be -- they would be the suspect.
15       Q.    So it was her race in addition to the
16 other things that you described as far as the facial
17 characteristics your ability to identify the suspect
18 that you claimed and assert was Georgia Thompson?
19       A.    Yeah, her whole profile.
20       Q.    Correct?
21       A.    Correct.
22       Q.    Now, were you able to accurately
23 determine the height, build, weight of the suspect
24 depicted in the videos as being the same or similar
25 to Ms. Thompson?

106

1    A.    It was essentially an approximate, just
2    based off of the surrounding, you know, not just
3    looking at her, the whole picture.
4    Q.    How were you able to determine what
5    videos you were going to review, first of all, at the
6    Walmart? Did somebody already do that for you, or
7    did you do it, or someone else?
8    A.    Well, I went with Detective Mauer. And
9    Loss Prevention assisted with that.
10   Q.    So who determined what part of the video
11   to look at?
12   A.    I believe once we had the subpoenaed --
13   to my knowledge, once we had the subpoenaed bank
14   records, they were able to pinpoint the time frame as
15   far as the fraudulent purchases. And on the -- on
16   the receipt -- I'm sorry. I'm just trying to
17   remember. Like I said, this is from quite a while
18   ago.
19          On the receipt, it tells you the time of
20   the fraudulent purchase along with the -- where the
21   fraudulent purchase happened, so it's that kiosk or
22   that checkout lane. So that's how you were able
23   to...
24   Q.    So at the time you issued your
25   supplemental report, the only thing that you -- you

107

1    didn't have the Walmart video or the Target video,
2    correct?
3    A.    At the time I...
4    Q.    Because you got our assignment on
5    April 13th, and you had a report completed and
6    suspects named in that report within 24 hours or so,
7    correct?
8    A.    Correct. Suspects, correct.
9    Q.    And you didn't have the -- the only
10   thing you looked at up to that point was the video
11   from the Bonefish Grill, correct?
12   A.    Let me just double check.
13   Q.    Sure, sure. That would be, I think,
14   P-2.
15   A.    Okay. So I followed up on the 13th. So
16   from the 13th to the 20th is when I went -- when that
17   whole other part transpired as far as the video and
18   credit cards.
19   Q.    Okay. Because I'm looking at your
20   signature, or where you're being designated as the
21   reporting officer, and it appears that this report
22   was prepared by you, maybe not reviewed yet, but
23   prepared by you on 4-14-2017, as I said 24 hours
24   after you got the assignment; is that right?
25   A.    Yeah. I mean, to my knowledge, it's

108

1    possible that we were able to get the -- obviously we
2    watched the video and from all the stores and...
3    Q.    So you were able to subpoena bank
4    records, get the bank to give you those records, and
5    coordinate that with Walmart and Target within 24
6    hours?
7    A.    We didn't get to -- as far as, like,
8    getting the records and stuff like that, I don't know
9    the exact date, but this is just like the --
10   Q.    What are you referring to?
11   A.    P-2.
12   Q.    Okay.
13   A.    Those were -- they were suspects at
14   this, like, point in time on the 14th or the 13th,
15   once I was starting to look into the initial report.
16   Q.    When you filed this report on 4-14-2017,
17   had you yet reviewed the videos from Target and
18   Walmart?
19   A.    As far as my report says, I did.
20   Q.    Who determined that Georgia Thompson was
21   a suspect at the Bonefish Grill, at that site, at
22   that time?
23   A.    Who determined?
24   Q.    Who made that determination?
25   A.    At that point?

109

1    Q.    Yeah.
2    A.    That would be the initial responding
3    officers.
4    Q.    They weren't there when this occurred,
5    correct?
6    A.    They weren't there when it actually
7    occurred, but they were there to take the report.
8    Q.    How did they determine that Georgia
9    Thompson was a suspect?
10   A.    Based off of the witness.
11   Q.    The witness that we don't know --
12   A.    Correct.
13   Q.    -- who it is? Who you never got a
14   statement or anything else, correct?
15   A.    Correct.
16   Q.    Wouldn't that have been a very important
17   witness?
18   A.    I mean, looking back at it, I mean, it
19   would have been, you know, a good thing for me to
20   follow up with as far as if we actually had the
21   witness. But, I mean, unfortunately, we -- like I
22   said, you know, before, that didn't happen.
23   Q.    Wasn't that a vital piece of information
24   or data as far as witnesses is concerned is to get
25   the eyewitness statement?

110

1  A.  I would say it would be a good -- a good
2  thing to have.
3  Q.  Well, who else would testify that
4  Georgia Thompson was even at the Bonefish Grill when
5  this happened; who would testify to that?
6  A.  Other than me?
7  Q.  How could you testify that? You weren't
8  there.
9  A.  Yeah, I don't -- I don't have an answer
10 to that.
11 Q.  All right. Almost done. Can you just
12 generally describe your background and experience as
13 a police officer?
14 A.  Sure.
15 Q.  Go ahead.
16 A.  All right. I've been a police officer
17 -- do you want to know how long ago?
18 Q.  Yeah. Just your general background. If
19 you want me to be more specific. First of all, what
20 was your first job as a police officer, in law
21 enforcement?
22 A.  I was a Class 1 and Class 2 special
23 police officer down in Seaside Park.
24 Q.  And to get that position, did you have
25 to take any training?

111

1  A.  The Class 1 was -- it was a PT, physical
2  fitness test, a written and an oral interview, a
3  sight test. Yes.
4  Q.  As a result of being a Class 1, were you
5  issued a badge and a gun?
6  A.  No.
7  Q.  So you were limited in your duties?
8  A.  It was essentially parking tickets and
9  borough ordinances and such.
10 Q.  When was your -- what was your first
11 position as a sworn police officer with a badge and a
12 gun?
13 A.  2012.
14 Q.  And for whom were you first employed?
15 A.  Well, as a sworn, it was -- so I was a
16 Class 2. I don't know if you're familiar with it. A
17 Class 2 Special Police Officer, technically it's like
18 part-time. So you're sworn -- you're sworn with full
19 powers on duty, but when you're off duty you're just
20 -- you're not a sworn police officer.
21 Q.  As Class 2, what training did you have
22 to take in order to be qualified for that position?
23 A.  You go through the police academy, the
24 normal police academy. You also have somewhat field
25 training.

112

1  Q.  Did that training entail criminal
2  investigations?
3  A.  Yes.
4  Q.  Did it entail the concept of probable
5  cause to investigate or to arrest?
6  A.  Yes.
7  Q.  Did you have any texts that you used
8  when you were down there for that purpose?
9  A.  What is it?
10 Q.  Did you have a text, or a textbook, or
11 something that you used when you were trained in
12 probable cause?
13 A.  As far as -- we had the police academy
14 manual. I don't know if you're talking about the TC
15 book. I mean, that's the criminal code book.
16 Q.  Okay. Let's just concentrate now on
17 Green Brook. How long have you been employed by
18 Green Brook as a police officer?
19 A.  Since 2014, October.
20 Q.  Did you have to have to do a
21 probationary period?
22 A.  Yes.
23 Q.  What was the probationary period? How
24 long?
25 A.  It was policy and procedure, like,

113

1  departmental policy and procedure. Like, when we're
2  on the road, like, what addresses or which streets
3  are where. It was either nine or 12 weeks of FTO,
4  like, field training with an officer.
5  Q.  What is your current title as a police
6  officer?
7  A.  Right now I'm -- technically I'm a
8  patrolman, but I'm in a position called Special
9  Operations now.
10 Q.  What was your title when you
11 investigated the Bonefish Grill incident in April
12 2017?
13 A.  Technically a patrolman, but Special
14 Operations at this time.
15 Q.  Did you have any special training up to
16 that point on doing an investigation?
17 A.  Well, at that point it was -- I was
18 actually, like -- I guess it was still, like,
19 on-the-job training per se. Because I was still
20 learning, like, paperwork as far as, like, subpoenas
21 and how Somerset County operates as far as, like,
22 screening packets and such.
23 Q.  At that time -- I'm referring to that
24 time, April of 2017 -- did Green Brook police
25 department have any policies and procedures regarding

114

1  conducting investigations?
2      A.    To my knowledge, they do. I mean, we
3  kind of think of -- I can't pull a policy out of my
4  head right now. I mean, there's a ton of policies.
5  To the best of my knowledge, I'm sure there's a
6  policy in there about...
7      Q.    How long had you been a police officer
8  with Green Brook when you investigated the Bonefish
9  Grill theft?
10     A.    So October 1st of '14 to April of '17,
11 was that roughly two-and-a-half years maybe.
12     Q.    And during those two-and-a-half years,
13 did you become familiar with the policies and
14 procedures for investigating crimes in your police
15 department?
16     A.    Did I become familiar?
17     Q.    Yeah.
18     A.    For the most part, yes. And, I mean, I
19 was still building on to my skills.
20     Q.    When was the last time you reviewed the
21 policies and procedures of your department concerning
22 investigations?
23     A.    Probably more than likely it was, to the
24 best of my knowledge, in 2014, October.
25     Q.    Did you have any specific training on

115

1  photo identification protocol with your department?
2      A.    Did I have any training as far as photo
3  identification?
4      Q.    Yes, the protocol.
5      A.    Not to my knowledge.
6      Q.    Did you have any specific training in
7  your department on Attorney General Guidelines
8  concerning photo identification or suspect
9  identification?
10     A.    I mean, I would have to -- I'm trying to
11 think at this point. To the best of my knowledge,
12 yeah, I mean, I probably at one point saw or read it.
13     Q.    Did your department have a checklist or
14 anything similar that you could refer to when doing a
15 photo identification or identifying a suspect?
16     A.    A checklist?
17     Q.    Something to assist you.
18     A.    I don't recall having. I'm sure...
19     Q.    Okay.
20     A.    I'm trying to understand what you're
21 saying. So a checklist to...
22     Q.    I'm just trying to determine whether
23 your department gave you as a form that says for a
24 photo array or a photo identification, these are the
25 steps you have to take according to the Attorney

116

1  General Guidelines.
2      A.    I'm sure we have one. As far as me
3  using a photo array, no.
4      Q.    Did you have anything, any
5  documentation, any checklist, or other data from your
6  police department when you did this investigation for
7  the Bonefish Grill as far as identifying a suspect?
8      A.    Any other data?
9      Q.    Yeah. A checklist, a form, something
10 that would help you conform with any guidelines or
11 court rules concerning photo identifications.
12     A.    I don't recall.
13     Q.    How many photo identifications had you
14 done prior to the Bonefish Grill incident on
15 April 8th, 2017?
16     A.    Prior to this? I'm not sure if I had
17 one before or after this. I don't recall exactly if
18 it was before. This might have been the first one,
19 or if this was the second one.
20     Q.    Approximately how many third and fourth
21 degree crimes did you investigate prior to April 8th,
22 2017?
23     A.    I don't recall. I'm not sure. As far
24 as in?
25     Q.    In Green Brook.

117

1      A.    In total?
2      Q.    Yeah. Approximately.
3      A.    I couldn't put a number on it. I don't
4  recall the exact number.
5      Q.    Had you ever done a photo array?
6      A.    A photo array as far as, like, a photo
7  lineup or anything like that?
8      Q.    Yes, with a witness.
9      A.    A witness? No, not to my knowledge.
10     Q.    Do you have any instructions or
11 procedures regarding an investigation and identifying
12 witnesses?
13     A.    As far as how to identify a witness?
14     Q.    A witness. During your investigation
15 you identify a person as a witness?
16     A.    Okay.
17     Q.    Do you record the name? What do you
18 record as far as that person is concerned?
19     A.    Oh, so if I have a witness to a crime or
20 such?
21     Q.    Yes.
22     A.    Okay. So typically what -- I mean, what
23 I like to do is get an interview with them, document
24 their pedigree information. And, you know, you can
25 either use a video -- or I'm sorry -- audio

118

1 recording. Or if for some exigent circumstances they
2 can't come in, or whatever the situation may be, a
3 written statement would suffice.
4    Q.   That would become part of your
5 investigation report?
6    A.   It would be part of -- correct.
7    Q.   Excuse me. Prior to doing the Bonefish
8 investigation, had you ever investigated a theft
9 before then?
10    A.   Looking back at the years.
11    Q.   This is before.
12    A.   Before April. I'm sure I have. I don't
13 recall, but I'm sure I have.
14    Q.   How about fraudulent credit card
15 transactions, how many of those had you investigated
16 before April 2017?
17    A.   To my knowledge, I'm not too certain if
18 it was prior to this, but it was a similar case to
19 this, or if it was after this.
20    Q.   Okay.
21    A.   So I'm not -- I'm not -- I'm not sure if
22 it was in March or if it was in May, you know.
23    Q.   So it would be two?
24    A.   What?
25    Q.   There were two -- you investigated two

119

1 incidents of credit card -- fraudulent credit card
2 transactions? This one --
3    A.   Well, I'm not sure if the other one was
4 prior to April or if it was after April.
5    Q.   But at most it was one before this --
6    A.   It could be either before or after.
7    Q.   So this Bonefish Grill investigation
8 could have been your very first?
9    A.   It could have been.
10    Q.   Have you been involved in situations or
11 investigations where you had to rely on surveillance
12 videos before April of 2017?
13    A.   I don't recall before. I don't know.
14    Q.   That's all I have, Officer. Thank you.
15    A.   Thank you.
16    MR. GUSS: I have a few.
17    MR. FEINSTEIN: Everyone's okay to keep
18 going? I'm going to be pretty short.
19 CROSS-EXAMINATION BY MR. FEINSTEIN:
20    Q.   Officer, my name again is Jason
21 Feinstein. I represent Detective Radlinsky and his
22 employer, Lawrence Township. I have a few questions
23 in follow-up.
24    Do you still have P-6? I think you
25 described this as a TRACS bulletin?

120

1    A.   Correct. It's right here.
2    Q.   Okay. Do you know what TRACS stands
3 for? Is that an abbreviation for something?
4    A.   The exact abbreviation is -- I'm not
5 sure. It's basically like a BOLO or informational.
6 I think TRACS is just the name of the company
7 perhaps, if I recall. I'm not...
8    Q.   Okay. And just to get a sequence and
9 date and time of events down for our record.
10 According to P-6, this bulletin was prepared by you;
11 is that right?
12    A.   Correct.
13    Q.   And it has a sent date and time of
14 April 14, 2017, at 12:02 p.m.; is that right?
15    A.   Correct.
16    Q.   And just putting that in relation to
17 your supplemental report in this matter, which is
18 Exhibit P-2, if you could just have that side-by-side
19 for the moment.
20    A.   Okay.
21    Q.   Okay. So you submitted your report,
22 P-2, on April 14, 2017, at 12:21 p.m.; is that right?
23    A.   Correct.
24    Q.   So the TRACS bulletin was sent about 20
25 minutes prior to you submitting your supplementary

121

1 report; do I have that right?
2    A.   Approximately. I just want to forewarn
3 you, some of these times are -- like, the time stamps
4 are off. I don't know if you're familiar with --
5 sometimes, like, for instance, like, if you do a DUI,
6 some computers are 20 minutes off compared to the
7 clock on the wall, so you have to, like, be specific.
8    Q.   Sure.
9    A.   So as far as the time frame as 20
10 minutes being the difference, it could be just based
11 off of a time difference, a differential between each
12 device.
13    Q.   If I'm understanding what you're telling
14 me correctly, you don't control the time and date
15 stamp, that's automatically generated, correct?
16    A.   That's automatically generated, correct.
17    Q.   But do you recall having prepared the
18 bulletin and your supplementary report at about the
19 same time?
20    A.   Correct. Like the same day.
21    Q.   All right. And when you submitted the
22 bulletin, is it fair to say that you had -- by the
23 time this was prepared, you had reviewed at the
24 Bonefish Grill their surveillance video; is that
25 correct?

122

1    A.    Yes, correct.
2    Q.    And by the time you had submitted the
3  TRACS report, you had reviewed the surveillance video
4  at the Walmart store; is that right?
5    A.    Correct.
6    Q.    And you had also already reviewed the
7  video from the Target store; is that right?
8    A.    Correct.
9    Q.    Okay.
10   A.    These pictures are from the store. That
11 would coincide with what you just said.
12   Q.    Yep. So let's talk about the photos
13 that were attached to your bulletin report, P-6.
14 There's four of them that go across the page from
15 left to right.
16         Starting with Photo 1 on the left-hand
17 side, is that a still taken from surveillance video?
18   A.    Correct. They're all stills from the
19 surveillance video.
20   Q.    And where -- which surveillance video,
21 which store was Photo 1 taken from?
22   A.    Considering there's red behind there, it
23 looks like Target.
24   Q.    Okay. How about Photo 2?
25   A.    Target.

