<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GEORGIA THOMPSON-EL,<br><br>          Plaintiff,<br><br>     v.<br><br>TOWNSHIP OF GREEN BROOK, *et al.*,<br><br>          Defendants. | Civil Action No. 19-14253 (GC) (TJB)<br><br>**<u>OPINION</u>** |

<u>**CASTNER, District Judge**</u>

    **THIS MATTER** comes before the Court upon Defendants'—Green Brook Township's and Anthony Pepe's (Green Brook Defendants)—Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure (Rule) 56.[1]  (ECF No. 79.)  Plaintiff Georgia Thompson-El opposed.  (ECF No. 76; *see also* ECF No. 82 (designating the relevant summary judgment motion papers).)  Defendants replied.  (ECF No. 81.)  The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, the Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.  Specifically, judgment is entered in Defendants' favor on the failure-to-train and unconstitutional custom claim against Green Brook Township (Count III) and supervisory liability claim against "Green Brook John Doe Defendant" (Count IV).  The Motion is denied as to all other claims.

---

[1]    Defendants Lawrence Township and Detective Joseph Radlinsky of the Lawrence Township Police Department (Lawrence Township Defendants) also filed a motion for summary judgment.  The Court has issued a separate decision as to those Defendants.

## I.    <u>BACKGROUND</u>[2]

### A. Procedural Background

On June 26, 2019, Plaintiff brought suit against Green Brook Township and Officer Anthony Pepe of the Green Brook Police Department (GBPD).  (ECF No. 1.)  Plaintiff alleges that she was "arrested and charged with multiple crimes without probable cause and with willful and reckless disregard as to whether [the Green Brook Defendants] had charged the right person with the alleged crimes."  (*Id.* at 5.[3])

Plaintiff asserts seven claims against the Green Brook Defendants: (1) unlawful arrest and imprisonment against Officer Pepe in violation of 42 U.S.C. § 1983 (Count I)[4]; (2) malicious prosecution against Officer Pepe in violation of § 1983 (Count II); (3) municipal liability against Green Brook Township in violation of § 1983 (Count III); supervisory liability against "Green Brook John Doe Defendant" in violation of § 1983 (Count IV); false arrest and false imprisonment in violation of state law (Count V); malicious prosecution in violation of state law (Count VI); and violations of the New Jersey Civil Rights Act (NJCRA), N.J. Stat. Ann. § 10:6-2 *et seq.* (Count VII).  (ECF No. 1.)

---

[2]    On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party."  *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019))

[3]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[4]    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

### B. Statement of Facts[5]

#### 1. *Undisputed Facts*

On April 8, 2017, while Plaintiff was at Bonefish Grill in Green Brook, a customer identified as T.L. observed her wallet laying on the ground and multiple credit cards missing. (ECF No. 79-5.) Shortly after discovering that her credit cards were missing, T.L. received alerts regarding potentially fraudulent activity. (*Id.*) Subsequently, an employee from Bonefish Grill called the GBPD to report the theft of T.L.'s credit cards. (Defs. SMF ¶ 1; Pl. SMF ¶ 1.)

Following the employee's call, three officers from the GBPD responded to Bonefish Grill and met with T.L. (Defs. SMF ¶ 2; Pl. SMF ¶ 2.) T.L. reported that she was sitting at a table inside Bonefish Grill when she felt someone bump into her, but she did not think much of it. (*Id.*) After receiving the bill, T.L. grabbed her purse on the empty chair next to her and realized her wallet was not inside the purse. (*Id.*) T.L. looked around the restaurant and located her wallet on the floor under the chair where the purse was located. (*Id.*) Only then did T.L. notice that multiple credit cards were missing from her wallet, including two Chase credit cards, one Target card, one Macy's credit card, one Walmart credit card, one TD Bank debit card, and one USAA debit card. (*Id.*) Soon after, T.L. received the alert of possible fraudulent activity, including at a Target and a Walmart—both in Watchung, New Jersey. [6] (*Id.*) T.L. was advised that the purchase at Walmart was processed around 7:15 p.m. (*Id.*) Additionally, one of the officers that responded to Bonefish

---

[5]     The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local Civil Rule 56.1. Defendants' Statement of Undisputed Material Facts is referred to as "Defs. SMF," (ECF No. 79-1), and Plaintiff's response to their Statement of Material Facts is referred to as "Pl. SMF," (ECF No. 76-2.) Plaintiff's Supplemental Statement of Additional Facts is referred to as "Pl. SAF," (ECF No. 76-2 at 18-21), and Defendant's response is referred to as "Def. SAF," (ECF No. 81-1).

[6]     Based on the record before the Court, it appears that T.L. started receiving alerts while still at Bonefish Grill. (*See* Defs. SMF ¶ 2; Pl. SMF ¶ 2.)

Grill viewed surveillance footage from the restaurant that showed three potential suspects, including a male and two females.  (*Id.*)

On April 13, 2017, Officer Anthony Pepe of the GBPD was assigned to follow up on the investigation regarding T.L.'s stolen credit and debit cards.  (Defs. SMF ¶ 3; Pl. SMF ¶ 3.)  While many aspects of Officer Pepe's investigation are disputed, it is undisputed that he did the following: (1) reviewed surveillance footage from the Bonefish Grill, Target, and Walmart; conducted a search of Plaintiff's motor vehicle information; and contacted Plaintiff via phone. (*Id.*; Pl. SAF ¶ 12; Def. SAF ¶ 12; ECF No. 76-6 at 35; Def. SAF ¶ 12.)  It is also undisputed that the Bonefish Grill surveillance footage Officer Pepe viewed was not preserved, and only still images from the video are available.  (Pl. SMF ¶ 3; ECF No. 76-6 at 78.)  Those images have been submitted to the Court.  (*See* ECF No. 76-5.)