123

1    Q.    Photo 3?
2    A.    Target.
3    Q.    And Photo 4?
4    A.    Target.
5    Q.    Okay. And are you the person who
6  determined which still photos to attach to this TRACS
7  bulletin?
8    A.    Yeah. I would be the one that would,
9  you know, try to get the best picture to put up on
10 there.
11   Q.    And were the four stills that you
12 included in your mind the best four that you had of
13 the suspects from the crime you were investigating?
14   A.    I mean, there was a couple that, you
15 know, could have been, you know, just as good. I
16 just, you know.
17   Q.    Again, just so we're clear, you were the
18 person that decided which photos to attach; is that
19 right?
20   A.    Yes.
21   Q.    All right. If you wanted to have
22 attached six photos instead of four photos, would the
23 software or the program you used have allowed you to
24 attach more than you did?
25   A.    I believe so. There would have been --

124

1  I think they're smaller the more you add on there.
2  I'm not sure how many pictures. I don't -- I don't
3  -- from my knowledge, I'd have to look at it. I'm
4  not sure if you -- there's not many more you can put
5  on after four.
6    Q.    If you had wanted to include a video
7  file, does the software permit that?
8    A.    No.
9    Q.    A photo would be the only type of image
10 you could attach?
11   A.    Correct.
12   Q.    All right. And the narrative
13 information that appears in the bulletin under the
14 four photos, is that your narrative?
15   A.    Correct.
16   Q.    Did anyone review or approve that
17 narrative before you posted this bulletin?
18   A.    I don't recall, to my knowledge, at that
19 time.
20   Q.    Did anyone instruct you to post this
21 bulletin?
22   A.    I'm not sure if someone actually said
23 post a bulletin. More so is I'm going to post this
24 bulletin to see if I could obtain more information in
25 regards to what I have, or if anyone else had the

125

1  same incident. But, you know, more than likely at
2  that time I had told somebody, you know, what I was
3  doing, yeah.
4    Q.    Prior to this investigation, had you
5  ever made an entry into the TRACS bulletin system?
6    A.    I don't recall. I probably -- I
7  probably have -- had.
8    Q.    And am I correct in my understanding
9  that the reason why you created this bulletin was
10 because you were seeking assistance to help you
11 identify the third suspect in the blue scrubs?
12   A.    I mean, this is basically everything. I
13 mean, it's -- it's either -- it's information
14 gathering, information dissemination. You know,
15 there's an -- I mean, yeah, I mean, it's to further
16 my -- my investigation. Just if I -- even if I
17 think, you know -- even I have suspects or say if --
18 say if I had charges, you know, just because I had
19 the charges, it doesn't mean your investigation is
20 over. It can still -- it can still flow longer than
21 just, okay, now that I have charges I'm done. It's
22 just if the investigation is able to go further as
23 far as information gathering.
24   Q.    And I'm not trying to put words in your
25 mouth. I'm reading from your supplementary report

126

1 wherein you said, "A TRACS bulletin was sent in an
2 attempt to identify the third female suspect wearing
3 blue scrubs."
4     A.    Yeah. I was still trying to identify
5 her.
6     Q.    And was that the reason why you created
7 this bulletin?
8     A.    I mean, yeah, that was -- that was the
9 main reason, is try to find the third suspect. But
10 it's also to anyone with any information with regards
11 to this investigation, you know, if they have
12 similar, you know, individuals.
13         So, I guess, like in Lawrence you guys
14 had similar people, I guess, wearing the same attire.
15 I'm not too sure what that investigation entailed,
16 but the detective saw this. Or, you know, from
17 Lawrence, you know, enough to call me and say, Hey,
18 we have an incident. And, you know, he never
19 followed up with me.
20     Q.    Just so I understand. If he didn't have
21 an unknown suspect in this investigation, and when
22 you wrote this notification you had already
23 identified Georgia Thompson and Douglass Thompson as
24 two of your three suspects, if there had not been a
25 third unknown suspect, would a document like this

127

1 notification still have been created by you?
2     A.    I believe so. If -- well, I'm
3 investigating a credit card fraud case, so I would
4 want to see if anyone else in the surrounding area is
5 also investigating the same type of crimes. As far
6 as information sharing, that's -- you know, that's
7 the whole purpose of that.
8     Q.    Now, the information that you included
9 in P-6 in the narrative section, when you created
10 this document was it accurate?
11     A.    Yes.
12     Q.    And when you prepared this notification
13 back in April of 2017, am I correct in saying that
14 you had identified both Douglass Thompson and Georgia
15 Thompson as two of your three suspects in the crime
16 you were investigating?
17     A.    Correct.
18     Q.    And by sending this out onto the TRACS
19 system, would it be fair to say that you would expect
20 other police departments that have access to that
21 system to rely on the information you put into your
22 notification?
23     A.    To rely. To -- I would say, yeah, to
24 rely on this information as far as if they have a
25 similar incident regarding the similar suspects to

128

1 assist them in an investigation. However, I mean,
2 they would still have to do their investigation.
3     Q.    Do you know how soon after you submitted
4 this report to TRACS that you had your conversation
5 with Detective Radlinsky from Lawrence Township?
6     A.    I don't recall the exact day I spoke to
7 him. I mean, it's probably in his report, right?
8     Q.    Well, you were shown his report. But my
9 question before we turn to his report is, does the
10 police file maintained by Green Brook and created in
11 part by you contain any information about your
12 conversation with Detective Radlinsky?
13     A.    No. I mean, because, from my knowledge,
14 I thought from our conversation at that time we were
15 going to get together. I thought we were setting up,
16 like, a formal date -- day to share information. But
17 I never received a follow-up phone call so...
18     Q.    Before that phone call ended, was an
19 actual day and time scheduled for an in-person?
20     A.    No.
21     Q.    Did you and Detective Radlinsky exchange
22 contact information so that that could occur?
23     A.    I don't -- I don't recall. I'm sure
24 maybe it was on a sticky note somewhere.
25     Q.    Was it your expectation that you were

129

1 waiting to hear again from him?
2     A.    Yes.
3     Q.    And what was it that the two of you
4 spoke that you had that expectation?
5     A.    He was -- we were going to -- he was
6 going to reach out to me to set up a date for
7 information, I guess, to share the information that
8 what he had and what I had.
9     Q.    Okay. Did you ever hear from him?
10     A.    No.
11     Q.    Did you ever contact him after that
12 initial phone call?
13     A.    I don't recall, like, contacting him as
14 far as this.
15     Q.    Were you interested in the progress of
16 his investigation of the crime he was involved with?
17     A.    Quite honestly, I don't -- since he
18 didn't follow up with me, I didn't really know where
19 he was going with his investigation.
20     Q.    Do you recall telling Detective
21 Radlinsky during that phone call that you had
22 attempted to reach, or rather that you spoke with
23 Georgia Thompson by phone?
24     A.    I'm not -- I don't recall if I did or
25 didn't, but I could have.

130

1    Q.    Have you already testified to everything
2  you remember about your phone conversation with
3  Detective Radlinsky?
4    A.    To my knowledge, yeah.
5    Q.    And one of the questions Counsel asked
6  you before, and he was referring to Detective
7  Radlinsky's report, which was marked as Exhibit P-9,
8  Detective Radlinsky put into his report in quotations
9  that you had identified Georgin Thompson and stated
10  that that ID was with -- and this is the quotes --
11  "100 percent certainty."
12        Do you recall using words or a phrase
13  like that during your call?
14    A.    I don't really recall -- I don't really
15  recall the conversation that well, like, period. I
16  mean, was there a possibility that I -- that I said I
17  identified -- this is what I have and I identified,
18  you know, this or that.
19        But as far as, like, the -- the gist of
20  our conversation, the only thing that really rings a
21  bell as far as that is -- pertaining to that is we
22  were going do get together for -- to share
23  information. And if that was to happen, it would
24  have happened, but it didn't.
25    Q.    Do you recall having sent Detective

131

1  Radlinsky anything via e-mail or through the Postal
2  Service related to your investigation?
3    A.    Not that I recall, no. The Postal
4  Service? Through the mail? E-mail? Not that I
5  recall. I mean, not to my recollection. I don't...
6    Q.    Detective Radlinsky's report, P-9, says,
7  "Officer Pepe provided me with Douglass Thompson's
8  pedigree information, which is as follows." It
9  includes his name and address, date of birth, his
10  Social Security number, and a driver's license
11  number.
12        Do you recall having provided that
13  information to Detective Radlinsky?
14    A.    I could have did it via telephone. I'm
15  not -- I don't really sending an e-mail. I mean,
16  it's... But, I mean, you can get all that pertinent
17  information just from a driver's license, which is --
18  well, their information is actually -- I thought it
19  was on here but...
20    Q.    Those are all my questions, Officer.
21  Thank you.
22    A.    You're welcome.
23  CROSS-EXAMINATION BY MR. GUSS:
24    Q.    I have a few questions, Officer Pepe.
25        With regard to the Somerset County

132

1  Prosecutor's Office, you cannot sign off on an
2  indictable offense in Somerset County until the
3  Somerset County's Prosecutor's Office approves that;
4  is that correct?
5    A.    Correct.
6    Q.    And you testified earlier, and you
7  identified as P-11, the memorandum that you forwarded
8  to the Prosecutor's Office, correct?
9    A.    Correct. The screening packet, correct.
10    Q.    Correct. And that package would include
11  all the materials that you've testified to today,
12  correct?
13    A.    Correct.
14    Q.    Your reports, Officer's Kula's reports,
15  Motor Vehicle look-ups, the photographs?
16    A.    Whatever they need, they get.
17    Q.    Okay. Now, if the Somerset County
18  Prosecutor's Office wanted more information from you,
19  they would ask for it, correct?
20    A.    They would request it, correct.
21    Q.    And in this case involving Ms. Thompson,
22  they did not request from you any other additional
23  information, correct?
24    A.    To my knowledge, correct. I don't
25  remember them sending me physically anything they

133

1  wanted.
2    Q.    And, in fact, they issued you a subpoena
3  to appear and testify before the grand jury in this
4  case, correct?
5    A.    Correct.
6    Q.    And you testified on December 13th,
7  2017, before the grand jury, and they returned a true
8  bill against her for these charges, correct?
9    A.    Correct.
10    Q.    When you took over this investigation --
11  you read Officer Kula's report, correct?
12    A.    Correct.
13    Q.    Okay. And at the time you read that
14  report, the Green Brook Police Department had spoken
15  to the victim, is that correct, Ms. Lee?
16    A.    Correct.
17    Q.    And they spoke to the unknown store
18  employee -- it's not a store -- restaurant employee,
19  correct?
20    A.    Correct.
21    Q.    And according to Officer's Kula's
22  report, that unknown individual told him, according
23  to this report, quote, "An employee was able to
24  obtain two New Jersey registrations of vehicles they
25  believe the actors left in," end of quote, correct?

134

1    A.   Correct.
2    Q.   Okay. And when you took over the
3    investigation, Officer Kula, or someone else in the
4    police department, had run the registration on those
5    two plates, correct?
6    A.   Correct.
7    Q.   One came back to Ms. Thompson?
8    A.   Correct.
9    Q.   The other came back to Junior Hamilton?
10   A.   Correct.
11   Q.   And further investigation revealed that
12   Ms. Thompson owned another vehicle, and there had
13   been a ticket of some sort, and that's how you got
14   Mr. Thompson's identification?
15   A.   Correct.
16   Q.   Okay. Now, you were shown earlier P-11
17   and P-12, the photographs of Mr. Thompson and
18   Ms. Thompson, correct?
19   A.   Correct.
20   Q.   Those are the driver's licenses
21   photographs?
22   A.   Correct.
23   Q.   When you went down to the Bonefish Grill
24   to look at the video, did you take those pictures
25   with you?

135

1    A.   Correct.
2    Q.   And did you look at those photographs
3    while you're looking at the videotape?
4    A.   Correct.
5    Q.   And you were able to identify those two
6    individuals by looking at the actual video, correct?
7    A.   Yes.
8    Q.   And you believe that's an important part
9    of this case?
10   A.   I think that's a huge -- a huge part of
11   the case. That video in realtime was, I would think,
12   crucial to the -- to the investigation.
13   Q.   And it's crucial because you're able to
14   see the facial features better?
15   A.   Correct. I mean, in my opinion, all of
16   these pictures that we have here are pictures or
17   screen grabs. They don't -- they don't depict it in,
18   like, realtime video. Even like the -- like, you're
19   taking a picture of a picture within, you know, with
20   a departmental-issued Ni -- you know, camera.
21   Q.   Now, but the photographs, the still
22   photographs, you were able to get from Bonefish. The
23   still photographs and videos that we have from Target
24   and Walmart, the clothes the people are wearing in
25   the shots from Bonefish match the clothes in the

136

1    Walmart and Target?
2    A.   The same clothing. That's how we were
3    able to easily identify them at the other stores too,
4    because they were wearing the same clothing.
5    Q.   Okay. Now, when you went back to the
6    Bonefish Grill when you looked at the video, is that
7    when you tried to figure out who this employee was?
8    A.   I tried -- I tried on numerous occasions
9    tried to find out who the employee was. Nobody --
10   the employee wouldn't come forward. During the
11   admissible -- I believe Bonefish changed hands of
12   ownership coincidentally.
13   Q.   But when you went down on April 13th,
14   five days later, despite your best efforts, no one
15   came forward?
16   A.   No one came forward. I'm not sure if it
17   was a different manager. If I recall, there was --
18   the place was essentially in turmoil as far as the
19   business.
20   Q.   And they're no longer in business now,
21   are they?
22   A.   I believe they're closed up.
23   Q.   Now, Officer Kula's report also says on
24   the third page, "Officer Seidel checked the video
25   footage inside the establishment, which had footage

137

1    of three possible actors, a male and a female,"
2    correct?
3    A.   Yes.
4    Q.   Did you yourself at some point in time
5    show Officer Seidel these photographs?
6    A.   Yes.
7    Q.   What did he tell you?
8    A.   He said the same thing as what I
9    thought, it's them, those are the people.
10       MR. GUSS: I don't have any other
11   questions.
12   REDIRECT EXAMINATION BY MR. LANZA:
13   Q.   Officer, you testified that this video
14   was crucial. In fact, you spent some time with your
15   attorney saying how crucial it is. Yet you never
16   obtained this crucial evidence, did you?
17   A.   I mean, I attempted to.
18   Q.   But you never -- you never got it. It
19   was crucial, wasn't it?
20   A.   It was important, correct.
21   Q.   It was crucial that you get the identify
22   -- identity of the employee who took the license
23   plate numbers; that was crucial too, correct?
24   A.   It would be a factor in here. I mean,
25   like I said before, the initiating officers, it would

138

1 be beneficial in they retained that information but I
2 don't...
3    Q.    Why didn't you subpoena the list of
4 employees, their names and addresses from the
5 Bonefish Grill?
6    A.    I don't know.
7    Q.    Because now you say the video is crucial
8 and it's important to have this person, but back then
9 you didn't think it was crucial, did you?
10    A.    I mean, I did think it was important.
11 That's why -- I attempted on multiple occasions to
12 try to get this information. Not just me that tried
13 to get this information, but other individuals in our
14 department tried to get this information. It just
15 wasn't -- the technology wasn't there as far as
16 trying to upload it to a zip drive.
17    Q.    Did you serve notice on the -- I'm
18 sorry, I didn't mean to interrupt you. That was
19 impolite.
20    A.    That's all right.
21    Q.    Did you serve notice on the Bonefish
22 Grill to preserve this crucial information, the
23 video?
24    A.    Not to my knowledge. I don't know if...
25    Q.    And you never subpoenaed either the

139

1 video or the list of the employees at the Bonefish
2 Grill, did you?
3    A.    Subpoenaed the list of the employees?
4    Q.    The employee list from Bonefish Grill.
5    A.    I mean, to my knowledge, I'm pretty sure
6 we were at a dead end as far as trying to actually
7 get the person to come forward. I don't necessarily
8 think it was a problem. It could have been that
9 these people -- the witness didn't think anything of
10 it. But, I mean, the managers knew that we were
11 trying to get this individual's information. As far
12 as the witness trying to -- wanting to come forward,
13 I'm not -- I'm not really exactly sure what
14 transpired within house at Bonefish.
15    Q.    You were the one in charge of the
16 investigation, correct?
17    A.    Correct.
18    Q.    And you attempted, you said, to get the
19 identity of the employee who took down the
20 information, the license plates of Ms. Thompson and
21 Miss -- Mr. Hamilton, correct?
22    A.    Correct.
23    Q.    All right. Now, did you demand this
24 information from the manager, or the owner, the
25 person who was in charge of the employees at the

140

1 Bonefish Grill?
2    A.    Yes.
3    Q.    Did they give it to you?
4    A.    It was -- I don't really know how to
5 explain what kind of operation they were running
6 there. But it was essentially like talking to a wall
7 and in circles. And it was basically the buck was
8 passed to other work. It was frustrating to try
9 to...
10    Q.    In your opinion, were the officials at
11 the Bonefish Grill, as a police officer, obstructing
12 justice?
13    A.    I'm not sure if they were -- I just
14 think they weren't on the same page. I really have
15 no idea why I wasn't able to have them give me that
16 information. I don't know why it wasn't initially
17 retained from the responding officers. I mean,
18 that's usually the thing to do.
19    Q.    Now, you said another member of your
20 department reviewed the video and also the photos of
21 Mr. and Mrs. Thompson?
22    A.    Yeah, yes.
23    Q.    And confirmed with you that these indeed
24 were the individuals in the video at the Bonefish
25 Grill?

141

1    A.    Correct.
2    Q.    How come that's not in your report? Or
3 if it is in your report, please show me that you
4 confirmed that.
5    A.    I don't know if why. I mean, if that's
6 not in my report, it's -- (witness mumbling).
7        All right. Well, I don't see it in my
8 report. But to the best of my knowledge if I was
9 writing -- as I was typing the report that's in my
10 mind it's just that's, you know.
11    Q.    Now you remember that happening?
12    A.    I just looked at the report.
13    Q.    When you do reports, are your reports
14 supposed to be accurate, truthful and thorough?
15    A.    Yes.
16    Q.    And is your report accurate, truthful
17 and thorough, that you issued in this matter?
18    A.    Yes.
19    Q.    Did any officer or official that is
20 African American assist in the identification of
21 Ms. Thompson as being a viable suspect?
22    A.    Anybody in my department?
23    Q.    Anyone that assisted you to make an
24 identification from the photographs and the video,
25 were they anyone of -- any person that was an African

142

1  American?
2      A.   No.
3      Q.   Well, one thing that did confuse me a
4  little bit was when Counsel was questioning you about
5  the bulletin you put out.
6      A.   Okay.
7      Q.   That actually had stills from Target.
8  And I thought you testified that you couldn't get the
9  stills from Target until you verified through bank
10  records about the times of the charges. Am I
11  incorrect?
12     A.   Well, not necessarily. Because like I
13  said, from the credit -- the last four digits of an
14  individual's credit card, to the best of my ability
15  right now, I'm trying to remember the specifics on
16  this. But they were able to know from the last four
17  digits through the credit card number of where the
18  register -- where the fraudulent purchases were
19  initiated.
20         The bank records for subpoena are just
21  so they're -- you know, when you subpoena bank
22  records, it's just because they're -- now they're,
23  like, legal, you know. Not as far as legal. But as
24  far as this kind of purpose you have, like, a legal
25  paper instead of just... But that's -- yeah, through

143

1  -- through the last four digits of a credit card.
2  I'm not sure how they did it through loss prevention,
3  but they're able to figure out where that credit card
4  was used, at what station, and get -- they were able
5  to print out a receipt from that, which showed me the
6  time frame.
7      Q.   Who was it that chose what -- first of
8  all, what registers or what areas of the Target store
9  to review the surveillance video? Who made that
10  determination as far as the location?
11     A.   It tells you on the receipt what -- what
12  register.
13     Q.   And who made the determination as to the
14  times?
15     A.   I believe that was based off the
16  receipt. It's time stamped.
17     Q.   Was it you or someone from Target that
18  extracted the videos or presented the videos to you?
19     A.   I think it was -- I think it was, like,
20  all of us together. Because we were all -- we were
21  all there, like, as I was there.
22     Q.   So you were viewing --
23     A.   I was there. From there, viewing it
24  from there.
25     Q.   With someone from Target?