As part of his investigation, Officer Pepe contacted Plaintiff via phone.  (Pl. SAF ¶ 12; Def. SAF ¶ 12.)  Plaintiff denied any involvement in the Bonefish Grill incident and hung up the phone on Officer Pepe.  (*Id.*)

Following the investigation, Officer Pepe sought to bring criminal charges against Plaintiff for the theft at the Bonefish Grill.  (Defs. SMF ¶ 4; Pl. SMF ¶ 4.)  Specifically, Officer Pepe sought to charge Plaintiff with the following crimes: third-degree intent to defraud an authorized user of a payment card, N.J. Stat. Ann. § 2C:21-6.1(b)(1); third-degree impersonation/identity theft, N.J. Stat. Ann. § 2C:21-17(a)(4); and third-degree theft by deception, N.J. Stat. Ann. § 2C:20-4(a). (Defs. SMF ¶ 4; Pl. SMF ¶ 4.)  In support of the charges, he submitted a Screening Decision Memorandum to the Somerset County Prosecutor's Office (SCPOM) and requested that a warrant be issued as Plaintiff was "out of the country" and had pending criminal charges in Mercer County. (*Id.*)  The "Narrative of Incident" in the SCPOM reads as follows:

> On 4/08/2017 at approximately 1615 hours the victim was eating [a]t Bonefish Grill located at 215 Rt. 22 East in Green Brook when her purse was stolen. After reviewing surveillance video[,] it shows both suspects enter the restaurant and leave within a short period of time. The same suspects are seen making purchases at Target and Walmart located at 1515 Rt. 22 West in Watchung NJ utilizing the Victim's stolen USAA credit card and TD Bank Debit card. The USAA credit card was used to purchase $2,600.00 in merchandise at Target. The victim's TD Bank debit card is used making a purchase in the amount of $505.31 by the same suspects on the same day. Both transactions were caught on CCTV surveillance video.

> [(ECF No. 79-7; Defs. SMF ¶ 4; Pl. SMF ¶ 4.)]

After the charges were approved, Officer Pepe filed a complaint-warrant against Plaintiff. (Defs. SMF ¶ 5; Pl. SMF ¶ 5.) The affidavit of probable cause, attached to the complaint-warrant, detailed the following:

> On 04/08/2017 at approximately 1930 hours, patrol responded to Bonefish Grill in reference to a stolen purse. Shortly after the incident, the victim received alerts of fraudulent activity on her USSA and TD Bank debit cards. Both cards were fraudulently used in Watchung at Target and Walmart by the defendant which was learned through surveillance video.

> [ECF No. 79-8; Defs. SMF ¶ 5; Pl. SMF ¶ 5.)]

A municipal court judge approved the complaint-warrant in September 2017. (Defs. SMF ¶ 6; Pl. SMF ¶ 6.) Subsequently, the Somerset County Prosecutor's Office (SCPO) presented the matter to the grand jury in December 2017. (Defs. SMF ¶ 7; Pl. SMF ¶ 7.) The grand jury indicted Plaintiff. (*Id.*)

While the parties do not include information regarding Plaintiff's arrest, it appears undisputed from the record that Plaintiff was arrested on April 4, 2018. (ECF No. 76-8 at 87.) Per the record, Plaintiff was pulled over and arrested based on the complaint-warrant. (ECF No. 76-6 Ex. A at 16:1-20:24.) Plaintiff spent several days detained in Somerset County and was then

transferred to Mercer County pursuant to a bench warrant related to the Lawrence Township matter. (*Id.*)

On November 2, 2018, the SCPO moved to dismiss the charges against Plaintiff, which was granted by the Superior Court of New Jersey. (Defs. SMF ¶ 8; Pl. SMF ¶ 8.)

### 2. *Disputed Facts*

The factual disputes in this case largely relate to Officer Pepe's investigation. First, the parties disagree as to which employee from Bonefish Grill reported the credit card thefts to the GBPD. (*See* Pl. SMF ¶ 1.) The Green Brook Defendants contend that Brian Sharkey, the manager of the Bonefish Grill reported the incident as reflected in the incident report.[7] (Defs. SMF ¶ 1 (citing ECF No. 79-4 at 2).) In contrast, Plaintiff contends that the identity of the Bonefish Grill employee is unknown. (Pl. SMF ¶ 1.) In support of this position, Plaintiff points to documentation from the SCPO that indicates the GBPD was unable to provide the name of the employee that reported the thefts because "[t]here is a high turnover at the restaurant and no one knows the name of the employee." (*Id.* (citing ECF No. 76-8).) Plaintiff further supports her position by citing to deposition testimony of Officer Pepe where he stated that the responding officers "didn't get that employee's info. . . . However, as I tried to follow up on both occasions, the witness didn't want to come forward . . . [and] it was impossible to actually get that witness's information" because the restaurant was "changing hands." (ECF No. 76 at 33:13-34:7.)

In light of the identity issue, the parties dispute the information reported by the Bonefish Grill employee. (*See* Pl. SMF ¶ 1.) The Green Brook Defendants assert that the employee told

---

[7]    The incident report lists the "reporting person" as "Brian" and lists the reporting person's address as "manager." (ECF No. 794 at 2.) The incident report also provides a phone number for the reporting person. (*Id.*)

6

law enforcement about three individuals that left on foot and then drove away in either a black sedan or a silver Nissan Altima, and that the employee provided license plate numbers for both cars. (*Id.*) Defendants also assert that the employee provided descriptions of the suspects: (1) a black male who was about six feet tall, 280 pounds, with a beard and who was wearing blue jeans, a purple long sleeve shirt, and a black hat; (2) a Black female about five feet six inches, wearing "possibly a thin long brown coat," red or pink shoes, a white hat, "large LV bag;" and (3) a black female about five feet six inches and 170 pounds, wearing long sleeve grey or purple button down shirt, chin length black hair. (Defs. SMF ¶ 1; Pl. SMF ¶ 1.) In contrast, Plaintiff disputes the legitimacy of these statements because the record does not provide information as to why the employee suggested the three individuals identified in the surveillance footage were the suspects in the theft. (Pl. SMF ¶ 1.) Therefore, Plaintiff argues that the employee's statements are "ambiguous and unclear at best." (*Id.*)

Second, the parties dispute Officer Pepe's identification of Plaintiff. (Pl. SMF ¶ 3.) The Green Brook Defendants contend that Officer Pepe conducted a lookup of the license plate numbers reported by the Bonefish Grill employee and determined that the black sedan was registered to Plaintiff.[8] (Defs. SMF ¶ 3; Pl. SMF ¶ 3.) Defendants further contend that Officer Pepe then conducted a lookup of Plaintiff's driver's license and identified Plaintiff as one of the three individuals depicted in the Bonefish Grill surveillance footage. (*Id.*) Additionally, Defendants assert that Officer Pepe subsequently identified the male suspect in the Bonefish Grill surveillance footage as Douglas Thompson, Plaintiff's ex-husband, by comparing his driver's license photograph to the footage. (*Id.*)

---

[8]     Plaintiff does not dispute that the license plate number is registered to her. (Pl. SMF ¶ 3.)

In contrast, Plaintiff asserts that the still images from the Bonefish Grill surveillance footage, the only available evidence related to the unpreserved footage, do not match Plaintiff's and Thompson's driver's license photographs, or the videos and still images from Target and Walmart. (Pl. SAF ¶¶ 1-4.) She further contends that "no reasonable person would conclude that those surveillance images are clear enough to make an identification." (*Id.*) In response, Defendants argue that Officer Pepe based his identification of Plaintiff on a comparison of the actual surveillance videos, specifically the Bonefish Grill video, and Plaintiff's driver's license photograph, not the still photographs from the various surveillance videos.[9] (Def. SAF ¶¶ 1-4.)