144

1      A.   Correct.
2      Q.   And then a fellow officer?
3      A.   Correct. The detective.
4      Q.   Okay. And you did testify in the -- at
5  the grand jury?
6      A.   Correct.
7      Q.   And you -- at the grand jury, you
8  testified that in fact Georgia Thompson was the
9  suspect and the defendant, correct?
10     A.   Correct.
11     Q.   You identified her, right?
12     A.   Correct.
13     Q.   Based on what you told us here today,
14  and your investigation, right?
15     A.   Correct.
16     Q.   And nothing else, right?
17     A.   Nothing else.
18     Q.   Thank you.
19         MR. FEINSTEIN: Nothing further.
20         MR. GUSS: I've just got one or two.
21  RECROSS-EXAMINATION BY MR. GUSS:
22     Q.   Officer Pepe, after you submitted the
23  memorandum to the Prosecutor's Office, the PLEIR
24  memorandum, did the assistant prosecutor handling the
25  file request you to issue any subpoenas, either to

145

1  get the video or the list of employees from the
2  Bonefish Grill?
3      A.   No, not to my knowledge.
4      Q.   And with regard to your efforts to
5  download the video at Bonefish, when you went down
6  there on the -- I believe it's the 13th, you said --
7  you went with -- Detective Mauer was with you,
8  correct?
9      A.   Correct.
10     Q.   And you tried to download that onto a
11  zip drive, correct?
12     A.   Correct.
13     Q.   And when you went back to headquarters
14  to play it, it never downloaded?
15     A.   Essentially what we got was a black
16  screen with a traffic cone and, like, an X-ray. So
17  there was some kind of corrupt -- you know, corrupt
18  data transfer.
19     Q.   You couldn't download it?
20     A.   It wouldn't work.
21     Q.   Nothing else. Thank you.
22     A.   Can I just add one thing to that?
23     Q.   Sure.
24     A.   So Somerset County -- you're probably
25  not familiar with it because I don't think they do it

146

1  in the county you're in, Mercer County. So if they
2  ask for more information, they're not going to --
3  they're not going to approve charges if they don't
4  think that there is enough information to approve
5  charges as far as probable cause, as far as the
6  evidence that I accumulated.
7       So if they ask for anything after that,
8  after the charges are approved, there's nothing you
9  can do if the charges are already approved by an
10 assistant prosecutor and a judge.
11      But if -- what they could have done, if
12 they don't -- this is just for -- so you guys are
13 aware of how it operates. If they get my screening
14 packet and the information attached to it, an AP
15 reviews it, like what we're doing here, and says this
16 is good or this is not good. So either if it's good,
17 they send a form saying these are the charges that
18 are approved, or this was remanded down to municipal
19 court. If it's not approved, or if it is approved,
20 then it's approved. Or if they say it's not approved
21 because I need this, that or this. So they would ask
22 for further things prior to approval of any kind of a
23 complaint issue.
24      MR. GUSS: Thank you, Officer.
25 FURTHER REDIRECT EXAMINATION BY MR. LANZA:

147

1    Q.    Sir, it was your identification in that
2  packet whereby you identified Georgia Thompson as the
3  suspect and the defendant, correct?
4    A.    Correct.
5    Q.    Thank you.
6    A.    You're welcome.
7         MR. GUSS: All right, you're done.
8         THE VIDEOGRAPHER: This concludes the
9  deposition. The time is 1:53 p.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

148

1         ERRATA SHEET
2
3  WITNESS'S NAME _____
4  DATE OF DEPOSITION _____
5  CASE NAME _____
6
7  PAGE  LINE  CORRECTION
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

149

1              WITNESS'S CERTIFICATION
2
3         _____
4           POLICE OFFICER ANTHONY PEPE
5
6  On _____ 2020, the foregoing
7  deposition was submitted to POLICE OFFICER ANTHONY
8  PEPE, the witness, taken on Monday, February 15,
9  2021 for his examination.
10      At which time the deposition was read by the
11 witness and any proposed changes desired were
12 subsequently entered upon the attached errata
13 sheet.
14      Thereafter, the deposition was duly
15 witnessed and signed by:
16
17      _____
18           Notary Public in and for the
19           County of _____
20           State of _____
21
22
23 _____
24 My Commission Expires
25

150

1           CERTIFICATE
2
3          I, RONDA L. REINSTEIN, a Certified Court
4    Reporter of the State of New Jersey, authorized to
5    administer oaths pursuant to R.S.41:2-2, do hereby
6    certify that prior to the commencement of the
7    examination, OFFICER ANTHONY PEPE, was sworn by me to
8    testify to the truth, the whole truth and nothing but
9    the truth.
10         I DO FURTHER CERTIFY that the foregoing is a
11   true and accurate transcript of the testimony as taken
12   stenographically by and before me at the time, place
13   and on the date herein before set forth, to the best
14   of my ability.
15         I DO FURTHER CERTIFY that I am neither a
16   relative nor employee nor attorney nor counsel of any
17   of the parties to this action, and that I am neither a
18   relative nor employee of such attorney or counsel, and
19   that I am not financially interested in the action.
20
21
22
23   RONDA L. REINSTEIN, CCR No. 30X100217800
24   Dated: March 4, 2021
25

EXHIBIT C

```
 1        UNITED STATES DISTRICT COURT

 2        FOR THE DISTRICT OF NEW JERSEY

 3        CIVIL ACTION NO. 3:19-cv-14253-BRM-TJB

 4  GEORGIA THOMPSON-EL,              :

 5              Plaintiff,            :

 6        vs.                         :CIVIL

 7  GREEN BROOK TOWNSHIP, a           :ACTION

 8  municipal corporation of New      :

 9  Jersey, POLICE OFFICER ANTHONY    :

10  PEPE, LAWRENCE TOWNSHIP, a        :

11  municipal corporation of New      :

12  Jersey, POLICE OFFICER JOSEPH     :

13  RADLINSKY and John Does 1-99,     :

14              Defendants.           :

15  -------------------------------x

16              VIDEOTAPED

17  DEPOSITION OF:  JOSEPH D. RADLINSKY

18   DATE:   THURSDAY, MARCH 4, 2021

19   COMMENCING AT 2:08 P.M.

20

21

22

23

24

25
```

2

1   Computer-aided transcript of the
2   videotaped deposition testimony of JOSEPH D.
3   RADLINSKY, taken stenographically in the
4   above-entitled matter before JOSEPHINE A.
5   SCHEUERMAN, a Certified Court Reporter, License
6   #30XI00092800, and Notary Public of the State of New
7   Jersey, at the offices of Eckert Seamans, Princeton
8   Pike Corporate Center, 2000 Lenox Drive, Suite 203,
9   Lawrenceville, New Jersey, on Thursday, March 4,
10  2021, commencing at 2:08 p.m.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1   APPEARANCES:
2
3
4   ECKERT SEAMANS
5   By: JASON S. FEINSTEIN, ESQ.
6       Princeton Pike Corporate Center
7       2000 Lenox Drive, Suite 203
8       Lawrenceville, New Jersey 08648
9       Tel: (609) 989-5057
10      E-mail: jfeinstein@eckertseamans.com
11  Attorneys for Defendants, Lawrence Township
12  and Police Officer Joseph Radlinsky
13
14
15
16  ALSO PRESENT:
17      Nick Marchese, Videographer
18
19
20
21
22
23
24
25

3

1   APPEARANCES:
2
3
4   LANZA & LANZA, LLP
5   By: JOHN R. LANZA, ESQ.
6       5 Main Street
7       Flemington, New Jersey 08822
8       Tel: (908) 782-2600
9       E-mail: jrlanza@lanzaandlanza.com
10  Attorneys for Plaintiff
11
12
13  DiFRANCESCO, BATEMAN, KUNZMAN,
14  DAVIS, LEHRER & FLAUM, PC
15  By: RICHARD J. GUSS, ESQ.
16      15 Mountain Boulevard
17      Warren, New Jersey 07059
18      Tel: (908) 757-7800
19      E-mail: rguss@newjerseylaw.net
20  Attorneys for Defendants, Green Brook
21  Township and Police Officer Anthony Pepe
22
23
24
25  (APPEARANCES CONTINUED ON PAGE 4....)

5

1           INDEX
2   WITNESS              PAGE
3   JOSEPH D. RADLINSKY
4   Examination By Mr. Lanza      9
5   Examination By Mr. Guss      102
6
7
8
9           EXHIBITS
10  ID      DESCRIPTION          PAGE
11  P-13  Internal Affairs Counseling    9
12       Form and Complaint re,
13       Anthem incident
14  P-14  Internal Affairs Counseling    9
15       Form and Complaint regarding
16       school incident
17  P-15  Complaint Summons against      9
18       Georgia Thompson with Affidavit
19       of Probable Cause
20  P-16  Incident Report with Narrative 9
21       for Police Officer Bruce Miller
22       and incident description from
23       citizen
24
25  (EXHIBITS CONTINUED ON PAGE 6....)

| | 6 |
|---|---|
| 1 | EXHIBITS |
| 2 | ID    DESCRIPTION    PAGE |
| 3 | P-17 Radlinsky Report |
| 4 | P-18 Photos on Lawrence Alert    9 |
| 5 | Bulletin |
| 6 | P-19 Still image of woman in white  9 |
| 7 | hat taken at 1:50:27 p.m. |
| 8 | P-20 Still image of woman in white  9 |
| 9 | hat taken at 1:50:28 p.m. |
| 10 | P-21 Still image of man in    9 |
| 11 | bucket hat |
| 12 | P-22 Still image of car taken    9 |
| 13 | 1:37:02 p.m. |
| 14 | P-23 DMV photo of Georgia Thompson  9 |
| 15 | P-24 Green Brook Alert Bulletin    9 |
| 16 | P-26 Grand Jury testimony    9 |
| 17 | |
| 18 | (EXHIBITS NOT ANNEXED HERETO.) |
| 19 | |
| 20 | REQUESTS |
| 21 | |
| 22 | (NO FORMAL REQUESTS WERE MADE.) |
| 23 | |
| 24 | |
| 25 | |

**8**

1  G-u-s-s, and I represent the Green Brook defendants
2  and Officer Pepe.
3          VIDEOGRAPHER:  The court reporter
4  will now swear in the witness and we can begin.
5          - - -
6  JOSEPH  D.  RADLINSKY, having been
7  duly sworn, was examined and testified as follows:
8          - - -
9  EXAMINATION BY MR. LANZA:
10    Q.    Sir, my name is John Lanza. I'm a
11  lawyer and I represent Georgia Thompson-El in
12  certain litigation that she's brought against you,
13  your department, and others concerning an
14  investigation and her ultimate complaint and
15  indictment under those circumstances.
16          If I state a question you do not hear
17  or understand, say so. I will repeat it or rephrase
18  it, whatever is necessary, so you both hear and
19  understand the question. Do you understand that,
20  sir?
21    A.    Yes.
22    Q.    Do you have any question of me or
23  your attorney before we start?
24    A.    No, sir.
25    Q.    Sir, I'm going to show you what we

**7**

1          (Exhibits were marked prior to
2  commencement of deposition.)
3          VIDEOGRAPHER: My name is Nick
4  Marchese. I am a legal videographer with Foreshore
5  Media located at 149 Ocean Ave., Island Heights, New
6  Jersey. The court reporter is Josie Scheuerman from
7  Jacqueline Klapp. Today's date is Thursday, March
8  4th, 2021. The time is 2:08 p.m. We are at the law
9  offices of Eckert Seamans located at 2000 Lenox
10  Drive, Suite 203, Lawrence Township, New Jersey
11  08648.
12          We are here to videotape the
13  deposition of Joseph Radlinsky. The caption of the
14  case is Georgia Thompson-El versus Green Brook
15  Township, et al.
16          Will each of the attorneys please
17  identify themselves and state your interest in the
18  case.
19          MR. LANZA: My name is John R. Lanza.
20  I have the privilege to represent the plaintiff,
21  Georgia Thompson.
22          MR. FEINSTEIN: Jason Feinstein. I
23  represent the defendants Lawrence Township and
24  today's witness, Joseph Radlinsky.
25          MR. GUSS: My name is Richard Guss,

**9**

1  marked P-13 for identification, or I have marked
2  P-13, and ask if you can identify it.
3    A.    It is a Lawrence Township Police
4  Department counseling form.
5    Q.    Does that concern an incident
6  involving yourself, sir?
7    A.    Yes, it does.
8    Q.    All right. And the date that this
9  was issued was October 8, 2014?
10    A.    Yes, sir.
11    Q.    And the supervisor was Lieutenant
12  Brian M., looks like Caloiaro?
13    A.    Caloiaro. Yes, sir.
14    Q.    Caloiaro. Okay.
15          Have you seen this before?
16    A.    Yes, sir.
17    Q.    Was this concerning an incident
18  involving you?
19    A.    Yes, it was.
20    Q.    All right. The first paragraph says
21  that your performance was deficient in certain
22  areas. Do you see that?
23    A.    Yes.
24    Q.    Do you recall that incident?
25    A.    Yes, I do.

10

1   Q.   Can you explain what occurred that
2 resulted in this counseling form?
3   A.   What occurred is what is written
4 here. If you would like me to read it, I could read
5 it. In terms of my recollection, I would have to
6 refer to this form.
7   Q.   All right. Will you refer to the
8 form, please, and read into the record what it
9 states?
10   A.   Yes. Starting with, "Your
11 performance is deficient in the following areas."
12 Paragraph 1: "On 2/3/2014 at 1800 hours, you were
13 in roll call with the E1 squad. After Sergeant
14 Chris Longo finished roll call, everyone started
15 talking about the Super Bowl. Part of the
16 conversation was about how the singer Queen Latifah
17 sang the National Anthem. At that time you said
18 something to the effect that she niggerized the
19 song."
20   Q.   All right. Did that --
21   A.   I'm sorry, sir. Would you like me to
22 continue with the violation?
23   Q.   Yes, sir.
24   A.   Paragraph two: LTPD Rules and
25 Regulation 37.11 states that an employee shall not

11

1 use language that is derogatory to anyone because of
2 race, sex, sexual orientation, creed, color,
3 national origin, ancestry or influence. Although no
4 one in roll call was offended by the comment, it was
5 still used in a -- at an inappropriate time and
6 place. It could have been taken out of context.
7 The use of the word is not acceptable in a
8 professional setting.
9   Q.   All right. Do you now recall the
10 incident?
11   A.   Yes, I do.
12   Q.   Did that incident occur?
13   A.   Yes, it did.
14   Q.   All right. And you were deemed to be
15 in violation of Rule 37.11, use of derogatory terms?
16   A.   Yes.
17   Q.   When you make that statement that she
18 niggerized the song, what did you mean?
19   A.   I don't recall how -- the context
20 that I used that word in, but I do -- but I did use
21 that word and I regret doing so.
22   Q.   All right. That was done at a roll
23 call, correct?
24   A.   Correct.
25   Q.   And at that roll call, you had fellow

12

1 officers, police officers present?
2   A.   Yes.
3   Q.   You had superior officers present?
4   A.   I -- I would imagine -- I can't
5 recall the exact event who was present. The
6 paragraph one says after Sergeant Chris Longo
7 finished the roll call. I don't know if he was
8 still present for that conversation or not.
9   Q.   Can you turn to the next page,
10 please.
11   A.   Yes.
12   Q.   It has, Officers involved, and it has
13 you, Detective Joseph Radlinsky, as being involved,
14 correct?
15   A.   Yes.
16   Q.   Now, it also has other witnesses,
17 correct?
18   A.   Yes.
19   Q.   Lieutenant Christopher Longo,
20 correct?
21   A.   Correct.
22   Q.   Police Officer Ryan J. Dunn, correct?
23   A.   Yes.
24   Q.   Police Officer James looks like
25 Steimle?

13

1   A.   Steimle. Yes, sir.
2   Q.   Steimle.
3     Michael Whitmore?
4   A.   Yes.
5   Q.   And if you go to Page 2, there are
6 other officers, a sergeant, a detective, and other
7 officers were present when you made that statement,
8 correct?
9   A.   Correct.
10   Q.   So you made this statement in front
11 of not only your fellow patrolmen and detective, but
12 also in front of your superior officers?
13   A.   Yes.
14   Q.   And you said it loud enough so they
15 could hear you, right?
16   A.   Yes.
17   Q.   And what did -- again, what did you
18 mean by she niggerized the song?
19   A.   I -- I don't recall why I used that
20 term. It -- in my Internal Affairs investigation, I
21 recalled seeing that term online referring to
22 someone who sings a song and puts more notes in it
23 than were originally used in the song. When I said
24 that I was referring to what I had seen online as a
25 joke which was in very poor taste and I realize now

14

1 and I realized then how hurtful that -- that word
2 is.
3    Q.    All right. When you used that term,
4 niggerized the song, you were referring to the
5 singer Queen Latifah, correct?
6    A.    Yes.
7    Q.    And she's an African American,
8 correct?
9    A.    Yes, she is.
10    Q.    A black woman, right?
11    A.    Yes.
12    Q.    Did that have anything to do with you
13 saying she niggerized the song?
14    A.    No, it did not.
15    Q.    Do you frequently or do you use the
16 term niggerized or the term nigger in your daily
17 conversations?
18    A.    I do not.
19    Q.    Do you use it while you're on duty?
20    A.    I do not.
21    Q.    Off duty?
22    A.    No.
23    Q.    Have you ever used that word?
24    A.    Yes.
25    Q.    Other than what is set forth in P-13?

15

1    A.    I cannot recall ever using that word
2 other than what is set forth in this.
3    Q.    So this is the only time you've ever
4 used that word?
5    A.    I can't recall another time.
6    Q.    All right. And I'm talking about the
7 word niggerized, the word nigger, or derivations
8 thereof?
9    A.    Yes, I understand that, and I can't
10 recall.
11    Q.    And this is the only time that you
12 can recall?
13    A.    That is the only time that I can
14 recall.
15    Q.    And this is -- and that was because I
16 showed you the -- the -- P-13 so you could refresh
17 your recollection?
18    A.    Yes, sir.
19    Q.    All right. I show you what we've
20 marked P-14 for identification and ask if you can
21 identify that.
22    A.    I've never seen this form before, but
23 it is a -- from the title a citizen complaint form.
24    Q.    All right. This is a citizen's
25 complaint. It says, IA number CC2017-35, correct?