Third, Plaintiff disputes that the Walmart surveillance footage shows the suspects entering Plaintiff's black sedan. (Pl. SAF ¶ 10.) Defendant asserts that Officer Pepe testified at his deposition that he believed the vehicle depicted in the Walmart surveillance footage was a 2014 Honda Accord, the same type of vehicle registered to Plaintiff.[10] (Def. SAF ¶ 10.) Plaintiff disputes Officer Pepe's identification of Plaintiff at the Walmart and Target based on surveillance footage. (Pl. SMF ¶ 3.) At her deposition, Plaintiff testified that after returning home from shopping at 4:45 p.m. she then drove to the Bonefish Grill where she had dinner with her friend Junior Hamilton and her boyfriend for approximately two hours. (ECF No. 76-6 Ex. A at 37:16-40:8; 40:9-47:6.) Following dinner, Plaintiff went to a Costco Gas Station and then returned home. (*Id.* at 46:25-47:6.)

---

9 Because the surveillance footage from Bonefish Grill has not been preserved or submitted, the Court can only review the still images provided in the parties exhibits for the Motion for Summary Judgment.

10 The surveillance videos from Walmart that have been supplied to the Court are grainy and of low resolution, and therefore cannot be adequately viewed. (*See* ECF No. 76-5.)

Last, the parties dispute whether Green Brook Township failed to train or supervise Officer Pepe. (Pl. SAF ¶¶ 19-20; Def. SAF ¶¶ 19-20.) In support of Plaintiff's position, Plaintiff submits an expert report in which the expert opines that Green Brook Township failed to properly train police Officer Pepe regarding aspects of criminal investigations, such as identification procedures, and that the Township established a custom of failing to properly train police officers. (Pl. SAF ¶¶ 19-20 (citing ECF No. 76-4).) Defendants assert that this expert report was not filed during the discovery period and that the Court should not consider it. (Def. SAF ¶¶ 19-20.) If the Court does consider the expert report, Defendants argue that it is an impermissible net opinion. (*Id.*; ECF No. 81.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[I]nferences, doubts, and issues of credibility should be

resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

III.    **DISCUSSION**

      A.  **Section 1983 Claims For Unlawful Arrest And Imprisonment (Count I) And Malicious Prosecution (Count II)**

"By its terms, . . . [§ 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Castro v. State of New Jersey*, 521 F. Supp. 3d 509, 517 n.6 (D.N.J. 2021) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).  To state a claim under § 1983, a plaintiff must establish that (1) the conduct deprived her of her rights, privileges, or immunities secured by the Constitution or laws of the United States, and (2) the conduct challenged was committed by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011); *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

Plaintiff asserts that Officer Pepe's conduct violated her rights under the Fourth and Fourteenth Amendments based on (1) unlawful arrest and imprisonment, and (2) malicious prosecution.  Generally, Plaintiff alleges that her arrest and prosecution were improper because Officer Pepe did not have probable cause to initiate the criminal action against her.  (*See* ECF No. 76-1 at 6-8.)  More specifically, Plaintiff asserts that: (1) "Officer Pepe needed more than his own identification of [Plaintiff], influenced by the provisions of her license plate number for reasons unknown, and with no clear image of her face or corroborating evidence;" (2) Officer Pepe falsely stated that he identified Plaintiff using credit cards through his review of surveillance footage; and (3) the procedures Officer Pepe employed when identifying Plaintiff were improper.  (*Id.* at 24-29.)

10

In response, Defendants argue that Officer Pepe had probable cause to initiate the prosecution and arrest of Plaintiff for the following reasons: (1) Officer Pepe obtained Plaintiff's photograph after running her license plate through the motor vehicle system and was able to confirm that Plaintiff was the individual in the Bonefish Grill, Target, and Walmart surveillance videos; (2) the SCPO signed off on Officer Pepe bringing criminal charges against Plaintiff; (3) a municipal court judge reviewed Officer Pepe's affidavit of probable cause attached to the complaint-warrant for Plaintiff and ultimately approved the warrant; and (4) a grand jury indicted Plaintiff.  (ECF No. 79-2 at 11-12; ECF No. 81 at 4.)

To bring a claim for unlawful or false arrest, a plaintiff must establish "(1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012).  A claim for unlawful or false imprisonment arises when a person is arrested without probable cause and is subsequently detained pursuant to that unlawful arrest. *See Adams v. Officer Eric Selhorst*, 449 F. App'x 198, 201 (3d Cir. 2011) (citations omitted).  In other words, a claim of false imprisonment in this context is derivative of a claim for arrest without probable cause.  *See Johnson v. Camden Cnty. Prosecutors' Off.*, Civ. No. 11-3588, 2012 WL 273887, at *4 n.2 (D.N.J. Jan. 31, 2012) (citations omitted).

"To prove malicious prosecution under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiffs favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing a plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."  *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (citation omitted).

The parties do not dispute that Plaintiff was arrested and detained. Further, the parties do not dispute that Officer Pepe initiated the criminal prosecution against Plaintiff and that the SCPO dismissed the charges against Plaintiff, meaning there was a favorable outcome. (*See generally* ECF No. 79-1; ECF No. 76-2.) The issue in this case is whether there was probable cause to arrest, detain, and initiate criminal proceedings against Plaintiff. (*See* ECF No. 79-2 at 9-12; ECF No. 81 at 3-4); *see also Baynard v. Mona*, Civ. No. 20-7723, 2021 WL 4473154, at *5 (D.N.J. Sep. 30, 2021) (noting that unlawful arrest, unlawful imprisonment, and malicious prosecution each "share one element—that is, a lack of probable cause" (first citing *Harvard v. Cesnalis*, 973 F.3d 190, 1990-203 (2020); and then citing *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016))).

### 1. *Probable Cause for Plaintiff's Arrest & Imprisonment*

The Fourth Amendment prohibits police from making an arrest except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)). Put another way, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995). Importantly, "summary judgment for false arrest and false imprisonment is proper only if no reasonable juror could find a lack of probable cause for any of the charged crimes." *Harvard*, 973 F.3d at 199; *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995).

At the summary judgment stage, a court must assess probable cause based on the totality of the circumstances known by the officer at the time he drafted the affidavit of probable cause attached to a warrant, and those circumstances must be viewed in the light most favorable to the nonmoving party. *Harvard*, 973 F.3d at 200, 202 n.4. "This totality-of-the-circumstances inquiry is 'necessarily fact-intensive' and thus 'it will usually be appropriate for a jury to determine whether probable cause existed.'" *Id.* at 200 (quoting *Dempsey*, 834 F.3d at 468). Nevertheless, a district court may conclude "that probable cause did exist as a matter of law if the evidence, viewed most favorably to [the nonmoving party], reasonably would not support a contrary factual finding." *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).