16

1    A.    Correct.
2    Q.    Now, IA would stand for Internal
3 Affairs?
4    A.    Yes.
5    Q.    And it was received on September 27,
6 2017 at 10 o'clock?
7    A.    Yes.
8    Q.    This said the citizen involved was a
9 Crystal Edwards, correct?
10    A.    Yes.
11    Q.    You said you never saw this before?
12    A.    I'm not familiar with this
13 departmental form.
14    Q.    Okay. Did you review the summary
15 that's at the bottom?
16            And I will assist you. I will read
17 it into the record and then ask you questions about
18 it.
19            On 9/25/2017, Sergeant James Smith
20 and Detective Joseph Radlinsky were at the LHS
21 investigating a possible bias incident with a
22 reference number. While meeting with Vice Principal
23 Allison Fisher and Guidance Counselor Christian
24 DeAngelo, they discussed whether a boy who used the
25 word Nigga, N-i-g-g-a, which was overheard by a

17

1 female student was classified as a bias incident.
2 During the conversation with Fisher and DeAngelo,
3 Detective Radlinsky reportedly said to Sergeant
4 Smith, Don't kids have free speech in school?
5 Radlinsky also reportedly asked Smith if there was
6 an African American officer working. Finally he
7 said, Where is Billy Chester when you need him.
8            Did I read that correctly?
9    A.    Yes, you did.
10    Q.    Did you recall that incident?
11    A.    I recall going to the school for --
12 for a bias incident, yes.
13    Q.    Do you recall making the statements
14 that were attributed to you in the summary?
15    A.    I do not recall saying that.
16    Q.    Do you know any reason why the --
17 this complaint would have been made by I guess it
18 was -- first of all, it looks like Crystal Edwards.
19 Do you know why she would make such a complaint?
20    A.    I -- I do not. I didn't -- I never
21 met Ms. Edwards.
22    Q.    She is the public school
23 superintendent. Crystal Edwards then called Chief
24 Mark Urby and requested a meeting with him. At the
25 meeting, Edwards related that she felt as though

18

1  Radlinsky's comments were insensitive, especially in
2  today's climate.
3        Are you familiar with Superintendent
4  Crystal Edwards?
5     A.   No, sir. I never met her.
6     Q.   Do you know any reason why she would
7  meet with the chief if you didn't engage in the
8  conversation or make the statements that are
9  allegedly made in the summary?
10    A.   I don't know why she would meet with
11 him.
12    Q.   Do you know whether or not she has
13 anything against you? Did you ever arrest her or
14 have anything against her?
15    A.   No, I never had any contact with
16 Crystal Edwards.
17    Q.   Do you recall the incident being
18 investigated?
19    A.   No. This is the first time that I'm
20 actually seeing this.
21    Q.   Do you admit -- or, first of all,
22 what's your comment or response to the allegations
23 that are made against you here?
24    A.   I don't recall ever having that
25 conversation where I said to Sergeant Smith don't

19

1  kids have free speech in school. I don't recall
2  ever asking if an African American officer was
3  working. And Billy Chester is a long-time friend
4  and coworker of mine.
5     Q.   Is --
6     A.   But I don't --
7     Q.   Okay.
8     A.   I never -- I do not recall saying
9  that.
10    Q.   All right.
11    A.   At the time Billy was assigned to the
12 high school.
13    Q.   Okay. When you state you don't
14 recall, is that because you don't recall that it --
15 that it happened which means that it could have
16 happened, you just don't remember, or something
17 else?
18    A.   When I say I don't recall the
19 incident or words used, it means I can't remember.
20    Q.   All right. Thank you, sir.
21    A.   Sure.
22    Q.   Okay. I'm going to show you what
23 we've marked P fifth -- 15 -- excuse me -- for
24 identification and ask if you can identify that.
25    A.   Yes. This is a Complaint-Summons

20

1  issued by the Lawrence Township Municipal Court.
2     Q.   Does your signature appear on P-15?
3     A.   Yes, it does.
4     Q.   And can you explain the circumstances
5  under which you signed the certification attesting
6  to the facts set forth in the complaint?
7     A.   The complaint was issued based on the
8  information revealed in my investigation in Police
9  Case Number 17-11039. It's signed and issued based
10 on the probable cause determined in that
11 investigation.
12    Q.   Okay. In the Complaint-Summons, you
13 make certain charges against Georgia Y. Thompson,
14 correct?
15    A.   Yes.
16    Q.   All right. You charge her with an
17 incident that occurred on April 8, 2017 in Lawrence
18 Township, correct?
19    A.   Yes.
20    Q.   You charge her with a disorderly
21 persons offense under 2C: 20-3A, correct?
22    A.   Yes.
23    Q.   And that disorderly persons offense
24 carries a penalty of up to six months in jail and up
25 to a thousand dollar fine?

21

1     A.   I'm not familiar with the penalties.
2  If that's what the penalties are, then, yes.
3     Q.   And you also charged Ms. Thompson
4  with a fourth degree or indictable offense under
5  2C:21-6C(1), correct?
6     A.   Correct.
7     Q.   And as an indictable offense of the
8  fourth degree, that exposes Ms. Thompson to up to 18
9  months in jail plus up to $10,000 in fines, correct?
10    A.   Again, I -- I defer to your knowledge
11 on the penalties. If that is what it is.
12    Q.   Were you ever --
13    A.   Yes.
14    Q.   -- ever instructed or take -- took
15 any courses regarding crimes or disorderly persons
16 offenses and what the penalties are?
17    A.   I don't recall any specific course,
18 no, other than -- if I could say.
19    Q.   Sure.
20    A.   Other than what caselaw we reviewed
21 in the police academy.
22    Q.   Sir, if there's any time you want to
23 clarify your answer, go back and clarify an answer,
24 add to an answer, you're free to do it.
25    A.   Thank you, sir.

## 22

1    Q.    Okay. Go to, if you will, Page 9 of
2  11 of P-15. And can you identify what starts on
3  Page 9?
4        A.    Page 9 is the probable cause section
5  of the complaint.
6        Q.    All right. As an experienced --
7  first of all, as of the date of this affidavit,
8  6/8/2017, could you just generally describe your
9  background and experience as a law enforcement
10 officer?
11       A.    Sure. I was hired by the Township of
12 Lawrence August 4th, 1997. After attending the
13 police academy, which I believe was 21 weeks, I came
14 to the department, went through the field training
15 program, the shadow program, subsequently went into
16 patrol rotation. I remained in the patrol rotation
17 until approximately 2015, I believe, when I was
18 reassigned to the detective bureau. I still
19 maintained the rank of patrol officer for a year, a
20 full year before being -- it's not an advancement,
21 so I'll say being made a detective in 2016.
22       Q.    With your experience as of 6/8/2017,
23 what was your understanding of the term probable
24 cause with regard to an affidavit of probable cause?
25       A.    My understanding of the term probable

## 23

1  cause is a reasonable person viewing the facts and
2  circumstances of a situation can determine that a
3  crime has occurred based on those facts and
4  circumstances.
5        Q.    And can you -- and we'll get into it
6  in more detail in a bit, but can you at least
7  generally describe the circumstances that led to
8  your charging Ms. Thompson with these crimes and the
9  affidavit of probable cause?
10       A.    I would best be referred to my
11 narrative. It was four years ago. I vaguely
12 remember the incident, but in order to give everyone
13 complete knowledge of the incident, I would have --
14 like to refer to my police report.
15       Q.    Sure. We can -- we'll get to that,
16 but -- then you would say that your reports have to
17 be thorough and accurate?
18       A.    Yes.
19       Q.    Because just like today, there may be
20 a lapse of time between the time you do your report
21 and the time you might have to testify in court
22 about the incident, correct?
23       A.    That's correct. That's why we do it
24 that way.
25       Q.    So your -- your reports have to be

## 24

1  true, accurate, and correct?
2        A.    Yes.
3        Q.    Right?
4              All right. Turning to Page 10. At
5  the top. I have Page 10 of 11. Do you see that?
6  They're out of order.
7        A.    Out of order. I'm sorry. It's the
8  last page. Yes, I see Page 10.
9        Q.    Okay. The top of the page there's a
10 statement that you put in your affidavit said,
11 "Victim witnessed defendant and codefendant at the
12 time that his wallet was stolen." Is that a true
13 and accurate statement?
14       A.    Again, if I wrote it, it was true and
15 accurate based on what was uncovered in my report,
16 if I wrote it here.
17       Q.    And the defendant that you refer to,
18 is that Georgia Y. Thompson?
19       A.    Yes.
20       Q.    All right. I'm going to start to get
21 -- talk to you -- somewhat switch to the incident
22 itself with reference to various records and
23 reports.
24             I'm going to show you what we marked
25 P-16 for identification and ask if you can identify

## 25

1  that?
2        A.    Yes. This is Lawrence Township
3  Police Department Incident Report. Technically an
4  offense report. It's given the OF designation.
5  That's the call for service.
6        Q.    All right. And what does that mean?
7        A.    It is an incident that involved an
8  offense.
9        Q.    Okay. Who prepared this document?
10       A.    This was prepared by Police Officer
11 Bruce Miller.
12       Q.    What was his involvement in the
13 investigation?
14       A.    Bruce Miller, Officer Miller was the
15 initial officer assigned to this investigation.
16       Q.    And was the document made in the
17 regular course of business?
18       A.    If you're asking is he required to
19 file this document.
20       Q.    Yes.
21       A.    Yes.
22       Q.    And what is the purpose of this
23 document?
24       A.    The purpose of this document is to
25 memorialize the events as related to him by the

26

1 reporting person.
2    Q.    And this document refers to the
3 incident that resulted ultimately in you charging
4 Ms. Thompson?
5    A.    Yes.
6    Q.    Going to the next page, and going to
7 the page after that. Okay. The Bates stamp on
8 this, and that's the stamp in the lower right-hand
9 corner, is LT zero, a number of zeros, the number
10 seven. Do you see that?
11    A.    Yes.
12    Q.    All right. Can you identify what
13 this part of P-16 is?
14    A.    This is the narrative portion of his
15 report.
16    Q.    Of --
17    A.    Officer Miller's report.
18    Q.    What role did Mr. or Officer Miller's
19 report play in your investigation?
20    A.    Typically the responding officer's
21 report is one of the first documents that I would
22 look at when being assigned an investigation. It
23 gives me the background of the investigation.
24    Q.    All right. And what background in
25 this report was important to your investigation?

27

1    A.    First that a crime had been
2 committed. The victim in this case as stated in the
3 assignment reported that his wallet had occurred --
4 theft of his wallet, I'm sorry, had occurred. It
5 was important to me that I saw that Officer Miller
6 met with the victim, a Mr. Lyneborg in this case,
7 and got a brief synopsis from him as to what
8 occurred that led to the theft of his wallet.
9    Q.    What did Officer Miller state in his
10 report that related to the alleged crime?
11    A.    That would be -- if I could read the
12 interview section.
13    Q.    Sure.
14    A.    Under Officer Miller's interview
15 section, which is the interview with the victim, it
16 states, On arrival I met with the victim, Peter
17 Lyneborg," L-y-n-e-b-o-r-g. He related that
18 approximately 1300 hours on 4/8/17, he was sitting
19 inside the restaurant and felt his jacket moving
20 that was on the chair behind him. Lyneborg stated
21 when he turned around he observed the three suspects
22 sitting at the table and asked what was going on --
23 what was going on and at the time -- excuse me --
24 and at the same time discovered his wallet missing
25 from his jacket. Lyneborg said they told him he --

28

1 he could search their bags, but he declined and left
2 shortly, continuing to shop in the area. Lyneborg
3 stated he then had his wife contact LTPD for a
4 report so he could obtain a replacement driver's
5 license.
6    Q.    Okay. Then there's a section that
7 says, Investigation/Action Taken. Correct?
8    A.    Yes.
9    Q.    And in the second sentence or
10 paragraph it states that, The subject -- subjects --
11 excuse me -- suspects were described as one B/M. Is
12 that black male?
13    A.    Yes.
14    Q.    And one B/M middle-aged. That would
15 be black female middle-aged?
16    A.    B/F, yes.
17    Q.    And one B/F black female mid-20s,
18 correct?
19    A.    Yes.
20    Q.    "No further descriptions could be
21 provided." Correct?
22    A.    Correct.
23    Q.    And that was -- so the description
24 was very limited, correct?
25    A.    Very limited.

29

1    Q.    Was -- and there was no
2 closed-circuit TV?
3    A.    No. The restaurant did not have any.
4    Q.    And he states, Officer Miller, that
5 the area was checked for suspects with negative
6 results, correct?
7    A.    Yes.
8    Q.    Now, can you turn to LT8.
9    A.    Yes.
10    Q.    What's that?
11    A.    This is a narrative pertaining to the
12 same incident entered by a private citizen. It's an
13 online report.
14    Q.    Okay. And that's part of your police
15 department's record of this incident?
16    A.    Yes, it is.
17    Q.    And there's a statement in there
18 about, beginning, "Monday the 10th of April at 10:20
19 I found my stolen wallet." Is that a reference to
20 Mr. Lyneborg?
21    A.    From speaking with then -- at the top
22 of the page the Approval ID is 178JA. That's
23 Lieutenant Joe Amodio. Speaking to him regarding
24 this investigation, the "I" is Mr. Lyneborg. He is
25 the one who contacted the department through the

| 30 | 32 |
|---|---|
| 1 online reporting service and made this document. | 1 I don't know if that's what you're referring to. |
| 2 Q. Okay. And in substance, what does | 2 This is my supplemental narrative for this |
| 3 Mr. Lyneborg report? | 3 investigation though. |
| 4 A. Yeah, I could read it verbatim for | 4 Q. And so the supplemental narrative is |
| 5 you if you like. | 5 the supplement to Officer Miller's initial report? |
| 6 Q. Sure. | 6 A. Correct. |
| 7 A. So, "This is an online report filed | 7 Q. All right. So this isn't a |
| 8 from 173.71.120.179." I have no idea what those | 8 supplemental report of a report that you had done? |
| 9 numbers mean. "The following is the incident | 9 A. No. This is a supplemental to his |
| 10 description entered by citizen." So on, Monday, the | 10 narrative. |
| 11 10th of April at 10:20 I found my wallet left at my | 11 Q. Okay. When were you assigned this |
| 12 doorstep at 1804 Barclay Boulevard. My Citibank | 12 investigation? |
| 13 credit card and PNC Bank debit card and cash, paren, | 13 A. I was assigned based on this report. |
| 14 10 to $15, was missing, but my driver's license was | 14 If I can refer to this too. |
| 15 still in the wallet together with 26 cent i coins. | 15 Q. You certainly may. |
| 16 Apparently he meant to type in coins. | 16 A. Okay. Like I said, it'll help with |
| 17 Q. Now, does it record on that document | 17 my recollection. I'll read verbatim. |
| 18 when that information was received? | 18 On 4/11/2017 at 0915 hours, I was |
| 19 A. It states that it was entered on | 19 assigned this investigation. So April 11th. |
| 20 April 19th, 2017 at approximately 9:40 a.m. I -- I | 20 Would you like me to continue? |
| 21 don't know if that was the time that Mr. Lyneborg | 21 Q. No. That's all right. |
| 22 reported it and Lieutenant Amodio entered or | 22 So that was a little over two days, |
| 23 Lieutenant Amodio entered this narrative. I'm not | 23 maybe a third day after the incident? |
| 24 certain of that. | 24 A. Approximately, yes. |
| 25 Q. . The narrative refers to the wallet | 25 Q. And when -- after you received this |

| 31 | 33 |
|---|---|
| 1 being returned to Mr. Lyneborg on April 10th, | 1 assignment, what was the first thing that you did? |
| 2 correct? | 2 A. First thing that I did in this |
| 3 A. Yes. | 3 investigation is what I do in every investigation. |
| 4 Q. And that's approximately two days | 4 I obtain the call for service which is the actual |
| 5 after the incident? | 5 call document from when the call is first called in. |
| 6 A. Yes. | 6 It details responding officers, their times when |
| 7 Q. All right. Okay. I'm going to show | 7 they were dispatched, when they arrived, when they |
| 8 you what we marked P-17 for identification, and ask | 8 left the scene, a disposition of what they did while |
| 9 if you can identify that document? | 9 they were at the scene, persons they talked to while |
| 10 A. This is the supplemental narrative | 10 at the scene. So that's what the call for service |
| 11 prepared by myself regarding the same investigation. | 11 is. And in addition to that, I got a copy of |
| 12 Q. All right. Do you want to take a | 12 Patrolman Miller's offense report which we've gone |
| 13 minute and just go through it to make sure it's a | 13 through. |
| 14 complete report, your complete report of this | 14 Q. All right. And what did you learn |
| 15 incident? | 15 from the information that you collected to that |
| 16 A. Thank you. | 16 point? |
| 17 Yes, sir. | 17 A. That would be listed in my summary |
| 18 Q. All right. So is P-17 a true, | 18 event, summary of the event. |
| 19 complete, and accurate report of your investigation? | 19 Q. And the incident occurred at -- I'll |
| 20 A. This is my report based on my | 20 just -- |
| 21 investigation. | 21 A. Oh. |
| 22 Q. Have you authored any other reports | 22 Q. No. That's okay. |
| 23 except the report that's marked P-17? | 23 A. I must have misunderstood you. |
| 24 A. My name will appear on property | 24 Q. No, no. The summary -- you have a |
| 25 records for anything that I've logged into property. | 25 summary of event, correct? |

34

1   A.   Yes.
2   Q.   And I'm just trying to sort of focus
3   in on certain things, certain times, but you state,
4   "On 4/8/2017 at approximately 1300 hours, he" -- and
5   that refers to Mr. Lyneborg?
6   A.   Yes.
7   Q.   -- "was seated in Zoe's Kitchen
8   located at 3325 Brunswick Pike, Lawrenceville, New
9   Jersey 08648, Mercer Mall." Correct?
10  A.   Yes.
11  Q.   All right. And it goes through in, I
12  guess, in summary form essentially what was in
13  Officer Miller's report?
14  A.   Yes, sir.
15  Q.   And he reported or told Patrolman
16  Miller about the three individuals that were sitted
17  (phonetic) -- seated near him and at the time that
18  his wallet was missing?
19  A.   Yes.
20  Q.   And, again, he describes as suspect
21  number two a middle-aged BF, black female, no
22  further description, correct?
23  A.   Going down to suspects, yes.
24  Q.   All right. Now, how did you
25  interpret that term, middle-aged?