When an officer seeks a warrant to arrest on the basis of probable cause, he or she must follow a two-step process. First, the officer prepares an affidavit providing a summary of the events giving rise to probable cause. *Dempsey*, 834 F.3d at 469. In doing so, the officer "is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Wilson*, 212 F.3d at 790; *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). Rather, the officer must "include in the affidavit all information 'any reasonable person would know that a judge would want to know' in making a probable cause determination.'" *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010) (quoting *Wilson*, 212 F.3d at 783). Second, "the officer presents the affidavit to a neutral magistrate, who conducts his own independent review of the evidence to determine whether it does, in fact, establish probable cause, and, if so, issues a warrant." *Dempsey*, 834 F.3d at 469. "If, however, the officer does not provide the neutral magistrate with an accurate affidavit of probable cause, the protection afforded by the

13

magistrate's review is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are." *Id.*

An arrest warrant, however, "does not, in itself, shelter an officer from liability for false arrest." *Wilson*, 212 F.3d at 786; *see Sherwood*, 113 F.3d at 399. Rather, a plaintiff may succeed in bringing a § 1983 claim if she can show the following: "the officer, with at least a reckless disregard for the truth, 'made false statements or omissions that create[d] a falsehood in applying for a warrant,' and . . . that those assertions or omissions were 'material, or necessary, to the finding of probable cause.'" *Dempsey*, 834 F.3d at 468-69 (quoting *Wilson*, 212 F.3d at 786).

In conducting a probable cause analysis involving an arrest warrant, "the district court must identify any improperly asserted or omitted facts and, if it determines there were reckless misrepresentations or omissions, 'excise the offending inaccuracies and insert the facts recklessly omitted' from the affidavit and assess whether the reconstructed affidavit would establish probable cause." *Id.* at 470 (quoting *Wilson*, 212 F.3d at 789). Where the officer's affidavit contains reckless misrepresentations or omissions, the court "perform[s] a word-by-word reconstruction of the affidavit."[11] *Dempsey*, 834 F.3d at 470; *Newsome v. City of Newark*, 279 F. Supp. 3d 515, 524 (D.N.J. 2017) (same). Similarly, "where additional information in the record bears on the materiality of the recklessly omitted information to probable cause, that additional information also should be included [in] the reconstructed affidavit." *Dempsey*, 834 F.3d at 475. If the reconstructed affidavit would still establish probable cause, "the plaintiff's claim fails because 'even if there had not been omissions and misrepresentations' in the affidavit presented to the

---

[11]    Courts in this district have determined that a reconstruction of the affidavit of probable must occur even if the parties do not perform the proper word-by-word reconstruction. *See, e.g., Baynard*, 2021 WL 4473154, at *6. Defendants assert that the Court needs to conduct a word-by-word reconstruction to address the disputed evidence. (*See* ECF No. 79-2 at 11.)

magistrate judge, there would have been probable cause for the charges against the plaintiff." *Id.* at 470 (quoting *Wilson*, 212 F.3d at 789).

As previously outlined, Plaintiff asserts several reasons why Officer Pepe lacked probable cause, including that he based his identifications on surveillance footage that could not clearly identify Plaintiff and that he falsely stated he identified Plaintiff using the stolen credit cards at Target and Walmart based on a review of surveillance footage. (*See* ECF No. 76-1 at 6-8, 24-29.) In other words, Plaintiff claims that Officer Pepe misrepresented facts in the affidavit of probable cause.

Upon review of the record in this case and viewing it most favorably to Plaintiff, the Court finds that Plaintiff has raised a genuine dispute of material fact as to whether Officer Pepe had probable cause at the time he applied for the warrant. This is so because the Bonefish Grill surveillance footage—which was the key evidence Officer Pepe relied on to make the initial, critical identification of Plaintiff—was not preserved. In other words, the Court cannot ascertain, based on a review of the entire record before it, whether Officer Pepe's probable cause determination was valid because the Court cannot review the surveillance footage from the Bonefish Grill. Officer Pepe testified during his deposition that he was able to identify Plaintiff based on the Bonefish Grill surveillance footage and that his subsequent identifications of Plaintiff at the Target and Walmart were possible because he observed the individual in those videos wearing the same clothing as in the surveillance footage at Bonefish Grill. (*See* ECF No. 76-6 at 47, 56-57, 61, 77.) Even considering other favorable evidence from Officer Pepe's investigation that he could have relied on for purposes of establishing probable cause, *see Wang v. New Jersey State Police*, Civ No. 18-11933, 2024 WL 3580671, at *11 (D.N.J. July 30, 2024), the Court cannot determine, based on the evidence before it, that Officer Pepe's probable cause determination was

proper, *see Wilson*, 212 F.3d at 789.  As a result, because probable cause for the warrant hinged on Officer Pepe's identification of Plaintiff in the Bonefish Grill surveillance footage, and viewing the facts and circumstances in the light most favorable to Plaintiff, the Court finds that a genuine dispute of material fact exists as to whether probable cause existed at the time Officer Pepe applied for an arrest warrant.  *See Castro*, 521 F. Supp. 3d at 523 (finding a genuine dispute of material fact as to probable cause because the plaintiff asserted, among other things, that the defendants failed to preserve critical evidence); *see also Liffiton v. Kiszewski*, 629 F. App'x 144, 145 (2d Cir. 2015) (finding that the issue of probable cause was properly before the jury because there were disputes as to what the detective knew prior to arresting the defendant).  In scenarios such as this, a "reasonable juror could find a lack of probable cause for any of the charged crimes." *Harvard*, 973 F.3d at 199.

Even accepting Plaintiff's misrepresentation arguments as true, "Plaintiff must show that 'the omissions were material, or necessary, to the probable cause determination.'" *Calabrese v. Tierney*, Civ. No. 19-12526, 2024 WL 448303, at *5 (D.N.J. Feb. 6, 2024) (quoting *United States v. Lucidonio*, 592 F. Supp. 3d 381, 388 (E.D. Pa. 2022)).  This inquiry requires courts to reconstruct the affidavit of probable cause.  *See Dempsey*, 834 F.3d at 470-71 (noting that courts "exercise 'scrupulous neutrality' [and] . . . [do] not engage the 'deliberately slanted perspective' [used] to make the ultimate determination as to whether summary judgment is appropriate." (quoting *Reedy*, 615 F.3d at 214 n.24)).  A reconstruction of the affidavit here would result in the Court removing the reference to the surveillance footage used to identify Plaintiff.  (*See* ECF No. 79-8 ("Both cards were fraudulently used in Watchung at Target and Walmart by the defendant which was learned through surveillance video.").); *see also Calabrese*, 2024 WL 448303, at *5 (reconstructing the affidavit without an actual line by line edit).