35

1   A.   Since I'm now myself middle-aged, I
2   interpreted it then as I would now, someone
3   approximately 50 years of age.
4   Q.   Okay. And, again, it was a limited
5   description with no video or other photographic
6   evidence of these suspects?
7   A.   Not at this time. I had only what
8   Officer Miller provided me.
9   Q.   Okay. Then the next section is
10  Investigation/Action Taken, correct?
11  A.   Yes.
12  Q.   You contacted Mr. Lyneborg?
13  A.   Yes, I did.
14  Q.   How did you do that?
15  A.   Via phone.
16  Q.   Did you have any personal contact
17  with him at this time?
18  A.   No. This was done by phone.
19  Q.   And what did he say to you, what did
20  you say to him in substance?
21  A.   I'm referring to my report again.
22  Q.   Uh-huh.
23  A.   Sorry. In substance, I first
24  introduced myself. I told him that I was assigned
25  to follow up on the investigation of his stolen

36

1   wallet. He reiterated the circumstances detailed in
2   his online report that Sergeant -- or, excuse me --
3   Lieutenant Amodio filed.
4        He said that some -- on 4/10/2017 at
5   1020 hours, someone put his stolen wallet on the
6   doorstep of his residence. He then went on to tell
7   me that he looked in the wallet and found that --
8   that there was property missing which coincided with
9   the property that he reported in his online report.
10  He said that he had canceled his credit cards
11  immediately after realizing his wallet was missing
12  on April 8th, 2017, and was later advised that there
13  had been three attempts to use the cards after they
14  were stolen.
15  Q.   Did you determine the location at
16  which the stolen credit cards were used or attempted
17  to be used?
18  A.   Yes.
19  Q.   And where was that?
20  A.   The Target store, Monmouth Junction,
21  which is South Brunswick, New Jersey.
22  Q.   How long -- well, first of all, let's
23  go to the second page, Page 10, in the -- I guess
24  I'll say the third paragraph of the third -- the
25  second full sentence.

37

1   A.   Uh-huh.
2   Q.   It states that, "On 4/13/2017, I went
3   to Zoe's Kitchen in an attempt to locate any video
4   surveillance or persons who may have witnessed the
5   incident. The area was checked and no witnesses or
6   video surveillance was located." Correct?
7   A.   Correct.
8   Q.   So at that time you had a very
9   limited description of the suspects?
10  A.   Correct.
11  Q.   And you continued your investigation?
12  A.   Yes.
13  Q.   What was the next thing that you did?
14  A.   After the --
15  Q.   After --
16  A.   Going to Zoe's Kitchen?
17  Q.   Yes.
18  A.   Okay. Because Mr. Lyneborg told me
19  that the attempts had made -- had been made on his
20  credit card at the Target store, I went to the
21  Target store and requested any video of persons who
22  used Mr. Lyneborg's credit cards.
23  Q.   All right.
24  A.   And the -- the Loss Prevention
25  officer was not there at the time. I told another

38

1 associate what I was requesting and asked if they
2 could pass it on to him.
3   Q.   There's -- on -- there's another
4 entry on 4/13/2017, correct?
5   A.   Yes.
6   Q.   You received a call from the Target
7 Loss Prevention officer?
8   A.   Yes.
9   Q.   Who was that?
10  A.   I do not know.
11  Q.   What was his name?
12  A.   I don't know.
13  Q.   You don't know his name, address,
14 phone number?
15  A.   No, I do not.
16  Q.   Did you take a statement from him?
17  A.   No, I did not.
18  Q.   Now, you were preparing this to go to
19 court, correct?
20  A.   Yes.
21  Q.   Eventually. How did you plan to
22 authenticate the -- any videos or other evidence
23 from the Target store without this man's identity?
24  A.   I -- I don't have an answer for that.
25  Q.   Okay. We go further down. It states

39

1 that the Loss Prevention officer related that he had
2 located the video footage that I, you requested, and
3 described the person using Lyneborg's stolen credit
4 card as a young black female. Correct?
5   A.   Yes.
6   Q.   So that wasn't a middle-aged person,
7 correct?
8   A.   No.
9   Q.   Looking at what the Loss Prevention
10 officer described, this young black female, and
11 turning back to the suspects identified or described
12 to some extent by Mr. Lyneborg, the number two
13 suspect is a middle-aged black or female, correct?
14 It's number two.
15  A.   Yes.
16  Q.   But number three is a black female
17 who appeared to be in her mid-20s, correct?
18  A.   Yes.
19  Q.   In your investigation, did you relate
20 the Loss Prevention officer's description of a young
21 black female to suspect number three or number two?
22  A.   Based on that, I don't recall who I
23 related it to, but based on the suspect description,
24 I would relate it to suspect number three.
25  Q.   Now, the next entry you have in your

40

1 report is for April 17, 2017, correct?
2   A.   Yes. .
3   Q.   You went to the Target store and
4 obtained the surveillance video?
5   A.   Yes.
6   Q.   All right. "Two still images of the
7 suspects and five individual pages of receipts
8 detailing the transactions attempted using the
9 victim's credit cards." Correct?
10  A.   Yes.
11  Q.   All right. The -- what did these
12 surveillance videos depict? I'm referring now to
13 assist you below the third transaction there's a
14 statement.
15  A.   Okay. I typically write a synopsis
16 of the video. I didn't know where it was. Thank
17 you.
18      "The surveillance video" -- I'll read
19 it verbatim. "The surveillance video shows a black
20 female wearing white and black colored sneakers with
21 red laces, blue jeans, a green colored long sleeve
22 jacket over a red colored shirt with white writing
23 on the front and a white colored baseball hat and a
24 larger framed black male wearing shoes with light
25 colored laces and tan sides, blue jeans, dark

41

1 colored long sleeve shirt and a tan colored, quote,
2 bucket hat, unquote. The male has a full" beard --
3 excuse me -- "has a full dark beard and mustache,
4 eyeglasses with dark colored frames and a large ring
5 on his right hand."
6      Continue?
7   Q.   Yes, if that's -- if that also
8 describes your view of -- your interpretation of the
9 video.
10  A.   Sure.
11      The next paragraph says, "The video
12 shows the female conducting the transactions. The
13 male is observed standing near the female by the
14 register and observing the transactions. He moves
15 to another register but" observes -- "but is
16 observed looking at the female several times as she
17 conducts the transactions. They are both observed
18 on their cell phones throughout the video and appear
19 to be in communication. They exit the store
20 separately and both get into a" dark -- excuse me --
21 "a larger dark-colored four-door vehicle and drive
22 from the parking lot."
23  Q.   Did you actually see a video of the
24 individuals getting into a larger dark-colored
25 four-door vehicle and drive away?

42

1    A.    I don't recall exactly what was on
2  that surveillance video.
3    Q.    All right. Did you supply your
4  attorney with all the surveillance video you had of
5  the -- the occurrences at the Target?
6    A.    Yes, I did.
7    Q.    Just one second.
8        Now, what I'm going to do is I have
9  marked -- I have in here the video. I have it also
10 on my screen, but what I'm going to do is let you
11 look at the video just to confirm it is a true and
12 accurate video of what you looked at for purposes of
13 this investigation. I will represent to you this is
14 the information that I obtained through your
15 attorney.
16    A.    Okay.
17        MR. LANZA: I'm sorry. I trailed
18 off.
19    Q.    If I can get it to work.
20        I'm going to put this so you can look
21 at it.
22    A.    Thank you.
23    Q.    I think it's running.
24    A.    Yes.
25        I thought I could get away without

43

1  them. They're fogging up a little.
2        That's better. Sit back further.
3        MR. LANZA: We can go off the record
4  if you'd like to take a break while he looks at
5  this. It's up to you fellows.
6        MR. GUSS: I'm not going anywhere.
7        MR. LANZA: All right.
8    A.    I don't recall how long this is.
9    Q.    I don't either. I did look at it a
10 few times. I don't recall exactly how long it is.
11    A.    Seven minutes and we're a minute and
12 a half in, so it's another five minutes, if you
13 could bear with me.
14    Q.    Sure. Take your time. If you need
15 any part of it played back, that's no problem.
16    A.    Thank you.
17        MR. FEINSTEIN: We can go off the
18 record.
19        MR. LANZA: Yeah, we can go off the
20 record until the officer is done with his review.
21        VIDEOGRAPHER: We are now going off
22 the record. The time is 2:55 p.m.
23        (Pause in proceedings.)
24        VIDEOGRAPHER: We are now back on the
25 record. The time is 3:01 p.m.

44

1  CONTINUED EXAMINATION BY MR. LANZA:
2    Q.    Officer, did you have an opportunity
3  to review the video that I showed you?
4    A.    Yes, I did.
5    Q.    Is that a true and accurate recording
6  of the video that you reviewed in conjunction with
7  your investigation?
8    A.    It is.
9    Q.    Is there anything that has been left
10 out, to your knowledge?
11    A.    I'm sorry. I'm referring to my
12 report.
13    Q.    That's fine.
14    A.    Other than the -- the video ended
15 prior to them actually exiting the store, there was
16 no parking lot footage on that video.
17    ' Q.    Was there ever parking lot footage,
18 'cause I'll represent to you we were provided with
19 still photographs that seem to --
20    A.    I wrote in here that I -- I viewed
21 the video and they exited separately and both got
22 into a larger dark-colored four-door vehicle and
23 drive from the parking lot. The only way that I
24 would have been able to determine that is if I
25 viewed parking lot video.

45

1        MR. LANZA: I would just ask to be
2  provided with that if it exists.
3        MR. FEINSTEIN: And I'm happy to
4  comply. I've been told what I've given you is what
5  the police department has, but I will follow up.
6        MR. LANZA: Yeah. I have no reason
7  to doubt that.
8  BY MR. LANZA:
9    Q.    Okay. Now, what -- can you just
10 generally describe what was depicted in the video
11 that you did review?
12    A.    Sure. Actually, after viewing the
13 video, I feel that my description of what I viewed
14 on April 17th of 2017 reflected what I viewed on the
15 video today.
16    Q.    All right. Except for the --
17    A.    Except for the parking lot. That
18 last sentence, they exit the store separately, I
19 could tell that -- I could tell that they walk away
20 from each other, but I can't tell if they've
21 actually exited the store from that video.
22    Q.    All right. Now, did -- is it -- what
23 did you obtain? Did you actually obtain video from
24 Target, or was it -- did you review the video at the
25 Target store or both?

46

1   A.   No. I obtained the video at the
2   Target. I don't recall if they provided me with a
3   DVD or a USB, or how they provided that to me, but
4   it was the video. I did not review it at the store.
5   I reviewed it at the police department.
6   Q.   And the video that you reviewed at
7   the police department, did that have a depiction or
8   a video depiction of the parking lot, the people
9   leaving and getting into the car?
10   A.   Yes, it did.
11   Q.   Okay. Did -- the video that you
12   reviewed just a few minutes ago, did you use that in
13   any way to form -- to identify Georgia Thompson as
14   being the suspect?
15   A.   I -- I use it with these descriptions
16   to determine that based on what I had known about
17   the suspects thus far, those two persons in that
18   video represented to me suspect number one and
19   suspect number three.
20   Q.   All right. Suspect number three, was
21   that the suspect that you eventually identified as
22   Georgia Thompson?
23   A.   Yes.
24   Q.   All right. Was the person that you
25   later identified as Georgia Thompson depicted in the

47

1   video that you looked at?
2   A.   Yes.
3   Q.   And can you describe the person that
4   you saw in the video that you believe to be Georgia
5   Thompson?
6   A.   Could I refer to the report?
7   Q.   Sure. You can always refer to the
8   report, Officer.
9   A.   Okay. I'm just used to asking for
10   permission. Sorry.
11       I would say it's paragraph one where
12   I write in it the surveillance video shows a black
13   female wearing a white -- wearing white and black
14   colored sneakers with red laces, blue jeans, green
15   colored long sleeve shirt over a red colored shirt
16   with white writing on the front and white colored
17   baseball hat, and that would be it.
18       The second portion of that paragraph
19   details the black male's clothing description.
20   Q.   From what's on the video, were you
21   able to discern or identify any facial
22   characteristics of suspect three?
23   A.   No, other than I -- I could discern
24   that she was mid twenty -- mid to -- twenties to 30-
25   year-old female, I felt, based on her -- her face.

48

1   Q.   And she was black, right?
2   A.   She was a black female, yes.
3   Q.   Anything else that you can discern
4   from what you saw on the video as far as the
5   physical characteristics of that person's face? The
6   shape of her nose, the shape of her lips, her eyes,
7   the color of her eyes?
8   A.   Well, at that time I did not have any
9   information on Ms. Thompson, so I wasn't looking to
10   compare the video at this time in the investigation.
11   I had not developed a suspect yet. What I can tell
12   you is what I wrote and that is all I knew based on
13   that video.
14   Q.   During the course of your
15   investigation, did you ever obtain a photograph of
16   Ms. Thompson?
17   A.   Yes.
18   Q.   And how did you obtain that
19   photograph?
20   A.   Based on my report, again, so just
21   keeping it in chronological order for everyone,
22   after I reviewed the video, it would have been the
23   same day that I developed Ms. Thompson as a suspect,
24   so I viewed this on the 17th of April and --
25   Q.   When you say you reviewed this, the

49

1   video?
2   A.   This, the video. I'm sorry.
3   Q.   That's okay.
4   A.   And so the same day, the 17th, I -- I
5   reviewed the alert bulletins, and seeing the one
6   bulletin from Green Brook, I recognized the photos
7   in -- in this case, Officer Pepe's alert bulletin as
8   being the -- the same people involved in my
9   incident, and -- and according to his bulletin, he
10   identified two suspects.
11   Q.   All right. I'm going to skip around
12   a little bit, but I'm going to show you what we've
13   marked P-24 and ask if you can identify that.
14       MR. GUSS: What was that again, Mr.
15   Lanza?
16       MR. LANZA: P-24.
17       THE WITNESS: P-24.
18       MR. GUSS: Thank you.
19   A.   Yes. This is an alert bulletin,
20   sometimes referred to as a Trak alert. It's put out
21   through APBnet, an online service for police
22   departments.
23   Q.   And how does P-24 relate to your
24   investigation?
25   A.   P-24 relates to my investigation

50

1  because it -- the first photo depicts the large
2  build framed --
3      Q.     You're going from left to right?
4      A.     Left to right, sir.  First photo is
5  the larger framed black male.  This is kind of poor
6  quality.  It appears he's talking on his phone
7  wearing a hat, wearing glasses.  The female in what
8  appears to be blue hospital scrubs, same photo.  A
9  close-up of the female in the blue hospital scrubs
10 next talking on her phone.
11             The third image, from this copy I
12 can't really tell what that is.  It's someone
13 standing at a check-out counter, it appears,
14 Saturday, April 8th.
15             The third -- I'm sorry.  The fourth,
16 final photo, is the female that I observed in my
17 video that I just watched and that I described in my
18 report wearing the same clothing in the fourth
19 photo.
20     Q.     Is this the publication by Officer
21 Pepe regarding an incident that occurred in his
22 jurisdiction?
23     A.     Yes, it is.  He's listed as the
24 author.  Typically, the person who authors these
25 alert bulletins is required to put their

52

1      A.     Based on her position in the door, I
2  could place an estimate on the height.
3      Q.     But as a result of your
4  investigation, did you estimate the height of the
5  suspect who you later identified as Georgia
6  Thompson, but was depicted in photographs and in
7  videos?
8      A.     I'd have to refer to my report to see
9  if I actually placed a height to that.
10     Q.     Are you able to place an estimate of
11 the height of the person in the video, in the alert,
12 P-24, that is labeled as Georgia Y. Thompson?
13     A.     Today, looking at this, is that what
14 you're looking for?  I could estimate.
15     Q.     What would you estimate?  What was
16 your estimate at the time of your investigation, the
17 height of suspect number three or the woman in the
18 white cap?
19     A.     I -- I don't recall.  I -- I would
20 have to look at the report to see if I actually put
21 a height.
22     Q.     All right.  Why don't we get to that.
23 If we run across it when you're going through your
24 report, you can --
25     A.     Okay.

51

1  identification in.
2      Q.     Now, the picture on the far right, is
3  that the person that you related to as suspect
4  number three in your investigation?  I'm just trying
5  to get a reference.
6      A.     I would say so.  Yes.
7      Q.     Now, in -- in P-24, the depiction of
8  the person on the far right, can you describe the
9  clothing that person has on?
10     A.     From this photo I could tell that --
11 again, that the copy is kind of bad, but going from
12 the bottom up, her shoes have lighter-colored soles,
13 darker-colored shoes.  I don't know what kind of
14 shoes those are, sneakers or boots or -- blue jeans.
15 She appears to be wearing a coat.  I can't tell the
16 color over a shirt, which I can't tell the color,
17 but it appears to have a white design on the front,
18 and a white baseball cap.
19     Q.     Are you able from the photograph on
20 P-24 of the person you just described, are you able
21 to identify any facial characteristics?
22     A.     I -- I can't tell from -- from this
23 copy, no.
24     Q.     Are you -- are you able to estimate
25 the height of the person?

53

1      Q.     You can say so.
2      A.     But if you'd -- you'd like, I could
3  estimate a height now.
4      Q.     What would you estimate?
5      A.     I would say she's approximately five
6  foot two inches to five foot four inches tall.
7      Q.     All right.
8      A.     Just -- I'm just basing that on the
9  exit door to -- it would be her right side where the
10 handle's located, where the lock is located.
11     Q.     Now, the -- there's a name under that
12 photograph, Georgia Y. Thompson.  Do you see that?
13     A.     Yes.
14     Q.     Is that the first time that you saw
15 the name Georgia Y. Thompson in your investigation
16 is when you saw P-24 for the first time?
17     A.     Yes, sir.
18     Q.     All right.  Did the depiction in P-24
19 of Georgia Y. Thompson relate in any way to your
20 identifying her as the suspect in your
21 investigation?
22     A.     This information on this alert
23 bulletin I would say was crucial for me, because up
24 to this point in my investigation I had three
25 unknown suspects.