16

The Court finds that if it cleansed the affidavit of the alleged misrepresentations, a reasonable jury could conclude that the reconstructed affidavit lacked probable cause.[12]  *See Dempsey*, 834 F.3d at 477; *see also Harvard*, 973 F.3d at 200 ("This totality-of-the-circumstances inquiry is 'necessarily fact-intensive' and thus 'it will usually be appropriate for a jury to determine whether probable cause existed.'" (quoting *Dempsey*, 834 F.3d at 468)).  Absent references to the surveillance videos, the facts remaining in the affidavit of probable cause would fail to demonstrate a "fair probability" that Plaintiff was the individual that stole the credit cards and subsequently used the credit cards at Target and Walmart.  *Cf. Calabrese*, 2024 WL 448303, at *5 (finding that the reconstructed affidavit still sufficiently outlined probable cause because it described a months long investigation into the plaintiff, such as numerous meetings with a confidential informant and surveillance by the local police department); *McCullough*, 2024 WL 1855053, at *3-5 (finding that a search warrant was not invalid and still sufficiently outlined probable cause because even though some of the surveillance videos officers relied on were low resolution and unclear, the officers had other evidence that supported a finding of probable cause).  While an officer is not required "to undertake an exhaustive investigation to validate the probable cause that, in his mind, already existed," *Merkel v. Upper Dublin School Dist.*, 211 F.3d 782, 790 (3d Cir. 2000), failing

---

[12]     Though uncommon, courts in the Third Circuit have determined that reconstructed affidavits of probable cause can still fail to pass the minimal showing required for probable cause. *See, e.g., Rivera-Guadalupe v. Pierce*, 2023 WL 2647859, at *5-7 (M.D. Pa. Mar. 27, 2023) (finding that even after reconstructing the affidavit, a reasonable jury could find a lack of probable cause for firearm and robbery charges); *McLee v. Brown*, 2021 WL 916651, at *16 (W.D. Pa. Feb. 19, 2021) (finding that the videos in the case contradicted the officer's affidavit of probable cause); *Kohlhaas v. New Jersey*, Civ. No. 16-1564, 2017 WL 4776756, at *7 (D.N.J. Oct. 23, 2017) (finding that based on the reconstruction, the defendant's alleged omissions could prevent a fact-finder from concluding the reconstructed affidavit still established probable cause).

to provide sufficient detail in an affidavit could potentially result in a finding that the officer failed to assert facts sufficient to establish probable cause.

Finally, the Court recognizes that a presumption of validity commonly attaches to warrants that have been approved by prosecutors, *see Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3d Cir. 2010), and those warrants that have been approved by judges, *see Franks v. Delaware*, 438 U.S. 154, 171 (1978). But, an arrest warrant approved by a prosecutor does not guarantee a presumption of validity, *see Kelly*, 622 F.3d at 256, nor does "an arrest warrant issued by a magistrate or judge . . ., in itself, shelter an officer," *Wang*, 2024 WL 3580671, at *10. The Court finds that these presumptions do not apply because Plaintiff has raised a genuine issue of fact as to probable cause for her arrest and imprisonment, and the Court is unable to view the surveillance video—the only evidence cited in the affidavit—to conclude otherwise.

Therefore, because the Court, on this record, cannot conduct a proper assessment of the evidence used to establish probable cause, and when viewing the facts in the light most favorable to Plaintiff, the Court finds that the issue of probable cause should be left to the jury. *Harvard*, 973 F.3d at 199. Therefore, summary judgment is denied as to Plaintiff's unlawful arrest and imprisonment claims.[13]

---

[13]    The Court will not consider Plaintiff's indictment in determining the validity of the unlawful arrest and imprisonment claim. *See Goodwin v. Conway*, 836 F.3d 321, 329 (3d Cir. 2016) (noting that the rebuttable presumption of probable cause attached to an indictment, "attaches only to the indictment and beyond, and thus has no bearing on an arrest that precedes the indictment"). In this case, the record indicates that the arrest was based on the complaint-warrant issued several months prior to the indictment. *See Johnson v. Stith*, Civ. No. 145032, 2017 WL 4119584, at *6 (D.N.J. Sep. 18, 2017) ("Because [the] [d]efendants first initiated a criminal proceeding by obtaining a Complaint-Warrant for [the] [p]laintiff's arrest . . ., the Court must determine whether the non-fabricated evidence possessed by [the] [d]efendants at that time amounted to probable cause.").

## 2. *Probable Cause for Initiating the Criminal Proceeding Against Plaintiff*

For similar reasons, Plaintiff has raised a genuine dispute of material fact as to probable cause to initiate the criminal proceedings. This is so even though a grand jury indicted Plaintiff. *See Xi v. Haugen*, 68 F.4th 824, 841 (3d Cir. 2023) (noting that while an indictment typically constitutes prima facie evidence of probable cause to prosecute, the presumption may be rebutted "by a plausible allegation that the indictment was 'procured by fraud, perjury or other corrupt means,' or that [a law enforcement officer] 'knowingly and deliberately, or with a reckless disregard for the truth, made [materially] false statements or omissions' in [a] warrant application." (first quoting *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989), and then quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997))). Because the Court has already determined that a question of material fact exists regarding Officer Pepe's identification of Plaintiff for purposes of the arrest warrant, the same questions of fact would apply to Plaintiff's malicious prosecution claim.

A decision issued by our sister court in *Roberts v. County of Essex* is instructive. 648 F. Supp. 3d 519 (D.N.J. 2022). In *Roberts*, a minor was raped and kidnapped. *Id.* at 527-28. While the victim did not know her assailant, she nevertheless identified the plaintiff and signed a statement that she was able to identify him based on a photograph. *Id.* at 528. Subsequently, and after submitting the victim's statement to a prosecutor, the detective on the case appeared before a municipal court judge and obtained two warrants for the plaintiff's arrest. *Id.* at 529-30. In 1996, the plaintiff was arrested on an unrelated theft charge and detained without bail because of the pending charges in the victim's case. *Id.* at 30. Approximately one month later, the plaintiff "was arraigned on and pled not guilty to charges of aggravated sexual assault and kidnapping." *Id.* The

plaintiff eventually entered into a plea agreement and was convicted on the kidnapping charge. *Id.* at 531.