54

1    Q.    And why was this crucial to your
2  investigation other than the fact that you had
3  unknown suspects?
4    A.    That was the same person that I saw
5  on the video from the Target in South Brunswick.
6    Q.    And what was similar about the Target
7  video and the alert bulletin, P-24, that led you to
8  that conclusion?
9    A.    This female is wearing identical
10  clothing to the female from the Target video. She
11  appears to be -- again, this is a little blurry, but
12  appears to be the same build, I would say thinner to
13  medium build, same height based on what I saw in the
14  video.
15    Q.    After you reviewed P-24, the alert
16  video, what action did you take as far as your
17  investigation of the Lawrenceville incident was
18  concerned?
19    A.    Again, after viewing the bulletin
20  from Officer Pepe, I contacted him again via phone
21  and -- and asked him, you know, about his case.
22    Q.    And in substance what did you ask him
23  and what did he tell you?
24    A.    This would be exactly what I have
25  written here.

56

1  did you say to him and what did he say to you?
2    A.    Basically, I didn't reiterate --
3  we -- we spoke about his alert bulletin.  I -- I
4  told him that I saw it, I believe my suspects were
5  the same persons that he has listed here, and he --
6  when -- the first paragraph in my report states,
7  Officer Pepe after determining the ownership of the
8  vehicle contacted Georgia Thompson via phone.  I
9  believe that's -- yes, that is referring to the
10  information contained in his alert bulletin which is
11  the second sentence.  I'll read it.  "Patrol were
12  able to obtain a New Jersey registration bearing
13  A31ELB."  This is -- I'm referring to P-24.  I'm
14  sorry.  Which is registered to Georgia Thompson.  So
15  that, where I write after determining ownership of
16  the vehicle, I'm referring to his statement in the
17  alert bulletin on P-24.
18    Q.    So that statement comes directly
19  from Officer Pepe's investigation and his bulletin
20  and not your investigation?
21    A.    Correct.
22    Q.    What else did Officer Pepe explain to
23  you at the time?
24    A.    He stated that during the course of
25  his investigation -- and, again, he put most of his

55

1    Just off the topic, the way this
2  investigation was conducted was not a -- was not a
3  fast-moving investigation where I would have time to
4  actually talk to someone and type as I'm talking to
5  them or go out to a -- say, the Target store,
6  retrieve the video, come back and document that I
7  retrieved the video at that date and time, which is
8  how I prepared this report.  I prepared this report
9  immediately after doing the actions that are listed
10  in this report.  So that was just an aside.
11    Q.    And so is it your testimony that you
12  weren't being rushed, you did a thorough
13  investigation?  Is that what you're saying?
14    A.    My testimony is that it wasn't a
15  fast-moving investigation.  No, I was not rushed.
16  I'm sure I had other cases, but I don't recall my
17  caseload at the time, but there was no one standing
18  over me telling me that it needed to be done, so --
19    Q.    All right.  Getting back to Officer
20  Pepe.
21    A.    Yes.
22    Q.    And your initial contact with him,
23  that was via phone?
24    A.    Yes.
25    Q.    Okay.  And, again, in substance, what

57

1  information on the alert bulletin, P-24, so -- but
2  when I spoke to him on the phone, he stated that
3  after he identified her, he tried to contact Ms.
4  Thompson via phone about his investigation.
5    Q.    All right.  And did he in substance
6  say what happened when he contacted Ms. Thompson by
7  phone?
8    A.    Yes.  He -- I wrote in here that he
9  advised her as to the -- as to the nature of his
10  call, to which she responded she knew nothing about
11  her vehicle being used in a crime.  When Officer
12  Pepe asked her to come to the police department,
13  Georgia Thompson refused and said she did not know
14  anything about the incident that he was
15  investigating.  She refused to answer -- and, again,
16  this is based on what he told me.  She refused to
17  answer further questions.  And, also, Pepe concluded
18  his phone interview with her.
19    Q.    All right.  So up to that point, the
20  only information that you had regarding contact with
21  Ms. Thompson was through Officer Pepe and not you,
22  correct?
23    A.    Correct.
24    Q.    And she in substance didn't want to
25  talk to him and said she knew nothing about an

58

1  incident, correct?
2    A.    Yes.
3    Q.    And you also did a background check,
4  a criminal background check on Ms. Thompson,
5  correct?
6    A.    Jumping down. Yes.
7    Q.    And she had no criminal history,
8  correct?
9    A.    Correct.
10   Q.    And when -- did you take into
11 consideration before you charged Ms. Thompson that
12 she stated to a police officer that she had no
13 knowledge about an incident and she had no criminal
14 history? Did you take that into consideration, sir?
15   A.    I took into account the no criminal
16 history, yes.
17   Q.    And how did you take that into
18 account?
19   A.    The way our complaints are filed
20 after bail reform, criminal history in the state of
21 New Jersey is a consideration. We type our
22 complaints in a manner so that they are to be
23 determined. Before we used to either type a
24 complaint summons or a complaint warrant. Now, the
25 complaints are entered into the system as a to-be-

59

1  determined. The to-be-determined is a designation
2  given to after they are reviewed by my supervisors,
3  a county official or our court based on the person's
4  criminal history, failure to appear, his likelihood
5  of flight, danger to the community, things of that
6  nature. The to-be-determined would -- would
7  basically turn into either a warrant or a summons
8  based on those things that I said. If a person had
9  an extensive criminal history and numerous FDAs, was
10 deemed to be a danger to the community, they would
11 most likely be placed on a warrant rather than a
12 summons. I did not see that in this case.
13   Q.    When you did your investigation, did
14 you determine whether or what Ms. Thompson's social
15 status was, that she was a single mother with a
16 number of children? Did you determine that?
17   A.    I did not.
18   Q.    Did you determine that she was
19 working as an electrician and working towards
20 becoming a licensed electrician?
21   A.    No, I did not know that.
22   Q.    That she was fully employed?
23   A.    No, I did not know that.
24   Q.    Would that have been important before
25 you charged her with an indictable offense?

60

1    A.    I -- it did not enter into my
2  investigation.
3    Q.    So it wasn't -- it wouldn't have been
4  important to you then, is that what you're saying?
5    A.    I'm not saying it wouldn't have been
6  important. I'm just saying I didn't do it.
7    Q.    Well, you said that you weren't being
8  rushed with your investigation, right?
9    A.    No. I said that, yes.
10   Q.    And --
11   A.    But, no, I was not being rushed.
12   Q.    Now, did you ever contact or attempt
13 to personally contact Ms. Thompson about the
14 incident that you were investigating?
15   A.    I did not.
16   Q.    Why not?
17   A.    I just did not. I couldn't give you
18 a reason why I did or didn't.
19   Q.    Would it have been insignificant to
20 you to determine her facial characteristics and her
21 -- even her hairdo at the time of the alleged
22 incident so you could compare it with your video and
23 photographs of the suspect number three?
24   A.    I would say that looking back on this
25 investigation, there are a number of things that I

61

1  could have done. They didn't occur and I don't know
2  why they didn't occur. Based on who I am now and my
3  experience now, you know, several years past, no
4  would be the answer to your question.
5    Q.    All right. Now, in the first
6  paragraph when you initially -- Page 4 of your
7  supplemental report, in your conversation with
8  Officer Pepe, did he say anything about Ms. Thompson
9  being -- stating to him that she was out of the --
10 going to be -- or being out of the country?
11   A.    No, he never mentioned that to me.
12   Q.    All right. You also asked Officer
13 Pepe about his identification?
14   A.    Yes, I did.
15   Q.    And what did he respond?
16   A.    He stated he identified her with,
17 quote, 100 percent certainty.
18   Q.    And what did he base that on?
19   A.    I'm assuming he based it -- I don't
20 know.
21   Q.    No. I'm just going from your report.
22   A.    Oh.
23   Q.    What you stated after that.
24   A.    Based on her driver's license photo
25 and his comparison to his video.

62

1  Q.  Okay.

2  A.  I did not know what his video

3  entailed.

4  Q.  Did you ever look at his videos?

5  A.  No, I did not.

6  Q.  Did there come a time where you

7  obtained Ms. Thompson's driver's license photograph?

8  A.  Yes. After speaking with Officer

9  Pepe and him identifying Ms. Thompson, I had our

10  dispatcher pull a driver's license photo.

11  Q.  I'm going to show you what we've

12  marked P-23 for identification and ask if you can

13  identify that?

14  A.  That's the driver's license photo

15  that -- it appears to be the driver's license photo

16  of Ms. Thompson. It looks to be the one on file

17  with the New Jersey Division of Motor Vehicles and

18  the one that I viewed.

19  Q.  Based on your investigation, you were

20  unaware of what hairstyle Ms. Thompson was wearing

21  at the time of the alleged crime, correct?

22  A.  Yes.

23  Q.  Now, if you -- were you able -- would

24  you have been able to contact Ms. Thompson by

25  telephone to talk to her?

64

1  you, Georgia Thompson's driver's license photo to

2  the surveillance video from Target store in Monmouth

3  Junction, South Brunswick and confirmed that the

4  female with the white colored baseball hat was

5  Georgia Thompson. See that?

6  A.  Yes.

7  Q.  So you compared P-23, correct?

8  A.  Yes.

9  Q.  And you compared it with the video

10  surveillance video from the Target store, correct?

11  A.  Yes.

12  Q.  All right. Can you tell me how you

13  did that?

14  A.  Basically watched the video and had

15  the driver's license right next to me.

16  Q.  Is your testimony that the facial

17  characteristics as depicted in the video and

18  whatever still photographs matched the photograph of

19  Ms. Thompson that's P-23?

20  A.  Yes.

21  Q.  All right. Can you show me that?

22  A.  I could try.

23  Q.  All right. What -- let's -- let's do

24  -- try do -- try and do something here, like maybe

25  speed this up a little bit.

63

1  A.  Yes, I -- I could have researched her

2  phone number.

3  Q.  Well, Officer Pepe had her phone

4  number, correct?

5  A.  I could have asked him for it. Yes.

6  Q.  But you never did that?

7  A.  No.

8  Q.  You could have gone to her home,

9  correct?

10  A.  I -- I don't -- I could have asked

11  permission to go to -- to her home being out of

12  township. Yes, I could have asked.

13  Q.  Could you have requested a local

14  police officer from Scotch Plains to approach Ms.

15  Thompson and to advise her that you would be

16  contacting her either by telephone or in some other

17  fashion?

18  A.  Yes.

19  Q.  Did you do that?

20  A.  No, I did not.

21  Q.  Okay. Getting down a little bit

22  further, it says that -- and I'm going to the

23  paragraph, I guess it's the third full paragraph

24  just before we get to you have now she's suspect

25  number one, but it says that I compared, meaning

65

1  I'm going to show you what's been

2  marked:P-18 for identification and ask if you can

3  identify that?

4  A.  Yes. Sorry. P-18 is the alert

5  bulletin that I authored after -- after I was

6  assigned this investigation, after I received the --

7  the video from the Target store prior to speaking to

8  Officer Pepe.

9  Q.  All right. Does the alert that you

10  issued, does that have the best photograph that you

11  had of Ms. Thompson or the suspect?

12  A.  I would say that that would be the

13  best photo I had of her.

14  Q.  All right. Now, I'm going to show

15  you what we've marked P-19 for identification and

16  ask if you can identify that?

17  A.  It appears to be the same still

18  photograph taken from the video that is -- appears

19  on P-18.

20  Q.  I'm going to show you what's been

21  marked P-20, and ask if you can identify that?

22  MR. FEINSTEIN: John, can I ask since

23  there's no markings on these documents what they are

24  or where they came from?

25  MR. LANZA: That's what I'm asking

66

1   him. This is from what you gave me.
2           MR. FEINSTEIN: My documents all had
3   an LT marking on them. These documents have no
4   markings on them.
5           MR. LANZA: Well, that's why I'm
6   asking him to identify them.
7           MR. FEINSTEIN: Well, I'd just like
8   to know where they came from.
9           MR. LANZA: That's where they came
10  from.
11          MR. FEINSTEIN: From where?
12          MR. LANZA: From discovery.
13          MR. FEINSTEIN: From my production?
14          MR. LANZA: As far as I know.
15          MR. FEINSTEIN: Okay.
16          MR. LANZA: I have -- I have the
17  video. I also have -- I have photographs taken from
18  your video right here.
19          MR. FEINSTEIN: Okay.
20          MR. LANZA: All right.
21  CONTINUED EXAMINATION BY MR. LANZA:
22  Q.    Where was -- where were we?
23  A.    Regarding this, could you ask me the
24  question again?
25  Q.    Yeah. I just ask you if you could

67

1   identify what's depicted in P-20.
2   A.    It appears to be a still image a
3   little further on in the video, perhaps a half a
4   second further on of the female in P-18 continuing
5   to walk out of the store.
6   Q.    All right.
7   A.    That's just based on the person
8   that's also in the image.
9   Q.    What I'm going to show you now is, we
10  -- and we can mark it. We have the video that was
11  produced by Eckert Seamans entitled, or DVD,
12  Thompson-El versus Lawrence Township, and I have
13  depicted on here what we received from them, and I'm
14  going to put that on the screen and you can take a
15  look at it, and the attorney can take a look at it
16  too.
17          Do you know how to work this
18  computer, I mean, as far as pushing the button,
19  'cause I saw you playing with it before. You seem
20  -- you seem to know what you're doing.
21  A.    I -- I -- I could try.
22  Q.    No. I'm just saying, we can --
23  A.    Which one are we looking for here?
24  Q.    These are photographs. I'll just --
25  A.    Okay.

68

1   Q.    -- represent to you these were
2   photographs in the video we took off the DVD.
3   A.    Sure.
4   Q.    And -- but you can just --
5   A.    I just click on one.
6   Q.    You can just click on one and take a
7   look and see if you can --
8   A.    Sure.
9   Q.    -- identify what's depicted in each,
10  and then --
11          THE WITNESS: You have a glare.
12          MR. FEINSTEIN: Go ahead. This now
13  answers my question now that I --
14          MR. LANZA: Oh. That's all right.
15  Fair question.
16  A.    There we go. Two clicks.
17          Okay. Do you want me to --
18  Q.    Yeah. Can you --
19  A.    -- say what I see on this photo?
20  Q.    I'm trying -- well, we'd have to
21  identify it somehow and the size of it is a bit
22  difficult, but it says, Saturday, April 8th, 2017,
23  looks like --
24  A.    One forty --
25  Q.    It's seven -- 1:47 P.

69

1   A.    Yeah.
2   Q.    And it has entrance of vestibule on
3   the -- on the bottom. Can you just --
4   A.    Sure.
5   Q.    -- say what that depicts?
6   A.    This depicts -- from this angle, it's
7   the larger framed black male wearing the -- what I
8   described as a bucket hat, it's sort of like a
9   fishing hat, I guess, entering the Target store. I
10  could tell he's entering because I could see
11  outside.
12  Q.    Did he eventually become a suspect?
13  A.    Yes, he did.
14  Q.    Okay.
15  A.    And there might be an arrow somewhere
16  over here to allow me to go -- there we are. This
17  should bring me to the next.
18          Okay. This is --
19  Q.    This is the second photo?
20  A.    This is the second photo, Saturday,
21  April 8th, 2017, 1:50:27 seconds p.m., exit
22  vestibule AP423.
23  Q.    Okay. Excuse me.
24          We have exhibits marked. I'm going
25  to show you what we've marked again P-21. Was this

70

1  the still photograph you first talked about?
2      A.    Yes, that is the still photograph
3  that I used to author my alert bulletin, the first
4  photo of the black male.
5      Q.    Was P-21 a true and accurate
6  depiction of the photograph you looked at on the
7  computer?
8      A.    It -- it's the same person, but it's
9  not the same photo.  This is -- P-21 is the
10  gentleman exiting the store.  The first image I
11  viewed on the computer here was him entering the
12  store.
13     Q.    Okay.
14     A.    But other than that, it's the same
15  person.
16     Q.    Okay.  And the photograph that's
17  depicted now that you're looking at on the computer,
18  I'm going to show you what is P-19 and ask if -- if
19  that is the same photograph?
20     A.    Yes, it appears to be.
21     Q.    And what does that photograph depict?
22     A.    That depicts the female identified as
23  Georgia Thompson by Officer Pepe exiting the Target
24  store.
25     Q.    Did you use that photograph in your

71

1  identification of Ms. Thompson in this
2  investigation?
3      A.    I don't recall exactly which photo I
4  used, but I will tell you that my identification of
5  her was based on all the video and all the
6  photographs that I had access to.
7      Q.    Okay.  We'll just put that there.
8           Can you move to the next photograph?
9      A.    Sure.  Okay.
10          That was the first one.
11          The second one, when you asked me to
12  click that, you'll see I think she's a little
13  further out.  It's a little different.
14     Q.    Yeah.  Take a look at P-20 and
15  compare that to the photograph on the computer.
16     A.    Okay.
17     Q.    Is that the same photograph?
18     A.    Yes, it is.
19     Q.    And what does that photograph depict?
20     A.    Again, it's Saturday, April 8th,
21  2017, 1:50:28 seconds p.m., so literally one second
22  past the second photo, exit vestibule AP423.  It
23  depicts the same female as the previous photo
24  exiting the Target store talking on her phone.
25     Q.    These photographs were taken from a

72

1  video, I presume?
2      A.    Yes.
3      Q.    Did you actually extract the
4  photographs from a video, or was it -- did someone
5  else do that?
6      A.    I don't know who extracted all the
7  photographs, but I will tell you that I extracted
8  these two photographs that I uses for my P-18, the
9  alert bulletin.
10     Q.    Okay.  Did you use the photograph in
11  P-20 to make your identification of Georgia Thompson
12  in your investigation?
13     A.    It played a part, I would say.  I
14  don't know if that was the specific --
15     Q.    Okay.
16     A.    -- one or not, but I did view that.
17     Q.    All right.  I have another --
18     A.    Okay.
19     Q.    -- photograph, and I'm going to show
20  you what we've marked P-22, and ask if you can
21  identify what's depicted in P-22 and compare it to
22  what's on the screen?
23     A.    P-22 is Saturday, April 8th, 2017,
24  1:37 and two seconds p.m., exterior PL front number
25  one AP, looks like 2012 camera.  I'm assuming that's

73

1  correct.
2      Q.    And what's depicted in that picture?
3      A.    It looks like the parking lot of the
4  Target store.
5      Q.    Why is it relevant to your
6  investigation?
7      A.    It's relevant to my investigation
8  because this, again, this still image, this video
9  must exist somewhere because that's the only way I
10  would have been able to obtain this still image.
11  That's the still image of the vehicle that I saw the
12  two parties who exited the store enter.
13     Q.    Yeah.  I'll represent to you I was
14  not provided with that video and I'm requesting that
15  I be provided with that video.
16     A.    I will -- I will ask when I go back
17  as well.
18     Q.    All right.  What -- can you depict
19  the make and model of the vehicle that's depicted?
20     A.    I can -- I can tell you that that is
21  a dark-colored vehicle.  I can't tell you what make
22  or model that is.
23     Q.    Based on your experience as a patrol
24  officer, are you able to identify that vehicle as a
25  2014 Honda Accord?