During the course of the plaintiff's efforts to withdraw the guilty plea and reverse his conviction, in 2005 the victim revealed that she never made a photo identification of her assailant and that she was not able to make a positive identification. *Id.* at 532-33. The plaintiff then filed for post-conviction relief (PCR). *Id.* at 533. Over the course of the PCR proceedings, the government was unable to locate the photograph that was purportedly used in the 1996 identification. *Id.* at 534. It was also determined that the plaintiff's DNA did not match the specimen contained in the victim's rape kit. *Id.* at 527, 532. As such, the plaintiff's guilty plea was vacated, and the charges were dismissed. *Id.* at 534. The plaintiff then filed an action under § 1983 for malicious prosecution, among other claims, against several defendants, including the detective that obtained the warrant for the plaintiff's arrest. *Id.* at 527-28, 535.

As to the malicious prosecution claim, the district court held that "the record present[ed] a triable factual issue requiring denial of summary judgment on the issue of probable cause." *Id.* at 535. The court determined that the warrant application was based on the victim's 1996 identification, and therefore a question of fact existed as to probable cause because the validity of the 1996 identification was directly called into question when the victim recanted her prior identification in 2005. *Id.* at 536. Concluding that a jury could find either way on the identification issue, the court determined that if the victim did not identify the plaintiff as her assailant, the detective "surely knew or recklessly 'must have entertained serious doubts' as to the truth of his statements in the report that [the victim] did make such an identification." *Id.* (quoting *Wilson*, 212 F.3d at 788). Thus, because the detective's statements in the warrant "were undoubtedly material," the court held that "[a] reasonable jury could therefore find (taking, as I must, the

20

plaintiff-favorable view that the statements were false) that [the detective] initiated proceedings against [the plaintiff] without probable cause." *Id.* at 537.

Here, like in *Roberts*, a genuine dispute of material fact exists as to whether Officer Pepe had probable cause to identify Plaintiff. The identification in this case was clearly material because without the identification, there was little linking Plaintiff to the crime. *See Id.* (finding that "without the purported photo identification, there was very little linking [the plaintiff] to the crime). The Court will not "make any credibility determinations or engage in any weighing of the evidence when ruling on a motion for summary judgment," and instead will leave this "issue for the jury, as factfinder, to decide." *Id.* at 536 (citing *Montone v. City of Jersey City*, 709 F.3d 181, 191 (3d Cir. 2013)). Therefore, summary judgment is denied as to Plaintiff's malicious prosecution[14] claim.[15] *See Halsey v. Pfeiffer*, 750 F.3d 272, 300 (3d Cir. 2014) ("Courts should exercise caution before granting a defendant summary judgment in a malicious prosecution case when there is a question of whether there was probable cause for the initiation of the criminal proceeding because, '[g]enerally, the existence of probable cause is a factual issue.'" (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir.1995))).

---

[14]     Malicious prosecution also requires a showing that the defendant acted maliciously in initiating the criminal proceedings. A "lack of probable cause generally creates an inference of malice." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010); *Roberts v. Cnty. of Essex*, 648 F. Supp. 3d 519, 537 (D.N.J. 2022) (quoting *Morales v. Busbee*, 972 F. Supp. 3d 252, 261 (D.N.J. 1997)) (same). "As a result, fact issues precluding a finding on probable cause will generally also preclude a finding on malice." *Roberts*, 648 F. Supp. 3d at 537.

[15]     Defendants raise the defense of qualified immunity. (*See* ECF No. 79-2 at 13-14.) Because the Court finds genuine disputes of material fact as to Counts I and II of the Complaint, it will not decide the issue of qualified immunity at this time. *See, e.g., Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."). "Once a jury has resolved the issues of probable cause, . . . the Court will determine whether . . . Defendants are entitled to qualified immunity." *Castro*, 521 F. Supp. 3d at 524 n.16.

**B.  Unlawful Policy, Custom, Practice, Or Inadequate Training (Count III)**

Plaintiff asserts that her damages, "and the conduct of Officer Pepe and other investigating police officers were directly and proximately caused by the actions and/or inactions of defendant Green Brook Township" which "encouraged, tolerated, ratified, and has been deliberately indifferent to . . . policies, patterns, practices, and customs, and to the need for more or different training, supervision, investigation, or discipline" regarding criminal investigations, racial profiling and stereotyping, and failure of police officers to follow proper policies and/or directives. (ECF No. 1 at 22-23.)  In her opposition brief, Plaintiff asserts that: (1) Green Brook failed to properly train Officer Pepe in various aspects of criminal procedure, (2) Green Brook failed to conduct an internal investigation into the incident against Plaintiff, and (3) Green Brook was not proactive on racial bias matters.  (ECF No. 76-1 at 36-39.)  Further, Plaintiff contends that "[u]nder the facts presented here, a jury could find that Green Brook had a custom or policy of deliberate indifference to the rights of the public to be free of prosecution without probable cause or to be free of racial[] profiling."  (*Id.* at 39.)

In response, the Green Brook Defendants argue that Plaintiff has failed to identify any specific training not provided to police officers that would reasonably be expected to prevent the alleged constitutional violations in this case, and that Plaintiff has failed to identify any policy or custom of the police department which amounted to a violation of Plaintiff's constitutional rights. (ECF No. 79-2 at 16.)

To find a municipality liable under § 1983, a plaintiff must prove the existence of a policy or custom that resulted in a constitutional violation.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978).  Liability "must be founded upon evidence that the government unit itself supported a violation of constitutional rights."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850

(3d Cir. 1990).  A plaintiff can show the existence of a policy when a decisionmaker with final authority "issues an official proclamation, policy, or edict."  *Id.* (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).  Custom may be established by showing that a "course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  *Id.*  A plaintiff must also "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

### 1.  Failure to Train

To make out a claim under a failure to train or supervise theory, the plaintiff must show that "the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact."  *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted).  "Additionally, 'the identified deficiency in a . . . training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation."  *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

To survive summary judgment on a failure-to-train claim, a plaintiff "must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred."  *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).  "Establishing municipal liability on a failure to train claim under § 1983 is difficult and applies in narrow situations."  *Cooper v. City of Paterson*, Civ. No. 23-03566, 2024 WL 1298917, at *5 (D.N.J. Mar. 27, 2024) (citation omitted).

Plaintiff relies on the expert report of Dr. Darrin Porcher,[16] a former police officer and adjunct professor, to assert that Green Brook failed to properly train Officer Pepe.  (*See* ECF No. 76-4.)  In particular, the report indicates that "Officer Pepe's training records failed to identify professional development in connection with identification procedures and crimes using a scanning device with intent to defraud" and that "Officer Pepe was never trained to make the identification of [Plaintiff] leading to her arrest."  (ECF No. 76-4 at 21-22.)  Further, the report alleges that Officer Pepe failed to abide by Green Brook Police Department policies that require officers to conduct thorough investigations, (*Id.* at 10-11), and the report, as well as Plaintiff's opposition brief, raises concerns about Officer Pepe's ability to follow New Jersey identification procedures.  (*Id.* 11-12, 21-22; ECF No. 76-1 at 37.)  Additionally, the report and Plaintiff's opposition brief alleges that Green Brook does not have proactive training for officers on the topic of racial bias matters.  (ECF No. 76-4 at 22-23; ECF No. 76-1 at 37-38.)