74

1    A.    Absolutely not.
2    Q.    Are you able to identify it as
3    anything other than a black car?
4    A.    No.
5    Q.    Did you use this in your
6    investigation, what we've marked P-22?
7    A.    I used it insofar as to determine
8    that they left in a vehicle.
9    Q.    Now --
10   A.    And that it was a dark vehicle.
11   Q.    All right. Do you have any other
12   videos or photographs that depict the suspect who
13   you identified as Georgia Thompson other than the
14   ones that we've reviewed so far?
15   A.    No.
16   Q.    Now, referring to P-19 and P-20.
17   A.    Okay. You have them.
18         That's 21.
19   Q.    And P-21.
20   A.    Okay.
21   Q.    P-21 is the gentleman.
22   A.    Okay.
23   Q.    Referring to those two, what
24   characteristics in this photograph did you use to
25   identify -- well, first of all, did you compare

75

1    those photographs to P-23?
2    A.    Yes.
3    Q.    All right. And what identifying
4    characteristics did you identify in these two that
5    led you to the conclusion that that was -- that the
6    suspect was indeed Georgia Thompson?
7    A.    When I compare a photo to a video,
8    I'm looking at, if possible, the location of the
9    eyes to the ears, the nose, the shape of the face,
10   the shape of the mouth, any scars, marks, tattoos
11   that are visible or any other identifying marks.
12         So with regards to your question, my
13   identification was based on the shape of her face,
14   the shape of her nose, her lips, anything that I
15   could see below the eyebrows because the brim of the
16   hat comes down.
17   Q.    So it is your testimony that the
18   shape of the face and the other characteristics you
19   mentioned of the suspect in P-19 and P-20 resemble
20   what's in P-23, Georgia Thompson?
21   A.    Yes.
22   Q.    Are you a hundred percent certain?
23   A.    I was at the time that I signed the
24   complaint, yes.
25   Q.    Now, you said you also used the

76

1    video?
2    A.    Yes.
3    Q.    All right. And do you recall what
4    parts of the video you -- you used in order to make
5    that identification?
6    A.    No. When I said I used the video, I
7    reviewed the entire video like I did here today, and
8    I don't recall where on that video that I would have
9    stopped to get a better view of the person.
10   Q.    Did you do that?
11   A.    I did do that, but I don't recall
12   like what specific section of the video that I used.
13   Q.    And what part of the person in the
14   video, the suspect in the video, what part of her
15   physical characteristics did you relate to the
16   photograph of Ms. Thompson, P-23?
17   A.    Again, I did the shape of the face,
18   height based on her driver's license like, but I
19   don't know what that is. I don't have that. The
20   shape of the nose, the lips.
21   Q.    And it's your testimony that all
22   that's depicted in the photographs and on the video?
23   A.    Yes.
24   Q.    Anything else that you used to
25   identify Ms. Thompson as the suspect in your

77

1    investigation?
2    A.    Other than Officer Pepe's statement
3    that he was a hundred percent sure it was her, no.
4    Q.    All right. Now, you also reviewed
5    the investigation of Officer Pepe with regard to a
6    Douglas E. Thompson, correct?
7    A.    Yes.
8    Q.    And in your report on Page 4 at the
9    bottom you state, I obtained a New Jersey photo
10   driver's license for Douglas E. Thompson. After
11   viewing the driver's license photo and comparing it
12   to the surveillance video from the Target store, I
13   was unable to determine with 100 percent certainty
14   that the large-framed black male from this incident
15   was Douglas E. Thompson. Correct?
16   A.    That's correct.
17   Q.    And --
18   A.    Excuse me.
19   Q.    -- now, as opposed to Mr. Thompson,
20   Georgia Thompson, you were 100 percent certain from
21   your investigation that indeed she was the -- she
22   was the suspect?
23   A.    Yes.
24   Q.    Okay. Going to Page 5 of your
25   report.

78

1        MR. FEINSTEIN: John, when you're at
2 the right place, can we just break? I don't -- I
3 don't want to stop your flow, but when you're there.
4        MR. LANZA: No, no, let's break now,
5 because I have -- I'm going to another topic on the
6 next page, so why don't we take -- I'm sorry. Any
7 time you need a break is fine.
8        VIDEOGRAPHER: We are now going off
9 the record. The time is 3:45 p.m.
10        (Brief recess.)
11        VIDEOGRAPHER: We are now back on the
12 record. The time is 3:55 p.m.
13 CONTINUED EXAMINATION BY MR. LANZA:
14    Q.    Sir, I want you to refer to Page 5 of
15 your report. It's Bates stamped LT13. Do you --
16 are you there? Do you see that?
17    A.    Yes, sir.
18    Q.    All right. It states that you had
19 contact with Peter Lyneborg. Do you see that?
20    A.    Yes.
21    Q.    All right. And that occurred on
22 4/27?
23    A.    When he actually arrived at the
24 department, yes.
25    Q.    Did you contact him some time before

79

1 that?
2    A.    Prior to that, yes.
3    Q.    All right. Now, the theft occurred
4 on 4/8/17?
5    A.    Yes.
6    Q.    And this is about 19 days later,
7 right?
8    A.    Correct.
9    Q.    All right. What happened after
10 Mr. Lyneborg arrived at the department?
11    A.    As it's stated, he arrived at the
12 police department on 4/27/2017 at approximately 1200
13 hours and was shown the above-listed photos as well
14 as a photo of the unidentified female wearing the
15 blue hospital scrubs.
16    Q.    All right. When you say the
17 above-listed photos, what was Peter -- first of all,
18 did he meet with you personally?
19    A.    Yes.
20    Q.    All right. And you were the one who
21 conducted the interview of Mr. Lyneborg at the time?
22    A.    Yes.
23    Q.    Was anyone else present?
24    A.    No.
25    Q.    Did -- can you define what

80

1 photographs and video you showed him?
2    A.    The -- the ones that I'm referring to
3 are the -- the photos used for my -- my alert
4 bulletin, so it would have been --
5    Q.    All right. I'll show you for your --
6 your assistance P-18. Is that what you're referring
7 to?
8    A.    Yes.
9    Q.    And you showed him that?
10    A.    I believe I did. If not, this, the
11 still photos that you have that aren't attached to
12 -- to this, the ones that I viewed on your computer
13 today.
14    Q.    Okay.
15    A.    But, yes, I believe that those were
16 them.
17    Q.    All right. So that was P-21,
18 correct?
19    A.    Yes.
20    Q.    And was P-20?
21    A.    Was there a 19 or --
22    Q.    There is a 19.
23    A.    Yeah, I think it was the 19 one
24 because this one's -- this is the one for this
25 photo, and these are the two I would have shown him.

81

1    Q.    Would you have shown him any other
2 photographs?
3    A.    No.
4    Q.    Now, when you showed him the
5 photographs, in substance what did you say to him
6 you were -- that you were doing?
7    A.    Let me correct myself.
8    Q.    Go ahead.
9    A.    I did show him a photo of the female
10 wearing what we described as blue hospital scrubs.
11    Q.    But she wasn't in the Target video,
12 was she?
13    A.    She wasn't in the Target video, so --
14    Q.    Where did you get that?
15    A.    I don't know where I obtained that
16 photo.
17    Q.    Well, potentially it was -- could it
18 have been Pepe's alert?
19    A.    I wouldn't have shown him the alert
20 bulletin because of the names attached to the alert
21 bulletin, but I may have shown him the photo. I --
22 I don't recall.
23    Q.    Well, what photos did you have in
24 your possession at that time of the woman in the
25 blue scrubs?

82

1  A.    The only --
2  Q.    And I'll show you P-24.
3  A.    Yeah. The -- that -- that would be
4  the only ones, I believe, that I had of that female.
5  I -- I can't recall any others that I obtained
6  personally.
7  Q.    When you -- how did you show him
8  those photographs if you didn't show him,
9  Mr. Lyneborg, P-24?
10  A.    I don't know. I -- I have no answer
11  for that. I know I showed -- I did not show him the
12  alert, but I showed him the photo of the female with
13  the blue scrubs.
14  Q.    All right.
15  A.    I can't recall. It's not documented
16  and I cannot recall where I got that photo.
17  Q.    Did you show him any other
18  photographs other than the photographs to which you
19  just referred and the video? First of all, did you
20  show him the video too?
21  A.    I don't think I showed him the video.
22  Q.    Okay. The only thing that you showed
23  him is what we've shown as P-19, P-21, and the woman
24  in the blue scrubs?
25  A.    Yes.

83

1  Q.    All right. And, in substance, could
2  you -- well, can you explain the process by which
3  you made any identifications or non-identifications?
4  A.    I documented that in the report, so
5  that would be paragraph three beginning with
6  Lyneborg --
7  Q.    Uh-huh.
8  A.    -- did not hesitate to identify the
9  large-framed black male as the same male that was
10  seated behind him at the restaurant. Additionally,
11  he stated that the black female wearing the white
12  baseball cap was the same female who told Lyneborg
13  that he could search her bag after he confronted her
14  about taking the wallet -- taking his wallet. I'm
15  sorry. Lyneborg pointed to the surveillance photo
16  and said she is carrying the same bag. I asked
17  Lyneborg about his identification and he stated he
18  recognized her clothing and physical features as
19  being the same as the individuals that he spoke to
20  in the restaurant. Lyneborg was unable to identify
21  the female in the blue-colored hospital scrubs as
22  being the second female that he reported was present
23  at the time of his theft -- of his wallet theft.
24  Sorry.
25  Q.    At that time, did you exhibit to

84

1  Mr. Lyneborg the P-23, the photo of Ms. Thompson?
2  A.    P-23? Driver's license photo, no.
3  Q.    So Mr. Lyneborg never identified P-23
4  or Ms. Thompson directly as being the woman that he
5  referred to as one of the suspects?
6  A.    No. My purpose of having him view
7  the -- the people, suspects in this case from the
8  surveillance -- stills taken from the surveillance
9  video was to corroborate his description of the
10  people who were in the restaurant at the time that
11  his wallet was stolen.
12  Q.    All right.
13  A.    I was just simply trying to see if I
14  had the right males and females.
15  Q.    So you, in essence, if I can
16  summarize, you were coordinating the Lawrenceville
17  incident with the Green Brook incident?
18  A.    No. I was coordinating the -- the --
19  the people in the Target using his cards to the
20  people that were in the restaurant with him when his
21  wallet was stolen.
22  Q.    Okay. Did -- did you have any other
23  purpose in that meeting other than what you just
24  defined?
25  A.    No, I did not.

85

1  Q.    All right. The next sentence is --
2  you state, Based on the totality of the
3  circumstances, probable cause was determined to
4  charge Georgia Thompson with the following offenses,
5  Incident Number 17-1109. What totality of the
6  circumstances did you have that establishes the
7  probable cause to charge Ms. Thompson?
8  A.    Based on my investigation. The
9  videos, the surveillance images, my identification
10  of her through her driver's license comparison to
11  the video and the still images coupled with Officer
12  Pepe's identification at -- of the person as Georgia
13  Thompson and him being 100 percent certain that that
14  person was Georgia Thompson, and that person in his
15  alert bulletin is wearing the same clothing as the
16  person in my alert bulletin committing a like
17  offense.
18  Q.    Based on what your investigation, not
19  what Mr. Pepe did, but your investigation, at the
20  time you determined probable cause to charge Ms.
21  Thompson, you were 100 percent certain that she was
22  the suspect involved in the crime that you
23  investigated?
24  A.    I was. I reviewed this case with my
25  supervisors.

86

1    Q.    So from what I understand from what
2    you've testified to, you -- it was only you and your
3    surveillance of the videos and the photographs and
4    Ms. Thompson's driver's license photo that caused
5    you to make the identification of her, correct?
6        A.    It was that coupled with Officer
7    Pepe's identification of who she was.
8        Q.    But this was your investigation,
9    right?
10       A.    Yes.
11       Q.    You signed the probable cause
12   affidavit, right?
13       A.    Yes.
14       Q.    You charged this woman with a
15   fourth-degree crime, right?
16       A.    Yes.
17       Q.    So it's your responsibility to
18   determine that there is just -- the probable cause
19   to charge her, right? That's part of your --
20       A.    Yes.
21       Q.    -- your job?
22       A.    Yes.
23       Q.    All right. You saw, I believe, in
24   the videos, the surveillance videos and some of the
25   stills that the -- we'll just say that the third

87

1    suspect, the woman with the white hat was on her
2    cell phone, correct?
3        A.    Yes.
4        Q.    Did you ever investigate Ms.
5    Thompson's cell phone records to see if they
6    coordinated with the times in the videos?
7        A.    No, I did not.
8        Q.    Why not?
9        A.    I can only say that at that time I --
10   I did not think it was necessary. I -- I don't know
11   why I wouldn't do it. I would do it today. I don't
12   know why I didn't do it then.
13       Q.    But you've also had other witnesses
14   that you didn't interview. I'm referring to the
15   clerks that were at the registers at the time the
16   suspect was attempting to use the credit cards.
17   Correct?
18       A.    Correct.
19       Q.    Did you ever record their identities?
20       A.    No.
21       Q.    You ever take a statement from them?
22       A.    No, I did not.
23       Q.    Did you ever show them any
24   photographs?
25       A.    No.

88

1        Q.    Of Ms. Thompson or anyone else?
2        A.    No.
3        Q.    Why not?
4        A.    It wasn't done. I don't know why I
5    didn't do it.
6        Q.    In P-18 -- P-18 that you've
7    identified as your -- I guess your announcement of
8    your investigation. How will you refer to P-18?
9        A.    An alert bulletin.
10       Q.    The alert bulletin. You -- on the
11   date that this was issued, you said the -- you
12   stated that the female has been tentatively
13   identified. You see that?
14       A.    Yes.
15       Q.    The second paragraph. What did you
16   mean tentatively identified?
17       A.    I must have misspoke before. I did
18   not read my own alert bulletin, and it would appear
19   that the identification that this was -- is this --
20       Q.    It's LT52. It's what was supplied in
21   discovery.
22       A.    This is the only alert bulletin that
23   you have?
24       Q.    That's it.
25       A.    Okay. All right.

89

1            Apparently, I authored this alert
2    bulletin after I spoke with Officer Pepe and Green
3    Brook, and then I authored this and sent it out on
4    the 18th at 12.
5        Q.    And what -- what had you done up to
6    the time you authored this alert, P-18, to establish
7    the identity of suspect number three or the woman in
8    the -- in the white cap?
9            Had you looked at the videos at that
10   point?
11       A.    Um.
12       Q.    Take your time.
13       A.    Yes.
14       Q.    And you looked at the photographs?
15       A.    I -- I had looked at the Target store
16   video. I had reviewed the transaction receipts.
17   And then on the 17th, the day prior to me authoring
18   this, I spoke with Officer Pepe, and then I authored
19   this bulletin.
20       Q.    Okay. So at the time you authored
21   bulletin, you were only tentatively able to identify
22   Georgia Thompson and you weren't 100 percent
23   certain, correct?
24       A.    Correct.
25       Q.    Okay. Sir, you gave testimony before

90

1    the grand jury in the matter of State of New Jersey
2    versus Georgia Thompson and Keith -- Kenneth Edwards
3    that resulted in Ms. Thompson being indicted?
4        A.    Yes. I'm not privy to the grand jury
5    testimony, but I do recall giving grand jury
6    testimony.
7        Q.    I'm going to show you what we marked
8    P-26 and represent to you that it is a transcript of
9    grand jury testimony given on February 1, 2018.
10       A.    Okay.
11       Q.    That I had obtained and supplied to
12   your attorney. If you would, could you turn to
13   page -- and I'll go by the PL number. It's PL62 on
14   the bottom.
15       A.    Okay. PL62.
16       Q.    It's Page 8. ·
17       A.    Okay.
18       Q.    It's on the top. I'm sorry.
19            Okay. You testified that you watched
20   the video. I'm referring to line eight, and this is
21   in the course of your testimony, and you -- you did
22   testify before the grand jury?
23       A.    Yes.
24       Q.    All right. And do you have any
25   question that this is not the transcript of your

91

1    testimony?
2        A.    If this is what they provided to us.
3        Q.    Well, it's probably what I provided
4    to them that the Court provided to us.
5            Do you want to take a moment to look
6    at it?
7        A.    I'll take a moment, but, like I said,
8    I don't recall so I'm just going to be looking at a
9    document that's the Grand Jury testimony.
10       Q.    Okay.
11       A.    I don't recall my answers.
12       Q.    Okay.
13       A.    So I can't compare them to what I
14   have, what -- what is on the document.
15       Q.    Well, why don't I do this? In order
16   to save some time, I'll do the question and answer
17   and see if whether or not that was a true and
18   accurate statement.
19       A.    Sure.
20       Q.    And maybe ask you to explain it.
21   Okay?
22       A.    So the same page, Page 8, Question.
23       Q.    On Page 8, beginning with line eight,
24   the -- the assistant prosecutor says, "Okay. And
25   you watched the video, they both exited the Target

92

1    separately, correct?" And you say, "Correct."
2        A.    Okay.
3        Q.    But the reference was to the two
4    suspects that we've referred to at the Target and
5    then the photographs that you've identified
6    previously, correct?
7        A.    Correct.
8        Q.    It says, "But there was surveillance
9    of them getting into the same vehicle?" And you
10   answer, "Yes." Right?
11       A.    Yes.
12       Q.    So there is a -- somewhere there's --
13   the video exists?
14       A.    That can be the only explanation for
15   you having a still image of that vehicle.
16       Q.    Oh, yeah, there has to be a video. I
17   agree.
18            Beginning on Page 10, you were asked
19   this question and gave this answer: "And you looked
20   at those photos and you identified the woman,
21   correct?" And you answer, "Yes."
22            "Question: And that woman, you
23   confirmed was the same woman that you had seen in
24   Target because she was wearing the same clothes?"
25            You answer, "Yes."