---

[16]     Defendants argues that the Court should not consider Plaintiff's expert report because it was not produced during the discovery period.  (ECF No. 81.)  Alternatively, Defendants assert that the expert report cannot be considered because it is an improper net opinion.  (*Id.*)  Based on the record, it appears that this expert report was not submitted during the discovery period and the Court should exclude it from the record.  *See Nissan Motor Acceptance Corp. v. Sports Car Leasing, LLC*, 529 F. Supp. 3d 371, 373 (E.D. Pa. 2021) (finding that "since [the nonmoving party] did not have the opportunity to depose the[] affiants during the discovery period of th[e] litigation and ask questions about the statements contained in the Affidavits, the Affidavits should be stricken as untimely and prejudicial"); *Salvitti v. Lascelles*, 669 F. Supp. 3d 405, 418 (E.D. Pa. 2023) ("Where a party fails to 'present[ ] any evidence or theories' as to a claim before a late stage in litigation, such as the summary judgment stage, the opposing party is prejudiced and so exclusion of such evidence may be warranted.  Moreover, where the curative act by the party seeking to present new evidence or theories would require 're-open[ing] depositions and attempt[ing] to secure fact discovery (and expert opinions)' at a late stage in litigation, fairness weighs in favor of excluding the new evidence or theory." (quoting *Astrazeneca AB v. Mut. Pharm. Co., Inc.*, 278 F. Supp. 2d 491, 506-07 (E.D. Pa. 2003))).  However, the Court need not address the merits of Defendants' arguments because even after considering the expert report, the Court finds that Plaintiff has not met the high burden associated with § 1983 claims asserted against a municipality.

Plaintiff's argument that Green Brook failed to properly train Officer Pepe in identification procedures lacks merit.  The identification procedures Plaintiff expresses concerns over relate to eyewitness identifications, such as photo lineups and arrays, not identifications made by police officers during their investigations.  This case does not involve eyewitness identifications, and therefore those procedures were not applicable to Officer Pepe's investigation.  *See generally State of New Jersey v. Henderson*, 27 A.3d 872 (N.J. 2011) (outlining the procedures for eyewitness identifications under New Jersey law).  And, regarding Plaintiff's claim that Officer Pepe failed to comply with Green Brook's policy of conducting a thorough investigation, Plaintiff has failed to show a pattern of conduct where officers are engaging in haphazard investigations without consequence.  *See Capps v. Dixon*, Civ No. 20-01118, 2024 WL 340842, at *21 (Jan. 30, 2024) ("A pattern of similar unconstitutional conduct by subordinate employees is typically necessary to show deliberate indifference for failure to train.").  As a result, summary judgment is appropriate in favor of Green Brook Township as to Plaintiff's claim.

Plaintiff's racial profiling allegations also fail at summary judgment.  Plaintiff's own expert report indicates that Green Brook conducted a racial profiling investigation after an anonymous complaint was filed in an unrelated matter from 2016. (ECF No. 76-4 at 21-23.)  While the expert report criticizes Green Brook's investigation, it does not conclude that there was evidence of racial profiling.  (*Id.*)  Moreover, Green Brook's policy requires lieutenants to periodically review motor vehicle stops to ensure the practice of racial profiling is not occurring, and there is no indication that Green Brook is failing to comply with that policy or that a pattern of racial profiling is occurring based on a review of motor vehicle stops.  (*Id.*)  Because Plaintiff has not identified a lack of policies, established a pattern of similarly alleged constitutional violations, or shown that Green Brook's policies are inadequate, Plaintiff cannot show "deliberate indifference" to the

constitutional rights of citizens. *Brooks v. Codispoti*, Civ. No. 12-05884, 2015 WL 9462086, at *12 (D.N.J. Dec. 28, 2015) (finding that the plaintiff "offered no evidence, beyond conjecture, to show a causal connection between a lack of data collection" regarding racial profiling and the constitutional violation at issue); *Altidor v. Toms River Police Dep't*, Civ. No. 18-14834, 2022 WL 17155698, at *5 (D.N.J. Nov. 22, 2022) (finding that the plaintiff did not provide any explanation as to how the municipality "acquiesced in racial profiling or failed to train officers against the use of racial profiling"); *see also Adams v. City of Atl. City*, 294 F. Supp. 3d 283, 304 (D.N.J. 2018) ("Ordinarily, '[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" (quoting *Thomas*, 749 F.3d at 223))

Without an evidentiary basis, Plaintiff's failure-to-train claim must be dismissed.  It cannot simply be inferred that there is a "causal nexus" between the alleged deprivation of Plaintiff's rights and Green Brook Township's training regime when there is "no proof . . . that implementing different training practices 'would have made any difference.'"  *Mills v. City of Philadelphia*, Civ. No. 14-593, 2024 WL 1253688, at *11 (E.D. Pa. Mar. 22, 2024) (citation omitted); *see Noble v. City of Camden*, 112 F. Supp. 3d 208, 224-25 (D.N.J. 2015) (noting that the plaintiff failed to provide evidence that there was a lack of training or supervision); *see also Connick v. Thompson*, 563 U.S. 51, 68 (2011) ("[F]ailure-to-train liability is concerned with the substance of the training, not the particular instructional format.  The statute does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States.").

Accordingly, summary judgment is granted as to Plaintiff's failure to train claim.

## 2. *Unconstitutional Custom*

For a § 1983 claim based on a municipal custom to survive summary judgment, a plaintiff must "show 'a municipal custom coupled with causation—*i.e.*, that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [Plaintiff's] injury.'" *Adams*, 294 F. Supp. 3d at 303 (quoting *Bielevicz*, 915 F.2d at 851). The custom must demonstrate "'deliberate indifference' toward the class of persons who might suffer a constitutional injury as a result of the conduct in question." *Benham v. Borough of Highland Park*, 79 F. Supp. 3d 513, 521 (D.N.J. 2015) (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1070 (3d Cir. 1991)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (citation omitted). However, "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 302 (D.N.J. 2015) (citation omitted).