93

1            And the woman that you're referring
2    to you identified later as Georgia Thompson,
3    correct?
4        A.    Yes.
5        Q.    All right. And starting at the
6    bottom of Page 10, at 25, the question is, "So
7    you -- it was also determined through the Green
8    Brook Police Department that the vehicle used in
9    their offense was registered to Georgia Thompson,
10   correct?"
11            "Answer: That's correct. They had a
12   video that showed the rear plate of the vehicle
13   with --" and it says, "You saw the plate? "-- and
14   the running" -- "and the running plate matched
15   the vehicle." See that?
16       A.    Uh-huh.
17       Q.    Did you ever see a video or a picture
18   of Ms. Thompson's license plate?
19       A.    No.
20       Q.    So that's incorrect when it says that
21   they -- that Green Brook had a video --
22       A.    I was still speaking when she -- when
23   she -- when I said "they had a video that showed the
24   rear plate of the vehicle with," and I was still
25   speaking when she said, "You saw the plate?" And

94

1 then I continued and said and the running of the
2 plate matched the vehicle, I -- I was still speaking
3 when she had asked that question. I don't think I
4 ever answered that question.
5    Q.    Did --
6    A.    You saw the plate.
7    Q.    Did you correct the -- or the
8 assistant prosecutor's conception that there was a
9 video that showed the rear plate of Ms. Thompson's
10 vehicle?
11    A.    Did I correct her?
12    Q.    Yes.
13    A.    I don't know.
14    Q.    All right. Question --
15    A.    I --
16    Q.    Okay.
17    A.    Okay. Yeah.
18    Q.    Anything else, sir?
19    A.    No. I was saying I don't know if
20 it's further down in the narrative or not.
21    Q.    All right. The next question: "And
22 Georgia Thompson was later identified as the
23 defendant in this case, correct?" And you say,
24 "Correct." Right?
25    A.    Yes.

95

1    Q.    Who ID'd Georgia being the
2 defendant in this case?
3    A.    The identification was based on my
4 investigation.
5    Q.    Yeah.
6    A.    So, me.
7    Q.    It was you? You, right?
8    A.    Yes.
9    Q.    Okay. And dropping down, "Question:
10 And you were able to match Georgia Thompson as the
11 woman who was using the credit card, the victim's
12 credit card, in Target in this case, correct?" And
13 you answer, "Correct."
14    A.    Yes.
15    Q.    Next question: "So you -- and then
16 the victim in this case positively identified
17 Georgia Thompson as the woman that was sitting
18 behind him at Zoe's kitchen?" "Answer: That's
19 correct." That's not true, is it?
20    A.    What -- what's written here is what's
21 written here, but what I would say that means is I
22 showed the victim, Mr. Lyneborg, the photos. He
23 identified them as the people being in the
24 restaurant sitting behind him, and I had already
25 identified Georgia Thompson as the female using his

96

1 credit card at the Target and was I don't want to
2 say drawing an inference, but trying to connect it
3 in that manner.
4    Q.    So you're --
5    A.    I don't know if I'm making myself
6 clear or not.
7    Q.    At the time you're testifying before
8 the grand jury, correct?
9    A.    Yes.
10    Q.    And they're going to make a decision
11 as to whether to indict Ms. Thompson, correct?
12    A.    Yes.
13    Q.    And the question again says, "So you
14 -- and then the victim in this case positively
15 identified Georgia Thompson as the woman that was
16 sitting behind him at Zoe's Kitchen." And you
17 answered, "That's correct." And -- but that's --
18 but the fact of the matter is as you've testified
19 before that the victim, Mr. Lyneborg, never
20 identified Georgia Thompson, correct?
21    A.    That's correct. I never showed him a
22 picture of Georgia Thompson.
23    "And he specifically stated, yeah,
24 that's the woman that told me I could search her
25 bags, correct?" And you said, Yes." Right?

97

1    A.    Yes. He told me that.
2    Q.    That's the woman, right, whom the --
3 whom in the prior question you identified by your
4 answer as Georgia Thompson?
5    A.    That's what it says, so --
6    Q.    So the impression given to the grand
7 jury by your testimony is that the victim
8 specifically identified Georgia Thompson as the
9 woman that was sitting behind him at Zoe's Kitchen,
10 correct?
11    MR. FEINSTEIN: Objection to the
12 form.
13    VIDEOGRAPHER: We are now going off
14 the record. The time is 4:17 p.m.
15    (Off video record.)
16    MR. FEINSTEIN: The objection is the
17 witness isn't here to testify as to what the grand
18 jury's impressions were of the testimony. He's here
19 to testify about what he recalls of the testimony.
20    MR. LANZA: All right. Fine.
21    VIDEOGRAPHER: We are now -- we are
22 now back on the record. The time is 4:18 p.m.
23 CONTINUED EXAMINATION BY MR. LANZA:
24    Q.    Okay. Sir, what you in these two
25 answers stated or testified that Mr. Lyneborg

98

1  identified Georgia Thompson as the woman in Zoe's
2  Kitchen that he saw, correct?
3      A.    Yes.
4      Q.    But you never showed him a picture of
5  Ms. -- Ms. Thompson, correct?
6  .   A.    Correct.
7      Q.    So he never, ever identified Ms.
8  Thompson as that woman, correct?
9      A.    No.
10     Q.    So that's false, right?
11     A.    Yes.
12     Q.    All right. And let's go to Page 12.
13 Question on -- starting at line 11: "And so the
14 victim at that point in time positively identified
15 Georgia Thompson as the person in Zoe's. Did you
16 show" him, "the victim the picture of Kenneth
17 Thompson or had you -- I mean, excuse" me, "of
18 Douglas Thomas or you had eliminated --" And you
19 answered, "I had not identified him yet." Correct?
20     A.    Yes.
21     Q.    All right. And on Page 13, beginning
22 at line 9, your answer is -- let's go back. Let's
23 start -- let's start at 2. "Okay. So the victim,"
24 and the victim that you're referring to in your case
25 is Mr. Lyneberg, correct?

100

1      A.    -- it's the way the question was
2  phrased by the assistant prosecutor and what I
3  meant. What I said was not what I meant.
4      Q.    All right.
5      A.    So --
6      Q.    What did you mean?
7      A.    I showed him the picture of Georgia
8  Thompson. That was -- I showed him the picture of
9  the female in the white ball cap whom I identified
10 as Georgia Thompson. Had I said that, this would
11 have made a little more sense, because, again, I
12 only showed him the picture of the woman in the
13 white ball cap to determine that that was the female
14 who was in the restaurant when his wallet was
15 stolen. So when I refer to Georgia Thompson in that
16 sentence, what I should have said is I showed him
17 the picture of the woman in the white ball cap. I
18 did not say that. I identified her.
19     Q.    You -- did you ever correct --
20     A.    No, I didn't.
21     Q.    -- that testimony before the grand
22 jury?
23     A.    No. This is the first time that I'm
24 actually seeing my grand jury testimony in writing
25 and the first time that I'm correcting that.

99

1      A.    Yes.
2      Q.    Borg.
3            "So the victim at this point in April
4  was only identified" -- "has only identified Georgia
5  Thompson as one of the people at Zoe's Kitchen?"
6            "Answer: What he -- he also
7  identified the, at that time, that "unidentified
8  male as the male that was seated behind him,"
9  answer.
10           "Okay. Okay." "Question: Okay.
11 Okay."
12           And then you say, state, Answer: "So
13 we had not gained an identity of that male. But
14 when I showed him the picture of Georgia Thompson,
15 he said that's the woman that said I could search
16 her bags," and "she was seated behind" him. You've
17 testified to that, didn't you?
18     A.    Yes.
19     Q.    And that was false, wasn't it?
20 Because you never showed him a picture of her,
21 right?
22     A.    I never showed him a picture of her.
23     Q.    So that's --
24     A.    But --
25     Q.    Okay. Go ahead.

101

1      Q.    All right. And as a result of
2  your -- you were the only one that testified before
3  the grand jury, correct?
4      A.    I don't know. That day, yes. I
5  don't recall seeing another officer from my
6  department there.
7      Q.    And as a result of your testimony in
8  whole or in part, Ms. Thompson was indicted,
9  correct?
10     A.    I don't know.
11     Q.    You don't -- to this day you don't
12 know whether or not she was indicted as a result of
13 your investigation?
14     A.    No. The Prosecutor's Office never
15 informed me of -- usually at the end of a grand jury
16 testimony, they'll ask you to remain until they're
17 done deliberating. They'll come out and they'll say
18 the person's been indicted, there's been no bill,
19 failed to indict for one reason or another. That
20 didn't occur that day. I don't know why. No one
21 ever told me.
22     Q.    What was your purpose then in
23 appearing before the grand jury?
24     A.    My purpose was to gain an indictment.
25     Q.    Of Ms. Thompson?

102

1    A.    Yes.
2          MR. LANZA:  No further questions.
3          Pass the witness.
4    EXAMINATION BY MR. GUSS:
5    Q.    Good afternoon, Detective.  My name
6    is Richard Guss and I represent Officer Pepe and the
7    other Green Brook defendants.  I just have a few
8    follow-up questions.
9    A.    Sure.
10   Q.    Now, if I understand your testimony
11   today, is the purpose of an alert for one local
12   police department to put information out to -- to
13   gain assistance from other police departments who
14   have made -- may have contact with suspects?
15   A.    I would say that's an accurate
16   description of the purpose of them.
17   Q.    Okay.  And the alert is a
18   standardized tool that police departments used and
19   continue to use, correct?
20   A.    Yes.
21   Q.    And is the alert something that you
22   would usually rely upon and when you conduct an
23   investigation?
24   A.    Yes.
25   Q.    And that would be based upon your

103

1    training and experience, correct?
2    A.    Yes, sir.
3    Q.    Okay.  Now, in this case, when you
4    got the alert from the Green Brook Police
5    Department --
6          THE WITNESS:  I just gave them back
7    to you.
8    Q.    No, I don't need to show you.
9    A.    Okay.
10   Q.    I'm just looking for the number to
11   the -- so the record is clear.
12         MR. LANZA:  What are you looking for,
13   Mr. Guss?  24?
14         MR. GUSS:  Is it 24?
15         MR. FEINSTEIN:  Yes.
16         THE WITNESS:  Just if I had to refer
17   to it.  I gave you back.
18   Q.    Yeah, that's correct.
19         And when you looked at P-24 --
20         THE WITNESS:  Thank you.
21   Q.    -- you saw what it had to say, and as
22   you testified, the photographs of who was identified
23   as Douglas Thompson and Georgia Thompson appeared to
24   look similar to photographs to the video you had
25   seen in the Target in your investigation?

104

1    A.    Yes.
2    Q.    Okay.
3    A.    That's the person that's identified
4    as Douglas Thompson.
5    Q.    Correct.
6    A.    And Georgia Thompson.
7    Q.    Well, let me clarify my question.
8          So when you looked at the alert which
9    we've marked as P-24 --
10   A.    Uh-huh.  Yes.
11   Q.    -- you had already looked at the
12   video from your Target store that you went to?
13   A.    Yes.
14   Q.    And the persons who were identified
15   in P-24 as Douglas Thompson and Georgia Thompson
16   looked familiar?
17   A.    Yes, they did.
18   Q.    Okay.  Now, you then spoke with
19   Officer Pepe?
20   A.    Yes.
21   Q.    And is it my understanding that what
22   you took away from that conversation was he had
23   identified Ms. Thompson positively as a suspect in
24   his case, correct?
25   A.    Correct.

105

1    Q.    Okay.  And am I correct in
2    understanding your testimony today that what you
3    took away from that conversation was Georgia
4    Thompson might be a suspect in the crime committed
5    in my town?
6    A.    Yes.
7    Q.    Okay.  You were not relying upon
8    Officer Pepe's identification of Ms. Thompson as his
9    suspect as part of your probable cause, correct?
10   A.    I don't know how to answer that.
11   Q.    Well, let me -- let me ask it a
12   different way.  Maybe I can try to get it a little
13   clearer.  What I'm trying to find out is, what if
14   anything did you take from the alert from Green
15   Brook and your conversation with Officer Pepe as it
16   pertains to your investigation?
17   A.    What I took away from the
18   investigation is Officer Pepe identified the female
19   in the white ball cap as Georgia Thompson with a
20   hundred percent certainty, and the same female
21   appears in the Target in South Brunswick who
22   committed the offense in Lawrence.
23   Q.    Okay.  So if I understand your
24   answer, you were taking away from Officer Pepe a
25   name of a suspect to assist your investigation?

106

1   A.   Yes.
2   Q.   Okay. You then independent of
3 Officer Pepe got a driver's license photograph of
4 Ms. Georgia Thompson, correct?
5   A.   Correct.
6   Q.   You then either it was before or
7 after had an opportunity to look at your Target
8 videos, correct?
9   A.   Correct.
10   Q.   And you independent of Officer Pepe's
11 opinion came to the conclusion that Ms. Thompson was
12 a suspect in this crime that we're talking about
13 today, the taking of the person, the using -- the
14 wallet and taking of credit cards, correct?
15   A.   Yes.
16   Q.   Okay. And when you submitted your
17 affidavit of probable cause on the summons on P-15,
18 Officer Pepe's opinion or findings are not part of
19 that probable cause, correct?
20   A.   I don't believe they were.
21   Q.   You have your own investigation, and
22 if I understand correctly was your review of the
23 videotape in comparison to the photograph of the DL
24 of her, correct?
25   A.   Yes.

107

1   Q.   And then the victim's identification
2 of the videos from the stores and his actual
3 interaction with them?
4   A.   Yes.
5        MR. GUSS: I don't have anything
6 else, Officer -- Detective. Thank you.
7        THE WITNESS: Sure.
8        MR. FEINSTEIN: I don't have any
9 questions.
10        MR. LANZA: Thank you, sir.
11        MR. FEINSTEIN: You're all done.
12        MR. GUSS: Appreciate it.
13        VIDEOGRAPHER: This concludes the
14 deposition. The current time is 4:28 p.m.
15        MR. FEINSTEIN: I'd like to order a
16 copy of the witness's testimony today.
17        MR. GUSS: Yes, I would like a copy
18 of the transcript of the detective, please.
19        (Deposition is concluded at 4:28
20 p.m.)
21
22
23
24
25

108

1        CERTIFICATE OF OFFICER
2
3        I, JOSEPHINE A. SCHEUERMAN, a
4 Certified Court Reporter and Notary Public of the
5 State of New Jersey, do hereby certify that prior to
6 the commencement of the examination, JOSEPH D.
7 RADLINSKY was duly sworn by me to testify to the
8 truth, the whole truth and nothing but the truth.
9        I DO FURTHER CERTIFY that the
10 foregoing is a true and accurate transcript of the
11 testimony as taken stenographically by and before me
12 at the time, place and on the date hereinbefore set
13 forth, to the best of my ability.
14        I DO FURTHER CERTIFY that I am
15 neither a relative nor employee nor attorney nor
16 counsel of any of the parties to this action, and
17 that I am neither a relative nor employee of such
18 attorney or counsel, and that I am not financially
19 interested in the action.
20        Josephine A. Scheuerman
21
22        JOSEPHINE A. SCHEUERMAN, CCR
23        CCR No. 30X100092800
24
25 DATE: March 29, 2021

EXHIBIT D





PL 722

EXHIBIT E

## Ian Oakley

**From:**      Joseph Radlinsky
**Sent:**      Monday, April 24, 2017 7:48 AM
**To:**        'Peter'
**Subject:**   RE: Case #17-11039

Mr. Lyneborg,
Thursday at noon is a good time. Please contact me if you have any trouble meeting with me at that time.
Thank you.
-Joe

**From:**
**Sent:** Sunday, April 23, 2017 7:36 PM
**To:** Joseph Radlinsky
**Subject:** Re: Case #17-11039

Tuesday or Thursday this week around noon would be a good time for me.
Best regards, Peter Lyneborg

Sendt fra min iPad

Den 21. apr. 2017 kl. 11.55 skrev Joseph Radlinsky

Mr. Lyneborg,
Thank you for responding to my request.
I work Monday through Thursday next week (April 24-28) from 7:00am to 5:00 pm.
Please contact me with a time that would be good for you to come to the police department to review
the photos of the suspects.
Thank you
-Joe

Detective Joseph Radlinsky
Badge #184
Lawrence Township Police Department
2211 Lawrence Road
Lawrenceville NJ 08648

1

## Ian Oakley

| | |
|---|---|
| **From:** | Peter |
| **Sent:** | Tuesday, April 18, 2017 12:20 AM |
| **To:** | Joseph Radlinsky |
| **Subject:** | Re: Lawrence Township Police Case #17-11039 |

Detective Radlinsky
I am in Utah right now, but will be back this weekend. I will call, as soon as we are back.
Best regards, Peter Lyneborg

Sendt fra min iPhone

Den 17. apr. 2017 kl. 11.22 skrev Joseph Radlinsky <

> Mr. Lyneborg,
> I would like you to contact me regarding coming to the Lawrence Township Police Department in order
> to view some surveillance photos of the subjects that I believe are responsible for stealing your wallet.
> Please contact me at the below listed number to arrange a time to view the photos.
> Thank you.
> -Joe
>
> Detective Joseph Radlinsky
> Badge #184
> Lawrence Township Police Department
> 2211 Lawrence Road
> Lawrenceville NJ 08648

1

EXHIBIT F



GreenBrook-137

PLAINTIFF'S
EXHIBIT
/-23

EXHIBIT G

CJIS 2000 Response



IMAGE PROVIDED BY NJ MVC THROUGH EPINET

Back

EXHIBIT H



GreenBrook-138

EXHIBIT I



LT000032