Here, Plaintiff asserts that Green Brook's failure to conduct an internal investigation after the charges against her were dropped and its failure to proactively train officers on the identification of racial profiling and misidentification of suspects, constitutes unconstitutional customs. (ECF No. 76-4 at 22-23; ECF No. 76-1 at 38-39.) This argument lacks merit because Plaintiff has failed to provide evidence that Green Brook has shown deliberate indifference to investigating cases similar to Plaintiff's in the past or deliberate indifference to identification issues associated with racial profiling. Rather, Plaintiff has simply noted isolated instances of alleged

27

misconduct—such as an anonymous racial profiling complaint from 2016[17] and the lack of an internal investigation into Plaintiff's case—as opposed to a course of conduct. *Cf. Adams*, 294 F. Supp. 3d at 302 (denying summary judgment because plaintiff provided evidence that the defendant knew of several excessive force claims ranging over the course of fourteen years and knew of numerous complaints against officers, but failed to properly investigate these claims); *Noble*, 112 F. Supp. 3d at 222 (finding that the defendants were deliberately indifferent to a pattern of excessive force for failing to promptly investigate nineteen excessive force complaints filed).

Accordingly, summary judgment is granted as to Plaintiff's unconstitutional custom claim.

### C. Supervisory Liability Claim (Count IV)

Next, the Court dismisses Plaintiff's claim for supervisory liability against "Green Brook John Doe Defendant" pursuant to Rule 21, which states, in relevant part, that "parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed. R. Civ. P. 21. District courts in this circuit have used this Rule to exclude John Doe parties from an action where appropriate. *Adams v. City of Camden*, 461 F. Supp. 2d 263, 271 (D.N.J. 2006) (citing *Hightower v. Roman, Inc.*, 190 F. Supp. 2d 740, 754 (D.N.J. 2002); *see also Atl. Used Auto Parts v. City of Pa.*, 957 F. Supp. 622, 625 (E.D. Pa. 1997) ("[F]ictitious party names may be used 'at least until reasonable discovery permits the actual defendants to assume their places. . . ,' however, . . . '[f]ictitious names must eventually be dismissed, if discovery yields no identities.'")).

---

[17]    As already addressed previously, Plaintiff has failed to provide evidence that the anonymous complaint actually revealed evidence of racial profiling. (*See* ECF No. 76-4 at 22-23.)

Here, the Complaint was filed on June 26, 2019, (ECF No. 1), and Defendants answered on August 20, 2019, (ECF No. 7).  On October 20, 2020, the magistrate judge ordered fact discovery to be completed by December 31, 2020.  Since then, Plaintiff has not substituted the identity of the unnamed John Doe Defendant in this action.  Thus, the Court determines that the interests of justice permit dropping this unnamed party from the suit.  *See, e.g., Jones v. Gloucester Cnty.*, Civ. No. 08-614, 2009 WL 10727989, at *7 (D.N.J. Sep. 30, 2009).  Therefore, the Court dismisses Plaintiff's supervisory liability claim against Green Brook John Doe Defendant.  Green Brook John Doe is dismissed from this action.

**D.  State Law Claims (Counts V, VI, & VII)**

Plaintiff also asserts claims for false arrest and imprisonment, malicious prosecution, and violations of the NJCRA.

### *1.  False Arrest, False Imprisonment, and Malicious Prosecution*

Under New Jersey law, "[a] basis for a suit for false arrest arises where the aggrieved party is arrested without legal authority, as where he is arrested pursuant to process that is void.  False arrest, or false imprisonment, is the constraint of the person without legal justification." *Mesgleski v. Oraboni*, 748 A.2d 1130, 1138 (N.J. Super. Ct. App. Div. 2000).  False arrest "requires an arrest or detention of the person against his or her will; and lack of proper legal authority or 'legal justification.'" *Id.* (quoting *Barletta v. Golden Nugget Hotel Casino*, 580 F. Supp. 614, 617 (D.N.J. 1984)).  "[F]alse imprisonment requires (1) arrest or detention against a person's will and (2) lack of legal authority or justification." *Bernard v. Cosby*, 648 F. Supp. 3d 558, 574 (D.N.J. 2023).

Malicious prosecution under New Jersey law "requires the plaintiff to prove four elements: (1) a criminal action was instituted by this defendant against this plaintiff; (2) the action was motivated by malice; (3) there was an absence of probable cause to prosecute; and (4) the action

was terminated favorably to the plaintiff." *LoBiondo v. Schwartz*, 970 A.2d 1007, 1023 (N.J. 2009).

Because Plaintiff's state law claims for unlawful arrest and imprisonment, and malicious prosecution concern whether Officer Pepe had probable cause as outlined previously, summary judgment is denied as to these claims.

### 2. NJCRA

Count VII asserts a claim under the NJCRA against all Green Brook Defendants.  In relevant part, the New Jersey Civil Rights Act provides:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for other injunctive or other appropriate relief.

[N.J. Stat. Ann. § 10:6-2(c).]

"The NJCRA 'was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitution[ ].'"  *Greenman v. City of Hackensack*, 486 F. Supp. 3d 811, 837 (D.N.J. 2020) (quoting *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011)).  "This district has repeatedly interpreted NJCRA analogously to § 1983."  *Hottenstein v. City of Sea Isle City*, 977 F. Supp. 353, 365 (D.N.J. 2013) (quoting *Pettit v. New Jersey*, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011)).

Because the parties have not suggested any distinction between the Count VII claims under NJCRA and Counts I and II under 42 U.S.C. § 1983, for the reasons previously stated, Defendants' motion for summary judgment is denied as to Count VII.  *See Greenman*, 486 F. Supp. 3d at 837.

### E. PUNITIVE DAMAGES

Defendant contends that Plaintiff's claim for punitive damages must be dismissed as to it because Plaintiff cannot recover punitive damages against a municipal entity. (ECF No. 79-2 at 17. Because Plaintiff cannot recover punitive damages from Green Brook Township for her asserted claims, Plaintiff's punitive damages claims are dismissed as to Green Brook Township. *See Vandegrift v. Bowen*, No. 07-2623, 2009 WL 1913412, at *6 (D.N.J. June 30, 2009) (holding that punitive damages are not available against a municipality under the NJCRA); *Joyce v. City of Sea Isle City*, No. 04-5345, 2008 WL 906266, at *25 (D.N.J. Mar. 31, 2008) ("Municipalities are immune from punitive damages on § 1983 and § 1985 claims."); *Mantz v. Chain*, 239 F. Supp. 2d 486, 508 (D.N.J. 2002) (finding that the "TCA expressly bars recovery of punitive damages against public entities").

## IV.    CONCLUSION

For the reasons stated above, and for other good cause shown, Defendants' Motion for Summary Judgment (ECF No. 79) is **GRANTED** in part and **DENIED** in part. An appropriate Order follows.

Dated: November ⎯⎯ 21 ⎯⎯, 2024

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE